IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

RMST HOLDING COMPANY, INC., a
Florida corporation, R.M. STARK &
CO, INC ., a Florida corporation, and
GARY L. STARK, individually,

      Plaintiffs

v.

PREMIUM 72 CAPITAL, LLC, a Texas
limited liability company, PREMIUM 72
INTERNATIONAL, LLC, a Nevada
limited liability company, AYNBET
INVESTMENTS, LLC, a Texas limited
liability company, ARTURO
NICOLAYEVSKY, individually, EDUARDO
PEREZ, individually, and ISAAC WRIGHT,
individually,

      Defendants
_____/

Case No:

# <u>COMPLAINT</u>

Plaintiffs, RMST HOLDING COMPANY, INC., a Florida corporation ("RMST"),
R.M. STARK & CO, INC., a Florida corporation ("RM STARK"), and GARY L. STARK,
individually ("STARK") (collectively "Plaintiffs"), hereby file suit against Defendants,
PREMIUM 72 CAPITAL, LLC, a Texas limited liability company (formerly known as OPC
ADVISORS, LLC, a Texas limited liability company) (collectively "PREMIUM 72" or
"OPC"), PREMIUM 72 INTERNATIONAL, LLC, a Nevada limited liability company
("PREMIUM INTL"), AYNBET INVESTMENTS, LLC, a Texas limited liability company
("AYNBET"), ARTURO NICOLAYEVSKY, individually ("NICOLAYEVSKY"), EDUARDO
PEREZ, individually ("PEREZ"), and ISAAC WRIGHT, individually ("WRIGHT");

1

(collectively, unless the context otherwise provides, "Defendants"), and allege and state as follows:

## NATURE OF THE DISPUTE

1.     This action for various forms of relief arises from the purchase by Defendants of RMST and RM STARK (collectively, the "PURCHASED ENTITIES") from STARK, and the subsequent claims stemming from Defendants' negligence, malfeasance, and mismanagement of the PURCHASED ENTITIES.

## PARTIES, JURISDICTION AND VENUE

2.     RMST is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Lake Worth Beach, Florida.

3.     RM STARK is a Florida corporation, wholly owned by RMST, organized and existing under the laws of the State of Florida with its principal place of business in Lake Worth Beach, Florida.

4.     STARK is an individual over the age of 18 and otherwise *sui juris* living in Okeechobee County, Florida.

5.     Upon information and belief, PREMIUM 72 is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Houston, Texas.

6.     Upon information and belief, PREMIUM INTL is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Houston, Texas.

7.    Upon information and belief, PREMIUM 72 and PREMIUM INTL are one hundred (100%) percent owned by NICOLAYEVSKY, PEREZ and/or AYNBET, individually or collectively.

8.    PREMIUM 72 has multiple unknown subsidiaries/affiliates/subsidiary companies under various names and incorporated in various jurisdictions; PREMIUM 72 uses such unknown subsidiaries/affiliates/subsidiary companies (including known companies PREMIUM INTL and OPC) as alter egos that are otherwise used interchangeably with PREMIUM 72.

9.    Upon information and belief, AYNBET is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Houston, Texas.

10.    Upon information and belief, AYNBET's sole member is NICOLAYEVSKY.

11.    Upon information and belief, NICOLAYEVSKY is an individual over the age of 18 and otherwise *sui juris* living in Houston, Texas.

12.    Upon information and belief, PEREZ is an individual over the age of 18 and otherwise *sui juris* living in Sugarland, Texas.

13.    Upon information and belief, WRIGHT is an individual over the age of 18 and otherwise *sui juris* living in Newark, New Jersey.

14.    Jurisdiction in this Court is predicated upon diversity of jurisdiction pursuant to 28 U.S.C. § 1332, as this dispute is between citizens of different states.

15.    The amount in controversy in the present case exceeds $75,000, exclusive of interest and costs.

16.     Pursuant to 28 U.S.C. § 1391, venue properly lies in the Southern District of Florida because all or a substantial part of the events or omissions giving rise to the claims raised herein occurred in the Southern District of Florida, or a substantial part of property that is the subject of the action is situated and located in the Southern District of Florida.

## FACTUAL ALLEGATIONS

17.     In 1994, STARK purchased a controlling interest in RM STARK (formerly known as A.J. Weed & Co., Inc., a New York corporation).

18.     Since 1994, RM STARK has operated as a broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC").

19.     As an SEC registered broker-dealer, RM STARK is subject to the rules and regulations of the Financial Industry Regulatory Authority ("FINRA").

### Premium 72's Purchase of RM Stark

20.     In the fall of 2019, PREMIUM 72 (under its prior name of OPC) commenced negotiations with STARK with respect to the purchase by PREMIUM 72 for one hundred percent (100%) of the issued and outstanding shares (the "Stock") of RMST (which is the holding company for RM STARK).

21.     At the commencement of negotiations on or about October 8, 2019, a Letter of Intent ("LOI") was executed by PREMIUM 72 and STARK, a true and correct copy of which is attached hereto as **Exhibit "A"** and incorporated herein by such reference.

22.     The LOI specifically states that it is " … confidential to the Parties and their representatives," as was all information acquired during the due diligence process.

4

23.     As part of the due diligence process, STARK and RMST provided to PEREZ and NICOLAYEVSKY, their counsel, and BYLINE BANK, the lender making a loan to Defendants for the purchase of the Stock, copies of all documents reflecting RM STARK's prior years' payroll and tax records so as to establish the value of the Stock.

24.     On or about January 2, 2020, PREMIUM 72 and STARK executed the "GARY L. STARK, et al. to OPC ADVISORS, LLC STOCK PURCHASE AGREEMENT" ("the Stock Purchase Agreement").   A true and correct copy of the Stock Purchase Agreement is attached hereto as **Exhibit "B"** and incorporated herein by such reference.

25.     As FINRA's rules provide that it has the right to approve the sale of one hundred (100%) percent of the Stock, the Stock Purchase Agreement expressly contemplated a bifurcated transaction, with only a portion of the Stock being transferred upon the initial closing (the "First Closing"), and the remainder to be transferred at a subsequent closing following FINRA approval (the "Second Closing").

26.     Accordingly, only forty-eight (48) shares (or twenty-four (24%) percent) of the Stock in RMST were contingently transferred to PREMIUM 72 at the First Closing on January 2, 2020, subject to FINRA's approval of the sale.

27.     The balance of the Shares were not to be transferred unless and until FINRA approved the transaction between PREMIUM 72 and STARK.

28.     As part of the process of obtaining FINRA's approval of the transaction, PREMIUM 72 submitted to FINRA a Form 1017 Continuing Membership Application (the "CMA").

29.     As contemplated by the parties, in the event FINRA approval was not forthcoming, the shares would be returned to RMST, the deal would be deemed null and

void, and all parties would revert back to *status quo* as of the date of execution of the Stock Purchase Agreement.

30.    On September 22, 2020, FINRA approved the CMA with numerous conditions.  True and correct copies of the CMA and approval letter are attached hereto as **Composite Exhibit "C"** and incorporated herein by such reference.

31.    Consequently, from and after January 2, 2020, the date of the First Closing at which PREMIUM 72 received twenty four percent (24%) of the Stock while awaiting FINRA approval, and continuing at all times thereafter until September 22, 2020, PREMIUM 72 was at best a conditional minority shareholder in RMST.

32.    At no time were subsequent to January 2, 2020 were any of the Defendants members of the Board of Directors, officers, or employees of RMST, nor did any of the Defendants have any apparent or actual authority to represent Plaintiffs or to hold themselves out as having any authority to bind RMST.

33.    At no time subsequent to January 2, 2020, and having no authority in any manner or form, did Defendants or any entity under the management and/or control of the Defendants have any right or authority, legally or otherwise, to take any action whatsoever in the decision-making, operation, management, or anything else whatsoever having to do with the business of RMST and/or RM STARK.

<u>Second Closing/Supplemental Purchase Agreement</u>

34.    Contemporaneously with the Second Closing, on or about September 22, 2020, PREMIUM INTL, NICOLAYEVSKY, PEREZ and STARK entered into a Supplemental Purchase Agreement (the "Supplemental Agreement"), a true and correct

copy of which is attached hereto as **Exhibit "D"** and incorporated herein by such reference.

35.     As and for part of the Supplemental Agreement, Section 2 thereof contains a security provision (the "Security Provision") pledging to STARK securities held by NICOLAYEVSKY and PEREZ with a market value of $2,900,000.00.

36.     In addition to the Supplemental Agreement and, specifically, the Security Provision contained therein, PREMIUM INTL, NICOLAYEVSKY and PEREZ executed a Promissory Note (the "Note") in favor of STARK, a true and correct copy of which is attached hereto as **Exhibit "E"** and incorporated herein by such reference.

37.     To provide further security for the performance of Defendants under the Supplemental Agreement, Section 2 thereof assigns to STARK the proceeds from NICOLAYEVSKY's life insurance policy (the "Insurance Assignment") in the amount of $2,900,000.

38.     The Note, the Security Provision and the Insurance Assignment were all contemplated and/or executed as additional security to guarantee the payments due STARK.

39.     The Supplemental Agreement between and among PREMIUM INTL, NICOLAYEVSKY, PEREZ and STARK was effectuated to provide for additional compensation to STARK for his expertise and in consideration of his agreement to assist Defendants in continuing the success of RMST and RM STARK, as well as assisting PREMIUM 72 and PREMIUM INTL in becoming successful, profitable enterprises.

40.     The Note and Security Provision expressly provided that STARK would be granted stock powers for the securities held by NICOLAYEVSKY and PEREZ and/or the

proceeds of NICOLAYEVSKY's life insurance policy in the event that NICOLAYEVSKY, PEREZ, PREMIUM 72 and/or PREMIUM INTL should default on the payments due under the Note.

41.     The Defendants subsequently defaulted on their obligations under the Note, and have failed and refused to make the payments due STARK.

42.     Notwithstanding such default, each of the Defendants have failed and refused to execute those stock powers in favor of STARK as required by the Supplemental Agreement/

43.     The Defendants have further failed and refused to furnish to STARK documentation evidencing the fact that the proceeds from NICOLAYEVSKY's life insurance policy have been affirmatively assigned to STARK.

44.     Plaintiffs have fulfilled all promises and covenants, and have performed all obligations required of them, pursuant to the terms of the Supplemental Agreement.

45.     Each of the Defendants has failed to perform any of their promises and covenants, and to perform any obligations required of them, pursuant to the terms of the Supplemental Agreement.

<u>FINRA CMA</u>

46.     RM STARK is an SEC-registered broker/dealer and, as such, RM STARK and RMST must comply with FINRA rules.

47.     Such FINRA rules require RM STARK and RMST to file and be subject to a CMA in order to protect investors by ensuring that a member firm's supervisory and compliance systems, policies, and procedures keep pace with industry standards, as amended from time to time.

48.     When there is a change in management of a member firm, a new CMA must be submitted to FINRA for FINRA approval.

49.     Within its discretion, FINRA may reject a CMA or otherwise place conditions or restrictions upon a CMA..

50.     A CMA is essentially, in part, a shareholders agreement between the member firm and FINRA as an additional party.

51.     Specifically, the FINRA-approved CMA for PREMIUM 72's purchase of RMST provides, in part, the following:

> There should be no material impact (financial, operational, managerial, supervisory) expected following the sale as most of the supervisory structure shall remain exactly as it is now.  Gary Stark ("Gary"), the CEO and FINOP shall remain as FINOP but a new CEO shall be introduced during the application.  All other personnel will remain as is.  (Emphasis added.)  [**Standard 1: Overview of the Applicants**. **1.e**.]

> As stated above, Premium 72 Advisors, LLC ["PREMIUM 72"] shall be the INDIRECT parent company of the Applicant subsequent to the closing, as described in the Stock Purchase Agreement.  Presently, PREMIUM 72…is owned 18% by Eduardo Perez ("Eduardo") … and 82% by AYNBET Investments, LLC ("AYNBET"), which is owned by Arturo Nicolayevsky ("Arturo")…  It is not currently contemplated that these two company [*sic*] shall conduct business per se, with the Applicant.  (Emphasis added; capitalization in original.)  [**Standard 1. 2.**]

> . . .Arturo and Eduardo shall be indirect owners of the Applicant and direct owners of PREMIUM 72.  They shall not be registered at the Applicant and remain passive indirect owners with no present responsibility or obligation for the day to day operation of the Applicant.  Note that the Applicant's staff shall remain substantially unchanged following FINRA approval.  Additional personnel shall be introduced elsewhere in the application… (Emphasis added.)  [**Standard 1**. **4.1.**]

> Q.3.  Will the Applicant have any non-registered officers, directors, or control persons following the change?  A.3.  No.  [**Standard 2:  Licenses and registrations.  3**.]

> At this time, since the business location(s) and the business conduct are not expected to change subsequent to FINRA approval and closing, no new agreements/contract/leases are contemplated by RM STARK and/or the eventual new ownership.  (Emphasis added.)  [**Standard 4: Contractual and business relationships. 1.**]

Q.3.  Will the proposed change result in the creation of an expense sharing agreement ("ESA") or amendment to an existing ESA?  A.3.  No.  [**Standard 4**. **3**.]

Q.5.   Will the proposed change result in any change in locations of the Applicant that are owned premises, or result in the addition of private residence used as office of the Applicant?  A.5.  No.  [**Standard 5:  Facilities**. **5**.]

Because no daily operational management (other than CEO change), or business conduct is changing as a result of this application, the Applicant does not expect any material impact on the communication and operational systems used for conducting business with customers and other firms.  As is currently the case, both (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity.   (Emphasis added.)   [**Standard 6: Communications and operational systems**. **1**.]

No changes are contemplated in this regard [systems and equipment…modifying existing systems].  It shall be business as usual post FINRA approval and closing.  (Emphasis added.) [**Standard 6**. **2**.]

No changes are contemplated in this regard [capacity…contingency plans…security…etc].  It shall be business as usual post FINRA approval and closing. (Emphasis added.)  [**Standard 6**. **3**.]

Q4.  Will the Applicant conduct business from multiple locations as a result of the change?  A.4.  No.  [**Standard 6**. **4**.]

Q5.  Will, as a result of the proposed change, one or more of the Applicant's proposed locations be the residence of an Associated Person?  A.5.  No.  [**Standard 6**.**5**.]

a. The source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business.  Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that the new indirect ownership is not seeking to modify the business model at this time.  PLEASE NOTE THAT GARY, THE CURRENT CEO AND MAJORITY INDIRECT OWNER HAS CONFIRMED THAT HE/THE PARENT HAS NOT FOUND IT NECESSARY TO INFUSE ADDITIONAL CAPITAL INTO THE  APPLICANT BECAUSE THE PREEXISTING REVENUE STREAM ADEQUATELY COVERS ALL APPLICANT CAPITAL NEEDS AND HAS DONE SO FOR A CONSIDERABLE TIME.  Additional capital infusions, if needed, would come from the current and post closing direct owner: RMST Holding company, Inc., and indirectly from the new indirect owner; PREMIUM 72 Advisors, LLC and it's [*sic*] majority upstream owner, Arturo…, as well…  b.  There are no current financing arrangements contemplated c. Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital condition.  (Emphasis added; capitalization in original.)  [**Standard 7:  Maintaining adequate net capital.  1.]**

10

Q.2.  Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position?  A2.  No.  [**Standard 7. 2.**]

Q3.  Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future.  A3.  As stated above, <u>the Applicant shall seek additional funding from it's [*sic*] parent organization if and when necessary</u>.  Please note Applicant's preexisting revenue stream.  (Emphasis added.)  [**Standard 7. 3.**]

The Applicant's statutory minimum is $100,000.00-there is no change in the net capital requirement or its calculation methodology resulting from the proposed change in <u>indirect ownership</u>.  (Emphasis added.)  [**Standard 7. 4.**]

The source of the Applicant's net capital shall continue to be from existing revenue streams generated by the Applicant's business.  Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that <u>the new indirect ownership is not seeking to modify the business model at this time</u>.  Revenue is earned by the Applicant via commissions.  (Emphasis added.)  [**Standard 7. 5.**]

As stated elsewhere in this CMA, the Applicant's business model shall not change as a result of the contemplated sale.  The applicant's management team, other than replacing current CEO, Gary, with proposed CEO, Stacey R. STARK ("Stacey"), shall not change.  Most importantly for this Standard 8 is that Mr. STARK shall remain the Applicant's FINOP and that Stacey is intimately knowledgeable of the Applicant's business having worked there under Gary for approximately 18 years.  (Emphasis added.)  [**Standard 8: Financial controls. 1.**]

Q.2.  Describe how the proposed change will affect any of the following items: a. <u>Accounting</u> system b. Hardcopy and/or electronic <u>books and records</u> c. <u>Authorized signatories on bank and trading accounts</u> d. <u>Individual(s) responsible for daily journal entries</u> and <u>monthly closing of books and records</u> e. <u>Authorizations required and procedures regarding withdrawals of capital</u> f. If the FinOp Principal works offsite or remotely: whether he…will have online access to bank accounts, clearing accounts, etc., and whether that access will be read-only g. <u>Whether the Applicant will employ or associate other persons who will support the financial and operation functions</u> (e.g., <u>internal bookkeeping staff</u>); if so, identify each such person and their roles and responsibilities.  A.2.  <u>No changes a. through and include g. above shall be affected in any material way post FINRA approval</u>.  (Emphasis added.)  [**Standard 8. 2.**]

<u>Other than the physical change of CEOs, as mentioned earlier in this CMA, management (hence compliance, supervisory, operational and internal control practices) shall remain the same</u>.  It is <u>not contemplated that the new CEO will seek to manage the applicant differently in any material way during the first 12 months</u> following FINRA approval. (Emphasis added.)  [**Standard 9: Written procedures. 2.**]

a.Stacey shall replace Gary as CEO.  Gary shall remain, however, as FINOP… c. The compliance officer shall remain the same.  Otherwise, as the CEO is an oversight position, the Applicant does not expect any material changes to the day to day operations within

the first 12 months of business following FINRA approval.  d. No changes expected re heightened supervision, and e. No changes expected re supervisory systems or supervisory framework.  (Emphasis added.)  [**Standard 10: Supervisory structure**. **1**.]

Q.3.  Will the proposed change to the Applicant result in a change in Chief Compliance Officer?  A.3.  No.  [**Standard 10: Supervisory structure**. **3**.]

As neither the business model or the day to day supervisory staff or procedures are expected to change in any material way following FINRA approval, there is no material impact contemplated as a result of such change with regard to any of items a. through d. [procedures, books and records, communication systems, software and systems] above. (Emphasis added.)  [**Standard 11: Books and records**. **1**.]

All entities and or services … shall remain the same following FINRA approval and closing.  (Emphasis added.)  [**Standard 11**. **2**.]

As no change to the Applicant's business model or supervisory system is contemplated, no changes are expected to the CE Plan as a result of the proposed sale of the Applicant. (Emphasis added.)  [**Standard 12: Continuing education**. **1**.]

No changes to the individual responsible for administering the Applicant's CE Plan. (Emphasis added.)  [**Standard 12**. **2**.]

52.     In addition, on May 5, 2020, both NICOLAYEVSKY and PEREZ executed

and presented written attestations to FINRA as part of the CMA Application, copies of

which are attached hereto as **Composite Exhibit "C,"** wherein both NICOLAYEVSKY

and PEREZ acknowledged and affirmed the following representations:

I hereby submit that I am exempt from registration under FINRA Rule 1210. Further, I will be permitted to continue as indirect owner of R.M. STARK & Co., Inc. ("Firm") without the benefit of registration as a principal so long as I am not actively engaged in the management of RM STARK's securities business, including the supervision, solicitation, conduct of business, or the training of persons associated with RM STARK.  I understand that I will not be permitted to become active in RM STARK's securities business as a registered representative or until such time as I have completed the registration as both an appropriate registered representative and principal classifications as outlined in FINRA Rules 1200-1240.  (Emphasis added.)

I understand that the exemption from principal registration may be rescinded if R.M. STARK & Co., Inc.'s [*sic*] changes its nature, scope, method of business or alters its operations from any of those included in its Membership Agreement. (Emphasis added.)

Unauthorized, Improper, and Unlawful Actions

53.     In direct violation of the CMA and without the knowledge or consent of Plaintiffs, PREMIUM 72, through NICOLAYEVSKY and/or PEREZ – then-contingent minority shareholders – undertook various efforts in an attempt to wholly dismantle RM STARK through a pattern of unlawful activity, gross mismanagement, and improper acts, including the following:

a.     Hiring Susan Davis in contemplation of replacing Jerry Desiderio, RM STARK's long-standing Chief Compliance Officer;

b.     Terminating Jerry Desiderio as RM STARK's long-standing Chief Compliance Officer;

c.     Hiring Peggy Lebert as RM STARK's new Chief Compliance Officer upon the resignation of Susan Davis;

d.     Creating and maintaining an employee organization chart in which NICOLAYEVSKY re-assigned employees' roles in RM STARK;

e.     Improperly directing the options of Regulation Best Interest Implementation on Salesforce;

f.     Executing the contracts for RM STARK's Data Storage, as well as executing the contract with Sycamore for RM STARK's operations, payroll, and compliance software;

g.     Revising RM STARK's recruiting procedures;

h.     Stripping Ellen Adler of her position as an officer and director of RM STARK and RMST, as well has her day-to-day responsibilities with both companies;

i.     Hiring an unqualified individual named Anisa Perez to maintain the company books and records, and to undertake some of the bookkeeping tasks of RM STARK (a position from which she was ultimately removed by NICOLAYEVSKY);

j.     Entering into written contractual obligations that bound RM STARK, including Addepar, Salesforce, Sycamore, and consulting agreements with Vantage Point, and thereafter canceling one or more of such contracts;

k.      Revising the on-boarding documents for new registered representatives, creating a new Independent Broker Agreement to include dual registration with PREMIUM 72, and digitizing such documents without RM STARK's knowledge or consent;

l.      Changing RM STARK's e-mail provider and payroll vendor[1];

m.      Canceling RM STARK's worker's compensation policy and 40l(k) Plan, and bundling them with the new payroll provider;

n.      Opening and controlling new J.P. Morgan Chase checking accounts and credit card in the name of RM STARK;

o.      Using NICOLAYEVSKY's personal address, in violation of Federal law, as the primary address for the J.P. Morgan Chase accounts;

p.      Taking a $5,000 cash advance on the RM STARK company credit card for NICOLAYEVSKY's own personal benefit;

q.      Consulting with multiple FINOP applicants in an effort the change the reporting methods and calculations of RM STARK's books and records in an effort to conceal Defendants' unlawful and illegal attempts to pillage RM STARK's finances;

r.      Consulting with Attorney Gregory Levine with respect to Expense and Fee Sharing Agreements between RM STARK and PREMIUM 72;

s.      Consulting with Attorney Jeff Barclay regarding the restructuring of RM STARK's financial affairs;

t.      Holding interviews with various individuals in an attempt to have RM STARK recruit them for internal positions, notwithstanding the individuals' qualifications or RM STARK's need for the position;

u.      Attempting to purchase and/or hire several brokers, some of whom were associated with a FINRA-expelled firm or required heightened supervision because of past disciplinary problems; and

v.      Unilaterally authorizing, in or about October of 2020, multiple withdrawals from RM STARK's Pershing account[2] and transferring the funds to J.P. Morgan Chase Bank which had a negative impact on RM STARK's net capital requirements pursuant to FINRA regulations (and, thereafter, even when NICOLAYEVSKY and PEREZ were confronted about the foregoing withdrawals, warned

---

[1] It should be noted that the payroll vendor chosen by Defendants was not capable of handling broker-dealer payroll.

[2] A Pershing account is a clearinghouse utilized by brokerage firms to ensure the immediate availability of funds to fund purchase and sale transactions.

about the severe consequences any such transfers could have on RM STARK's net capital requirements, and told that Defendants were required to disclose any and all existing or potential liabilities for which Defendants had or intended to cause RM STARK to become obligated, Defendants refused to disclose any and all existing or potential liabilities incurred by Defendants); and

w.     Stalling and refusing to allow RM STARK's certified public accountant to prepare the necessary and appropriate 2020 tax returns for RM STARK by the March 15, 2021 deadline.

54.     As if the foregoing were not enough to demonstrate the bad acts of the Defendants, during the time in which Peggy Lebert was the Chief Compliance Officer for RM STARK, she appears to have consciously overlooked the unlawful use and conversion of RM STARK's monies and assets by NICOLAYEVSKY and PEREZ, including their retention of such monies and assets for their own personal benefits in total and absolute disregard of her alleged position as Chief Compliance Officer, and in violation of her licenses with FINRA.

55.     In or about March of 2021, NICOLAYEVSKY and PEREZ attempted to gain access to various accounts of clients of RM STARK, in violation of Federal law.

56.     On March 23, 2021, after Ms. Lebert's termination, in direct violation of Fla. Stat. §815.06 and 18 USC 1030 et seq., she unlawfully accessed RM STARK's computer systems, presumably at the direction of NICOLAYEVSKY and PEREZ, in an attempt to block the officers and employees of RM STARK from performing their essential job functions.

57.     On March 24, 2021, NICOLAYEVSKY and PEREZ purported to terminate Stacey Stark, RM STARK's then-acting Chief Executive Officer.

58.     The purported termination of Stacey Stark was a direct and proximate result of (a) the discovery by Ms. Stark that NICOLAYEVSKY and PEREZ unlawfully obtained

several loans by pledging the assets of RM STARK as collateral, and by fraudulently executing the loan documents as officers of RM STARK in violation of the CMA, FINRA Rules and Florida law, and her related expression of concern for the safety of RM STARK.[3]

59.     On March 24, 2021 (and again in violation of both the CMA and FINRA Rules, as well as in contravention of Florida law, and without any legal authority or basis to do so), NICOLAYEVSKY and PEREZ purported to hire Michael Cutbirth as the new Chief Executive Officer.

60.     The attempt to hire Michael Cutbirth was in complete and flagrant disregard of the CMA, which required a person operating a brokerage firm to have prior experience and FINRA approval – neither of which Mr. Cutbirth had.

61.     On March 25, 2021, in direct violation of Fla. Stat. §815.06 and 18 USC 1030 et seq., and again presumably at the direction of NICOLAYEVSKY and PEREZ, Peggy Lebert again improperly interfered with RM STARK's computer systems, further restricting access to aspects of the computer systems to its officers and employees and preventing such officers and employees from carrying out their essential job functions.

62.     On or about September 3, 2021, NICOLAYEVSKY, PEREZ and WRIGHT unlawfully, and without any authority whatsoever, noticed and improperly convened a "Board of Directors and Shareholders Meeting" whereat they purportedly voted to remove and replace STARK, Stacey Stark and Ellen Adler as Officers and Directors of RMST and RM STARK.

---

[3] Additionally, based on comments made by NICOLAYEVSKY and PEREZ at the time of the purported termination, such termination may have been in retaliation for Ms. Stark's termination of Peggy Lebert, and/or may have been due to Ms. Stark's gender.

<u>Unauthorized, Improper and Unlawful Loans</u>

*Loans from AMZ Group, LLC*

63.     On or about November 6, 2020, without Plaintiffs' prior knowledge or consent, NICOLAYEVSKY and PEREZ deliberately concealed their unilateral decision to enter into and execute an agreement known as "Contract 467" with AMZ Group, LLC ("AMZ") wherein Defendants "sold" future revenues of RM STARK and RMST in the amount of $274,000, for which Defendants received the sum of $200,000.  A true and correct copy of the AMZ agreement (the "AMZ Agreement") is attached hereto as **Composite Exhibit "F"** and incorporated herein by such reference.

64.     NICOLAYEVSKY and PEREZ knew, or should have known, that many of the principles of AMZ were barred by FINRA from lending money to broker-dealers such as RMST or RM STARK.

65.     The Security Provision and subsequent Form UCC-1 filing by AMZ revealed that all of RM STARK's assets – including 100% of RMST's stock – were pledged as collateral for the funds received by NICOLAYEVSKY and PEREZ.

66.     Apparently, in the AMZ Agreement, NICOLAYEVSKY and PEREZ represented that AMZ had priority over the assets of RM STARK, notwithstanding that the assets of RM STARK were already pledged elsewhere as collateral.

67.     The AMZ Agreement was signed by NICOLAYEVSKY as principal, even though the CMA did not allow him to act in such capacity for either RMST or RM STARK.

68.     It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into the AMZ Agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

69.    NICOLAYEVSKY and PEREZ continued with this outrageous course of conduct and deception when, on or about December 3, 2020, Defendants deliberately concealed the unilateral decision of NICOLAYEVSKY and PEREZ to enter into and execute another agreement known as "Contract 489" with AMZ, further encumbering the assets of RM STARK for an additional $206,400, for which Defendants received the additional sum of $160,000.  A true and correct copy of AMZ Contract 498 is attached hereto as part of **Composite Exhibit "F."**

70.    Again, the actions of NICOLAYEVSKY and PEREZ were undertaken without the knowledge or consent of the Plaintiffs.

71.    It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into Contract 489 on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

72.    On or about January 28, 2021, in an all-too familiar tune, and again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the unilateral decision of NICOLAYEVSKY and PEREZ to enter into and execute yet another agreement known as "Contract 516" with AMZ.  A true and correct copy of AMZ Contract 516 is attached hereto as part of **Composite Exhibit "F."**

73.    Although Contract 516 purportedly consolidated the AMZ Agreement, Contract 489 and Contract 516, additional monies were also added to the principal, thereby further encumbering the assets of RMST and RM STARK.

74.    It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into the AMZ Agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

18

75.     In order to further conceal the defalcations of the Defendants, NICOLAYEVSKY and PEREZ attempted to replace STARK as RM STARK's then-acting Chief Executive Officer; however, this attempt was unsuccessful.

76.     The Plaintiffs did not become aware of the unlawful actions of NICOLAYEVSKY and PEREZ until February 16, 2021, after PREMIUM 72 defaulted on the loans with AMZ, when Stacey Stark was called by Nationwide Financial Services, a debt collector.

77.     Notwithstanding the continued requests from Plaintiffs that Defendants disclose any actions the Defendants may have undertaken that might otherwise impact the financial integrity of RM STARK (as Plaintiffs are required to report their financial condition to FINRA), Defendants continued to obfuscate the details of all transactions, refused to produce documents, and failed to disclose to Plaintiffs all relevant facts and circumstances relating to their financial misdeeds.[4]

78.     Upon direct questioning by Stacey Stark, NICOLAYEVSKY and PEREZ intimated that there are, in fact, other undisclosed liabilities for which NICOLAYEVSKY and PEREZ have incurred liability for RM STARK; however, Defendants have refused to reveal any additional information as to what (or how much) these liabilities may be.

79.     Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and due to the loans improperly obtained from AMZ (and potentially other lenders), the financial statements submitted by Plaintiffs to FINRA were false and incorrect.

---

[4] To date, Defendants have yet to disclose this relevant and necessary information.

80.     Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and due to the loans improperly obtained from AMZ (and potentially other lenders), Plaintiffs unknowingly violated FINRA's net capital rules.

81.     Defendants knew or should have known that their actions, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

82.     On or about August 1, 2021, counsel for PREMIUM 72 subsequently confirmed that there are other undisclosed liabilities incurred by NICOLAYEVSKY and PEREZ on behalf of the Plaintiffs, but refused to disclose any additional information.

83.     Counsel for PREMIUM 72 knew or should have known that the actions of Defendants, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

*Loans from U.S. Small Business Administration*
*through the Payroll Protection Program*

84.     Sometime after January 2, 2020 (but well before September 22, 2020, while NICOLAYEVSKY was a contingent minority shareholder), NICOLAYEVSKY sought COVID-19 relief loans offered to businesses by the U.S. Small Business Administration through its Payroll Protection Program ("PPP").

85.     Specifically, NICOLAYEVSKY prepared and submitted applications to governmental entities and lending institutions on behalf of PREMIUM 72, some of its subsidiaries and/or affiliates, and RMST, all utilizing RM STARK's payroll and tax documentation and information for calendar year 2019.   A true and correct copy of documentation reflecting issuance of the PPP loans to PREMIUM 72 and RMST, as obtained from FederalPay.org, are attached hereto as **Composite Exhibit "G"** and is incorporated herein by such reference.

86.     At no time whatsoever did NICOLAYEVSKY seek permission from STARK – who, at the time, was the majority shareholder and President of RMST and RM STARK – to seek PPP loans, or to submit any loan application or any other document of any kind or nature whatsoever, by or on behalf of RMST or RM STARK or otherwise utilizing RM STARK's payroll and tax information, or any such other information provided to NICOLAYEVSKY and PEREZ, in confidence, during the negotiations leading up to the implementation of the Stock Purchase Agreement.

87.     Moreover, at no time whatsoever did NICOLAYEVSKY and/or PEREZ disclose to Plaintiffs this fraudulent, deceptive, duplicitous, and illegal conduct.  As an example of the lengths to which Defendants went to ensure Plaintiffs would not learn of the PPP loan applications, NICOLAYEVSKY utilized his home address as RMST's corporate address for purposes of such applications.

88.     On or about June 15, 2021, only by casually googling "PREMIUM 72" and "OPC" did Plaintiffs discover that approximately $195,970 in PPP loan proceeds had been paid to RMST and RM STARK, which funds were misappropriated by NICOLAYEVSKY and/or PEREZ.

89.     This online research also revealed that PREMIUM 72 and OPC had each utilized RM STARK's identical payroll figures and documents in order to procure additional PPP loans in similar amounts from Byline Bank and Chase Bank for other entities affiliated with NICOLAYEVSKY and PEREZ.

90.     Upon information and belief, none of these entities had any employees (and, consequently, no payroll); therefore, upon information and belief, RM STARK's documentation was utilized in yet another scheme to improperly procure PPP loans.

21

91.     All loan proceeds related to these PPP loans to RMST, RM STARK, and other entities affiliated with NICOLAYEVSKY and PEREZ were transmitted to NICOLAYEVSKY at his home address in April and June of 2020.

92.     Neither NICOLAYEVSKY nor PEREZ advised the Plaintiffs that they received proceeds from any PPP loan, notwithstanding the fact that such proceeds were the property of RMST and RM STARK, and never belonged to NICOLAYEVSKY and PEREZ, nor were NICOLAYEVSKY and PEREZ entitled to the possession or use of such funds, and despite the demands of Plaintiffs for return of the funds, NICOLAYEVSKY and PEREZ have failed and refused to relinquish same.  A true and correct copy of such demand is attached hereto as **Exhibit "H"** and is incorporated herein by such reference.

93.     It is abundantly clear that NICOLAYEVSKY and PEREZ did not utilize these PPP loan proceeds for the very purpose for which they were intended: payroll!  Instead, NICOLAYEVSKY and PEREZ diverted the funds and used them for purposes other than payroll, rent, or other operating expenses of RMST or RM STARK.

94.     By procuring PPP loans utilizing payroll and tax information of RM STARK, NICOLAYEVSKY and PEREZ engaged in deliberate, fraudulent, and illegal conduct.

<u>Sale to Wright</u>

95.     Upon information and belief, in order to raise capital for RMST, NICOLAYEVSKY and PEREZ arranged for the sale of fifty-six (56%) percent of RMST's stock to WRIGHT pursuant to that certain Share Purchase-Transfer Agreement (the "WRIGHT Agreement"), by and between WRIGHT, as the purchaser, and PREMIUM 72, RMST, and RM STARK, as the sellers.  A true and correct copy of the WRIGHT

Agreement is attached hereto as **Exhibit "I"** and is incorporated herein by such reference.

96.     Pursuant to the WRIGHT Agreement, the transfer was to be effectuated in two (2) separate phases; in phase 1, in exchange for the sale of twenty-four (24%) percent of RMST's stock to WRIGHT, WRIGHT was to pay the sum of $1,000,000 to RMST on or before June 30, 2021.

97.     RMST and RM STARK fulfilled all of the promises and obligations required to be performed by them under the terms of the WRIGHT Agreement.

98.     Nevertheless, WRIGHT has failed to make payment to RMST as he is contractually obligated to do pursuant to the WRIGHT Agreement.

99.     The willful refusal of WRIGHT to pay for the shares of stock which he has received has damaged RMST, and further supports the Plaintiffs' contention that the Defendants – including WRIGHT – have engaged in a persistent and deliberate pattern of corporate raiding with respect to both RMST and RM STARK, thereby necessitating this action.

**CLAIMS FOR RELIEF**

<u>COUNT I</u>

*DECLARATORY RELIEF AGAINST*
*AGAINST PREMIUM 72, NICOLAYEVSKY and PEREZ*
*AS TO MANAGEMENT, OPERATION AND CONTROL OF RMST and RM STARK*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

100.    The CMA requires Defendants to remain passive investors of RMST and RM STARK.

101.    Pursuant to FINRA guidelines, which control the operation of RMST and

RM STARK, <u>passive investors do not have the right of management or control</u>.

102.    Defendants contend that the Bylaws of RM STARK allow the Defendants to control the governance of RM STARK, inexplicably arguing that the conditions imposed by the CMA, and under FINRA guidelines, are meaningless and irrelevant.

103.    Based on the widely disparate positions of the parties to this action, there is a bona fide, actual, and practical need for a declaration by this Court as to whether Defendants may unilaterally manage the affairs of RM STARK, electing and removing directors and otherwise affecting corporate management at will.

104.    This is a present controversy as to the obligations and duties of the parties.

105.    There is a clear need for a declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ have no right to participate in the management of RMST and RM STARK;

B.      Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ cannot violate the CMA;

C.      Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

D.      For any and all further relief that this Court deems just and proper under the circumstances.

COUNT II

*INJUNCTIVE RELIEF*
*AGAINST PREMIUM 72, NICOLAYEVSKY and PEREZ*
*ENJOINING INTERFERENCE IN THE*
*MANAGEMENT, OPERATION AND CONTROL OF RMST and RM STARK*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

106.    Defendants have continuously and unlawfully interfered in the management of RM STARK.

107.    Plaintiffs have been damaged by such continuous and unlawful interference, and do not have an adequate remedy at law.

108.    Plaintiffs have suffered, and will continue to suffer, irreparable harm unless Defendants are enjoined from the conduct as set forth herein.

109.    The public interest will be served by the issuance of an injunction prohibiting the conduct as set forth herein.

110.    Plaintiffs have a substantial likelihood of success on the merits of this matter.

111.    Plaintiffs have a clear legal right to the relief sought.

WHEREFORE, Plaintiffs respectfully request that this Court enter injunctive relief in their favor as follows:

A.      Grant temporary and permanent mandatory injunctions against Defendants, enjoining each Defendant from interfering or otherwise involving themselves in any way with the management of Plaintiffs;

B.      Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper

25

under the circumstances.

<u>COUNT III</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY and PEREZ*
*AS TO TERMS OF PROMISSORY NOTE and SECURITY PROVISION*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

112.    The Security Provision creates a viable security interest in the securities of RMST and other stock held by Defendants, notwithstanding Defendants' failure to execute the stock powers as contemplated by Section 2 of the Security Provision.

113.    The failure of Defendants to execute the necessary stock powers does not obviate or eliminate STARK's security interest in the securities of RMST and other stock held by Defendants; it merely impedes STARK's ability to exercise the rights granted to him upon default of Defendants in the absence of such executed stock powers.

114.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that in the absence of the requisite stock powers, STARK may assert and exercise his security interest in the securities of RMST and other stock held by Defendants.

115.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

116.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The Security Provision creates for STARK a viable security interest in the securities of RMST and other stock held by Defendants, notwithstanding the failure of Defendants to execute the stock powers;

B.      Defendants are required to execute the requisite stock powers within five (5) days of entry of such order of this Court and, failing same, by operation of law, STARK may proceed to assert or exercise his security interest in the securities of RMST and other stock held by Defendants;

C.      Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

D.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT IV</u>

*BREACH OF PROMISSORY NOTE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

117.    On or about September 22, 2020, Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ signed and delivered to STARK the Note in the original principal amount of $2,900,000.00 with interest thereon at the rate of five (5%) percent per annum.

118.    In accordance with the terms of the Note, Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ promised to pay to STARK on September 22, 2021, the sum of $261,749.11, representing a principal payment of $225,499.11 and accrued interest in the amount of $36,250.00.

119.    Upon default in payment, the express provisions of the Note provide that the entire balance may be accelerated.

120.    Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ have defaulted in the payment of said Note.

121.    There is presently due and owing the Plaintiff the amount of $2,900,000.00, plus all accrued interest thereon at a rate of five (5%) percent per annum.

122.    Plaintiff is entitled to payment in full pursuant to the terms of the Note.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Awarding STARK all amounts due under the Note, together with all accrued, unpaid interest thereof, pursuant to the default of Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ;

B.    Awarding STARK his attorneys fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

COUNT V

*BREACH OF STOCK PURCHASE AGREEMENT*
*AS TO PREMIUM 72, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

123.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ entered into a Stock Purchase Agreement with STARK pursuant to which Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ were to purchase RMST and RM STARK.

124.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ not only failed to comply with the Stock Purchase Agreement, but NICOLAYEVSKY unilaterally and without any justification whatsoever caused the escrow agent, Attorney Gregory Levine, to withhold an amount in excess of $30,000 from STARK at the time of the closing.

125.    These monies remain outstanding and are still due and payable to STARK.

126.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ breached the Stock Purchase Agreement with STARK by failing to pay in full the amounts due under the Stock Purchase Agreement.

127.    STARK has been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Awarding STARK all remaining amounts due under the Stock Purchase Agreement as a result of the default of Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ;

B.    Awarding STARK his attorneys fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT VI</u>

*BREACH OF SUPPLEMENTAL PURCHASE AGREEMENT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

128.    Defendants entered into a Supplemental Purchase Agreement to further compensate STARK for the purchase of his RMST stock.

129.    Defendants failed to comply with the Supplemental Purchase Agreement by their failure to make payment as contemplated therein.

130.    As a result, Defendants have breached the Supplemental Purchase Agreement.

131.    STARK has been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Awarding STARK all amounts due and owing under the Supplemental Purchase Agreement;

B.    Awarding STARK his attorneys fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT VII</u>

*BREACH OF CMA*
*AS TO PREMIIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

132.    Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ are subject to the CMA.

133.    Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ failed to comply with the CMA by wrongfully interfering with the management and operations of RMST and RM STARK.

134.    As a result, Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ have breached the CMA.

30

135.    Plaintiffs have been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.       Finding that the Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ breached the CMA by wrongfully interfering with the management and operations of RMST and RM STARK;

B.       Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

C.       For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT VIII</u>

*BREACH OF FIDUCIARY DUTY*
*AS TO PREMIIUM 72, AYNBET, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

136.    As a result of the consummation of the Second Closing pursuant to the Stock Purchase Agreement between STARK and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ are majority shareholders in RMST.

137.    As the majority shareholders, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ owe a fiduciary duty to the Plaintiffs.

138.    Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ have breached their fiduciary duty to Plaintiffs by flagrantly violating the CMA; applying for loans and using the assets of RMST and RM STARK as collateral without authorization;

causing RM STARK's net capital to fall below FINRA requirements; engaging in identity fraud by utilizing the confidential information of RM STARK to procure PPP loans and otherwise using the proceeds of said loans for their own personal benefit; and concealing their malicious, fraudulent, and illegal conduct from Plaintiffs.

139.   Plaintiffs have been damaged by such breach.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.     Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ breached their fiduciary duties to Plaintiffs;

B.     Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

C.     For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT IX</u>

*TORTIOUS INTERFERENCE*
*AGAINST PREMIIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

140.   Plaintiffs have a business and contractual relationship with FINRA.

141.   As part of the dealings between Plaintiffs and Defendants, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT were well aware of Plaintiff's relationship with FINRA, and knew that RMST and RM STARK were subject to FINRA regulations.

142.   Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT willfully and tortiously interfered in the relationship between RMST and RM

STARK, without justification other than to harm RMST and RM STARK.

143.   Plaintiffs have been damaged by such breach.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.   Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT breached their fiduciary duties to Plaintiffs;

B.   Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

C.   For any and all further relief that this Court deems just and proper under the circumstances.

## COUNT X

*ACCOUNTING AND ACCESS TO RECORDS*
*AGAINST PREMIIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

144.   There is a complex relationship between Plaintiffs and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT.

145.   Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have a fiduciary relationship with Plaintiffs.

146.   The transactions between Plaintiffs and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT are voluminous and complex.

147.   Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have stated to Plaintiffs that there are financial transactions affecting Plaintiffs that have not been disclosed to Plaintiffs.

148.   Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have withheld relevant documentation from Plaintiffs and obfuscated access to the records of RMST and RM STARK.

149.   As a result of the unknown and deliberately concealed or undisclosed information in the possession of Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT, Plaintiffs have no adequate remedy at law.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.   Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have a fiduciary duty to Plaintiffs;

B.   Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT engaged in voluminous and complex transactions with Plaintiffs;

C.   Requiring the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT to provide an accounting of all transactions on behalf of, or on account of, RMST or RM STARK from October 8, 2019 through the present date;

D.   Requiring the Defendants to provide Plaintiffs with access to all documentation and records in the possession of Defendants within five (5) days of this Court's order;

E.   Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

F.      For any and all further relief that this Court deems just and proper under the circumstances.

## COUNT XI

### PETITION TO APPOINT A RECEIVER
### AS TO PREMIUM 72 and PREMIUM INTL

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

150.    STARK is the Chairman of the Board of RM STARK.

151.    To the wrongful exclusion of STARK as the Chairman of the Board of RM STARK, NICOLAYEVSKY and PEREZ have improperly and recklessly managed PREMIUM 72 and PREMIUM INTL and their respective assets, including RM STARK.

152.    NICOLAYEVSKY and PEREZ have managed PREMIUM 72 and PREMIUM INTL in a manner that violates the Stock Purchase Agreement, the Supplemental Purchase Agreement, and the CMA; they have defaulted on the Promissory Note; and they have taken such other actions that are inconsistent with the rights of the Plaintiffs.

153.    The actions of NICOLAYEVSKY and PEREZ have placed the ongoing business and security of RM STARK in serious jeopardy.

154.    Consequently, NICOLAYEVSKY and PEREZ cannot, and should not, be trusted to manage or operate RM STARK in a manner which jeopardizes its business as a going concern, its reputation, or its licensure as a broker-dealer, and the services of a Court-appointed receiver are necessary to protect and preserve the interests of RM STARK.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Appointing a receiver to operate the affairs of PREMIUM 72 and

PREMIUM INTL (including, but not limited to, the operation and management of RM STARK) in a manner consistent with the way in which RM STARK was operated and managed under STARK and/or Stacey Stark, each as Chief Executive Officer;

      B.    Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

      C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XII</u>

*CIVIL THEFT*
*AS TO NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

155.   NICOLAYEVSKY and PEREZ have knowingly misappropriated funds from Plaintiffs by virtue of applying for and obtaining various PPP loans, which proceeds were taken and utilized by NICOLAYEVSKY and PEREZ, individually.

156.   NICOLAYEVSKY and PEREZ obtained and used the Plaintiffs' property – to-wit, the PPP loan proceeds – with felonious intent.

157.   NICOLAYEVSKY and PEREZ have temporarily or permanently deprived Plaintiffs of the right to benefit from the PPP loan proceeds, or have otherwise appropriated the property for their own use.

158.   Plaintiffs demanded return of all such misappropriated funds which should have been, and were, the rightful property of RM STARK.

159.   Notwithstanding the demands of Plaintiffs, NICOLAYEVSKY and PEREZ have willfully and deliberately refused to return the monies to Plaintiffs.

160.   Plaintiffs have been damaged by the actions of NICOLAYEVSKY and

36

PEREZ.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

   A.   Finding that NICOLAYEVSKY and PEREZ have misappropriated the funds of Plaintiffs;

   B.   Ascertaining the amount misappropriated by NICOLAYEVSKY and PEREZ;

   C.   Requiring repayment of all misappropriated amounts to Plaintiffs, including interest thereon;

   D.   Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

   E.   For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XIII</u>

*CONVERSION*
*AS TO NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 99 as if fully set forth herein.

161.   NICOLAYEVSKY and PEREZ have knowingly misappropriated funds from Plaintiffs by virtue of applying for and obtaining various PPP loans, which proceeds were taken and utilized by NICOLAYEVSKY and PEREZ, individually.

162.   The proceeds of any PPP loans issued to RM STARK were and are the property of RM STARK.

163.   NICOLAYEVSKY and PEREZ wrongfully obtained and used the Plaintiffs' property, to-wit: the PPP loan proceeds, and converted such PPP loan proceeds to their

37

own personal use.

164.   The wrongful acts of NICOLAYEVSKY and PEREZ are inconsistent with the property rights of the Plaintiffs and their interest in and to the PPP loan proceeds.

165.   Plaintiffs have been damaged by the actions of NICOLAYEVSKY and PEREZ.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.   Finding that NICOLAYEVSKY and PEREZ have improperly converted the property of the Plaintiffs to their own personal use;

B.   Ascertaining the amount converted by NICOLAYEVSKY and PEREZ;

C.   Requiring repayment of all converted amounts to Plaintiffs, including interest thereon;

D.   Awarding Plaintiffs their attorneys fees and costs in connection with this action; and

E.   For any and all further relief that this Court deems just and proper under the circumstances.

Dated:  October 28, 2021

Respectfully submitted,

_____
**JOEL MARTIN MCTAGUE, ESQ.**
Florida Bar No. 174416
**LEANNE B. WAGNER, ESQ.**
Florida Bar No. 0057847
Counsel for Plaintiffs
Frank Weinberg Black, P.L.
7805 SW 6th Court

Plantation, FL 33324
Phone:   954-474-8000
Email:    jmctague@fwblaw.net
              talberga@fwblaw.net