### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:21-cv-81995-AMC

**RMST HOLDING COMPANY, INC., a**
**Florida corporation, R.M. STARK & CO.,**
**INC., a Florida corporation, and GARY L.**
**STARK, individually,**

      Plaintiffs,

v.

**PREMIUM 72 CAPITAL, LLC, a Texas**
**Limited liability company, PREMIUM 72**
**INTERNATIONAL, LLC, a Nevada limited**
**liability company, AYNBET INVESTMENTS,**
**LLC, a Texas limited liability company, ARTURO**
**NICOLAYEVSKY,  individually, EDUARDO**
**PEREZ, individually, and ISAAC WRIGHT,**
**Individually,**

      Defendants.

_____/

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs RMST Holding Company, Inc. ("RMST"), R.M. Stark & Co., Inc. ("RM Stark"), and Gary L. Stark ("Mr. Stark") (collectively, "Plaintiffs") request a temporary restraining order ("TRO") and a preliminary injunction ("PI") requiring, or enjoining and restraining, Defendants Premium 72 Capital, LLC ("Premium Capital"), Premium 72 International, LLC ("Premium International"), Aynbet Investments, LLC ("Aynbet"), Arturo Nicolayevsky ("Mr. Nicolayevsky"), Eduardo Perez ("Mr. Perez"), and Isaac Wright ("Mr. Wright") (collectively, "Defendants"), and any natural person or business and/or legal entity or association affiliated with Defendants, from further encumbering the assets of RM Stark and from further engaging in the management of RM Stark.  This Motion is brought pursuant to Federal Rule of Civil Procedure 65(b), on the grounds that Defendants have jeopardized and continue to jeopardize RM Stark's business through failure to adhere to the Financial Industry Regulatory Authority's ("FINRA") continuing membership agreement with RM Stark and through pledging RM Stark's assets as

collateral for several improper loans. The continued encumbrance of RM Stark's assets also depletes the value of collateral securing repayment to Mr. Stark under various transaction documents.

This Motion is based on the attached Memorandum of Points and Authorities, the concurrently filed declarations of Gary L. Stark and Richard D'Amura, the pleadings and papers on file in this matter, including the Amended Complaint (the "AC"), and on such other evidence and argument that may be presented to the Court at the time of hearing on this Motion.

Dated: May 3, 2022

Respectfully submitted,

**D'AMURA & ZAIDMAN, PLLC**

*/s/ Richard A. D'Amura*
RICHARD A. D'AMURA
Florida State Bar No. 663921
RICHARD T. LOBAS (*pro hac vice*)
Ohio Bar No. 0093658
1061 Michigan Ave., Unit 1
Miami Beach, Florida 33139
Phone: (310) 945-5306
Email:  rdamura@dz-pllc.com
          rlobas@dz-pllc.com

*Attorneys for Plaintiffs RMST Holding Company, Inc., R.M. Stark & Co., Inc., and Gary L. Stark*

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   <u>PRELIMINARY STATEMENT</u>

This case concerns Defendants' breach of various transaction documents and a promissory note related to Mr. Stark's sale of RMST stock to Defendants.  Defendants have utterly failed to comply with their obligations to Mr. Stark and are in arrears to the tune of several million dollars.  Worse still, Defendants are actively mismanaging and encumbering the assets of RM Stark, a subsidiary of RMST, thereby diminishing the value of collateral securing payment to Mr. Stark.  Absent immediate Court intervention through a temporary restraining order and a preliminary injunction, Defendants will continue to eviscerate RM Stark, thereby depriving Mr. Stark of collateral securing payment.

## II.   <u>FACTUAL BACKGROUND</u>

### A.   <u>Defendants Acquire RMST</u>

In 1994, Mr. Stark purchased a controlling interest in RM Stark, now a Florida corporation. (Stark Dec., ¶ 2).  Since then, RM Stark has continuously operated as a broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC").  As a SEC registered broker-dealer, RM Stark is subject to the rules and regulations of the Financial Industry Regulatory Authority ("FINRA").  *Id.*  At all times relevant to this action, RM Stark was wholly owned by RMST.

#### i.   *The LOI*

On October 8, 2019, Mr. Stark, as President and CEO of RM Stark, executed a Letter of Intent (the "LOI") with OPC Advisors, LLC ("OPC").  *Id.* at ¶ 3.  OPC is now known as Premium 72 Capital, LLC, a defendant in this case.  That entity will hereafter be referred to as Premium 72 Capital/OPC. Mr. Nicolayevsky executed the LOI on behalf of Premium 72 Capital/OPC.  The LOI set forth RM Stark and Premium 72 Capital/OPC's mutual intention to transfer RM Stark ownership to Mr. Nicolayevsky, his associates, and/or entities owned or controlled by him or his associates.  *Id.*  At the time of the LOI, Mr. Stark was the majority, controlling shareholder, president, and CEO of RMST. *Id.* at ¶ 6.

ii.    *The Stock Purchase Agreement and Bifurcated Transaction Due to FINRA Rules*

On January 2, 2020, as President and CEO of RMST, Mr. Stark executed the Gary L. Stark, et al. to OPC Advisors, LLC Stock Purchase Agreement (the "Stock Purchase Agreement").  *Id.* at ¶ 7.  The parties to the Stock Purchase Agreement were Premium 72 Capital/OPC as purchaser on the one hand and Mr. Stark, as seller, on the other.[1]  Mr. Nicolayevsky executed the Stock Purchase Agreement on behalf of Premium 72 Capital/OPC on January 2, 2020.  *Id.*  The intent of the Stock Purchase Agreement was to sell one hundred percent (100%) of the outstanding stock of RMST to Mr. Nicolayevsky, his associates, including Mr. Perez, and/or entities owned or controlled by him. *Id.* at ¶ 8.

FINRA's rules provide that FINRA has a right to approve (or disapprove) the sale of one hundred percent (100%) of the stock of the holding company of a FINRA registered broker-dealer, like RMST.  Due to this requirement, the parties devised a bifurcated transaction, as detailed in the Stock Purchase Agreement, whereby a portion of the RMST stock would be transferred upon an initial closing (the "First Closing") and the balance of the stock would be transferred in a subsequent closing following the necessary FINRA approval (the "Second Closing").  *Id.* at ¶ 9.  In connection with the First Closing, forty-eight (48) shares, equivalent to twenty-four percent (24%), of RMST were contingently transferred to Premium 72 Capital/OPC on or about January 2, 2020. *Id.* at ¶ 10.

iii.    *The Continuing Membership Application and FINRA Approval*

In furtherance of efforts to obtain FINRA approval and thereafter proceed to the Second Closing, Premium 72 Capital/OPC filed a Continuing Member Application Form (the "Application") to be filed with FINRA on August 20, 2020.  *Id.* at ¶ 11.  On September 2, 2020, FINRA approved the Continuing Membership Application via letter (the "Approval Letter").  *Id.* at ¶ 12; Ex. D.  The Approval Letter provides as follows, in pertinent part:

> It should be noted that, in issuing this decision, FINRA has relied upon the information and documentation submitted as part of the application process and deems the latest versions of any and all documentation submitted in support of the Firm's application as final submissions.  FINRA has relied upon such information and documents to be a complete and accurate representation of the activities and

---

[1] The Bryan and Gretchen Florescue Irrevocable Trusts were also parties to the Stock Purchase Agreement. Those trusts were passive shareholders in RMST, and their shares were also transferred to Premium 72 Capital/OPC as part of the transaction at issue.

procedures to be conducting by the Firm, notwithstanding any indication, implied or otherwise, that such documents were submitted as drafts.

\*\*\*

The Firm is reminded of FINRA Rule 1017, which requires notification to and approval by FINRA of a material change in business operations prior to such change being effected. Rule 1017 also requires that the Firm file an application for approval of a change of ownership or control at least 30 days prior to effecting such change. The Firm is also reminded to discuss regulatory issues and business developments with its assigned FINRA Risk Monitoring Analyst.

*Id.* at p. 2.

Additionally, FINRA's approval of the Continuing Member Application was contingent upon the execution of a Membership Agreement by RM Stark's incoming replacement CEO, Stacey Stark. Stark Dec., ¶ 12. Stacey Stark executed the R.M. Stark & Co., Inc. Membership Agreement (the "Membership Agreement") on September 2, 2020, and submitted it to FINRA. *Id.* at ¶ 13. The Membership Agreement provides, in pertinent part:

Pursuant to Article VI, Section1, of FINRA By-Laws, [RM Stark] agrees:

(3) that this Agreement has been executed on behalf of, and with the authority of [RM Stark]. The undersigned and [RM Stark] represent that the information and statements contained within the [Application] and other information filed are current, true, and complete. The undersigned and the Firm further represent that, to the extent any information previously submitted is not amended, such information is currently accurate and complete and agree that the information contained in Form BD will be kept current and accurate by properly amending Form BD as changes occur.

Any activity that does not conform to the provisions set forth in this Agreement may form the basis for disciplinary action by FINRA against [RM Stark], its owners, or Associated Persons.

*Id.* at Ex. E, p. 3.

FINRA approved the Membership Agreement based on the truth and accuracy of representations made in the Application. FINRA relied on the Application in issuing its Approval Letter and entering into the Membership Agreement. If any of the information relayed to FINRA in the Application became inaccurate, RM Stark was required to inform FINRA of such change and submit an amended Form BD (the Uniform Application for Broker-Dealer Registration).[2]

---

[2] https://www.finra.org/registration-exams-ce/broker-dealers/form-bd (last accessed April 29, 2022).

Through the Application, RM Stark made several representations to FINRA, to which RM Stark must adhere pursuant to the Membership Agreement:

> There should be no material impact (financial, operational, managerial, supervisory) expected following the sale as most of the supervisory structure shall remain exactly as it is now. Gary Stark ("Gary"), the CEO and FINOP shall remain as FINOP but a new CEO shall be introduced during the application. <u>All other personnel will remain as is</u>. (Emphasis added) [Standard 1: Overview of the Applicants. 1.e.]. *Id.* at Ex. C, p. 4.
>
> \*\*\*
>
> ...[Mr. Nicolayevsky] and [Mr. Perez] shall be indirect owners of the Applicant and direct owners of [Premium 72 Capital/OPC]. They shall not be registered at the Applicant and remain passive indirect owners with no present responsibility or obligation for the day to day operation of the Applicant. Note that the Applicant's staff shall remain substantially unchanged following FINRA Approval. Additional personnel shall be introduced elsewhere in the application... [Standard 1. 4.1] *Id.* at p. 6.
>
> \*\*\*
>
> At this time, since the business location(s) and the business conduct are not expected to change subsequent to FINRA approval and closing, no new agreements/contracts/leases are contemplated by [RM Stark] and/or the eventual new ownership. [Standard 4: Contractual and business relationships. 1.] *Id.* at p. 12.
>
> \*\*\*
>
> Because no daily operational management (other than CEO change), or business conduct is changing as a result of this application, the Applicant does not expect any material impact on the communication and operational systems used for conducting business with customers and other firms. As is currently the case, both (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity, remain as is. [Standard 6: Communications and operational systems. 1.] *Id.* at p. 14.
>
> \*\*\*
>
> No changes are contemplated [with regard to systems and equipment of Applicant]. It shall be business as usual post FINRA approval and closing. [Standard 6.2] *Id.*
>
> \*\*\*
>
> No changes are contemplated [with regard to business continuity]. *Id.*
>
> \*\*\*

a. The source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business.  Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that the new indirect ownership is not seeking to modify the business model at this time. PLEASE NOTE THAT GARY STARK, THE CURRENT CEO AND MAJORITY INDIRECT OWNER HAS CONFIRMED THAT HE/THE PARENT HAS NOT FOUND IT NECESSARY TO INFUSE ADDITIONAL CAPITAL INTO THE APPLICANT BECAUSE THE PREEXISTING REVENUE STREAM ADEQUATELY COVERS ALL APPLICANT CAPITAL NEEDS AND HAS DONE SO FOR A CONSIDERABLE TIME.  Additional capital infusions, if needed, would come from the current and post closing direct owner: RMST Holding Company, Inc., and indirectly from the new indirect owner, [Premium 72 Capital/OPC] and it's (sic) majority upstream owner, [Mr. Nicolayevsky], as well. Mr. Nicolayevsky's personal account statements are provided below, along with [Premium 72 Capital/OPC's] account statements.  b. There are no current financing arrangements contemplated.  c. Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital position.  [Standard 7: Maintaining adequate net capital. 1.]. *Id.* at p. 15.

\*\*\*

Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position?  A: No. [Standard 7.2] *Id.*

\*\*\*

Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future.  A: As stated above, the Applicant shall seek additional funding from it's (sic) parent organization if and when necessary. Please note Applicant's preexisting revenue stream. [Standard 7.3]. *Id.* at p. 16.

\*\*\*

As stated elsewhere in this [Application], the Applicant's business model shall not change as a result of the contemplated sale.  The Applicant's management team, other than replacing current CEO, Gary, with proposed CEO, Stacey R. Stark ("Stacey"), shall not change.  Most importantly for this Standard 8 is that Mr. Stark shall remain the applicant's FINOP and that Stacey is intimately knowledgeable of the Applicant's business having worked there under Gary for approximately 18 years.  [Standard 8: Financial controls].  *Id.* at p. 17.

\*\*\*

Describe how the proposed change will affect any of the following items: a. Accounting system b. Hardcopy and/or electronic books and records c. Authorized signatories on bank and trading accounts d. individual(s) responsible for daily journal entries and monthly closing of books and records e. Authorizations required and procedures regarding withdrawals of capital... g. Whether the Applicant will employ or associate other persons who will support the financial and operation functions (e.g., internal bookkeeping staff); if so, identify each such person and

their roles and responsibilities. A: No changes a. through and include (sic) g above shall be affected in any material way post FINRA approval. [Standard 8.2] *Id.*

\*\*\*

a. Stacey [Stark] shall replace Gary [Stark] as CEO. Gary shall remain, however, as FINOP... c. The compliance officer shall remain the same. Otherwise, as the CEO is an oversight position, the Applicant does not expect any material changes to the day to day operations within the first 12 months of business following FINRA approval. [Standard 10: Supervisory structure. 1.] *Id.* at p. 20.

\*\*\*

Will the proposed change to the Applicant result in a change in Chief Compliance Officer? A: No. [Standard 10: Supervisory structure. 3.] *Id.*

\*\*\*

As neither the business model or (sic) the day to day supervisory staff or procedures are expected to change in any material way following FINRA approval, there is no material impact contemplated as a result of such change with regard to any of items a through d. [i.e., procedures, books and records, communication systems, software and systems] above. [Standard 11: Books and records. 1.] *Id.*

Based on the foregoing, RM Stark was to carry on business as usual following FINRA approval and upon completion of the sale of its corporate parent (RMST) to Premium 72 Capital/OPC. Specifically, there was to be no material change to its book and record keeping systems and software, no change to its key personnel aside from the pre-approved replacement of Mr. Stark with Stacey Stark as CEO, and capital was to be obtained through existing revenue streams, not from taking on additional debt, which could negatively impact RM Stark's net capital position.

  iv.  *The Second Closing*

Following FINRA's approval and execution of the Membership Agreement, the parties proceeded to the second phase of the bifurcated transaction. On or about September 22, 2020, Mr. Stark executed a Supplemental Purchase Agreement between him, on one hand, and Premium 72 International[3], Mr. Nicolayevsky, and Mr. Perez on the other. Pursuant to the Supplemental Purchase Agreement, Mr. Stark was to receive a total of four million five-hundred thousand dollars

---

[3] The "Premium 72" entity that was a party to the original Stock Purchase Agreement was Premium 72 Capital/OPC. While Premium 72 International, a different entity, was a party to the Supplemental Purchase Agreement, the Supplemental Purchase Agreement nonetheless contemplates transfer of RMST stock to Premium 72 Capital/OPC. However, the Supplemental Purchase Agreement requires Premium 72 International and its managing members, i.e., Mr. Nicolayevsky and Mr. Perez, to assume the liability for the purchase price of RMST. Stark Dec., Ex. F at p. 1.

($4,500,000) in connection with the Second Closing.  Specifically, the Supplemental Purchase Agreement contemplated payment to Mr. Stark in the amount of one million six-hundred thousand dollars ($1,600,000) on or about September 22, 2020, and Premium 72 International would execute a promissory note, to be guaranteed by Messrs. Nicolayevsky and Perez, in Mr. Stark's favor, for the remaining two million nine-hundred thousand dollars ($2,900,000).  To that end, on September 22, 2020, Premium 72 International, as maker, and Messrs. Nicolayevsky and Perez, as guarantors, entered into a Promissory Note in Mr. Stark's favor (the "Promissory Note"). *Id.* at ¶ 17; Ex. G.

Importantly, as security for prompt payment, the Supplemental Purchase Agreement and Promissory Note provided for a security interest in Mr. Stark's favor in the RMST stock being transferred to Premium 72 Capital/OPC. In the event Premium 72 International, Mr. Nicolayevsky, and Mr. Perez defaulted on their obligations under the Supplemental Purchase Agreement and Promissory Note, Mr. Stark could execute on that security interest and the stock would revert back to him.[4] Specifically, the Supplemental Purchase Agreement provides as follows, in pertinent part:

> 2. **Collateral**. As collateral for the monies due pursuant to the [Promissory Note], [Mr. Stark], [Mr. Nicolayevsky], and [Mr. Perez] shall execute stock powers for the transfer of all securities held by [Premium 72 Capital/OPC] to [Mr. Stark] in an amount equal to the balance of all principal and interest due under the [Promissory Note].

Stark Dec., Ex. F. at p. 2.

The Promissory Note echoed the Supplemental Purchase Agreement, and provides as follows, in pertinent part:

> As security for the prompt payment of this [Promissory Note], [Mr. Nicolayevsky and Mr. Perez] shall execute stock powers for the transfer of securities held by {Mr. Nicolayevsky and Mr. Perez] to [Mr. Stark] in an amount equal to the balance of all principal and interest due under [the Promissory Note].

Stark Dec., Ex. G at p. 1.

On or about September 22, 2020, at the Second Closing, as contemplated in the Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note, Premium 72 Capital/OPC was required to pay Mr. Stark one million six-hundred thousand ($1,600,000) in cash

---

[4] The Supplemental Purchase Agreement and Promissory Note additionally provided for a security interest in Mr. Stark's favor in all other securities Premium 72 Capital/OPC, Mr. Nicolayevsky, and Mr. Perez owned (not just the RMST stock) having a value equal to the amount due under the Supplemental Purchase Agreement and Promissory Note.

(the "Partial Payment").  Mr. Stark received the Partial Payment at the Second Closing, except for approximately thirty five thousand dollars ($35,000), which remains outstanding.  Stark Dec., ¶ 20.  Thereafter, in reliance on the Partial Payment and promises made in the Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note, Mr. Stark transferred the remaining shares of RMST to Premium 72 Capital/OPC on or about September 22, 2020.  *Id.* at ¶ 21. Mr. Stark has <u>not</u> received any additional payment under the Supplemental Purchase Agreement or the Promissory Note since the Partial Payment. *Id.* at ¶ 22.

Accordingly, Premium 72 Capital/OPC, Premium 72 International, Mr. Nicolayevsky, and Mr. Perez are in complete and material default of their obligations to Mr. Stark.  Worse still, Mr. Nicolayevsky and Mr. Perez have refused to execute stock powers transferring the RMST or any other stock owned by them to Mr. Stark as required by the Supplemental Purchase Agreement and Promissory Note. *Id.* at ¶ 23.

B.     <u>Defendants' Mismanagement of RM Stark, Failure to Adhere to the Membership Agreement with FINRA, and Improper Encumbering RMST and RM Stark's Assets</u>.

Despite Premium 72 Capital/OPC, Premium 72 International, Mr. Nicolayevsky, and Mr. Perez's failure to pay the balance of the amount owed to Mr. Stark under the Supplemental Purchase Agreement and Promissory Note, Mr. Stark has continued to serve as RM Stark's Financial and Operations Principal ("FINOP"), as required by the Membership Agreement.  *Id.* at ¶ 25.  As FINOP, Mr. Stark has observed and uncovered numerous actions by Mr. Nicolayevsky, Mr. Perez, and the entities they control, including Premium 72 Capital/OPC and Premium 72 International, that jeopardize and continue to jeopardize the business and well-being of RM Stark, through failure to comply with the Membership Agreement.

i.     *Membership Agreement Violations Related to RM Stark Systems and Personnel*

As detailed above, the Membership Agreement includes numerous requirements related to RM Stark's systems and personnel.  The essence of those requirements is that RM Stark conduct "business as usual," with the only key personnel change to be the replacement of Mr. Stark with Stacey Stark as CEO.  Despite those clear requirements, Mr. Nicolayevsky, Mr. Perez, and entities they control, have engaged in a pattern of conduct that blatantly ignores those requirements, jeopardizing RM Stark's FINRA registration – the lifeblood of its business.  Conduct that Mr.

Stark has witnessed or uncovered in this regard, and which is non-compliant with the Membership Agreement, includes:

1. Hiring Susan Davis in contemplation of replacing Jerry Desiderio, RM Stark's long-standing Chief Compliance Officer;

2. Terminating Jerry Desiderio as RM Stark's long-standing Chief Compliance Officer;

3. Hiring Peggy Lebert as RM Stark's new Chief Compliance Officer upon the resignation of Susan Davis;

4. Creating and maintaining an employee organization chart through which Mr. Nicolayevsky purported to re-assign various employees' roles at RM Stark;

5. Improperly directing the options of Regulation Best Interest Implementation on Salesforce;

6. Executing contracts on behalf of RM Stark for RM Stark's data storage, as well as executing a contact with Sycamore for RM Stark's operations, payroll, and compliance software;

7. Revising RM Stark's recruiting procedures;

8. Stripping Ms. Adler of her position as an officer and director of RM Stark and RMST, as well as her day-to-day responsibilities with both companies;

9. Hiring an individual named Anisa Perez to maintain the company books and records, and to undertake certain bookkeeping tasks of RM Stark;

10. Entering into various written contracts on behalf of RM Stark, including with entities such as Addepar, Salesforce, Sycamore, and Vantage Point;

11. Revising on-boarding documents for new registered representatives, creating a new Independent Broker Agreement to include dual registration with Premium 72 International, and digitizing such documents without RM Stark's knowledge or consent;

12. Changing RM Stark's email and payroll vendor to a payroll vendor not capable of handling broker-dealer payroll;

13. Canceling RM Stark's worker's compensation policy and 401(k) Plan, and bundling them with a new payroll provider not qualified to service the payroll requirements of a broker-dealer;

14. Opening and controlling JP Morgan Chase checking accounts and credit card in RM Stark's name and improperly using Mr. Nicolayevsky's personal address as the primary address for those accounts;

15. Taking a $5,000 cash advance on RM Stark's company credit card for Mr. Nicolayevsky's own personal benefit;

16. Consulting with various FINOP applicants in furtherance of an effort to replace  Mr. Stark;

17. Unilaterally authorizing multiple withdrawals from RM Stark's Pershing account and transferring the funds to the JP Morgan Chase accounts, thereby negatively impacting RM Stark's net capital requirements under FINRA regulations;

18. Demanding access to RM Stark's computer database at Pershing, LLC (RM Stark's clearing firm), to allow them to access all company and customer files and accounts;

19. Purporting to terminate Stacey Stark, in contravention of the CMA, and purporting to hire Michael Cutbirth as the new Chief Executive Officer;

20. Listing Mr. Nicolayevsky as RM Stark's Director of Finance on a recent SEC filing; and,

21. Improperly convened a "Board of Directors and Shareholders Meeting" on September 3, 2021, at which Mr. Nicolayevsky and Mr. Perez purportedly voted to remove and replace  Mr. Stark, Stacey Stark, and Ellen Adler as Officers and Directors of RMST and RM Stark.

Stark Dec., ¶ 38.

> ii.   *Defendants' Have Improperly Encumbered RMST and RM Stark's Assets, in Violation of the Membership Agreement and Mr. Stark's Rights as a Creditor*

Pursuant to the Membership Agreement, RM Stark was required to obtain capital only through existing revenue streams, from its corporate parent RMST, or from its indirect owners – Mr. Nicolayevsky and Mr. Perez.  Moreover, RM Stark was not to undertake any obligations that would have a negative impact on its net capital structure.  Mr. Nicolayevsky, Mr. Perez, Premium 72 Capital/OPC, and Premium 72 International have engaged in a pattern of conduct of encumbering RMST and RM Stark's assets that is blatantly inconsistent with these requirements and which jeopardizes RM Stark's business.

On or about November 6, 2020, Mr. Nicolayevsky, purportedly on behalf of RM Stark, executed an Agreement for the Purchase and Sale of Future Receipts with AMZ Group, LLC ("AMZ"), identified as Contract ID 467 ("AMZ Contract 467"). Pursuant to AMZ Contract 467, and without Mr. Stark's knowledge or consent, Mr. Nicolayevsky and Mr. Perez sold two hundred and seventy-four thousand dollars ($274,000) of future revenues of RM Stark to AMZ for the sum of two hundred thousand dollars ($200,000).  Stark Dec., ¶ 41.  Mr. Stark also learned through reviewing a Form UCC-1 filing by AMZ that all of RM Stark's assets were pledged as collateral to secure payment under AMZ Contract 467.  *Id.* at ¶ 42.  AMZ Contract 467 is signed by Mr. Nicolayevsky as "principal" of RM Stark.  At the time, Mr. Nicolayevsky had no authority to act

as principal of RM Stark and was prohibited from so acting pursuant to the Membership Agreement.

Mr. Stark further discovered that on or about December 3, 2020, Mr. Nicolayevsky and Mr. Perez, again purportedly on behalf of RM Stark, executed another Agreement for the Purchase and Sale of Future Receipts with AMZ, identified as Contract ID 489 ("AMZ Contract 489"). Pursuant to AMZ Contract 489, and without Mr. Stark's knowledge or consent, Mr. Nicolayevsky and Mr. Perez sold two hundred and six thousand dollars ($206,000) of future revenues of RM Stark to AMZ for the sum of one hundred and sixty thousand dollars ($160,000). *Id.* at ¶ 44. AMZ Contract 467 is signed by Mr. Nicolayevsky and Mr. Perez on behalf of RM Stark. Again, at the time, Mr. Nicolayevsky and Mr. Perez had no authority to act on behalf of RM Stark and were prohibited from so acting pursuant to the Membership Agreement.

Further still, on or about January 28, 2021, Mr. Nicolayevsky and Mr. Perez, again purportedly on behalf of RM Stark, executed a Merchant Agreement with AMZ, identified as Contract ID 516 ("AMZ Contract 516"). While AMZ Contract 516 purports to consolidate AMZ Contract 467 and AMZ Contract 489, it added monies to the principal amount of RM Stark's receivables "purchased" by AMZ, thereby further encumbering RM Stark's assets. *Id.* at ¶ 46. AMZ Contract 516 is signed by Mr. Nicolayevsky and Mr. Perez on behalf of RM Stark. Continuing the pattern, Mr. Nicolayevsky and Mr. Perez had no authority to act on behalf of RM Stark and were prohibited from so acting pursuant to the Membership Agreement.

Mr. Nicolayevsky and Mr. Perez have represented to Stacey Stark that there are even <u>more</u> undisclosed liabilities whereby they have further encumbered RM Stark's assets. Mr. Nicolayevsky and Mr. Perez, however, have <u>refused</u> to provide Ms. Stark, or anyone else at RM Stark, with information regarding such encumbrances. *Id.* at ¶ 48. Despite this refusal to provide information about how they have leveraged the company, Mr. Stark uncovered the following UCC Financing Statement Addendums which appear to evidence further improper encumbrances on the assets of RM Stark and RMST:

<ol type="a">
<li>February 7, 2020 UCC Financing Statement, identifying Byline Bank as the Secured Party and RMST as the Debtor.</li>
<li>August 2, 2021 UCC Financing Statement, identifying Byline Bank as the Secured Party and RMST as the Debtor.</li>
<li>August 26, 2021 UCC Financing Statement, identifying Zahav Asset Management LLC the Secured Party and RMST as an Additional Debtor.</li>
</ol>

     d.  December 20, 2021 UCC Financing Statement, identifying Kingdom Logistics LLC as the Secured Party and Premium 72 Capital as the Debtor.

     e.  February 22, 2022 UCC Financing Statement, identifying NFG Advance LLC as the Secured Party and Premium 72 Capital as the Debtor.

*Id.* at ¶ 49.

     All of the foregoing encumbrances are in contravention of the Membership Agreement, as they are in conflict with RM Stark's representations in the Application. *Id.* at ¶ 50. Accordingly, the encumbrances jeopardize RM Stark's FINRA registration because such registration is dependent upon its compliance with the Membership Agreement. *Id.* at ¶ 51. Notably, the final two encumbrances above were made after this lawsuit was filed. Moreover, the encumbrances jeopardize RM Stark's business because the leveraging of RM Stark's assets could result in a creditor foreclosing on its security interest on RMST's assets in the event of a default on any relevant financing agreement. Any such foreclosure would result in a potential change in ownership of RMST (and, thereby, RM Stark) and myriad regulatory issues, causing irreversible harm to RM Stark's employees and customers. *Id.* at 52.

     Additionally, the encumbrances on RM Stark's assets, without any notice or additional information to RM Stark, adversely affects RM Stark's accounting reporting and net capital requirements. Rule 17a-5(d), promulgated by the Securities and Exchange Commission pursuant to the Exchange Act of 1934, requires RM Stark to report its financials periodically. Mr. Stark prepares those financial reports, and these encumbrances, if valid, but without disclosure to Mr. Stark or anyone at RM Stark aside from Defendants, may adversely affect the veracity of RM Stark's obligatory filings. (Stark Dec. at ¶ 51) Furthermore, the encumbrances, if valid, but without disclosure to RM Stark, could cause RM Stark to be in violation of Rule 15c3-1, promulgated by the Securities and Exchange Commission pursuant to the Exchange Act of 1934, in that encumbrances on the company's assets would change the net capital requirements. Essentially, the undisclosed and unreported loans by Nicolayevsky *et al* may be causing RM Stark to violate multiple Securities and Exchange Commission rules unknowingly and against its will.

     Further still, the improper encumbrance of RM Stark's assets is also in obvious contravention of the Supplemental Purchase Agreement and Promissory Note. Mr. Nicolayevsky and Mr. Perez were required to execute stock powers for the transfer of securities held by Premium 72 Capital/OPC, including RMST. Through encumbering the assets of RM Stark (RMST's sole asset), Mr. Nicolayevsky and Mr. Perez have improperly diminished value of collateral securing

payment to Mr. Stark under the Supplemental Purchase Agreement and Promissory Note. *Id.* at ¶ 53. As evidenced by their refusal to provide information about additional encumbrances and Mr. Stark's discovery of further leverage in UCC filings, the conduct of Mr. Nicolayevsky, Mr. Perez and entities they control, and their continued mismanagement of RM Stark, jeopardize RM Stark's continued business operations and Mr. Stark's collateral. Absent immediate injunctive relief, Mr. Stark and RM Stark will suffer irreparable harm. This is particularly true given that the filing of this lawsuit has not deterred Defendants from further encumbering RM Stark's assets.

## III.   STANDARDS FOR ISSUING TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS

Pursuant to Federal Rule of Civil Procedure 65(b):

[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

The same four factors apply to the determination of whether to grant a temporary restraining order or preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). The primary difference between the entry of a temporary restraining order and a preliminary injunction is that a temporary restraining order may be entered before the defendant has an adequate opportunity to respond, even if notice has been provided. *Textron Financial Corp. v. Unique Marine, Inc.*, 2008 WL 4716965 (S.D. Fla. Oct. 22, 2008).

In considering a motion for preliminary injunctive relief, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). When considering a motion for preliminary injunction, a district court may assess the relative

strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party.  *See Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006).

## IV.   MR. STARK IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PREVENTING MR. NICOLAYEVSKY, MR. PEREZ, OR ANY ENTITY WITH WHICH THEY ARE AFFILIATED FROM MANAGING RM STARK OR FURTHER ENCUMBERING ITS ASSETS

### A.   Mr. Stark is Very Likely to Succeed on the Merits of His Breach of Contract Claim

"[P]roof of a substantial likelihood of success on the merits is an indispensable prerequisite to a preliminary injunction."  *All care Nursing Serv. v. Bethesda Mem. Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). Thus, "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success.  *Home Oil Company, Inc. v. Sam's East, Inc.*, 199 F.Supp.2d 1236, 1249 (M.D. Ala. 2002).

Mr. Stark brought claims against Defendants for breaches of the Promissory Note (AC, ¶¶ 117-22), the Stock Purchase Agreement (*Id.* at ¶¶ 123-27), and the Supplemental Purchase Agreement (*Id.* at ¶¶ 128-31) (collectively, the "Contract Claims").  To prevail on the Contract Claims, Mr. Stark must establish the existence of the contracts, a material breach of the contracts by Defendants, and damages resulting from the breach.  *Guarantee Insurance Co. v. Brand Management Service, Inc.*, 2014 WL 11531365, *11 (S.D. Fla. Sept. 15, 2014).  Where two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract. *Clayton v. Howard Johnson Franchise Systems, Inc.*, 954 F.2d 645, 648 (11th Cir. 1992).

The Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note document the transaction whereby Mr. Nicolayevsky, Mr. Perez, Premium 72 Capital/OPC, and Premium 72 International would pay Mr. Stark a total of four million five-hundred thousand dollars ($4,500,000) in exchange for one hundred percent (100%) of RMST stock.  Stark Dec., Exs. B, F, G.  At the time of the Second Closing, Defendants paid Mr. Stark approximately one million five-hundred and seventy thousand dollars ($1,570,000), leaving a balance owed of two

million nine-hundred and thirty thousand dollars ($2,930,000). Two million nine-hundred thousand dollars ($2,900,000) was to be paid pursuant to the terms of the Supplemental Purchase Agreement and Promissory Note over time. Following the Second Closing, Mr. Stark performed his obligations under the parties' agreements by transferring all of RMST's stock to Premium 72 Capital/OPC. The time for payment of the $2,900,000 under the Promissory Note has lapsed and Defendants have failed to pay Mr. Stark. Accordingly, Defendants are in default of their obligations under the transaction documents. There is no reasonable dispute regarding Defendants' failure to perform under the Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note. Accordingly, there can be no question that Mr. Stark is extremely likely to prevail on the merits of his Contract Claims.

B.     Mr. Stark Will Suffer Irreparable Harm in the Absence of Immediate Injunctive Relief

Courts have found irreparable harm where a defendant's conduct results in dissipation or diminishment of collateral securing an obligation to a plaintiff. *See Textron Financial Corp. v. Unique Marine, Inc.*, 2008 WL 4716965, *8 (S.D. Fla. Oct. 22, 2008) (finding irreparable harm where there existed a significant risk that defendant would continue to liquidate assets pledged as collateral, thereby frustrating plaintiff's right to collect the collateral); *See also Micro Signal Research, Inc. v. Otis*, 417 F.3d 28, 31 (1st Cir. 2005); *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (upholding a preliminary injunction upon finding that it was "probable that [the defendant] would engage in misconduct or conceal or dissipate assets"); *Elliot v. Kissewetter*, 98 F.3d 47, 58 (3rd Cir. 1996) (upholding freeze order on money assets "given [defendant's history of fraud with respect to the [plaintiff's] assets"). *GE Commercial Distrib. Fin. Corp. APSCO Appliance*, No. 8:14-cv-2775-T-33TBM, 2014 WL 12597069, at **1-2 (M.D. Fla. Nov. 4, 2014) (granting *ex parte* TRO where lender demonstrated a risk of injury by the opposing party's sale of inventory subject to a security agreement); *GE Commercial Distrib. Fin. Corp. v. Martin Marine, Inc.*, No. 1:10-cv-356, 2010 WL 5090989, at **1-3 (E.D. Tenn. Dec. 7, 2010) (granting *ex parte* TRO where writ of possession was granted and plaintiff demonstrated that "Defendants ha[d] repeatedly continued to sell easily movable items out of trust").

Here, Mr. Nicolayevsky, Mr. Perez, Premium 72 Capital/OPC, and Premium 72 International must be enjoined from further (mis)management of RM Stark and further

encumbrance of RM Stark's assets.  As detailed above, Defendants' involvement in RM Stark's affairs have caused it to be in material violation of its Membership Agreement with FINRA. Despite RM Stark's representations to FINRA that it would be "business as usual" following the Second Closing and transfer of ownership to Premium 72 Capital/OPC, Defendants have attempted to alter RM Stark's business operations significantly.   Namely, Defendants have attempted to implant their own leadership, entered into new contracts with vendors and bookkeepers, and secured capital through prohibited third-party loans.  Stark Dec., ¶ 38.  RM Stark's good standing with FINRA is dependent upon its compliance with the Management Agreement.  Defendants' mismanagement of RM Stark has caused it to be in violation of the Management Agreement, thereby jeopardizing its good standing with FINRA.  Should FINRA take enforcement action against RM Stark, including potential revocation of its registration as a broker-dealer, its business would come to a halt.

Additionally, and even more directly, Defendants' continued encumbrance of RM Stark's assets, even after the filing of this lawsuit, have a negative impact on RM Stark's business.  First, those encumbrances are a direct violation of the Membership Agreement.  In the Application, RM Stark represented to FINRA that it would maintain its net capital requirements through existing revenue streams.  Or, in the event it needed a capital infusion, RM Stark would look to its indirect owners – Mr. Nicolayevsky, Mr. Perez, or Premium 72 Capital/OPC.  The Application (and subsequent Membership Agreement) did not contemplate loans disguised as "sales" of future revenue or Defendants' pledging RM Stark's assets as security for other loans.

Defendants' mismanagement and the potential for FINRA enforcement action seriously jeopardize RM Stark's business and, consequently, the value of RM Stark. Moreover, the continued encumbrance of RM Stark's assets increases the potential for foreclosure by one of Defendants' creditors, thereby reducing RM Stark's value.  Defendants pledged their ownership of RMST, RM Stark's parent company, as collateral to secure payment to Mr. Stark under the Supplemental Purchase Agreement and Promissory Note.   Accordingly, Defendants' mismanagement of RM Stark, and continued encumbrance of RM Stark's assets, have resulted in a diminution in value of collateral securing payment to Mr. Stark.  Defendants' dissipation of the collateral demonstrates a clear likelihood of irreparable harm to Mr. Stark absent Court intervention.

C.      The Balance of Hardships Strongly Favors Plaintiffs

There is no reasonable argument that the balance of hardships of any temporary restraining order and preliminary injunction does not favor Mr. Stark.  Mr. Stark is simply requesting that Defendants refrain from further diminishing the value of collateral securing payment under binding agreements.  Mr. Stark is not requesting Defendants be stripped of any ownership interest.  Rather, Mr. Stark simply requests that Defendants be enjoined from participating in the management of RM Stark given their proven track record of conduct in violation of the Membership Agreement.  Moreover, Mr. Stark also requests that Defendants be enjoined from further encumbering RM Stark's assets, which is already prohibited under the Membership Agreement.  Compliance with the Membership Agreement is not a "hardship" for Defendants.

D.      Granting the Requested Injunctive Relief Would Advance the Public Interest

Courts routinely find that "the public is well-served when courts enforce the terms individuals' binding agreements." *Textron Financial Corp. v. Unique Marine, Inc.*, *9, 2008 WL 4716965 (S.D. Fla. Oct. 22, 2008).  The injunctive relief requested herein simply serves to enforce Defendants' agreement with Mr. Stark and RM Stark's Membership Agreement with FINRA.  Accordingly, the requested relief advances the public interest.

V.      **THIS COURT SHOULD NOT REQUIRE A BOND**

Federal Rule of Civil Procedure 65(c) vests the district court with discretion as to whether to require a bond, and, if so, the amount of the required bond, if any.  *Carillon Importers v. Frank Pesce Intern. Group Ltd.*, 112 F.3d 1125 (11th Cir. 1997).  The district court may dispense with the filing of a bond.  *BellSouth Telecommunications Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964 (11th Cir. 2005); *see also Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000).  A strong likelihood of success on the merits may also favor "a minimal bond or no bond at all."  *Univ. Books & Videos, Inc. v. Metro. Dade Cnty*, 33 F.Supp.2d 1364, 1374 (S.D. Fla. 1999).  Given Mr. Stark's strong likelihood of success on the merits and the very clear breach of the Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note, a bond should not be required in this case.

## VI.   **CONCLUSION**

The injunctive relief requested in this case is necessary to put an immediate end to Defendants' ongoing misconduct and threats of future misconduct, all of which threaten irreparable harm to Plaintiffs.  Accordingly, Plaintiffs respectfully request that this Court grant their Motion in its entirety, and issue a temporary restraining order and preliminary injunction against Defendants and anyone acting in concert with them, for the duration of this action:

1.  That Defendants, and any third-party entities affiliated or associated with them, be enjoined from participating in the management of RM Stark, and that management be conducted pursuant to the Membership Agreement; and.

2.  That Defendants, and any third-party entities affiliated or associated with them, be enjoined from further encumbering the assets of RMST and/or RM Stark.

Dated: May 3, 2022

Respectfully submitted,

**D'AMURA & ZAIDMAN, PLLC**

*/s/ Richard A. D'Amura*
RICHARD A. D'AMURA
Florida Bar No. 663921
RICHARD T. LOBAS (*pro hac vice*)
Ohio Bar No. 0093658
1061 Michigan Ave., Unit 1
Miami Beach, Florida 33139
Phone: (310) 945-5306
Email:  rdamura@dz-pllc.com
           rlobas@dz-pllc.com

*Attorneys for Plaintiffs RMST Holding Company, Inc., R.M. Stark & Co., Inc., and Gary L. Stark*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF and is being served via Electronic Mail on the following: Jason Ward Johnson ([jjohnson@byrdcampbell.com](mailto:jjohnson@byrdcampbell.com)), Tucker H. Byrd ([tbyrd@byrdcampbell.com](mailto:tbyrd@byrdcampbell.com)) Counsel for the Defendants, on this 3rd day of May, 2022.

By: *<u>/s/ Richard A. D'Amura</u>*