IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

RMST HOLDING COMPANY, INC., a        Case No:     9:21-CV-81995-AMC
Florida corporation, R.M. STARK &
CO, INC., a Florida corporation, and
GARY L. STARK, individually,

     Plaintiffs,

v.

PREMIUM 72 CAPITAL, LLC, a Texas
limited liability company; PREMIUM 72
INTERNATIONAL, LLC, a Nevada
limited liability company; AYNBET
INVESTMENTS, LLC, a Texas limited
liability company; ARTURO
NICOLAYEVSKY, individually; EDUARDO
PEREZ, individually; ISAAC WRIGHT,
individually; ZAHAV ASSET MANAGEMENT,
LLC, a New York limited liability company;
KINGDOM LOGISTICS, LLC, a Texas limited
Liability company; NFG ADVANCE, LLC, a
New York limited liability company; PROMPT
CAPTIAL FUNDING, LLC, a New York limited
liability company; PINNACLE BUSINESS
FUNDING, LLC, a New York limited liability
company; MONEY STORE FUNDING, a New
York limited liability company; BITTY ADVANCE
2, LLC, a Wyoming limited liability company;
and BYLINE BANK, an Illinois Bank

     Defendants.

_____/

**BYLINE BANK**                   Consolidated Action: 22-80838-CIV-AMC

     Plaintiff,

v.

**PREMIUM 72 CAPITAL LLC,** *et al.*

     Defendants.

_____/

## THIRD AMENDED COMPLAINT

Plaintiffs, RMST HOLDING COMPANY, INC., a Florida corporation ("RMST"), R.M. STARK & CO, INC., a Florida corporation ("RM STARK"), and GARY L. STARK, individually ("STARK") (collectively "Plaintiffs"), hereby file suit against Defendants, PREMIUM 72 CAPITAL, LLC, a Texas limited liability company (formerly known as OPC ADVISORS, LLC, a Texas limited liability company[1]) (collectively "PREMIUM 72" or "OPC"), PREMIUM 72 INTERNATIONAL, LLC, a Nevada limited liability company ("PREMIUM INTL"); AYNBET INVESTMENTS, LLC, a Texas limited liability company ("AYNBET"); ARTURO NICOLAYEVSKY, individually ("NICOLAYEVSKY"); EDUARDO PEREZ, individually ("PEREZ"); and ISAAC WRIGHT, individually ("WRIGHT") (collectively the "PURCHASING DEFENDANTS"); ZAHAV ASSET MANAGEMENT, LLC, a New York limited liability company ("ZAM"); KINGDOM LOGISTICS, LLC, a Texas limited Liability company ("KINGDOM"); NFG ADVANCE, LLC, a New York limited liability company ("NFG"); PROMPT CAPTIAL FUNDING, LLC, a New York limited liability company ("PROMPT"); PINNACLE BUSINESS FUNDING, LLC, a New York limited liability company ("PINNACLE"); MONEY STORE FUNDING, a New York limited liability company ("MONEY STORE"); BITTY ADVANCE 2, LLC, a Wyoming limited liability company ("BITTY"); and BYLINE BANK, an Illinois Bank ("BYLINE") (collectively the "LENDING DEFENDANTS"), (collectively, unless the context otherwise provides, the PURCHASING and LENDING DEFENDANTS are referred to as the "Defendants"), and allege and state as follows:

---

[1] As subsequently averred in this Amended Complaint, the various entities used by NICOLAYEVSKY and PEREZ, were used as alter egos of each other and interchangeably without any corporate formalities.

2

## NATURE OF THE DISPUTE

1.      This action for various forms of relief arises from the purchase by PURCHASING DEFENDANTS of RMST and RM STARK from STARK, and the subsequent claims stemming from Defendants' negligence, malfeasance, and mismanagement RMST and RM STARK.

## PARTIES, JURISDICTION AND VENUE

2.      RMST is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Lake Worth Beach, Florida. RMST is a citizen of Florida.

3.      RM STARK is a Florida corporation, wholly owned by RMST, organized and existing under the laws of the State of Florida with its principal place of business in Lake Worth Beach, Florida. RM STARK is a citizen of Florida.

4.      STARK is an individual over the age of 18 and otherwise *sui juris* living in Okeechobee County, Florida. STARK is a citizen of Florida.

5.      PREMIUM 72 is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Houston, Texas. Based upon public information available at present, the individual members of PREMIUM 72 are citizens of Texas.

6.      PREMIUM INTL is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Houston, Texas. Based upon public information available at present, the individual members of PREMIUM INTL are citizens of Texas.

7.     Based upon public information available at present, PREMIUM 72 and PREMIUM INTL are one hundred (100%) percent owned by NICOLAYEVSKY, PEREZ and/or AYNBET, individually or collectively.

8.     PREMIUM 72 has multiple unknown subsidiaries/affiliates/subsidiary companies under various names and incorporated in various jurisdictions; PREMIUM 72 uses such unknown subsidiaries/affiliates/subsidiary companies (including known companies PREMIUM INTL and OPC) as alter egos that are otherwise used interchangeably with PREMIUM 72.

9.     AYNBET is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Houston, Texas.  Based upon public information available at present, the individual members of AYNBET are citizens of Texas.

10.    Based upon public information available at present, AYNBET's sole member is NICOLAYEVSKY.

11.    NICOLAYEVSKY is an individual over the age of 18 and otherwise *sui juris* living in Houston, Texas.

12.    PEREZ is an individual over the age of 18 and otherwise *sui juris* living in Sugarland, Texas.

13.    WRIGHT is an individual over the age of 18 and otherwise *sui juris* living in Newark, New Jersey.

14.    ZAM is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in Cedarhurst, New York. Based upon public information available at present, including ZAM's own representations in its

lawsuit filed against certain of the Defendants in the Supreme Court of the State of New York indicating that ZAM is a New York limited liability company, the individual members of ZAM are citizens of New York.  Service upon ZAM may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as ZAM operates, conducts, engages in, or carries on a business or business venture in Florida.

15.    KINGDOM is a limited liability company organized and existing under the laws of the State of Wyoming with its principal place of business in Irving, Texas. Based upon public information available at present, including a publicly-available lawsuit filed against Kingdom Logistics in the United States District Court, Northern District of Texas, all individual members of KINGDOM are citizens of Pennsylvania and/or Texas. KINGDOM'S members include (i) Anthony Zingarelli, a resident and citizen of Pennsylvania; (ii) Scott Haire, a resident and citizen of Texas; (iii) Clifford Ellery, a resident and citizen of Texas; and (iv) Robert Stout, a resident and citizen of Texas. Service upon KINGDOM may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as KINGDOM operates, conducts, engages in, or carries on a business or business venture in Florida.

16.    NFG is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in Brooklyn, New York. Based upon public information available at present, including NFG's own representations in a lawsuit filed in the United States District Court, Central District of California, all individual members of NFG are citizens of New York.  Service upon NFG may be effectuated, to

5

the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as ZAM operates, conducts, engages in, or carries on a business or business venture in Florida.

17.    PROMPT is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in New York. Based upon public information available at present, all individual members of PROMPT are citizens of New York.  Service upon PROMPT may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as PROMPT operates, conducts, engages in, or carries on a business or business venture in Florida.

18.    PINNACLE is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in New York. Based upon public information available at present, including a publicly available bankruptcy petition filed by a debtor in the United States District Court, Middle District of Florida, all individual members of PINNACLE are citizens of New York and/or Maryland.  Service upon PINNACLE may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as PINNACLE operates, conducts, engages in, or carries on a business or business venture in Florida.

19.    MONEY STORE is a limited liability company organized and existing under the laws of the State of New York with its principal place of business in New York. Based upon public information available at present, including MONEY STORE's own representations in a lawsuit filed in the Supreme Court of the State of New York indicating that MONEY STORE is a citizen of New York, all individual members of MONEY STORE

6

are citizens of New York.  Service upon MONEY STORE may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as MONEY STORE operates, conducts, engages in, or carries on a business or business venture in Florida.

20.     BITTY is a limited liability company organized and existing under the laws of the State of Wyoming with its principal place of business is Wyoming. Based on public information available at present, including a lawsuit filed in United States District Court indicating that BITTY is a Wyoming limited liability company, Western District of Texas, all individual members of BITTY are citizens of Wyoming. Service upon BITTY may be effectuated, to the extent necessary, through Florida's Secretary of State pursuant to Fla. Stat. Ann. §§ 48.062, 48.161, and 48.181, as BITTY operates, conducts, engages in, or carries on a business or business venture in Florida.

21.     BYLINE is a state organized banking institution existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

22.     Jurisdiction in this Court is predicated upon diversity of jurisdiction pursuant to 28 U.S.C. § 1332, as this dispute is between citizens of different states.

23.     The amount in controversy in the present case exceeds $75,000, exclusive of interest and costs.

24.     This Court has personal jurisdiction over all Defendants because the claims against the Defendants arise out of the respective Defendant's contact with Florida and/or the claims relate to the respective Defendants' contacts with Florida. Further, Pursuant to 28 U.S.C. § 1391, venue and jurisdiction properly lies in the Southern District of Florida because all or a substantial part of the events or omissions giving rise to the claims raised

herein occurred in the Southern District of Florida, or a substantial part of property that is the subject of the action is situated and located in the Southern District of Florida.

## FACTUAL ALLEGATIONS

25.     In 1994, STARK purchased a controlling interest in RM STARK (formerly known as A.J. Weed & Co., Inc., a New York corporation).

26.     Since 1994, RM STARK has operated as a broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC").

27.     As an SEC registered broker-dealer, RM STARK is subject to the rules and regulations of the Financial Industry Regulatory Authority ("FINRA").

<u>Premium 72's Purchase of RM Stark</u>

28.     In the fall of 2019, PREMIUM 72 (under its prior name of OPC) commenced negotiations with STARK with respect to the purchase by PREMIUM 72 for one hundred percent (100%) of the issued and outstanding shares (the "Stock") of RMST (which is the holding company for RM STARK).

29.     At the commencement of negotiations on or about October 8, 2019, a Letter of Intent ("LOI") was executed by PREMIUM 72 and STARK, a true and correct copy of which is attached hereto as **<u>Exhibit A</u>** and incorporated herein by such reference.

30.     The LOI specifically states that it is " … confidential to the Parties and their representatives," as was all information acquired during the due diligence process.

31.     As part of the due diligence process, STARK and RMST provided to PEREZ and NICOLAYEVSKY, their counsel, and BYLINE BANK, the lender making a loan to Defendants for the purchase of the Stock, copies of all documents reflecting RM STARK's

current and prior years' audited and unaudited financial statements, payroll and tax records so as to establish the value of the Stock.

32.     On or about January 2, 2020, PREMIUM 72 and STARK executed the "GARY L. STARK, et al. to OPC ADVISORS, LLC STOCK PURCHASE AGREEMENT" ("the Stock Purchase Agreement").   A true and correct copy of the Stock Purchase Agreement is attached hereto as **Exhibit B** and incorporated herein by such reference.

33.     As FINRA's rules provide that it has the right to approve the sale of one hundred (100%) percent of the Stock, the Stock Purchase Agreement expressly contemplated a bifurcated transaction, with only a portion of the Stock being transferred upon the initial closing (the "First Closing"), and the remainder to be conditionally transferred at a subsequent closing following FINRA approval (the "Second Closing").

34.     Accordingly, only forty-eight (48) shares (or twenty-four (24%) percent) of the Stock in RMST were contingently transferred to PREMIUM 72 at the First Closing on January 2, 2020, subject to FINRA's approval of the sale.

35.     The balance of the Shares were not to be transferred unless and until FINRA approved the transaction between PREMIUM 72 and STARK.

36.     As part of the process of obtaining FINRA's approval of the transaction, PREMIUM 72 submitted to FINRA a Form 1017 Continuing Membership Application (the "CMA").

37.     As contemplated by the parties, in the event FINRA approval was not forthcoming, the shares would be returned to RMST, the deal would be deemed null and void, and all parties would revert back to *status quo* as of the date of execution of the Stock Purchase Agreement.

38.     On September 2, 2020, FINRA approved the CMA with numerous conditions.  True and correct copies of the CMA and approval letter are attached hereto as **Composite Exhibit C** and incorporated herein by such reference.

39.     Consequently, from and after January 2, 2020, the date of the First Closing at which PREMIUM 72 received twenty four percent (24%) of the Stock while awaiting FINRA approval, and continuing at all times thereafter until September 22, 2020, PREMIUM 72 was at best a conditional minority shareholder in RMST.

40.     At no time were subsequent to January 2, 2020, were any of the Defendants members of the Board of Directors, officers, or employees of RMST, nor did any of the Defendants have any apparent or actual authority to represent Plaintiffs or to hold themselves out as having any authority to bind RMST.

41.     At no time subsequent to January 2, 2020, and having no authority in any manner or form, did Defendants or any entity under the management and/or control of the Defendants have any right or authority, legally or otherwise, to take any action whatsoever in the decision-making, operation, management, or anything else whatsoever having to do with the business of RMST and/or RM STARK.

Second Closing/Supplemental Purchase Agreement

42.     Contemporaneously with the Second Closing, on or about September 22, 2020, PREMIUM INTL, NICOLAYEVSKY, PEREZ and STARK entered into a Supplemental Purchase Agreement (the "Supplemental Agreement"), a true and correct copy of which is attached hereto as **Exhibit D** and incorporated herein by such reference.

10

43.     As and for part of the Supplemental Agreement, Section 2 thereof contains a security provision (the "Security Provision") pledging to STARK securities held by NICOLAYEVSKY and PEREZ with a market value of $2,900,000.00.

44.     In addition to the Supplemental Agreement and, specifically, the Security Provision contained therein, PREMIUM INTL, NICOLAYEVSKY and PEREZ executed a Promissory Note (the "Note") in favor of STARK, a true and correct copy of which is attached hereto as **Exhibit E** and incorporated herein by such reference.

45.     To provide further security for the performance of Defendants under the Supplemental Agreement, Section 2 thereof assigns to STARK the proceeds from NICOLAYEVSKY's life insurance policy (the "Insurance Assignment") in the amount of $2,900,000.

46.     The Note, the Security Provision and the Insurance Assignment were all contemplated and/or executed as additional security to guarantee the payments due STARK.

47.     The Supplemental Agreement between and among PREMIUM INTL, NICOLAYEVSKY, PEREZ and STARK was effectuated to provide for additional compensation to STARK for his expertise and in consideration of his agreement to assist Defendants in continuing the success of RMST and RM STARK, as well as assisting PREMIUM 72 and PREMIUM INTL in becoming successful, profitable enterprises.

48.     The Note and Security Provision expressly provided that STARK would be granted stock powers for all securities held by NICOLAYEVSKY and PEREZ, including RMST, with a value equal to the total amount due STARK, as well as the proceeds of NICOLAYEVSKY's life insurance policy in the event that NICOLAYEVSKY, PEREZ,

11

PREMIUM 72 and/or PREMIUM INTL should default on the payments due under the Note.

49.     The Defendants subsequently defaulted on their obligations under the Note, and have failed and refused to make the payments due STARK.

50.     Notwithstanding such default, each of the Defendants have failed and refused to execute any stock powers in favor of STARK as required by the Supplemental Agreement.

51.     The Defendants provided evidence that proceeds from NICOLAYEVSKY'S life insurance policy were assigned to STARK; they, however, misrepresented the policy as having cash value when, in fact, it appears to have been a term policy. Without STARK's knowledge or consent, NICOLAYEVSKY ceased making premium payments and the policy is now worthless.

52.     Plaintiffs have fulfilled all promises and covenants, and have performed all obligations required of them, pursuant to the terms of the Supplemental Agreement.

53.     Each of the Defendants has failed to perform any of their promises and covenants, and to perform any obligations required of them, pursuant to the terms of the Supplemental Agreement.

<u>FINRA CMA</u>

54.     RM STARK is an SEC-registered broker/dealer and, as such, RM STARK and RMST must comply with FINRA rules.

55.     Such FINRA rules require RM STARK and RMST to file and be subject to a CMA in order to protect investors by ensuring that a member firm's supervisory and

compliance systems, policies, and procedures keep pace with industry standards, as amended from time to time.

56.     When there is a change in management of a member firm, a new CMA must be submitted to FINRA for FINRA approval.

57.     Within its discretion, FINRA may reject a CMA or otherwise place conditions or restrictions upon a CMA.

58.     A CMA is essentially, in part, a shareholders agreement between the member firm and FINRA as an additional party.

59.     Specifically, the FINRA-approved CMA for PREMIUM 72's purchase of RMST provides, in part, the following:

> There should be no material impact (financial, operational, managerial, supervisory) expected following the sale as most of the supervisory structure shall remain exactly as it is now.  Gary Stark ("Gary"), the CEO and FINOP shall remain as FINOP but a new CEO shall be introduced during the application.  All other personnel will remain as is. (Emphasis added.)  [**Standard 1: Overview of the Applicants**. **1.e**.]

> As stated above, Premium 72 Advisors, LLC ["PREMIUM 72"] shall be the INDIRECT parent company of the Applicant subsequent to the closing, as described in the Stock Purchase Agreement.  Presently, PREMIUM 72…is owned 18% by Eduardo Perez ("Eduardo") … and 82% by AYNBET Investments, LLC ("AYNBET"), which is owned by Arturo Nicolayevsky ("Arturo")…  It is not currently contemplated that these two company [*sic*] shall conduct business per se, with the Applicant.  (Emphasis added; capitalization in original.)  [**Standard 1. 2.**]

> . . .Arturo and Eduardo shall be indirect owners of the Applicant and direct owners of PREMIUM 72.  They shall not be registered at the Applicant and remain passive indirect owners with no present responsibility or obligation for the day to day operation of the Applicant.  Note that the Applicant's staff shall remain substantially unchanged following FINRA approval.  Additional personnel shall be introduced elsewhere in the application… (Emphasis added.)  [**Standard 1**. **4.1.**]

> Q.3.  Will the Applicant have any non-registered officers, directors, or control persons following the change?  A.3.  No.  [**Standard 2:  Licenses and registrations.  3**.]

> At this time, since the business location(s) and the business conduct are not expected to change subsequent to FINRA approval and closing, no new agreements/contract/leases

13

are contemplated by RM STARK and/or the eventual new ownership. (Emphasis added.) [**Standard 4: Contractual and business relationships. 1.**]

Q.3.  Will the proposed change result in the creation of an expense sharing agreement ("ESA") or amendment to an existing ESA?  A.3.  No.  [**Standard 4**. **3**.]

Q.5.   Will the proposed change result in any change in locations of the Applicant that are owned premises, or result in the addition of private residence used as office of the Applicant?  A.5.  No.  [**Standard 5:  Facilities**. **5**.]

Because no daily operational management (other than CEO change), or business conduct is changing as a result of this application, the Applicant does not expect any material impact on the communication and operational systems used for conducting business with customers and other firms. As is currently the case, both (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity.   (Emphasis added.)   [**Standard 6: Communications and operational systems**. **1**.]

No changes are contemplated in this regard [systems and equipment…modifying existing systems].  It shall be business as usual post FINRA approval and closing.  (Emphasis added.) [**Standard 6**. **2**.]

No  changes  are  contemplated  in  this  regard  [capacity…contingency plans…security…etc].  It shall be business as usual post FINRA approval and closing. (Emphasis added.) [**Standard 6**. **3**.]

Q4.  Will the Applicant conduct business from multiple locations as a result of the change?  A.4.  No.  [**Standard 6**. **4**.]

Q5.  Will, as a result of the proposed change, one or more of the Applicant's proposed locations be the residence of an Associated Person?  A.5.  No.  [**Standard 6**.**5**.]

a. The source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business.  Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that the new indirect ownership is not seeking to modify the business model at this time.  PLEASE NOTE THAT GARY, THE CURRENT CEO AND MAJORITY INDIRECT OWNER HAS CONFIRMED THAT HE/THE PARENT HAS NOT FOUND IT NECESSARY TO INFUSE ADDITIONAL CAPITAL  INTO  THE   APPLICANT  BECAUSE  THE  PREEXISTING  REVENUE STREAM ADEQUATELY COVERS ALL APPLICANT CAPITAL NEEDS AND HAS DONE SO FOR A CONSIDERABLE TIME.  Additional capital infusions, if needed, would come from the current and post closing direct owner: RMST Holding company, Inc., and indirectly from the new indirect owner; PREMIUM 72 Advisors, LLC and it's [*sic*] majority upstream owner, Arturo…, as well…  b.  There are no current financing arrangements contemplated c. Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital

14

condition.  (Emphasis added; capitalization in original.)  [**Standard 7:  Maintaining adequate net capital.  1.**]

Q.2.  Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position?  A2.  No.  [**Standard 7**. **2.**]
Q3.   Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future.  A3.  As stated above, <u>the Applicant shall seek additional funding from it's [</u>*sic*<u>] parent organization if and when necessary</u>.  Please note Applicant's preexisting revenue stream.  (Emphasis added.)  [**Standard 7**. **3**.]

The Applicant's statutory minimum is $100,000.00-there is no change in the net capital requirement or its calculation methodology resulting from the proposed change in <u>indirect ownership</u>.  (Emphasis added.)  [**Standard 7. 4**.]

The source of the Applicant's net capital shall continue to be from existing revenue streams generated by the Applicant's business.  Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that <u>the new indirect ownership is not seeking to modify the business model at this time</u>.  Revenue is earned by the Applicant via commissions.  (Emphasis added.)  [**Standard 7. 5**.]

As stated elsewhere in this CMA, the Applicant's business model shall not change as a result of the contemplated sale.  The applicant's management team, other than replacing current CEO, Gary, with proposed CEO, Stacey R. STARK ("Stacey"), shall not change.  Most importantly for this Standard 8 is that Mr. STARK shall remain the Applicant's FINOP and that Stacey is intimately knowledgeable of the Applicant's business having worked there under Gary for approximately 18 years.  (Emphasis added.)  [**Standard 8: Financial controls**. **1.**]

Q.2. Describe how the proposed change will affect any of the following items: a. <u>Accounting</u> system b. Hardcopy and/or electronic <u>books and records</u> c. <u>Authorized signatories on bank and trading accounts</u> d. <u>Individual(s) responsible for daily journal entries</u> and <u>monthly closing of books and records</u> e. <u>Authorizations required and procedures regarding withdrawals of capital</u> f. If the FinOp Principal works offsite or remotely: whether he…will have online access to bank accounts, clearing accounts, etc., and whether that access will be read-only g. <u>Whether the Applicant will employ or associate other persons who will support the financial and operation functions</u> (e.g., <u>internal bookkeeping staff</u>); if so, identify each such person and their roles and responsibilities.  A.2.  <u>No changes a. through and include g. above shall be affected in any material way post FINRA approval</u>.  (Emphasis added.)  [**Standard 8**. **2**.]

<u>Other than the physical change of CEOs, as mentioned earlier in this CMA, management (hence compliance, supervisory, operational and internal control practices) shall remain the same</u>.  It is <u>not contemplated that the new CEO will seek to manage the applicant differently in any material way during the first 12 months</u> following FINRA approval. (Emphasis added.)  [**Standard 9: Written procedures**. **2**.]

a.Stacey shall replace Gary as CEO.  Gary shall remain, however, as FINOP… c. The compliance officer shall remain the same.  Otherwise, as the CEO is an oversight position, the Applicant does not expect any material changes to the day to day operations within the first 12 months of business following FINRA approval.  d. No changes expected re heightened supervision, and e. No changes expected re supervisory systems or supervisory framework.  (Emphasis added.)  [**Standard 10: Supervisory structure**.  **1**.]

Q.3.  Will the proposed change to the Applicant result in a change in Chief Compliance Officer?  A.3.  No.  [**Standard 10: Supervisory structure**.  **3.**]

As neither the business model or the day to day supervisory staff or procedures are expected to change in any material way following FINRA approval, there is no material impact contemplated as a result of such change with regard to any of items a. through d. [procedures, books and records, communication systems, software and systems] above. (Emphasis added.)  [**Standard 11: Books and records**.  **1**.]

All entities and or services … shall remain the same following FINRA approval and closing.  (Emphasis added.)  [**Standard 11. 2**.]

As no change to the Applicant's business model or supervisory system is contemplated, no changes are expected to the CE Plan as a result of the proposed sale of the Applicant. (Emphasis added.)  [**Standard 12: Continuing education. 1.**]

No changes to the individual responsible for administering the Applicant's CE Plan. (Emphasis added.)  [**Standard 12**. **2**.]

60.     In addition, on May 5, 2020, both NICOLAYEVSKY and PEREZ executed and presented written attestations to FINRA as part of the CMA Application, copies of which are part of the CMA included with **Composite Exhibit C** wherein both NICOLAYEVSKY and PEREZ acknowledged and affirmed the following representations:

I hereby submit that I am exempt from registration under FINRA Rule 1210. Further, I will be permitted to continue as indirect owner of R.M. STARK & Co., Inc. ("Firm") without the benefit of registration as a principal so long as I am not actively engaged in the management of RM STARK's securities business, including the supervision, solicitation, conduct of business, or the training of persons associated with RM STARK.  I understand that I will not be permitted to become active in RM STARK's securities business as a registered representative or until such time as I have completed the registration as both an appropriate registered representative and principal classifications as outlined in FINRA Rules 1200-1240.  (Emphasis added.)

<u>I understand that the exemption from principal registration may be rescinded if R.M. STARK & Co., Inc.'s [*sic*] changes its nature, scope, method of business or alters its operations from any of those included in its Membership Agreement</u>. (Emphasis added.)

<u>Unauthorized, Improper, and Unlawful Actions</u>

61.    In direct violation of the CMA and without the knowledge or consent of Plaintiffs, PREMIUM 72, through NICOLAYEVSKY and/or PEREZ – then-contingent minority shareholders – undertook various efforts in an attempt to wholly dismantle RM STARK through a pattern of unlawful activity, gross mismanagement, and improper acts, including the following:

a.    Hiring Susan Davis in contemplation of replacing Jerry Desiderio, RM STARK's long-standing Chief Compliance Officer;

b.    Terminating Jerry Desiderio as RM STARK's long-standing Chief Compliance Officer;

c.    Hiring Peggy Lebert as RM STARK's new Chief Compliance Officer upon the resignation of Susan Davis;

d.    Creating and maintaining an employee organization chart in which NICOLAYEVSKY re-assigned employees' roles in RM STARK;

e.    Improperly directing the options of Regulation Best Interest Implementation on Salesforce;

f.    Executing the contracts for RM STARK's Data Storage, as well as executing the contract with Sycamore for RM STARK's operations, payroll, and compliance software;

g.    Revising RM STARK's recruiting procedures;

h.    Stripping Ellen Adler of her position as an officer and director of RM STARK and RMST, as well has her day-to-day responsibilities with both companies;

i.    Hiring an unqualified individual named Anisa Perez to maintain the company books and records, and to undertake some of the bookkeeping tasks of RM STARK (a position from which she was ultimately removed by NICOLAYEVSKY);

j.      Entering into written contractual obligations that bound RM STARK, including Addepar, Salesforce, Sycamore, and consulting agreements with Vantage Point, and thereafter canceling one or more of such contracts;

k.      Revising the on-boarding documents for new registered representatives, creating a new Independent Broker Agreement to include dual registration with PREMIUM 72, and digitizing such documents without RM STARK's knowledge or consent;

l.      Changing RM STARK's payroll vendor[2];

m.      Canceling RM STARK's worker's compensation policy and 40l(k) Plan, and bundling them with the new payroll provider;

n.      Opening and controlling new J.P. Morgan Chase checking accounts and credit card in the name of RM STARK;

o.      Using NICOLAYEVSKY's personal address, in violation of Federal law, as the primary address for the J.P. Morgan Chase accounts;

p.      Taking a $5,000 cash advance on the RM STARK company credit card for NICOLAYEVSKY's own personal benefit;

q.      Consulting with multiple FINOP applicants in an effort the change the reporting methods and calculations of RM STARK's books and records in an effort to conceal Defendants' unlawful and illegal attempts to pillage RM STARK's finances[3];

r.      Consulting with Attorney Gregory Levine with respect to Expense and Fee Sharing Agreements between RM STARK and PREMIUM 72;

s.      Consulting with Attorney Jeff Barclay regarding the restructuring of RM STARK's financial affairs;

t.      Holding interviews with various individuals in an attempt to have RM STARK recruit them for internal positions, notwithstanding the individuals' qualifications or RM STARK's need for the position;

u.      Attempting to purchase and/or hire several brokers, some of whom were associated with a FINRA-expelled firm or required heightened supervision because of past disciplinary problems; and

---

[2] It should be noted that the payroll vendor chosen by Defendants was not capable of handling broker-dealer payroll.
[3] NICOLAYEVSKY's plan was to become the FINOP for RM STARK.  His stated vision was for the firm be "more creative" in its accounting.  He scheduled the FINOP exam but never sat for it.

v.     Unilaterally authorizing, in or about October of 2020, multiple withdrawals from RM STARK's Pershing account[4] and transferring the funds to J.P. Morgan Chase Bank;

w.     Stalling and refusing to allow RM STARK's certified public accountant to prepare the necessary and appropriate 2020 tax returns for RM STARK by the March 15, 2021 deadline; and

x.     Acquiring Sandlapper Securities, LLC, ("SANDLAPPER") notwithstanding that FINRA expelled the company and its principles earlier that year, and obligating RMST for repayment of the SBA Loan without the Boards of Directors' knowledge or consent.

62.     As if the foregoing were not enough to demonstrate the bad acts of the Defendants, during the time in which Peggy Lebert was the Chief Compliance Officer for RM STARK, she appears to have consciously overlooked the unlawful use and conversion of RM STARK's monies and assets by NICOLAYEVSKY and PEREZ, including their retention of such monies and assets for their own personal benefits in total and absolute disregard of her alleged position as Chief Compliance Officer, and in violation of her licenses with FINRA.

63.     In or about March of 2021, NICOLAYEVSKY and PEREZ attempted to gain access to various accounts of clients of RM STARK, in violation of Federal law.

64.     On March 23, 2021, after Ms. Lebert's termination, in direct violation of Fla. Stat. §815.06 and 18 USC 1030 et seq., she unlawfully accessed RM STARK's computer systems, presumably at the direction of NICOLAYEVSKY and PEREZ, in an attempt to block the officers and employees of RM STARK from performing their essential job functions.

---

[4] A Pershing account is a clearinghouse utilized by brokerage firms to ensure the immediate availability of funds to fund purchase and sale transactions.

65.     On March 24, 2021, NICOLAYEVSKY and PEREZ purported to terminate Stacey Stark, RM STARK's then-acting Chief Executive Officer.

66.     The purported termination of Stacey Stark was a direct and proximate result of (a) the discovery by Ms. Stark that NICOLAYEVSKY and PEREZ unlawfully obtained several loans by pledging the assets of RM STARK as collateral, (b) by fraudulently executing the loan documents as officers of RM STARK in violation of the CMA, FINRA Rules and Florida law, and (c) her related expression of concern for the safety of RM STARK.[5]

67.     On March 24, 2021 (and again in violation of both the CMA and FINRA Rules, as well as in contravention of Florida law, and without any legal authority or basis to do so), NICOLAYEVSKY and PEREZ purported to hire Michael Cutbirth as the new Chief Executive Officer.

68.     The attempt to hire Michael Cutbirth was in complete and flagrant disregard of the CMA, which required a person operating a brokerage firm to have prior experience and FINRA approval – neither of which Mr. Cutbirth had.

69.     On March 25, 2021, in direct violation of Fla. Stat. §815.06 and 18 USC 1030 et seq., and again presumably at the direction of NICOLAYEVSKY and PEREZ, Peggy Lebert again improperly interfered with RM STARK's computer systems, further restricting access to aspects of the computer systems to its officers and employees and preventing such officers and employees from carrying out their essential job functions.

---

[5] Additionally, based on comments made by NICOLAYEVSKY and PEREZ at the time of the purported termination, such termination may have been in retaliation for Ms. Stark's termination of Peggy Lebert, and/or may have been due to Ms. Stark's gender.

70.     On or about September 3, 2021, NICOLAYEVSKY, PEREZ and WRIGHT unlawfully, and without any authority whatsoever, noticed and improperly convened a "Board of Directors and Shareholders Meeting" whereat they purportedly voted to remove and replace STARK, Stacey Stark and Ellen Adler as Officers and Directors of RMST and RM STARK.

<u>UNAUTHORIZED, IMPROPER AND UNLAWFUL LOANS</u>

*The 2019 BYLINE SBA Loan*

71.     In or about December 2019, the PURCHASING DEFENDANTS engaged in efforts to fraudulently obtain a U.S. Small Business Association loan through, and with the assistance, facilitation and aid of BYLINE, for an amount of approximately $1,575,000 (herein referred to as the "2019 SBA Loan") secured by, in part, the assets of RMST and ultimately RM STARK.

72.     At this time, and as BYLINE was well aware, STARK was 100% owner of RMST, and that the PURCHASING DEFENDANTS had no authority whatsoever to enter into any agreements to borrow funds secured by the assets of RMST (or RM STARK).

73.     In connection with their efforts to obtain the SBA Loan through BYLINE, the PURCHASING DEFENDANTS made fraudulent and gross misrepresentations in connection with the lending application process, affirmed in writing on the loan application and paperwork.

74.     On or about December 5, 2019, NICOLAYEVSKY completed Sections I and II of the SBA 7(a) Borrower Information Form in connection with obtaining the 2019 SBA Loan (the "Borrower Information Form"). A copy of the Borrower Information Form is

attached hereto as **Exhibit F**. The Borrower Information Form contains the following false representations:

(i)     NICOLAYEVSKY owned 82% of RMST at the time the Borrower Information Form was completed.

(ii)    PEREZ owned 18% of RMST at the time the Borrower Information Form was completed.

(iii)   NICOLAYEVSKY was Managing Member of RMST at the time the Borrower Information Form was completed.

(iv)    PEREZ was CFO and a "Member" of RMST at the time the Borrower Information Form was completed.

(v)     NICOLAYEVSKY was President of RMST at the time the Borrower Information Form was completed;

(vi)    NICOLAYEVSKY was Owner of RMST at the time the Borrower Information Form was completed.

75.     Also in connection with obtaining the 2019 SBA Loan, on or about December 31, 2019, without authorization or the right to do so, NICOLAYEVSKY prepared a Record of Action Taken by Unanimous Written Consent of the Sole Shareholder and Sole Director of the Board of Directors of RMST Holding Company, Inc. (the "Unauthorized Shareholder Action"). A copy of the Unauthorized Shareholder Action is attached hereto as **Exhibit G**.

76.     Through the Unauthorized Shareholder Action, NICOLAYEVSKY falsely represented that he was the "Sole Shareholder and Director" of RMST. At the time, NICOLAYEVSKY did not have any affiliation whatsoever with RMST and had no authority

to make any of the purported authorizations referenced in the Unauthorized Shareholder Action.

77.     Through the Unauthorized Shareholder Action, NICOLAYEVSKY purported to unilaterally authorize RMST to enter into a $1,575,000 loan from BYLINE, which ultimately became the 2019 SBA Loan. This authorization was not legitimate and NICOLAYEVSKY had no authority to make such an authorization on behalf of RMST.

78.     Through the Unauthorized Shareholder Action, NICOLAYEVSKY purported to unilaterally authorize himself, purportedly on behalf of RMST, to execute and deliver various loan documents to BYLINE to effectuate the 2019 SBA Loan. This authorization was not legitimate and NICOLAYEVSKY had no authority to make such an authorization on behalf of RMST.

79.     Through the Unauthorized Shareholder Action, NICOLAYEVSKY purported to unilaterally authorize himself, purportedly on behalf of RMST, to "mortgage, pledge, assign, hypothecate, or a grant a security interest or lien" the assets or properties of RMST to BYLINE and/or the SBA as security or collateral for the 2019 SBA Loan. This authorization was not legitimate and NICOLAYEVSKY had no authority to make such an authorization on behalf of RMST.

80.     In connection with the 2019 SBA Loan, on December 31, 2019, NICOLAYEVSKY entered into a Loan Agreement with Byline Bank purportedly on behalf of OPC ADVISORS, LLC (now PREMIUM 72), AYNBET, and RMST (the "2019 Loan Agreement"). Andrew Weisner executed the Loan Agreement on December 31, 2019 on behalf of BYLINE. NICOLAYEVSKY had no authority to enter into the 2019 Loan

Agreement on behalf of RMST. A copy of the 2019 Loan Agreement is attached hereto as part of **Composite Exhibit H**.

81.     Also in connection with the 2019 SBA Loan, on December 31, 2019, NICOLAYEVSKY entered into a Note in the amount of One Million Five Hundred Seventy Five Thousand Dollars ($1,575,000.00) purportedly on behalf of OPC ADVISORS, LLC, (now PREMIUM 72), AYNBET, and RMST, in favor of BYLINE (the "2019 Note"). NICOLAYVESKY had no authority to enter into the 2019 Note on behalf of RMST. A copy of the 2019 Note is attached hereto as part of **Composite Exhibit H**.

82.     Also in connection with the 2019 SBA Loan, on December 31, 2019, NICOLAYEVSKY entered into a Security Agreement purportedly on behalf of OPC ADVISORS, LLC (now PREMIUM 72), AYNBET, and RMST, in favor of BYLINE (the "2019 Security Agreement"). NICOLAYEVSKY had no authority to enter into the 2019 Security Agreement on behalf of RMST. A copy of the 2019 Security Agreement is attached hereto as part of **Composite Exhibit H**.

83.     Also in connection with the 2019 SBA Loan, on December 31, 2019, NICOLAYEVSKY entered into an Unconditional Guarantee wherein he guaranteed repayment of the 2019 Note (the "2019 Guarantee"). A copy of the 2019 Guarantee is attached hereto as part of **Composite Exhibit H**.

84.     Through execution of the 2019 Loan Agreement, 2019 Note, and 2019 Security Agreement, NICOLAYEVSKY falsely represented that he was President of RMST, that he was authorized to act on RMST's behalf,  and that he had the requisite authority to bind RMST to the various loan documents with BYLINE. NICOLAYEVSKY had no such authority.

24

85.     The 2019 Loan was a 7(a) SBA Loan.

86.     A 7(a) SBA Loan requires a complete change of control of the management of the business.

87.     BYLINE approved and closed on the SBA Loan on or about December 31, 2019, and thereafter funded the 2019 SBA Loan.

88.     Prior to funding the 2019 Loan, NICOLAYEVSKY and/or his representatives, provided BYLINE with copies of the Stock Purchase Agreement, the Unauthorized Shareholder Action, the 2019 Loan Agreement, the 2019 Note, the 2019 Security Agreement, and the 2019 Guarantee, as well as other documents.

89.     The Stock Purchase Agreement clearly provides that OPC Advisors, LLC (now PREMIUM 72) would be purchasing shares of RMST from STARK. NICOLAYEVSKY was not to receive any shares of RMST under the Stock Purchase Agreement. Additionally, as detailed above, the transaction was to be bifurcated and subject to FINRA approval.

90.     Based on information provided to BYLINE, BYLINE knew or should have known that neither NICOLAYEVSKY nor any of the PURCHASING DEFENDANTS had any ownership interest whatsoever in RMST at the time any of the 2019 SBA Loan documents were executed and/or the time the 2019 SBA Loan was funded.

91.     BYLINE knew or should have known that neither NICOLAYEVSKY nor any of the PURCHASING DEFENDANTS had any authority to act on behalf of RMST in any capacity whatsoever, whether as president, manager, or otherwise, at the time the 2019 SBA Loan documents were executed and/or the time the 2019 SBA Loan was funded.

92.     BYLINE knew or should have known that neither NICOLAYEVSKY nor any of the PURCHASING DEFENDANTS served on the Board of Directors of RMST at the time the 2019 SBA Loan documents were executed and/or at the time the 2019 SBA Loan was funded.

93.     In fact, based on an email from NICOLAYEVSKY's counsel to BYLINE, at the time of the SBA Loan closing, BYLINE was well aware that the representations and warranties made by the PURCHASING DEFENDANTS as to their claimed role in RSMT, interest in RMST, and purported authority to act on behalf of RMST were untrue and completely false. In that email exchange, BYLINE representative Daniel Branco is engaged in a discussion with Gregory Levine, counsel to NICOLAYEVSKY, regarding the 2019 SBA Loan. NICOLAYEVSKY, PEREZ, Darin Manis of Advisor Loans, and Kellie Fiorito of BYLINE are copied on the email exchange. No authorized representative and/or owner of RMST is included on the email exchange. A copy of the email exchange is attached hereto as **Exhibit I.**

94.     NICOLAYEVSKY'S counsel makes clear to BYLINE on January 22-23, 2020, that the transaction for purchase of RMST is bifurcated, and that as of that date the purchase had not yet been effectuated and, therefore, NICOLAYEVSKY did not have a controlling interest in RMST. This email exchange takes place after NICOLAYEVSKY had represented to BYLINE that he had authority to act on behalf of RMST. Accordingly, as of January 22-23, 2020, BYLINE was aware that NICOLAYEVSKY's prior representations about his authority to bind and act on behalf of RMST were false, and that all of NICOLAYEVSKY's purported actions taken on behalf of RMST prior to that point, including executing the 2019 SBA Loan documents on RMST's behalf, were not valid.

95.    By reason of the January 22-23, 2020 email exchange and receipt of the Stock Purchase Agreement, BYLINE further knew or should have known that the PURCHASING DEFENDANTS had, at best, a contingent minority interest in RMST after January 2, 2020.

96.    PREMIUM 72 likewise admitted that BYLINE was aware that PREMIUM 72 had only acquired a 24% interest in RMST in January 2020, and that is acquisition of the remaining interest was contingent upon FINRA's approval of the transaction. A copy of a letter from PREMIUM 72 to BYLINE to such effect is attached hereto as **Exhibit J**.

97.    Notwithstanding BYLINE's actual and imputed knowledge that NICOLAYEVSKY acted without authority to bind RMST in connection with the 2019 SBA Loan, BYLINE proceeded to approve, effectuate and fund the 2019 SBA Loan.

98.    Additionally, with actual and imputed knowledge of the false representations made by NICOLAYEVSKY and/or the other PURCHASING DEFENDANTS in connection with the 2019 SBA Loan, BYLINE approved and effectuated the loan, including the submission of the known fraudulent loan application and paperwork to the SBA.

99.    RMST did not receive the proceeds of the 2019 SBA Loan.

100.    BYLINE was aware and/or understood that its customers, the PURCHASING DEFENDANTS, owed a fiduciary duty to RMST and Stark, by virtue of their minority shareholder status and purported authority to enter into the 2019 SBA Loan, and/or by way of NICOLAYEVSKY'S represented role as President of RMST.

101.    BYLINE knew or should have known that the SBA Loan was not being used to purchase 100% of the business as required by the 7(a) SBA Loan program.

102.   BYLINE profited on the fraudulent transaction, including, but not limited to, by way of loan transaction fees.

103.   At all relevant times herein, BYLINE knew or should have known that the PURCHASING DEFENDANTS had no authority to pledge or encumber any assets of RMST or RM STARK whatsoever in connection with the 2019 SBA Loan, and accordingly BYLINE takes no interest whatsoever in RMST or its assets.

104.   In fact, the plain terms of the 2019 Loan Agreement indicate that "[t]he Loan proceeds advanced by Lender are to be used, in whole or in part, to purchase all outstanding stock, including intangible assets described as goodwill, of R.M.Stark & Co., Inc. held by RMST..." Accordingly, by the plain terms of the 2019 Loan Agreement, Byline entered into a transaction with an entity (RMST) to fund a loan that would be used to purchase something that entity already owned (because RMST already owned R.M. Stark & Co., Inc.). BYLINE chose to overlook this plain inconsistency and allow NICOLAYEVSKY to move forward with an unauthorized transaction purported binding RMST to a loan to purchase an entity RMST already owned.

105.   Additionally, in connection with the 2019 SBA Loan transaction, Byline received a "certification" from NICOLAYEVSKY, purportedly as RMST's president, that the 2019 SBA Loan proceeds, which were purportedly going to be issued to RMST, were going to be used to acquire "all or part of [RMST]'s corporate stock." A copy of the certification is attached as **Exhibit K**. This supposed certification from RMST indicating that the loan it was being issued was to be used to purchase its own stock is highly irregular.

106.    Additionally, the 2019 Loan Agreement provides that the Borrowers were to provide BYLINE with various documents, including the Stock Purchase Agreement, ownership interest conveyance documents, and organizational documents of borrowers, including RMST.

107.    BYLINE reviewed the documents referenced in the 2019 Loan Agreement, which indicated that NICOLAYEVSKY was not an owner or other authorized representative of RMST, yet proceeded with executing, funding, and/or otherwise effectuating the 2019 Loan.

108.    Alternatively, BYLINE negligently failed to review the documents referenced in the 2019 Loan Agreement, which would have made clear that NICOLAYEVSKY had no authority to act on RMST's behalf or bind it to any of the 2019 SBA Loan documents.

109.    As a result of BYLINE's gross and outrageous misconduct and actions in connection with the 2019 SBA Loan, the Plaintiffs have incurred substantial damages.

110.    BYLINE likewise collected at least $15,209.29 in closing fees in connection with the 2019 SBA Loan. A closing statement reflecting the closing fees is attached hereto as **Exhibit L**.

*Loans from AMZ Group, LLC*

111.    On or about November 6, 2020, without Plaintiffs' prior knowledge or consent, NICOLAYEVSKY and PEREZ deliberately concealed their unilateral decision to enter into and execute an agreement known as "Contract 467" with AMZ Group, LLC ("AMZ") wherein Defendants "sold" future revenues of RM STARK and RMST in the amount of $274,000, for which Defendants received the sum of $200,000.  A true and

correct copy of the AMZ agreement (the "AMZ Agreement") is attached hereto as **Composite Exhibit M** and incorporated herein by such reference.

112.   NICOLAYEVSKY and PEREZ knew, or should have known, that many of the principals of AMZ were barred by FINRA from lending money to broker-dealers or utilizing the assets of RMST and/or RM STARK as collateral for the personal loans obtained by NICOLAYEVSKY and PEREZ.

113.   The Security Provision and subsequent Form UCC-1 filing by AMZ revealed that all of RM STARK's assets – including 100% of RMST's stock – were pledged as collateral for the funds received by NICOLAYEVSKY and PEREZ.

114.   Apparently, in the AMZ Agreement, NICOLAYEVSKY and PEREZ represented that AMZ had priority over the assets of RM STARK, notwithstanding that the assets of RM STARK were already pledged elsewhere as collateral to STARK and, as subsequently discovered, to BYLINE.

115.   The AMZ Agreement was signed by NICOLAYEVSKY as principal, even though the CMA did not allow him to act in such capacity for either RMST or RM STARK.

116.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into the AMZ Agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

117.   NICOLAYEVSKY and PEREZ continued with this outrageous course of conduct and deception when, on or about December 3, 2020, Defendants deliberately concealed the unilateral decision of NICOLAYEVSKY and PEREZ to enter into and execute another agreement known as "Contract 489" with AMZ, further encumbering the assets of RM STARK for an additional $206,400, for which Defendants received the

additional sum of $160,000.   A true and correct copy of AMZ Contract 498 is attached hereto as part of **Composite Exhibit M.**

118.   Again, the actions of NICOLAYEVSKY and PEREZ were undertaken without the knowledge or consent of the Plaintiffs.

119.   The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

120.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into Contract 489 on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

121.   On or about January 28, 2021, in an all-too familiar tune, and again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the unilateral decision of NICOLAYEVSKY and PEREZ to enter into and execute yet another agreement known as "Contract 516" with AMZ.   A true and correct copy of AMZ Contract 516 is attached hereto as part of **Composite Exhibit M.**

122.   Although Contract 516 purportedly consolidated the AMZ Agreement, Contract 489 and Contract 516, additional monies were also added to the principal, thereby further encumbering the assets of RMST and RM STARK.

123.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into the AMZ Agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

124.   In order to further conceal the defalcations of the Defendants, NICOLAYEVSKY and PEREZ attempted to replace Stacey Stark as RM STARK's then-acting Chief Executive Officer; however, this attempt was unsuccessful.

125.    The Plaintiffs did not become aware of the unlawful actions of NICOLAYEVSKY and PEREZ until February 16, 2021, after PREMIUM 72 defaulted on the loans with AMZ, when Stacey Stark was called by Nationwide Financial Services, a debt collector, working on behalf of AMZ.

126.    Notwithstanding the continued requests from Plaintiffs that Defendants disclose any actions the Defendants may have undertaken that might otherwise impact the financial integrity of RM STARK (as Plaintiffs are required to report their financial condition to FINRA), Defendants continued to obfuscate the details of all transactions, refused to produce documents, and failed to disclose to Plaintiffs all relevant facts and circumstances relating to their financial misdeeds.[6]

127.    Upon direct questioning by Stacey Stark, NICOLAYEVSKY and PEREZ intimated that there are, in fact, other undisclosed liabilities for which NICOLAYEVSKY and PEREZ have incurred liability for RM STARK; however, Defendants have refused to reveal any additional information as to what (or how much) these liabilities may be.

128.    Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and due to the loans improperly obtained from AMZ (and potentially other lenders), the financial statements submitted by Plaintiffs to FINRA were false and incorrect.

129.    Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and due to the loans improperly obtained from AMZ (and potentially other lenders), Plaintiffs may have unknowingly violated the SEC's net capital rules as set forth in Rule 15c3-1, as well as FINRA's and Pershing's minimum net capital requirements.  By

---

[6] To date, Defendants have yet to disclose this relevant and necessary information regarding the purported loans.

pledging the stock of RM STARK, the firm had to account for the AMZ loans on its books and records.   Upon becoming aware of the shares being collateralized, STARK immediately reported the violation to FINRA and worked with FINRA to resolve the deficiency.

130.    Because of NICOLAYEVSKY and PEREZ, RM STARK was not in compliance for several months and was at the risk of being shut down by FINRA.  But for the relationship STARK had built with FINRA over the years, RM STARK could certainly have been the subject of enforcement actions, including fines and closure.  Defendants knew or should have known that their actions, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

131.    Each month, STARK, as RM STARK's FINOP, was and is responsible for the Firm's compliance with the net capital requirements and the filing of monthly Net Capital computations with FINRA.  Each month, STARK inquired of NICOLAYEVSKY to disclose any contracts, obligations, or other actions that were directly or indirectly collateralized by any current or future obligations of RM STARK.   NICOLAYEVSKY always responded that there were none.  Nevertheless, on or about August 1, 2021, counsel for PREMIUM 72 subsequently confirmed that there are other undisclosed liabilities incurred by NICOLAYEVSKY and PEREZ in the names of the Plaintiffs, but refused to disclose any additional information.

132.    Counsel for PREMIUM 72 knew or should have known that the actions of Defendants, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

*Loans from U.S. Small Business Administration*
*through the Payroll Protection Program*

133.    Sometime after January 2, 2020 (but well before September 22, 2020, while NICOLAYEVSKY was a contingent minority shareholder), NICOLAYEVSKY sought COVID-19 relief loans offered to businesses by the U.S. Small Business Administration through its Payroll Protection Program ("PPP").

134.    Specifically, NICOLAYEVSKY prepared and submitted applications to governmental entities and lending institutions on behalf of PREMIUM 72, some of its subsidiaries and/or affiliates, and on behalf of RMST, all utilizing RM STARK's payroll and tax documentation and information for calendar year 2019.  A true and correct copy of documentation reflecting issuance of the PPP loans to PREMIUM 72 and RMST, as obtained from FederalPay.org, are attached hereto as **Composite Exhibit N** and is incorporated herein by such reference.

135.    At no time whatsoever did NICOLAYEVSKY seek permission from STARK – who, at the time, was the majority shareholder and President of RMST and RM STARK – to seek PPP loans, or to submit any loan application or any other document of any kind or nature whatsoever, by or on behalf of RMST or RM STARK or otherwise utilizing RM STARK's payroll and tax information, or any such other information provided to NICOLAYEVSKY and PEREZ, in confidence, during the negotiations leading up to the implementation of the Stock Purchase Agreement.

136.    Moreover, at no time whatsoever did NICOLAYEVSKY and/or PEREZ disclose to Plaintiffs this fraudulent, deceptive, duplicitous, and illegal conduct.  As an example of the lengths to which Defendants went to ensure Plaintiffs would not learn of

the PPP loan applications, NICOLAYEVSKY utilized his home address as RMST's corporate address for purposes of such applications.

137. On or about June 15, 2021, only by casually googling "PREMIUM 72" and "OPC," did Plaintiffs discover that approximately $195,970 in PPP loan proceeds had purportedly been paid to RMST and RM STARK, which funds were misappropriated by NICOLAYEVSKY and/or PEREZ.

138. This online research also revealed that PREMIUM 72 and OPC had each utilized RM STARK's identical payroll figures and documents in order to procure additional PPP loans in similar amounts from BYLINE Bank and Chase Bank for other entities affiliated with NICOLAYEVSKY and PEREZ.

139. Upon information and belief, none of these entities had any employees (and, consequently, no payroll); therefore, upon information and belief, RM STARK's documentation was utilized in yet another scheme to improperly procure PPP loans.

140. All loan proceeds related to these PPP loans to RMST, RM STARK, and other entities affiliated with NICOLAYEVSKY and PEREZ were transmitted to NICOLAYEVSKY at his home address in April and June of 2020.

141. Neither NICOLAYEVSKY nor PEREZ advised the Plaintiffs that they received proceeds from any PPP loan, notwithstanding the fact that such proceeds were the property of RMST and RM STARK, and never belonged to NICOLAYEVSKY and PEREZ, nor were NICOLAYEVSKY and PEREZ entitled to the possession or use of such funds, and despite the demands of Plaintiffs for return of the funds, NICOLAYEVSKY and PEREZ have failed and refused to relinquish same. True and correct copies of such

demands are attached hereto as **Exhibit O** and **Exhibit P** and are incorporated herein by such reference.

142.   The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

143.   It is abundantly clear that NICOLAYEVSKY and PEREZ did not utilize these PPP loan proceeds for the very purpose for which they were intended: payroll!  Instead, NICOLAYEVSKY and PEREZ diverted the funds and used them for purposes other than payroll, rent, or other operating expenses of RMST or RM STARK.

144.   By procuring PPP loans utilizing payroll and tax information of RM STARK, NICOLAYEVSKY and PEREZ engaged in deliberate, fraudulent, and illegal conduct.

145.   Not surprisingly, BYLINE was directly involved, and participated in, the PURCHASING DEFENDANTS' fraudulent scheme to receive $195,970 in PPP funds based on NICOLAYEVSKY'S application on behalf of "RMST" (herein referred to as the "BYLINE PPP Loan").

146.   At the time that BYLINE approved the BYLINE PPP Loan and issued the funds to NICOLAYEVSKY, it was well aware that the PURCHASING DEFENDANTS did not have control or any majority ownership interest in the RMST.   In fact, BYLINE knew or should have known that, at best, the PURCHASING DEFENDANTS, at the time of the BYLINE PPP Loan, only had a contingent minority interest in RMST, with no authority or right to take or divert funds belonging to RMST.  BYLINE further knew or should have known that STARK was the majority owner and in control of RMST at the time, and that RMST was located in Florida.  Notwithstanding the knowledge that the PURCHASING DEFENDANTS' representations in connection with the BYLINE PPP Loan were false,

misleading and intended to defraud, BYLINE approved the PPP Loan and issued the PPP funds directly to NICOLAYEVSKY at his home address in Houston, Texas.

147.    BYLINE profited on the fraudulent transaction, including, but not limited to, by way of loan transaction fees.

148.    PLAINTIFFS did not receive any proceeds of the BYLINE PPP Loan. BYLINE was aware that these funds rightfully belonged to the PLAINTIFFS, but fraudulently diverted them to the PURCHASING DEFENDANTS.   Based on BYLINE's conduct and actions in connection with its facilitation, approval, funding and disbursement of the knowingly fraudulent BYLINE PPP Loan, the Plaintiffs have incurred substantial damages.

*ZAM Loan*

149.    On or about August 26, 2021, without Plaintiffs' prior knowledge or consent, NICOLAYEVSKY and PEREZ deliberately concealed their unilateral decision to enter into and execute an agreement to borrow money from ZAM wherein Defendants pledged all of their assets to ZAM as collateral for an unknown sum.   A true and correct copy of the loan agreement and the UCC filed by ZAM is attached hereto as **Exhibit Q** and incorporated herein by such reference.

150.    The Security Provision and subsequent Form UCC-1 filing by ZAM revealed that all of RM STARK's assets – including 100% of RMST's stock – were pledged as collateral for the funds received by NICOLAYEVSKY and PEREZ.

151.    Also, some of the additional collateral pledged by the Defendants for the loan, upon information and belief, are defunct or shell companies that have no operational business.

152.   The UCC-1 provided the following legend:

DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN.   THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

153.   Upon information and belief, in the ZAM Agreement, NICOLAYEVSKY and PEREZ represented that ZAM had priority over the assets of RM STARK, notwithstanding that the assets of RM STARK were already pledged elsewhere as collateral.  Other assets listed on the UCC include many assets that, at the time of the granting of the loan, were defunct corporations.

154.   Upon information and belief, the ZAM Agreement was signed by NICOLAYEVSKY as principal, even though the CMA did not allow him to act in such capacity for either RMST or RM STARK.

155.   The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

156.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into the ZAM Agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

157.   Such loan with ZAM has been concealed from RMST and RM STARK. Upon request, knowing that the purpose of the information was to prepare RM STARK's financial statements properly, Defendant's legal counsel refused to provide any information regarding the ZAM Agreement.

158.   Again, the actions of NICOLAYEVSKY and PEREZ were undertaken without the knowledge or consent of the Plaintiffs.

159.   On or about December 27, 2021, ZAM filed a lawsuit against PREMIUM 72, NICOLAYEVSKY and other related business entities in Kings Supreme Court in New York under Case Number 533083/2021.  A copy of the Complaint in that suit is attached as **Exhibit R.**

160.   The case alleged that PREMIUM 72, et al., defaulted under their agreement with ZAM that was just entered into not less than four months before.

161.   One of the affirmative defenses of PREMIUM 72 is that it claims that it should not be required to repay the loan because it was under economic duress when it entered into the loan.  A copy of PREMIUM 72's Answer in the Kings Supreme Court lawsuit reflecting that affirmative defense is attached hereto as **Exhibit S**.

162.   Notwithstanding their claim of economic duress, PREMIUM 72's filing with the Securities and Exchange Commission claims that "Premium 72 Capital is not aware of any financial conditions that are reasonably likely to impair the Firm's ability to meet its contractual commitments to its clients."  See PREMIUM 72's Form ADV, attached hereto as **Exhibit T.**

163.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into any loan agreement with ZAM on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

*KINGDOM Loan*

164.   Notwithstanding that STARK, BYLINE and evidently KINGDOM claiming interest in the collateral and prohibitions against further encumbrances, on or about December 20, 2021, in an all-too familiar tune, and again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the decision of NICOLAYEVSKY and PEREZ to enter into and execute yet another loan agreement with KINGDOM for an undisclosed amount of money, again pledging RMST and RM STARK as part of the collateral, without the knowledge or consent of RMST or RM STARK. The UCC financing statement securing the KINGDOM loan is attached hereto as **Exhibit U**.

*NFG Loan*

165.   If having four loans encumbering the collateral were not enough with three of them apparently in default, NICOLAYEVSKY, without any authority whatsoever, borrowed another sum of approximately $25,962.28, from NFG. The UCC related to the NFG loan is attached hereto as **Exhibit V.**

166.   The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

167.   It goes without saying that NICOLAYEVSKY and PEREZ had no right to enter into any agreement on behalf of RMST or RM STARK, or to otherwise pledge RMST or RM STARK's assets as collateral, and they did so in violation of applicable law.

*PROMPT Loan*

168.   Upon information and belief, notwithstanding that STARK, BYLINE and evidently other parties claiming interest in the collateral and prohibitions against further encumbrances, again without the knowledge or consent of the Plaintiffs, Defendants

deliberately concealed the decision of NICOLAYEVSKY and PEREZ to enter into and execute yet _another_ loan agreement with PROMPT for an undisclosed amount of money, again pledging RMST and RM STARK as part of the collateral, without the knowledge or consent of RMST or RM STARK.

169. The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

170. Upon information and belief, NICOLAYEVSKY and PEREZ defaulted on the loan to PROMPT.

171. Upon information and belief, PROMPT has filed a lawsuit against PREMIUM 72 and NICOLAYEVSKY.

### *PINNACLE Loan*

172. Upon information and belief, notwithstanding that STARK, BYLINE and evidently other parties claiming interest in the collateral and prohibitions against further encumbrances, again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the decision of NICOLAYEVSKY and PEREZ to enter into and execute yet _another_ loan agreement with PINNACLE for an undisclosed amount of money, again pledging RMST and RM STARK as part of the collateral, without the knowledge or consent of RMST or RM STARK.

173. The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

174.    Upon information and belief, NICOLAYEVSKY and PEREZ defaulted on the loan to PINNACLE.

175.    Upon information and belief, PINNACLE has filed a lawsuit against PREMIUM 72 and NICOLAYEVSKY.

*MONEY STORE Loan*

176.    Upon information and belief, notwithstanding that STARK, BYLINE and evidently other parties claiming interest in the collateral and prohibitions against further encumbrances, again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the decision of NICOLAYEVSKY and PEREZ to enter into and execute yet another loan agreement with MONEY STORE for an undisclosed amount of money, again pledging RMST and RM STARK as part of the collateral, without the knowledge or consent of RMST or RM STARK.  A copy of the loan agreement is attached hereto as **Exhibit W**.

177.    The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

178.    Upon information and belief, NICOLAYEVSKY and PEREZ defaulted on the loan to MONEY STORE.

179.    On January 12, 2022, MONEY STORE filed a lawsuit against PREMIUM 72 and NICOLAYEVSKY in Kings Supreme Court in New York under Case Number 501056/2022.  A copy of the Complaint in that case is attached as **Exhibit X.**

180.    As an affirmative defense, PREMIUM 72 claims that they should not have to pay back the loan obtained by the MONEY STORE because of economic duress, again

conflicting with the disclosure to the Securities and Exchange Commission on their Form ADV-2.

BITTY *Loan*

181.   Upon information and belief, notwithstanding that STARK, BYLINE and evidently other parties claiming interest in the collateral and prohibitions against further encumbrances, again without the knowledge or consent of the Plaintiffs, Defendants deliberately concealed the decision of NICOLAYEVSKY and PEREZ to enter into and execute yet <u>another</u> loan agreement with BITTY for an undisclosed amount of money, again pledging RMST and RM STARK as part of the collateral, without the knowledge or consent of RMST or RM STARK.  See **<u>Exhibit Y.</u>**

182.   The Boards of Directors of neither RM STARK nor RMST approved the loans as required by F.S. 607.0801.

183.   Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and because of the loans improperly obtained from ZAM, KINGDOM, RFG, PROMPT, PINNACLE, MONEY STORE and BITTY (and potentially other lenders), the financial statements submitted by Plaintiffs to FINRA may be false and incorrect.

184.   Strictly and solely as a result of NICOLAYEVSKY and PEREZ's unlawful activities, and due to the loans improperly obtained from ZAM, KINGDOM, RFG, PROMPT, PINNACLE, MONEY STORE and BITTY (and potentially other lenders), Plaintiffs unknowingly may have violated the SEC's net capital rules at 15c3-1.

185.   Defendants knew or should have known that their actions, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

186.    On or about August 1, 2021, counsel for PREMIUM 72 subsequently confirmed that there are other undisclosed liabilities incurred by NICOLAYEVSKY and PEREZ on behalf of the Plaintiffs, but refused to disclose any additional information.

187.    Counsel for PREMIUM 72 knew or should have known that the actions of Defendants, coupled with their subsequent efforts to conceal such actions, were to the detriment of RM STARK.

188.    Upon information and belief, as a result of NICOLAYEVSKY's and PEREZ's actions, FINRA commenced enforcement actions against them.  One of the potential consequences of such enforcement actions is FINRA permanently barring NICOLAYEVSKY and PEREZ from any participation whatsoever in the financial services industry.  Additional sanctions and penalties are also possible.  See **Exhibit _Z_** for the letters informing NICOLAYEVSKY and PEREZ of the referral to FINRA's enforcement division.

189.    Notwithstanding said Defendants' actual notification of such enforcement actions, in PREMIUM 72's filing of Form ADV with the SEC, when asked "[a]re you or any advisory affiliate[7] now the subject of any regulatory proceeding that could result in a "yes" answer to any part of Item 11.C, 11.D., or 11.E?" PREMIUM 72 failed to disclose the regulatory actions against them by FINRA.  See **Exhibit T.**

190.    Furthermore, in the Form ADV, when asked about any current civil court proceedings that may affect their investment related activity, PREMIUM 72 failed to disclose the existence of this current action or the other litigation initiated by one or more of its creditors.

---

[7] Advisory Affiliate is defined to include NICOLAYEVSKY and PEREZ.

*Additional BYLINE Loan*

191.    In   or   about   October,   2020,   shortly   after   the   second   closing, NICOLAYEVSKY  approached  RM  STARK  about  the  possible  acquisition  of  another broker dealer called SANDLAPPER.

192.    RM STARK and RMST rejected the acquisition because of various legal issues experienced by SANDLAPPER, including, but not limited to, that SANDLAPPER was recently expelled in June, 2020, as a FINRA member firm and its principals were permanently barred from the securities industry because FINRA found its employees defrauded investors of more than $8,000,000.  See FINRA Enforcement decision against Sandlapper, attached hereto as **Exhibit AA**.

193.    Upon information and belief, and notwithstanding RM STARK and RMST's advice   to   reject   the   acquisition,   NICOLAYEVSKY   went   ahead   to   purchase SANDLAPPER's assets through PREMIUM 72 in December, 2020.  Stacey Stark, however, refused to register SANDLAPPER personnel with RM STARK.

194.    In or about December, 2020, NICOLAYEVSKY approached BYLINE about obtaining a second SBA loan for the purchase of SANDLAPPER. The ("2020 SBA Loan"). Similar to the 2019 SBA Loan, NICOLAYEVSKY executed a 2020 Loan Agreement, a 2020 Note, a 2020 Security Agreement, and a 2020 Personal Guarantee in connection with  the  2020  SBA  Loan.  Those  2020  SBA  Loan  documents  are  attached  hereto  as **Composite Exhibit BB.**

195.    In the loan documents to BYLINE, NICOLAYEVSKY represented that RMST was involved in the acquisition, notwithstanding RMST's and RM STARK's previous rejection of the proposal.

196.   The Boards of Directors of neither RM STARK nor RMST approved the acquisition or the loan as required by F.S. 607.0801.

197.   BYLINE knew, or should have known, that SANDLAPPER, being an expelled company, had regulatory issues.

198.   Furthermore, BYLINE knew, or should have known, based on the CMA that NICOLAYEVSKY himself lacked any authority to acquire the assets of SANDLAPPER.

199.   Once again, without Plaintiffs' knowledge or consent, the assets of RMST and RM STARK were pledged as collateral for the second SBA loan through BYLINE, thereby further threatening non-compliance with the regulatory net capital requirement rules and regulations.

200. RMST did not receive the proceeds of this 2020 loan.

*Sale to WRIGHT*

201.   Upon information and belief, in order to raise capital for RMST, NICOLAYEVSKY and PEREZ arranged for the sale of fifty-six (56%) percent of RMST's stock to WRIGHT pursuant to that certain Share Purchase-Transfer Agreement (the "WRIGHT Agreement"), by and between WRIGHT, as the purchaser, and PREMIUM 72, RMST, and RM STARK, as the sellers.   A true and correct copy of the WRIGHT Agreement is attached hereto as **Exhibit CC** and is incorporated herein by such reference.

202.   Pursuant to the WRIGHT Agreement, the transfer was to be effectuated in two (2) separate phases; in phase 1, in exchange for the sale of twenty-four (24%) percent of RMST's stock to WRIGHT, WRIGHT was to pay the sum of $1,000,000 to RMST on or before June 30, 2021.

203.    RMST and RM STARK fulfilled all of the promises and obligations required to be performed by them under the terms of the WRIGHT Agreement.

204.    Nevertheless, WRIGHT has failed to make payment to RMST as he is contractually obligated to do pursuant to the WRIGHT Agreement. As a result, prior stock transfers to WRIGHT were voided. Despite this, WRIGHT assisted NICOLAYEVSKY and PEREZ in improperly noticing and convening a "Board of Directors and Shareholder Meeting" whereat they purportedly voted to remove and replace STARK, Stacey Stark, and Ellen Adler as Officers and Directors of RMST and RM STARK.

205.    The willful refusal of WRIGHT to pay for the shares of stock which he originally received and his improper attempts to participate in the management of RMST and RM STARK has damaged RMST, and further supports the Plaintiffs' contention that the Defendants – including WRIGHT – have engaged in a persistent and deliberate pattern of corporate raiding with respect to both RMST and RM STARK, thereby necessitating this action.

**CLAIMS FOR RELIEF**

<u>COUNT I</u>

*DECLARATORY RELIEF AGAINST*
*PREMIUM 72, NICOLAYEVSKY and PEREZ*
*AS TO MANAGEMENT, OPERATION AND CONTROL OF RMST and RM STARK*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

206.    The CMA requires Defendants to remain passive investors of RMST and RM STARK.

207.    Pursuant to FINRA guidelines, which control the operation of RMST and RM STARK, passive investors do not have the right of management or control.

47

208.    Defendants contend that the Bylaws of RM STARK allow the Defendants to control the governance of RM STARK, inexplicably arguing that the conditions imposed by the CMA, and under FINRA guidelines, are meaningless and irrelevant.

209.    Based on the widely disparate positions of the parties to this action, there is a bona fide, actual, and practical need for a declaration by this Court as to whether Defendants may unilaterally manage the affairs of RM STARK, electing and removing directors and otherwise affecting corporate management at will.

210.    This is a present controversy as to the obligations and duties of the parties.

211.    There is a clear need for a declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ have no right to participate in the management of RMST and RM STARK;

B.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ cannot violate the CMA;

C.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

D.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT II</u>

*INJUNCTIVE RELIEF*
*AGAINST PREMIUM 72, NICOLAYEVSKY and PEREZ*
*ENJOINING INTERFERENCE IN THE*
*MANAGEMENT, OPERATION AND CONTROL OF RMST and RM STARK*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

212.    Defendants have continuously and unlawfully interfered in the management of RM STARK.

213.    Plaintiffs have been damaged by such continuous and unlawful interference, and do not have an adequate remedy at law.

214.    Plaintiffs have suffered, and will continue to suffer, irreparable harm unless Defendants are enjoined from the conduct as set forth herein.

215.    The public interest will be served by the issuance of an injunction prohibiting the conduct as set forth herein.

216.    Plaintiffs have a substantial likelihood of success on the merits of this matter.

217.    Plaintiffs have a clear legal right to the relief sought.

WHEREFORE, Plaintiffs respectfully request that this Court enter injunctive relief in their favor as follows:

A.    Grant temporary and permanent mandatory injunctions against Defendants, enjoining each Defendant from interfering or otherwise involving themselves in any way with the management of Plaintiffs;

B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper

under the circumstances.

<u>COUNT III</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY and PEREZ*
*AS TO TERMS OF PROMISSORY NOTE and SECURITY PROVISION*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

218.    The Security Provision creates a viable security interest in the securities of RMST and other stock held by Defendants, notwithstanding Defendants' failure to execute the stock powers as contemplated by Section 2 of the Security Provision.

219.    The failure of Defendants to execute the necessary stock powers does not obviate or eliminate STARK's security interest in the securities of RMST and other stock held by Defendants; it merely impedes STARK's ability to exercise the rights granted to him upon default of Defendants in the absence of such executed stock powers.

220.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that in the absence of the requisite stock powers, STARK may assert and exercise his security interest in the securities of RMST and other stock held by Defendants.

221.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

222.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

50

A.      The Security Provision creates for STARK a viable security interest in the securities of RMST and other stock held by Defendants, notwithstanding the failure of Defendants to execute the stock powers;

B.      Defendants are required to execute the requisite stock powers within five (5) days of entry of such order of this Court and, failing same, by operation of law, STARK may proceed to assert or exercise his security interest in the securities of RMST and other stock held by Defendants;

C.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

D.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT IV</u>

*BREACH OF PROMISSORY NOTE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

223.   On or about September 22, 2020, Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ signed and delivered to STARK the Note in the original principal amount of $2,900,000.00 with interest thereon at the rate of five (5%) percent per annum.

224.   In accordance with the terms of the Note, Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ promised to pay to STARK on September 22, 2021, the sum of $261,749.11, representing a principal payment of $225,499.11 and accrued interest in the amount of $36,250.00.

225.    Upon default in payment, the express provisions of the Note provide that the entire balance may be accelerated.

226.    Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ have defaulted in the payment of said Note.

227.    There is presently due and owing the Plaintiff the amount of $2,900,000.00, plus all accrued interest thereon at a rate of five (5%) percent per annum.

228.    Plaintiff is entitled to payment in full pursuant to the terms of the Note.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Awarding STARK all amounts due under the Note, together with all accrued, unpaid interest thereof, pursuant to the default of Defendants PREMIUM INTL, NICOLAYEVSKY and PEREZ;

B.    Awarding STARK his attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

COUNT V

*BREACH OF STOCK PURCHASE AGREEMENT*
*AS TO PREMIUM 72, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

229.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ entered into a Stock Purchase Agreement with STARK pursuant to which Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ were to purchase RMST and RM STARK.

230.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ not only failed to comply with the Stock Purchase Agreement, but NICOLAYEVSKY unilaterally and without any justification whatsoever caused the escrow agent, Attorney Gregory Levine, to withhold an amount in excess of $30,000 from STARK at the time of the closing.

231.    Notwithstanding NICOLAYEVSKY's acknowledgment that the withheld amount is due and payable to STARK, these monies remain outstanding and are still due and payable to STARK.

232.    Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ breached the Stock Purchase Agreement with STARK by failing to pay in full the amounts due under the Stock Purchase Agreement.

233.    STARK has been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Awarding STARK all remaining amounts due under the Stock Purchase Agreement as a result of the default of Defendants PREMIUM 72, NICOLAYEVSKY and PEREZ;

B.      Awarding STARK his attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

## COUNT VI

*BREACH OF SUPPLEMENTAL PURCHASE AGREEMENT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

234.    Defendants entered into a Supplemental Purchase Agreement to further compensate STARK for the purchase of his RMST stock.

235.    Defendants failed to comply with the Supplemental Purchase Agreement by their failure to make payment as contemplated therein.

236.    As a result, Defendants have breached the Supplemental Purchase Agreement.

237.    STARK has been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Awarding STARK all amounts due and owing under the Supplemental Purchase Agreement;

B.    Awarding STARK his attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT VII</u>

*BREACH OF CMA*
*AS TO PREMIIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

238.    Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ are subject to the CMA.

239.    Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ failed to comply with the CMA by wrongfully interfering with the management and operations of RMST and RM STARK.

240.   As a result, Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ have breached the CMA.

241.   Plaintiffs have been damaged by such breach.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Finding that the Defendants PREMIUM 72, PREMIUM INTL, AYNBET, NICOLAYEVSKY and PEREZ breached the CMA by wrongfully interfering with the management and operations of RMST and RM STARK;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT VIII</u>

*BREACH OF FIDUCIARY DUTY*
*AS TO PREMIIUM 72, AYNBET, NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

242.   As a result of the consummation of the Second Closing pursuant to the Stock Purchase Agreement between STARK and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ are majority shareholders in RMST.

243.   As the majority shareholders, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ owe a fiduciary duty to the Plaintiffs.

244.    Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ have breached their fiduciary duty to Plaintiffs by flagrantly violating the CMA; applying for loans and using the assets of RMST and RM STARK as collateral without authorization; causing RM STARK's net capital to fall below FINRA requirements; engaging in identity fraud by utilizing the confidential information of RM STARK to procure PPP loans and otherwise using the proceeds of said loans for their own personal benefit; and concealing their malicious, fraudulent, and illegal conduct from Plaintiffs.

245.    Plaintiffs have been damaged by such breach.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY and PEREZ breached their fiduciary duties to Plaintiffs;

B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT IX</u>

*TORTIOUS INTERFERENCE*
*AGAINST PREMIIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

246.    Plaintiffs have a business and contractual relationship with FINRA.

247.    As part of the dealings between Plaintiffs and Defendants, Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT were well aware of Plaintiff's relationship with FINRA, and knew that RMST and RM STARK were subject to

FINRA regulations.

248. Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT willfully and tortiously interfered in the relationship between RMST and RM STARK, without justification other than to harm RMST and RM STARK.

249. Plaintiffs have been damaged by such breach.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A. Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT breached their fiduciary duties to Plaintiffs;

B. Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C. For any and all further relief that this Court deems just and proper under the circumstances.

## COUNT X

*ACCOUNTING AND ACCESS TO RECORDS*
*AGAINST PREMIIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

250. There is a complex relationship between Plaintiffs and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT.

251. Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have a fiduciary relationship with Plaintiffs.

252. The transactions between Plaintiffs and Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT are voluminous and complex.

253. Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have stated to Plaintiffs that there are financial transactions affecting Plaintiffs that have not been disclosed to Plaintiffs.

254. Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have withheld relevant documentation from Plaintiffs and obfuscated access to the records of RMST and RM STARK.

255. As a result of the unknown and deliberately concealed or undisclosed information in the possession of Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT, Plaintiffs have no adequate remedy at law.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A. Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT have a fiduciary duty to Plaintiffs;

B. Finding that the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT engaged in voluminous and complex transactions with Plaintiffs;

C. Requiring the Defendants PREMIUM 72, AYNBET, NICOLAYEVSKY, PEREZ and WRIGHT to provide an accounting of all transactions on behalf of, or on account of, RMST or RM STARK from October 8, 2019 through the present date;

D. Requiring the Defendants to provide Plaintiffs with access to all documentation and records in the possession of Defendants within five (5) days of this Court's order;

E.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

F.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XI</u>

*PETITION TO APPOINT A RECEIVER*
*AS TO PREMIUM 72 and PREMIUM INTL*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

256.    STARK is the Chairman of the Board of RM STARK.

257.    NICOLAYEVSKY and PEREZ failed and refused to advise STARK, as Chairman of the Board of the Board of RM STARK and PREMIUM 72 of any business plans, decisions, and by such failure and refusal or allow STARK to exercise any authority, control, or vote in such management and decisions affecting the entities, NICOLAYEVSKY and PEREZ have improperly and recklessly managed PREMIUM 72 and PREMIUM INTL and their respective assets, including RM STARK.

258.    NICOLAYEVSKY and PEREZ have managed PREMIUM 72 and PREMIUM INTL in a manner that violates the Stock Purchase Agreement, the Supplemental Purchase Agreement, and the CMA; they have defaulted on the Promissory Note; and they have taken such other actions that are inconsistent with the rights of the Plaintiffs.

259.    The actions of NICOLAYEVSKY and PEREZ have placed the ongoing business and security of RM STARK in serious jeopardy.

260.    Consequently, NICOLAYEVSKY and PEREZ cannot, and should not, be trusted to manage or operate RM STARK in a manner which jeopardizes its business as a going concern, its reputation, or its licensure as a broker-dealer, and the services of a

Court-appointed receiver are necessary to protect and preserve the interests of RM STARK.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Appointing a receiver to operate the affairs of PREMIUM 72 and PREMIUM INTL (including, but not limited to, the operation and management of RM STARK) in a manner consistent with the way in which RM STARK was operated and managed under STARK and/or Stacey Stark, each as Chief Executive Officer;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XII</u>

*CIVIL THEFT*
*AS TO NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

261.    NICOLAYEVSKY and PEREZ have knowingly misappropriated funds from Plaintiffs by virtue of applying for and obtaining various PPP loans, which proceeds were taken and utilized by NICOLAYEVSKY and PEREZ, individually.

262.    NICOLAYEVSKY and PEREZ obtained and used the Plaintiffs' property – to-wit, the PPP loan proceeds – with felonious intent.

263.    NICOLAYEVSKY and PEREZ have temporarily or permanently deprived Plaintiffs of the right to benefit from the PPP loan proceeds, or have otherwise appropriated the property for their own use.

264.    Plaintiffs demanded return of all such misappropriated funds which should have been, and were, the rightful property of RM STARK.

265.    Notwithstanding the demands of Plaintiffs, NICOLAYEVSKY and PEREZ have willfully and deliberately refused to return the monies to Plaintiffs.

266.    Plaintiffs have been damaged by the actions of NICOLAYEVSKY and PEREZ.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.    Finding that NICOLAYEVSKY and PEREZ have misappropriated the funds of Plaintiffs;

B.    Ascertaining the amount misappropriated by NICOLAYEVSKY and PEREZ;

C.    Requiring repayment of all misappropriated amounts to Plaintiffs, including interest thereon;

D.    Awarding treble damages pursuant to Fla. Stat. 772.11;

E.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

F.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XIII</u>:

*AIDING AND ABETTING CIVIL THEFT*
*(AS TO BYLINE)*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

267.    BYLINE knowingly rendered substantial assistance to the PURCHASING

DEFENDANTS in knowingly misappropriating funds from Plaintiffs by virtue of providing the proceeds of the 2019 SBA Loan, the BYLINE PPP Loan, and/or the 2020 SBA Loan to one or all of the PURCHASING DEFENDANTS and/or allowing NICOLAYEVSKY to enter into those loans on RMST's behalf without RMST's authorization.

268.    Based on an email from NICOLAYEVSKY's counsel to BYLINE, at the time of the SBA Loan closing, BYLINE knew or should have known that the representations and warranties made by the PURCHASING DEFENDANTS as to their claimed role and interest in RMST were untrue and completely false.  BYLINE further knew or should have known that the PURCHASING DEFENDANTS had, at best, a contingent minority interest in RMST.  Nevertheless, with actual and/or imputed knowledge of the false representations made by the PURCHASING DEFENDANTS in connection with the SBA Loan and PPP Loan, BYLINE approved and effectuated the loans, including the submission of the known fraudulent loan applications and paperwork to the SBA.

269.    Based on said email exchange and other circumstances described above regarding BYLINE's conduct in entering into the loan transactions with NICOLAYEVSKY, BYLINE had actual knowledge of NICOLAYEVSKY's intent to enter into unauthorized loan transactions purportedly on behalf of RMST with the intent to deprive RMST and/or the other Plaintiffs of those funds.

270.    BYLINE knowingly rendered substantial assistance to the PURCHASING DEFENDANTS in obtaining and using the Plaintiffs' property – to-wit, the loan proceeds – with felonious intent.

271.    BYLINE knowingly rendered substantial assistance to the PURCHASING DEFENDANTS in temporarily or permanently depriving Plaintiffs of the right to benefit

from the loan proceeds, or have otherwise appropriated the property for their own use.

272.   BYLINE's conduct was fraudulent, negligent, and/or reckless and with malicious intent to harm Plaintiffs.

273.   Plaintiffs have been damaged by the actions of BYLINE.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.     Finding that BYLINE aided and abetted the PURCHASING DEFENDANTS misappropriating the funds of Plaintiffs;

C.     Requiring repayment of all misappropriated amounts to Plaintiffs, including interest thereon;

D.     Awarding treble damages pursuant to Fla. Stat. 772.11;

E.     Awarding Plaintiffs punitive damages, as well as their attorneys' fees and costs in connection with this action; and

F.     For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XIV</u>

*CONVERSION*
*AS TO NICOLAYEVSKY and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

274.   NICOLAYEVSKY and PEREZ have knowingly misappropriated funds from Plaintiffs by virtue of applying for and obtaining various PPP loans, which proceeds were taken and utilized by the PURCHASING DEFENDANTS.

275.   The proceeds of any PPP loans issued to RM STARK were and are the property of RM STARK.

276.    NICOLAYEVSKY and PEREZ wrongfully obtained and used the Plaintiffs' property, to-wit: the PPP loan proceeds, and converted such PPP loan proceeds to their own personal use.

277.    The wrongful acts of NICOLAYEVSKY and PEREZ are inconsistent with the property rights of the Plaintiffs and their interest in and to the PPP loan proceeds.

278.    Plaintiffs have been damaged by the actions of NICOLAYEVSKY and PEREZ.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Finding that NICOLAYEVSKY and PEREZ have improperly converted the property of the Plaintiffs to their own personal use;

B.      Ascertaining the amount converted by NICOLAYEVSKY and PEREZ;

C.      Requiring repayment of all converted amounts to Plaintiffs, including interest thereon;

D.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

E.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XV</u>

AIDING AND ABETTING CONVERSION AS TO BYLINE

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

279.    BYLINE knowingly rendered substantial assistance to the PURCHASING

DEFENDANTS in knowingly misappropriating funds from Plaintiffs by virtue of providing the proceeds of various loans written in favor of the Plaintiffs to the PURCHASING DEFENDANTS and/or in allowing NICOLAYEVSKY to enter into loan transactions on RMST's behalf without RMST's authorization.

280.   Based on an email from NICOLAYEVSKY's counsel to BYLINE, at the time of the SBA Loan closing, BYLINE knew or should have known that the representations and warranties made by the PURCHASING DEFENDANTS as to their claimed role and interest in RMST were untrue and completely false.  BYLINE further knew or should have known that the PURCHASING DEFENDANTS had, at best, a contingent minority interest in RMST.   Nevertheless, with actual and/or imputed knowledge of the false representations made by the PURCHASING DEFENDANTS in connection with the SBA Loan and PPP Loan, BYLINE approved and effectuated the loans, including the submission of the known fraudulent loan applications and paperwork to the SBA.

281.   Based on said email exchange and other circumstances described above regarding BYLINE's conduct in entering into the loan transactions with NICOLAYEVSKY, BYLINE had actual knowledge of NICOLAYEVSKY's intent to enter into unauthorized loan transactions purportedly on behalf of RMST with the purpose of depriving RMST and/or the other Plaintiffs of those funds.

282.   The proceeds of the BYLINE PPP Loan RMST were and are the property of RMST.

283.   Neither RMST or any of its assets can be attached or levied by BYLINE in connection with the BYLINE SBA Loan.

284.   BYLINE knowingly rendered substantial assistance the PURCHASING

DEFENDANTS in wrongfully obtaining and using the Plaintiffs' property, to-wit: the various loan proceeds, and converted such loan proceeds to their own personal use.

285.   BYLINE knowingly rendered substantial assistance to the PURCHASING DEFENDANTS in committing wrongful acts inconsistent with the property rights of the Plaintiffs and their interest in and to the various loan proceeds.

286.   Plaintiffs have been damaged by the actions of BYLINE.

287.   BYLINE's conduct was fraudulent, reckless and with malicious intent to harm Plaintiffs.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Finding that BYLINE has aided and abetted the PURCHASING DEFENDANTS in improperly converting the property of the Plaintiffs to their own personal use;

B.      Ascertaining the amount misappropriated by the PURCHASING DEFENDANTS attributable to BYLINE's substantial assistance;

C.      Requiring repayment of all converted amounts to Plaintiffs, including interest thereon;

D.      Awarding Plaintiffs punitive damages, as well as their attorneys' fees and costs in connection with this action; and

E.      For any and all further relief that this Court deems just and proper under the circumstances.

COUNT XVI

NEGLIGENCE AS TO BYLINE

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

288.  BYLINE owed Plaintiffs a duty of care in reviewing, approving and funding the 2019 SBA Loan,  the BYLINE PPP Loan, and/or the 2020 SBA Loan.

289.   According to BYLINE, RMST was a "borrower" under the 2019 SBA Loan, the Byline PPP Loan, and the 2020 SBA Loan. Based on this position, RMST was a customer of BYLINE in connection with the 2019 SBA Loan transaction, the Byline PPP Loan transaction, and the 2020 SBA Loan transaction.

290.   A bank, such as BYLINE, has a duty to use ordinary care in all of its dealings.

291.   A bank, such as BYLINE, owes a duty to use ordinary care in transactions with customers.

292.   A bank, such as BYLINE, when dealing with a purported officer of a corporation has a duty to inquire into the officer's authority when circumstances indicate a potentially fraudulent purpose.

293.   Alternatively, if RMST was not a customer of BYLINE, BYLINE was nonetheless aware and/or understood that its customers, the PURCHASING DEFENDANTS, owed a fiduciary duty to RMST and STARK, by virtue of their minority shareholder status and purported authority to enter into the 2019 SBA Loan, the Byline PPP Loan, and/or the 2020 SBA Loan, and/or by way of NICOLAYEVSKY'S represented role as President of RMST.

294.   BYLINE breached its duty to RMST in allowing NICOLAYEVSKY, an

unauthorized individual, to enter into the 2019 SBA Loan transaction on behalf of RMST with BYLINE.

295.   BYLINE breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the BYLINE PPP Loan transaction.

296.   BYLINE breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the 2020 SBA Loan transaction on behalf of RMST with BYLINE.

297.   BYLINE breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the 2019 SBA Loan transaction, the BYLINE PPP Loan transaction, and/or the 2020 SBA Loan transaction without first adequately verifying NICOLAYEVSKY's authority to bind and/or act on behalf of RMST in connection with any or all of those transactions.

298.   BYLINE further breached its duty when it advanced the loan proceeds to one or all of the PURCHASING DEFENDANTS in connection with the 2019 SBA Loan,  the BYLINE PPP Loan, and/or the 2020 SBA Loan while it was aware that none of the PURCHASING DEFENDANTS were not authorized to apply for and receive same, and that gross misrepresentations of fact were made on the loan applications and/or other loan documents.

299.   PLAINTIFFS have suffered injury as a result of BYLINE's breach of its duty of care, including but not limited to injury in the form of encumbrance upon RMST and/or RM Stark's assets, decline in RMST and/or RM Stark's value by reason of such encumbrances.

300.   BYLINE's negligence is the direct and proximate cause of Plaintiffs' injuries.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.     Finding that BYLINE acted negligently reviewing, approving and funding the proceeds of the 2019 SBA Loan, a the BYLINE PPP Loan, and/or the 2020 SBA Loan to the PURCHASING DEFENDANTS;

B.     Requiring repayment of all loan amounts to Plaintiffs, including interest thereon;

C.     Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

D.     For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XVII</u>

GROSS NEGLIGENCE AS TO BYLINE

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

301.  BYLINE owed Plaintiffs a duty of care in reviewing, approving and funding the 2019 SBA Loan,  the BYLINE PPP Loan, and/or the 2020 SBA Loan.

302.   According to BYLINE, RMST was a "borrower" under the 2019 SBA Loan, the Byline PPP Loan, and the 2020 SBA Loan. Based on this position, RMST was a customer of BYLINE in connection with the 2019 SBA Loan transaction, the Byline PPP Loan transaction, and the 2020 SBA Loan transaction.

303.   A bank, such as BYLINE, has a duty to use ordinary care in all of its dealings.

304.   A bank, such as BYLINE, owes a duty to use ordinary care in transactions

with customers.

305.   A bank, such as BYLINE, when dealing with a purported officer of a corporation has a duty to inquire into the officer's authority when circumstances indicate a potentially fraudulent purpose.

306.   Alternatively, if RMST was not a customer of BYLINE, BYLINE was nonetheless aware and/or understood that its customers, the PURCHASING DEFENDANTS, owed a fiduciary duty to RMST and STARK, by virtue of their minority shareholder status and purported authority to enter into the 2019 SBA Loan, the Byline PPP Loan, and/or the 2020 SBA Loan, and/or by way of NICOLAYEVSKY'S represented role as President of RMST.

307.   BYLINE recklessly breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the 2019 SBA Loan transaction on behalf of RMST with BYLINE.

308.   BYLINE recklessly breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the BYLINE PPP Loan transaction.

309.   BYLINE recklessly breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the 2020 SBA Loan transaction on behalf of RMST with BYLINE.

310.   BYLINE recklessly breached its duty to RMST in allowing NICOLAYEVSKY, an unauthorized individual, to enter into the 2019 SBA Loan transaction, the BYLINE PPP Loan transaction, and/or the 2020 SBA Loan transaction without first adequately verifying NICOLAYEVSKY's authority to bind and/or act on behalf of RMST in connection with any or all of those transactions.

311.   BYLINE breached its duty when it recklessly advanced the proceeds of 2019 SBA Loan, the Byline PPP Loan, and/or the 2020 SBA Loan to one or all of the PURCHASING DEFENDANTS, individually, while aware that none of the PURCHASING DEFENDANTS were authorized to apply for and receive the proceeds of such loans.

312.   In advancing the loan proceeds to one or all of the PURCHASING DEFENDANTS, BYLINE acted with conscious disregard or indifference to the rights of the Plaintiffs.

313.   Plaintiffs have suffered injury as a result of BYLINE's reckless breach of its duty of care, including but not limited to injury in the form of encumbrance upon RMST and/or RM Stark's assets and decline in RMST and/or RM Stark's value by reason of such encumbrances.

314.   BYLINE's gross negligence is the direct and proximate cause of Plaintiffs' injuries.

**WHEREFORE,** the Plaintiffs respectfully request that this Court enter a judgment as follows:

A.      Finding that BYLINE was grossly negligent in reviewing, approving and funding the proceeds of the various loans to the PURCHASING DEFENDANTS;

B.      Awarding Plaintiffs punitive damages pursuant to Fla. Stat. § 768.72(2)(b);

C.      Requiring repayment of all loan amounts to Plaintiffs, including interest thereon;

D.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

E.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XVIII</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ and BYLINE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

315.    NICOLAYEVSKY and PEREZ, without any authority whatsoever, borrowed money on behalf of RMST with BYLINE through the  2019 SBA Loan, Byline PPP Loan and 2020 SBA Loan.

316.    The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

317.    By its own express terms, the 2019 SBA Loan demonstrated that because NICOLAYEVSKY was purchasing RMST, he would have lacked the authority to enter into a transaction on RMST's behalf prior to the purchase.

318.    Additionally, at all times relevant NICOLAYEVSKY lacked any authority to bind RMST to the 2019 SBA Loan, , Byline PPP Loan and/or the 2020 SBA Loan.

319.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the 2019 SBA Loan, Byline PPP Loan and 2020 SBA Loan from BYLINE is not enforceable against RMST and RM STARK.

320.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

321.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.   The 2019 SBA Loan, Byline PPP Loan and 2020 SBA Loan from BYLINE are unenforceable against RMST and RM STARK;

B.   Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.   For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XIX</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ and ZAM*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

322.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with ZAM.

323.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

324.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from ZAM is not enforceable against RMST and RM STARK.

325.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

326.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory

judgment in their favor, finding that:

A.   The loan from ZAM is unenforceable against RMST and RM STARK;

B.   Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.   For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XX</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ and KINGDOM*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

327.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with KINGDOM.

328.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

329.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from KINGDOM is not enforceable against RMST and RM STARK.

330.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

331.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The loan from KINGDOM is unenforceable against RMST and RM STARK;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

COUNT XXI

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *NFG*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

332.    NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with NFG.

333.    The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

334.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from NFG is not enforceable against RMST and RM STARK.

335.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

336.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory

75

judgment in their favor, finding that:

A.     The loan from NFG is unenforceable against RMST and RM STARK;

B.     Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.     For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXII</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *PROMPT*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

337.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with PROMPT.

338.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

339.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from PROMPT is not enforceable against RMST and RM STARK.

340.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

341.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The loan from PROMPT is unenforceable against RMST and RM STARK;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXIII</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *PINNACLE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

342.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with PINNACLE.

343.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

344.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from PINNACLE is not enforceable against RMST and RM STARK.

345.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

346.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The loan from PINNACLE is unenforceable against RMST and RM STARK;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXIV</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *MONEY STORE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

347.    NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with MONEY STORE.

348.    The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

349.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from MONEY STORE is not enforceable against RMST and RM STARK.

350.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

351.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present

controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

      A.    The loan from MONEY STORE is unenforceable against RMST and RM STARK;

      B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

      C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXV</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *BITTY*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

352.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with BITTY.

353.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

354.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from BITTY is not enforceable against RMST and RM STARK.

355.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

356.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

      A.    The loan from BITTY is unenforceable against RMST and RM STARK;

      B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

      C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXVI</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, PEREZ* and *BYLINE*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

357.   NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged RMST and RM STARK as collateral for a loan with BYLINE for the acquisition of SANDLAPPER's assets.

358.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

359.   Willfully and intentionally, BYLINE failed to do any due diligence with respect to the SANDLAPPER acquisition. BYLINE's decision to approve loans to NICOLAYEVSKY and PEREZ is core to this controversy. The BYLINE's complete lack of due diligence resulted in loans being made that should never have been granted. Thus STARK, RMST, and RM STARK have all suffered grievous harm. In addition to declaring that the loan in not enforceable we need to claim substantial damages from the BYLINE.

360.   Accordingly, there is a bona fide actual and practical need for a declaration

by this Court that the loan from BYLINE is not enforceable against RMST and RM STARK.

361.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

362.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.    The loan from BYLINE for the acquisition of SANDLAPPER is unenforceable against RMST and RM STARK;

B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXVII</u>

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

363.   F.S. 607.0801 requires that all corporate actions must be exercised by or under the authority of the board of directors of the corporation.

364.   NICOLAYEVSKY and PEREZ's actions purportedly on behalf of RM STARK and RMST were taken unilaterally in flagrant disregard of Florida law.

365.   As such, their actions on behalf of RM STARK and RMST were ultra vires and without authority.

81

366.    Those dealing with NICOLAYEVSKY and PEREZ knew or should have known, and had a duty to inquire, as to their capacity to enter into the transactions.

367.    Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the actions taken unilaterally by NICOLAYEVSKY and PEREZ on behalf of RM STARK and RMST without the requisite approval of the Board of Directors pursuant to F.S. 607.0801 was ultra vires.

368.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

369.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The unilateral actions by NICOLAYEVSKY and PEREZ on behalf of RMST and RM STARK were ultra vires and void as a matter of law;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

COUNT XXVIII

*DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY, and PEREZ*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

370.    NICOLAYEVSKY and PEREZ, without any authority whatsoever, pledged

RMST and RM STARK as collateral for a loan with BYLINE as to the PPP loans.

371.   The lack of authority of NICOLAYEVSKY and PEREZ to enter into a loan that encumbers RMST and RM STARK's assets is untenable.

372.   Accordingly, there is a bona fide actual and practical need for a declaration by this Court that the loan from BYLINE as to the PPP loan is not enforceable against RMST and RM STARK.

373.   This is a present controversy as to the obligations and duties of the Defendants and the impact upon STARK of the failure of Defendants to act.

374.   There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.      The PPP loan from BYLINE is unenforceable against RMST and RM STARK;

B.      Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.      For any and all further relief that this Court deems just and proper under the circumstances.

<u>COUNT XXIX</u>

*ALTERNATIVE DECLARATORY RELIEF*
*AGAINST PREMIUM 72, PREMIUM INTL, NICOLAYEVSKY and PEREZ*
*AS TO BYLINE, ZAM, KINGDOM, NFG, PROMPT, PINNACLE, MONEY STORE,*
*BITTY*

Plaintiffs reaffirm and reallege Paragraphs 1 through 205 as if fully set forth herein.

375.    In the event any loan by BYLINE, ZAM, KINGDOM, NFG, PROMPT, PINNACLE, MONEY STORE OR BITTY by is held to be valid against RMST or RM STARK, because of the competing claims of priority, there is a bona fide actual and practical need for a declaration by this Court as to the priorities of the claims by STARK, BYLINE, ZAM, KINGDOM, NFG, PROMPT, PINNACLE, MONEY STORE OR BITTY.

376.    This is a present controversy as to the obligations and duties of the Defendants and the impact upon Plaintiffs.

377.    There is a clear need for the declaration by this Court; this is not a mere request for an advisory opinion but, rather, a request for relief to resolve a present controversy between the subject parties.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter declaratory judgment in their favor, finding that:

A.    If any loan by BYLINE, ZAM, KINGDOM, NFG, PROMPT, PINNACLE, MONEY STORE OR BITTY by is held to be valid against RMST or RM STARK, a declaration as to the priorities of the loans;

B.    Awarding Plaintiffs their attorneys' fees and costs in connection with this action; and

C.    For any and all further relief that this Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury with the maximum number of jurors permitted by law.

Dated:  November 14, 2022

**D'AMURA & ZAIDMAN, PLLC**

_/s/ Richard A. D'Amura_
RICHARD A. D'AMURA
Florida State Bar No. 663921
1061 Michigan Ave., Unit 1
Miami Beach, Florida 33139
Phone: (310) 945-5306
Email: rdamura@dz-pllc.com

AND

_/s/ Joel M. McTague_
JOEL MARTIN MCTAGUE, ESQ.
Florida Bar No. 174406
LEANNE B. WAGNER, ESQ.
Florida Bar No. 0057847
Frank Weinberg Black, P.L.
7805 SW 6th Court
Plantation, FL 33324
Phone: 954-474-8000
Email: jmctague@fwblaw.net
          talberga@fwblaw.net

_Attorneys for Plaintiffs RMST Holding
Company, Inc., R.M. Stark & Co., Inc., and
Gary L. Stark_

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF and is being served via Electronic Mail on the following: Justin C. Carlin (eservice@carlinfirm.com), counsel for Premium 72 Capital, LLC, Premium 72 International, LLC, Aynbet Investments, LLC, Arturo Nicolayevksy, and Eduardo Perez, and Jason Henry Baruch and (jason.baruch@hklaw.com) and Daniel L. Buchholz (daniel.buchholz@hklaw.com), counsel for Byline, on this 14th day of November, 2022. Service will be accomplished upon the following parties not having yet appeared pursuant to Fed.R. 4:

        Zahav Asset Management, LLC

        Kingdom Logistics, LLC

        NFG Advance, LLC

        Prompt Capital Funding, LLC

        Pinnacle Business Funding, LLC

        Money Store Funding,

        Bitty Advance 2, LLC

                        */s/ Richard A. D'Amura*
                        Richard A. D'Amura