## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ARTURO NICOLAYEVSKY | Civil Case No. 9:21-CV-81995-AMC |
| **Plaintiff/Cross-Complainants,** | FILED BY _____ hot _____ D.C. |
| **v.** | FEB 17 2023 |
| GARY STARK,<br>ELLEN ADLER,<br>STACEY STARK. | ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S.D. OF FLA. – W.P.B. |
| **Defendants.** | |

### PLAINTIFF'S CROSS-COMPLAINT, SEEKING DISSOLUTION OF PSA AND INDEMNIFICATION, IN RESPONSE TO DEFENDANT'S THIRD AMENDED COMPLAINT DATED NOVEMBER 14, 2022

It is hereby submitted before this honorable Court:

That Plaintiff, ARTURO NICOLAYEVSKY, is submitting this instant cross-complaint ("**Cross-Complaint**") in response to Defendant's complaint dated November 14, 2022, filed before this court ("**Complaint**"). For the reasons set out below, Plaintiff requests that the contents of the Complaint be dismissed by the court in its entirety and that the relief requested in Plaintiff's Cross-Complaint be granted.

### I.   BACKGROUND:

1. Plaintiff[1] vehemently maintains that the Defendant's[2] intentions towards Plaintiff regarding the sale of RMST[3] were not pure, honest, nor transparent from the beginning. Plaintiff has extensive experience in M&As and bought RMST, an <u>unprofitable business</u> from the Defendant with the purpose of turning it around, growing it, and make it profitable, in the

---

[1] Arturo Nicolayevsky
[2] Gary Stark
[3] RMST Holding, Co., Inc. a FL S Corporation

traditional manner M&A transactions are done. Nevertheless, after 2nd Closing,[4] and Byline[5] having paid RMST's purchase price to the Defendant, the Defendant wanted to continue getting same benefits and salaries as before the sale, and to continue to control the Firm[6], based on false assumptions. Since 2nd Closing (09/22/2020) to date, the Defendant has never allowed Plaintiff to manage the Firm as lawful Director/Shareholder,[7] less alone mismanage it.

2. It is clear to Plaintiff that Defendant's intentions all along since Defendant initiated Lawsuit[8] Civil Case No. 9:21-CV-81995-AMC on 10/28/2021 have been malicious, slanderous, false, unsupported, unexplainable, misrepresentative, etc. For example:

    a. RMST's ownership mistake made by GL[9] and Adler[10] in PSA,[11] they wrote that RMST's Buyer was OPC,[12] instead of Arturo Nicolayevsky and Eduardo Perez as individual shareholders of RMST. CPA[13] together with and Eric Hosner[14] discovered PSA's mistake and corrected it with the IRS. CPA proceeded in filing 2020 RMST's Tax returns with IRS, with Plaintiff, Eduardo Perez, and Defendant as individual shareholders of RMST, each receiving a K-1. Both CPA and Eric Hosner advised both Plaintiff and Defendant to amend PSA, Byline's Loan and FINRA's registrations. Furthermore, all MCA loans Plaintiff made with MCA lenders, (unlawfully listed as Defendants in Lawsuit Docket [117]) were signed under P72's[15] name, and nowhere in any of these MCA loans is ever mentioned nor included RMST/RMS. Therefore, P72, OPC, AynBet[16] and all MCA Lenders included in Lawsuit Docket [117] are out of place in Lawsuit and should not be included as Defendants, as none of the entities above

---

[4] Date when Plaintiff remaining 76% of RMST's equity on 09-22-2020.
[5] Byline Bank, Plaintiff's SBA Lender
[6] RM Stark, Co., Inc. a FL S Corporation
[7] Arturo Nicolayevsky
[8] Lawsuit Case 9-21-CV-81995-AMC, US District Court for Southern District of FL
[9] Greg Levine, Plaintiff's Securities Lawyer who wrote PSA (together with Adler), CMA, Net Capital Clause in Byline's Loans, an RIA and Broker Dealer specialist.
[10] Ellen Adler (Defendant), Defendant's Partner
[11] Equity Purchase and Sell Agreement for P72 to purchase RMST written by Greg Levine and Ellen Adler
[12] OPC Advisors, LLC's new name is Premium 72 Capital, LLC (P72), a TX LLC. Name was changed on 11/2020.
[13] Rob Dunleavy is Defendant's CPA
[14] Plaintiff's Tax Attorney
[15] Premium 72 Capital, LLC, a TX LLC is the new name of OPC Advisors, LLC. Name was changed on 11/2020.
[16] AynBet Investments, LLC, a TX LLC owned 100% by Arturo Nicolayevsky, that owns 82% of Premium 72 Capital, LLC. AynBet was started on 04/12/2011.

mentioned have any relationship nor involvement nor participation with RMST/RMS,[17] nor did any of these companies ever signed a document or agreement with Defendant. Defendant knew this, but maliciously included all the above entities in Lawsuit, to further convolute, confuse and prolong Lawsuit, with the intention of financially destroying and driving Plaintiff to bankruptcy while keeping RMST/RMS and Byline's payment.

b. During Plaintiff's trip to Florida on 02/2020, Defendant told Plaintiff that he had to be registered as an RMS employee and needed to take Plaintiff's fingerprints to register him with FINRA. Plaintiff followed Defendant's requests, which totally contradict Attestation Letter Plaintiff signed on 04/05/2020. Defendant then charged Plaintiff for his FINRA registration and defamed Plaintiff with FINRA, by telling them Plaintiff registered himself as RMS' employee and violated Attestation Letters, and FINRA's regulations. This is one of many premeditated and malicious acts Defendant did to Plaintiff, right after 1st Closing.

3. Defendant hired BFA,[18] a Forensic Accounting Firm, and an employee of CRC,[19] a 3rd party FINRA registered and licensed FINOP with more than 35 years of experience, to reproduce and further research the accounting records Defendant had provided Plaintiff before PSA was signed, during CMA, and after 2nd Closing. Both CRC and BFA concluded in their report that they both found several accounting irregularities in RMS' financial records and reports. Plaintiff requested additional information from Defendant, and Defendant and his counsel at FWB, illegally refused to provide them to Plaintiff. Moreover, after 2nd Closing, it became clear that neither Defendant nor CEO wanted to provide detailed financial supportive information to Plaintiff, despite the Plaintiff and BFA discovering major differences from what Defendant reported in financial statements and tax returns to IRS, FINRA and SEC, and what real-time Firm's cash flow showed.

---

[17] RM Stark, Co., Inc. a FL S Corporation
[18] Bederson Forensic Accountants
[19] CRC's Independent FINOP hired by P72 to review Defendant's work.

4. Based on the above, it is very clear to the Plaintiff that the Defendant has been and continues to withhold and hide RMS' true financial information from FINRA, SEC, Byline, IRS, Byline and Plaintiff. Plaintiff confronted Defendant many times and requested verbally and in writing such supportive financial information; however, the Defendant refused to provide it despite their fiduciary and legal obligation to Plaintiff as Shareholder and Director of the Firm.

5. Hence, the Defendant misrepresented a plethora of information to the Byline, FINRA, Plaintiff, a few of which are highlighted herein below:

   a. **<u>BYLINE:</u>**

      i. Byline and SBA, per regulations, lawfully prepared RMST's SBA loan documentation which included a) GL's approved Net Capital Clause, b) SBA's requirement for Plaintiff to sign as RMST's President before 2nd Closing and c) SBA's requirement for putting RMST as co-borrower of the loan. These were and are SBA and Banking regulations, which Plaintiff has no control of, and Plaintiff just followed Byline's instructions. There was never a deliberate, malicious action nor misrepresentation by neither Byline nor Plaintiff towards Defendant or any regulator.

      ii. RMST' SBA Loan documentation (including all language, and false accusations Defendant's claims in Lawsuit) was approved by SBA, Byline and FINRA. Moreover, Defendant got a copy of Byline's loan documentation that included Net Capital Clause, Plaintiff as President of RMST, and RMST as co-borrower by Byline by 06/2020. Had Defendant had any problem with Byline's/SBA's documents and verbiage within, Defendant had 3 months to cancel/rescind RMST's sale, as 2nd Closing was scheduled for 09/22/2020; however, Defendant never did which means Defendant agreed with all Byline's Loan documents.

      iii. Byline and SBA, per SBA regulations, lawfully prepared P72's PPP[20] Loans. Any debt that Plaintiff may have with SBA, will be dealt between SBA/Byline and

---

[20] SBA PPP loan Byline funded Plaintiff.

Plaintiff. Defendant has no right to claim proceeds of PPP loan from Plaintiff nor Byline. Plaintiff lawfully used the PPP proceeds to pay P72's SBA approved expenses and <u>not</u> for personal use, as Defendant falsely accused Plaintiff.

iv.   Neither Plaintiff nor Byline ever committed fraud.  Byline is a regulated and registered bank that would never collude with any client to do illicit/illegal activities, as Defendant has absurdly accused both Byline and Plaintiff.

**b.  <u>FINRA:</u>**

i.   <u>CMA's questionnaire:</u> Defendant misrepresented FINRA, Byline, SBA and Plaintiff of <u>RMS' Material Weakness</u> and <u>RMS' Cash Flow</u>.  RMS was losing money every month most of 2019 and 2020, as per Financial Statements Defendant provided Byline, FINRA and Plaintiff.

ii.   <u>CMA Questionnaire:</u> Plaintiff asserts that Defendant and his counsel wrongfully used "certain" CMA's questionnaire answers, as basis of their accusations, including Defendant alleged Plaintiff's intrusion in RMS' day-to-day activities in their 03/19/2021 and 03/26/2021 Cease and Desists letters and Lawsuit.  Plaintiff NEVER intervened in any day-to-day operations, as FINRA defines it.  Plaintiff always acted in duly lawful way with Defendant, as Director and Shareholder of RMST/RMS.

iii.   <u>CMA Approval:</u> FINRA summarized its decision to approve Plaintiff as new RMST/RMS owner based on: (i) Questionnaire's answers, (ii) 04-05-2020 Attestations Letters, where FINRA prohibited Plaintiff to actively work or be part of RMS' day-do-day operations, until such time as Plaintiff obtains the proper FINRA licenses to become principal; and (iii) 09-02-2020 FINRA's Final approval letter, where FINRA <u>only</u> (not numerous conditions, as Defendant claimed in Lawsuit) request was that they had to be informed by new owners if and when new owners want to make material changes to the Firm, i.e., add/remove any officers from RMS.

During 2021, Plaintiff contacted FINRA regarding changing RMS' officers and FINRA provided Plaintiff with a detailed questionnaire.

c. **NET CAPITAL:**

    i. Defendant always kept money in RMS' Net Capital account than what was required by both FINRA and Pershing. The additional cash Defendant put in RMS' Net Capital account was Defendant's own personal money that disguised regulators on Defendant' obligation of calculating RMS' Net Capital daily as per FINRA's 15c3-1 rule. All Broker Dealers must calculate Net Capital daily. Nevertheless, Defendant only calculated RMS' Net Capital once a month with 7-week-old data. After 2nd Closing, Plaintiff wanted to implement new technology in order for Firm to be able to calculate Net Capital daily and be in compliance with FINRA. Therefore, in Plaintiff's opinion, none of the Net Capital calculations and reports that RRS[21] and/or FINOP's[22] produced and continue to produce on a monthly basis and file with both FINRA and Pershing have never been nor correct nor accurate nor timely; these inaccurate Net Capital Reports also apply to those reports that were Defendant used during FINRA's AMZ investigation.

    ii. AMZ' loans were mistakenly drafted with a clerical error that Defendant used as an excuse to accuse Plaintiff of "purposely" putting the Firm in jeopardy by borrowing money with collateral of clients' assets for his own personal benefit. This is an absurd accusation, as no investor would purposely jeopardize his/her investment in his/her newly purchased company.

II. **LEGAL GROUNDS FOR CROSS-COMPLAINT**

Based on all the above and based on the irreconcilable differences that both Plaintiff and Defendant have for each other, Plaintiff hereby seeks relief from this Court that a) the PSA signed

---

[21] Renaissance Regulatory Services, RMS' Compliance Consultants
[22] Gary Stark

between Plaintiff and Defendant on 01-02-2020 be dissolved and b) Plaintiff seeks <u>complete</u> <u>indemnification from the Defendant</u>, pursuant to reasons and processes defined in PSA's Articles 5.1 and 5.3.

III.    <u>PSA SECTION 5.1</u>

"*…An inaccuracy in any representation of the Company or the Seller[23] in this Agreement or any other Transaction Document…*"

1.  Reference is also made to 2022 Florida Statutes § 92.525, § 775.083, § 837.02, wherein the following perjuries are considered 2nd or 3rd degree felonies.

    a.  <u>Defendant committed perjury/felony, as he lied under oath to FINRA,</u>

        Defendant stated in FINRA's CMA questionnaire that:

        "*… please note that <u>Gary Stark</u>, the current CEO and majority indirect owner has confirmed that he/the parent <u>has not found it necessary</u> to infuse additional capital into the applicant because the pre-existing revenue stream adequately covers all applicant capital needs and has done so for a considerable time.…*"

        "*…c) Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital condition.*"

        However, RMS had been losing money for several months before, during and after CMA. Contrary to what the Defendant affirmed above, after 2nd Closing, FINOP/CEO asked Plaintiff to make capital contributions to RMST/RMS almost every month thereafter, to keep RMS afloat and in compliance with FINRA's Net Capital Regulations.

        Then again, in its Complaint, the Defendant stated that:

        "*…the source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business. Please note that the Applicant is a long standing and viable FINRA member broker dealer firm and that the new*"

---

[23] Gary Stark

*indirect ownership is not seeking to modify the business model at this time. Revenue is earned by the Applicant via commissions..."*

Defendant failed to disclose to FINRA, RMS' material weakness during CMA and clearly violated FINRA's attestations in questionnaire, deceiving FINRA, Byline and Plaintiff.

b.  <u>Defendant committed perjury/felony as he signed under oath both 2019 and 2020 RMS' SEC Audits Reports</u>

Defendant, as RMS' CEO and FINOP and individually responsible for all RMS' financial activities, acknowledged the data included in both SEC Audit Reports was correct, in spite of the several misrepresentations SEC Auditor represented in both reports.  There are several errors and accounting discrepancies between each of 2019 and 2020 SEC's Audit Reports and their corresponding financial statements, including substantial differences in RMS' Net Income and other Firm's expenses as stated by AD's[24], RRS' and Plaintiff' reports. Furthermore, in 2019's Report, there is a -$44,000 "bad debt" reported by AD, that neither AD nor Defendant/FINOP knew where it came from; however, Plaintiff later identify it as payroll. In 2020's Report as well, there is a $245,000 legal expense reported by AD, which should not have been reported in SEC's Audit.

Nevertheless, both 2019 and 2020 SEC Audit Reports attest that Defendant provided.

*"...Supplemental Information..."* to AD, and it was *"...Defendant' responsibility of its accuracy..."*

Plaintiff frequently requested Defendant both verbally and in writing copies of all RMS' "Financial and Accounting Supplemental Information", but Defendant always refused to provide such information to Plaintiff.  Both 2019 and 2020 SEC Audit Reports were done under regular GAAP financial accounting, as stated on page 11 of the 2019 and 2020 SEC Audits:

---

[24] Assurance Dimensions, RMS' SEC Auditor

"... *The Company principally earns revenue (commissions) from brokerage activities, which are recognized **on a trade date basis**...*"

and not under accrued accounting FINRA's 15c3-1 regulation. However, CEO and Defendant told Plaintiff that RMS recognized revenue on **settlement date basis**. Plaintiff never knew what was and is the correct and current financial position of the Firm.

c.    Defendant committed perjury/felony, as he signed under oath Byline's Attestation

Defendant confirmed the validity of financial information Defendant provided Byline and Plaintiff prior RMST' SBA Loan, which constituted a misrepresentation of financial data.

d.    Defendant breached PSA's Sections A.j and 2.14,

Defendant did not pay all FINRA's and litigations' expenses incurred during the O'Grady case from Defendant' own money. Even after 2nd Closing, Defendant continued to illegally pay his personal litigation attorneys' fees from RMS' accounts. Therefore, Defendant is guilty of unauthorized expenditures and embezzlement in the amount of $165,972.

2.    All in all, the Defendant violated FINRA, SEC, Florida State Law, RMST's Bylaws, PSA by misrepresenting and providing false financial information to Plaintiff, Byline, FINRA, CMA, IRS, FINRA's Net Capital reports, Monthly Financial Statements, LOI, PSA, and Plaintiff, information that most likely account for theft, fraud, perjuries, felonies and misrepresentations by Defendant. A few of them are outlined herein below, some of which BFA in their 3rd party report confirmed:

a.    Office Expenses: Unexplained, unsupported and unreal;

b.    Professional Fees: These reported fees excluded compliance, legal and accounting expenses. These fees are unexplained, unsupported and unreal;

c.    Clearing Fees: Inability to properly track them;

d.    RIA-Advisory Fees and Expenses: Inability to properly track them;

e.   <u>Compensation</u>: Inability to properly track salaries;

f.   <u>Rent</u>: Inability to properly track rent. RMS made 14-16 rent payments during one calendar year;

g.   <u>Contributions and Distributions</u>: Inability to properly track them;

h.   <u>Uncashed Checks</u>: RMS kept in their FINRA reports, uncashed checks since 2004, clearly a FINRA violation;

i.   <u>ADP Payroll and other expenses</u>: Material differences were found between RMST's tax returns and ADP's Payroll reports. In addition, Defendant reported other unsupported numbers in Tax Returns;

j.   <u>Accrual Expenses</u>: Inability to make sense of or track them. Defendant reported an unexplainable increase of Accrual Expenses from 01/2019 till 08/2021; a **782%** increase that Defendant refused to ever explain Plaintiff or provide any supportive documentation to Plaintiff;

k.   <u>Insurance Expenses</u>: Unexplained insurance expenses paid by RMS, and inability to track them; and

l.   <u>Untrustworthy and often mistaken Financial Information</u>: Plaintiff' mistrust of Defendant' disclosed financial information to FINRA (during CMA), Byline, SBA, and Plaintiff, stems from Defendant' recurring mistakes and careless attitude in his financial reports, as stated on Defendant' May 22, 2020, e-mail, which stated:

> "...*Arturo, I wouldn't rely on these numbers as the correct costs. Over the last seven months there have been numerous account back and forth adjustments...*"

m.   <u>Actual vs. Tax Return reported data</u>: Inability to properly track the multiple differences between the actual expenses and what was reported in tax returns;

n.   <u>Accounting, Reporting and Financial processes and systems</u>: Defendant's eight different accounting variables made RMS' books and records impossible to reconcile and understand to any 3rd party reader:

i.   <u>Variable 1</u>: Defendant <u>only</u> calculated and tracked SEC's required Internal <u>Compliance</u> Control Reporting, which is what RRS filed with FINRA (FINRA's accrual Net Capital calculations and reports)

ii.  <u>Variable 2</u>: Defendant did **<u>not</u>** calculate **<u>nor</u>** tracked SEC's required Internal <u>Financial</u> Control Reporting (regular GAAP accounting methods used by all financial institutions, IRS, and SEC Auditor).    Plaintiff and Byline had a problem with Defendant in this regard.

iii. <u>Variable 3</u>: Revenue calculated and reported on <u>settlement date</u>, as Defendant explained Plaintiff;

iv.  <u>Variable 4</u>: Revenue calculated and reported on <u>trade date</u>, as explained in SEC Auditor's 2019 and 2020 annual reports.

v.   <u>Variable 5</u>: SEC's fiscal year ends on <u>09/30</u>

vi.  <u>Variable 6</u>: IRS fiscal year ends on <u>12/31</u>

vii. <u>Variable 7</u>: Net Capital Calculations were done/reported with 7-week-old data.

viii. <u>Variable 8</u>: Defendant did NOT include in any of the financial statements and filed reports with FINRA <u>any footnotes, no appendices, no explanations</u> on how Defendant arrived at any given reported amount.

All the above variables and their combinations made all RMS' financial statements, FINRA's reports, Tax Returns, SEC audit reports, etc. virtually impossible to reconcile, understand, explain, etc. and <u>in complete violation</u> of all GAAP, IRS, Banking, FINRA, SEC, Florida State Law, and RMST's Bylaws laws and regulations;

## IV.   <u>PSA'S SECTION 5.1-B</u>

*"...An inaccuracy in any representation of the Company or the Seller in this Agreement or any other Transaction Document..."*

1. From the time PSA was signed on 01/02/2020 and the 2nd Closing on 09/22/2020, Defendant had nine months to fix, update, write, complete unfinished work, and make all the appropriate changes and arrangements to RMS and RMST in order to properly sell and deliver the Firm in good standing to Plaintiff by 2nd Closing. However, the Defendant violated the PSA and FINRA's CMA by not delivering to Plaintiff RMS' accounting, HR, compliance, custodial, financial, reporting in good standing/condition and up to date by 2nd Closing. For example:

   a. <u>Defendant failed to provide Plaintiff</u> transparent Financial Reports with footnotes, supporting documents, notes, etc. and all RMS financial activities were not accurate nor transparent, and there were no recorded information of <u>how Defendant processed</u> all financial information.

   b. <u>Defendant violated SEC regulations</u> by not executing SEC's two required methods of reporting: Internal Control over <u>Financial</u> Reporting and Internal Control over <u>Compliance</u> Reporting.

   c. <u>Defendant violated PSA</u> by not complying with Section 481 of IRS Code requiring SEC GAAP Accounting Reports, Section B,

      *"...all accounting terms used in this agreement and not expressly defined in this agreement will have THE MEANINGS GIVEN TO THEM UNDER GAAP..."*

   d. <u>Defendant failed to provide Plaintiff</u> updated and accurate QuickBooks files. The Firm had two files, 1) Adler's, which was used to track all RMS' daily deposits, expenses and payroll. This file is corrupt and unable to produce trustworthy, reconciled nor accurate reports of any kind and b) RRS' QuickBooks File, which only reflects once a month totals per category and does not track each transaction the Firm incurs on a daily basis.

   e. <u>Defendant failed to fix his accounting reports</u> to clearly represent and track in Firm's Financial Statements: a) all of RMS' Pershing accounts, b) income from RR's fees, c) RR's FINRA's registration fees paybacks, among other things.

f. <u>Defendant failed to provide Plaintiff</u> supportive documentation for his Closing Settlement calculations at 2nd Closing, even though Plaintiff requested it. In addition, BFA stated in their report, RMS' inability to properly track Contributions and Distributions and 2nd Closing Settlement's Debits and Credits. As per BFA's report, <u>Plaintiff overpaid Defendant $93,000.</u>

g. Defendant and Plaintiff had a conversation after 1st Closing[25] in regard to changing SEC fiscal year-end to match IRS'; SEC's Fiscal year ends on 09/30 and IRS' Fiscal year ends on 12/31. Defendant failed to consolidate both Year-Ends by 2nd Closing.

2. Adler violated FINRA's regulation, as she is required by FINRA to be licensed with Series 99 in order to legally perform all of Adler's day-to-day activities at RMS, which include as legal advisor, bookkeeper, payroll processer, bill payer, money manager, 401k manager etc. Adler also violated FINRA's AML rule, as she is NOT an independent, nor an unbiased nor an outsider individual to perform AML reviews at RMS, which FINRA considers a conflict-of-interest violation.

3. Defendant's misrepresentation of RMS' true financial information, as Defendant co-mingled SFA's's[26] and RMS' revenue and expenses:

a. When PSA was signed, Defendant owned two business SFA and RMS. Both businesses used the same office space, employees, custodians, etc. Defendant only sold RMS to Plaintiff.

b. During the time of Plaintiff and Defendant signing the PSA and 2nd Closing, Defendant had close to nine months to make a choice of a) formally create a Sharing Agreement between SFA and RMS or b) disassociate these two companies, their shared accounts, and their revenues and expenses, their shared policies, etc. However, even after 2nd Closing, Defendant continued to have five RMS and SFA joint accounts at Pershing, as well as shared RMS and SFA E&O Policy.

---

[25] Date when Plaintiff bought 24% of RMST's equity on 02-06-2020.
[26] Stark Financial Advisors, RIA owned by Defendant not sold to Plaintiff.

    c. After 2nd Closing, SFA's and RMS' affiliation had been separated at FINRA's Gateway but continued to operate as affiliated entities with Pershing.

    d. Moreover, SFA never paid RMS their proportionate share of E&O insurance premium nor their share of payroll, rent, office expenses, utilities, etc. At 2nd Closing, Defendant misrepresented E&O's Policyholders to Plaintiff; and charged Plaintiff all of the Policy's pre-paid amount, including SFA's portion.

    e. The co-mingling of both SFA and RMS revenue and expenses was never accounted nor shown in any of the financial statements Defendant provided Plaintiff, Byline, FINRA, SBA, etc.

    f. After 2nd Closing, SFA and RMS continued to transfer money between both companies without a FINRA registered Sharing Agreement, or any documentation that accounted for each transfer, the amount and the reason for the transfer.

    g. Defendant committed various FINRA violations with the co-mingled accounts and misrepresented and mislead Plaintiff, Byline, SBA, FINRA, SEC, on RMS' true revenue and expenses during Plaintiff' and Byline's due diligence, PSA, 1st Closing, CMA process and even after 2nd Closing period.

4. Other omissions and misrepresentations include items that the Defendant never corrected, updated nor disclosed to Plaintiff <u>prior to 2nd Closing</u>. For example:

    a. <u>Defendant failed to inform</u> Plaintiff that both Jerry Desiderio and Tom Buddie owned less than 5% in the ownership of RMS each.

    b. <u>Defendant failed to inform</u> Plaintiff one day before the 2nd Closing, that Defendant had signed an Independent Contract Agreement with his brother, which included a previously undisclosed fixed salary of $2,000 per month. The Plaintiff asked CEO to explain this matter, but neither CEO nor the Defendant ever properly answered nor resolved this issue. The Defendant also failed to disclose to FINRA, RMS' Material Weakness during CMA.

c.  Defendant failed to deliver to Plaintiff by 2nd Closing, Firm's documents and manuals of operations that were current and in compliance with FINRA. As per FINRA regulations, all company manuals must be current in their documentation of all Firms' operational, financial, custodial, strategic, accounting methods, payroll, IT, processes, activities and policies and procedures, in order to have clarity in the Firm's management and preserve Firm's continuity of operations to avoid disruption in case of employees' dismissal, death, and/or succession. The following documents were not complete nor updated by 2nd Closing:

i.   Accounting and Payroll procedures in Manual of Operations: Defendant violated FINRA's regulation and PSA for not having documented all accounting, recordkeeping, HR, RR's[27] vetting and payroll processes and procedures in RMS' Manual of Operations.

ii.  FINRA monthly Financial Reports: Defendant failed to document the sources, methods and procedures Defendant used to calculate financial data employed to create RMS' FINRA Net Capital and monthly financial reports.

iii. SFA – RMS Sharing Agreement: After 2nd Closing, CEO and Defendant continued to have joint accounts at Pershing under RMS and SFA names. There is no documentation in RMS explaining what portion or percentages of revenue/expenses belongs to SFA and what to RMS; nor do Financial Statements have any explanations, nor state RMS' corresponding portion of revenue received from the five Pershing joint accounts. The CEO acknowledged a Sharing Agreement between SFA and RMS needed to be created even before 2nd Closing; however, CEO failed to executed or registered such agreement with FINRA.

iv.  RRs' Fees: After 2nd Closing, Plaintiff did his own research and reconciliation on what Defendant had given him in regard to RR's signed independent

---

[27] RMS' Registered Reps

contractor's agreements, their compensation and contractual fees RR's needed to pay RMS; however, by 2nd Closing Defendant had failed to:

1. Document and provide accurate fees each RR paid RMS every month;

2. Document and explain the existing discrepancy between a) the written percentage stated in RRs' Signed Agreements and what RMS paid them and b) what contractual fees RRs needed to pay RMS every month, as stated in RRs' Signed Agreements;

3. Document compensation changes RRs and Defendant verbally agreed;

4. Update unsigned RR's contracts and their FINRA registrations;

5. Report RRs' monthly fees paid to RMS as revenue; they were never included in Income Statement;

6. Document RR's current compensation schedule that included those RRs that had a U-4 and were registered with FINRA but there was no RR Signed Agreements to be found;

7. Document FINOP's processes of calculating RR's compensation, so they match their Independent Contract Agreements.

8. Document RR's vetting processes, criteria, method of calculating their profitability with Firm, etc.


## V.    PSA'S SECTION 5.1-C

*"…Any claim by a holder of or former holder of any ownership interests of the Company, or any other Person Seeking to assert ownership or rights to ownership of any membership interests or other equity of the Company; Based upon any rights of a holder of membership interests, option, or preemptive rights of the Company; or Based upon any rights under the Organizational Documents of the Company…"*

1. All Defendant', CEO's and Adler's "officer's actions" are serious violations with FINRA, Florida State Law, and RMST's Bylaws as after 2nd Closing, Defendant never acted as

Defendant had executed and finalized RMST's sale, but Defendant, Adler and CEO continued to act as Owners, Directors and Shareholders of RMST/RMS, in spite of RMST's sale had been consummated, money and stock certificates exchanged by both parties during both 1st and 2nd Closing, legal documents were signed and CMA approved.

2. Defendant baselessly believed he had the "right" to be the "Chairman of the Board" of RMST/RMS and even P72. However, there are no documents Plaintiff and Defendant ever signed that states that Defendant was, is, or was going to be Chairman of the Board of RMS, RMST and/or P72 after 2nd Closing. Furthermore, only in SA,[28] which Adler wrote, states that both Plaintiff and Defendant were going to be members of P72-H,[29] a company that

   "... *aspires and intends* to become the holding company owning companies and other entities,..."

and Defendant was going to be Chairman of the Board of P72-H.  It is important to note that P72 was never part of SA.  P72 and P72-H are two different and independent LLCs, with no affiliation to each other; nor P72-H has ever owned or owns any equity in P72.

3. By 2nd Closing, CEO did not have the credential nor experience to be RMS' CEO, as she had no financial knowledge (expected from every CEO of every company), and only relied on FINOP's and RRS inaccurate financial information.  Plaintiff requested CEO both verbally and in writing multiple time to provide Plaintiff RMS' 2021 Budget, which CEO was incapable of doing; less along CEO is not aware of the multiple variables RMS tracks revenue and expenses as stated in Section III.2.k in this document. CEO is an experienced COO but not a CEO. Since 2nd Closing, it was apparent to Plaintiff that Defendant and CEO[30] refused to make the business profitable, in spite of Director's advice. As such, the Plaintiff has not been able to make a profit nor make money in over two and a half years.

4. After 2nd Closing, Defendant illegally took advantage of his *"Perceived Rights as Chairman of the Board"*, or even part of RMST/RMS Board.; However, after 2nd Closing, Defendant

---

[28] Supplemental Agreement
[29] Premium 72 International, LLC, now called Premium 72 Holdings, LLC, an inactive company then, that currently continues to still be inactive.
[30] Stacey Stark (Defendant), Defendant's daughter

was no longer a Shareholder nor Director of RMST/RMS; nevertheless, Defendant accused multiple times Plaintiff in Lawsuit, claiming that Plaintiff never requested Defendant's approval for any actions Plaintiff took, when Plaintiff, as majority Shareholder and Director of RMST/RMS did NOT have to.

5. Nevertheless, Defendant, CEO and Adler continued to act as owners of RMST/RMS, in spite of Defendant's only position as an officer of RMS, and as FINRA registered RMS' FINOP and Insurance and Munis Principal after 2nd Closing. In Defendant' own admission he wanted to hold this positions for a short time only and did out "out of courtesy".

6. After AMZ' incident, Defendant, Adler, and CEO felt illegally "entitled" to take over the Firm as: a) CEO, without any previous authorization from Shareholder-Director, and without any RMS' minutes signed, unilaterally removed Plaintiff as PTSD of RMS in Sunbiz.org and registered herself as RMS' new PTSD (a FINRA, Florida State Law, RMST's Bylaws violations), b) Defendant, CEO and Adler, without any previous authorization from Shareholder-Director, hired legal counsel paid by RMS funds (FINRA's Sec. 3 violation) to illegally represent Defendant, Adler and CEO, as employees of the Firm against Plaintiff, who is the lawful majority shareholder and Director of RMST/RMS who sent Plaintiff Cease-and-Desist letters and Lawsuit against him; c) During this time, Defendant took advantage of the above situations, and Plaintiff's bad health, to misrepresent Plaintiff and further damage his reputation and credibility with regulators, by further including in Defendant' reports and lawsuit baseless, unsupported, false, unreal, and illogical accusations to Plaintiff. The Defendant took this opportunity to take legal action against Plaintiff, as Defendant felt "entitled" to illegally "highjack" RMS from Defendant and slander them with regulators.

7. Moreover, after 2nd Closing, the Defendant, CEO and Adler violated FINRA's, SEC's, RMST's Bylaws, US Corporate law and Florida State Law regulations by disrespecting, disapproving, disregarding, disobeying and ignoring Plaintiff' rights, orders, and strategies to

follow as Plaintiff is majority Owner/Shareholder[31] and PTSD of RMST/RMS, by "hijacking" RMS from Plaintiff in a hostile Corporate Raid/Takeover.

## VI.   PSA'S SECTION 5.1-D

*"...Any fees, expenses or other payments incurred or owed by the Seller or the Company to any agent, broker, investment banker or other Person retained or employed by any of them in connection with this Agreement..."*

1. The CEO paid Attorney fees on 03/2021, as stated above in this document in Section V.6 of this document violating FINRA's Sec. 3, that states that *"...no officer, employee, member of the Board or of any committee shall have any power to incur or contract any liability on behalf of the Corporation not authorized by the Board. Plaintiff was the Board. The Board may delegate to the Chief Executive Officer of the Corporation or the Chief Executive Officer's delegate such authority as it deems necessary to contract on behalf of the Corporation or to satisfy unanticipated liabilities during the period between Board meetings..."*

2. Defendant is guilty of unauthorized expenditures and embezzlement to the tune of $165,972, as stated above in this document in Section III.1.d

## VII.   PERSONAL OFFENSES

1. Defendant has committed slander against the Plaintiff. Since 12/2020, Plaintiff has spent a considerable amount of money trying to defend himself from Defendant and their legal counsel's Cease and Desist Letters and Lawsuit.

2. Defendant and his legal counsel have tried to ruin Plaintiff's reputation with all their hundreds of false of unsupported, invented, malicious, vindictive claims, allegations, and accusations against P72 and Plaintiff.

---

[31] Arturo Nicolayevsky

3. <u>Defendant has negatively influenced all regulators'</u> opinion of Plaintiff' ethics, character and reputation, including Defendant' accusation of Plaintiff stealing client assets; this is slander and a serious and unsupported accusation and defamation.

4. <u>Defendant continuously threaten and bullied Plaintiff</u>, demanding, among other things, to approve 2020 Tax preparations at Defendant's time, and not allowing Plaintiff to carefully review all reported data in RMST's tax returns.  Plaintiff was RMST/RMS largest Shareholder and Director and control of the Firm.

5. Plaintiff's opinion is that all legal accusations that Plaintiff has gone through in the past 3 years, is part of Defendant' strategy to keep RMST/RMS and financially ruin Plaintiff by driving him into personal bankruptcy and defamed his public and personal reputation.

## VIII.    <u>PRAYER(S):</u>

In view of the above, it is humbly requested before this honorable Court that the Court dismisses the contents of the Defendant' Complaint for failing to prove or provide any evidence in support of its baseless and wrong assertions.

It is further requested that the Court:

1. Dissolves the PSA signed between Plaintiff and Defendant on 01/02/2020.

2. Orders Defendant to provide full indemnification to the Plaintiff, pursuant to reasons and processes defined in PSA's Article 5, Sections 5.1 and 5.3;

3. Orders Defendant to return Byline RMST's purchase price Byline paid Defendant, plus interest.

4. Orders Defendant to void and cancel Supplemental Agreement and Note with Plaintiff

5. Orders Defendant to grant compensation to Plaintiff for damages caused by Defendant's slander, lies, false and illegal, irrelevant and unsupported, accusations and defamation with regulators and custodians.

6. Orders that the Plaintiff's and Defendant's pending Debits and Credits between them shall be paid to each other.

7. Orders Plaintiff to return all stock certificates to Defendant, and for Defendant to own and continue to operate RMST/RMS, as they have been doing all the time.

Any other relief, which this honorable Court deems fit and proper, may also be granted to Plaintiff.

**Respectfully Submitted By:**

**/s/ Arturo Nicolayevsky**
Arturo Nicolayevsky
121 N Post Oak Ln., # 705
Houston, TX 77024
arturon26@hotmail.com
(281) 591-7777

**Place: Houston, Texas**

**Date: February 16, 2023**

◄ Insert shipping document here.

ORIGIN ID:NQIA    (281) 591-7777
ARTURO NICOLAYEVSKY

121 N. POST OAK LANE
SUITE 705
HOUSTON, TX 77024
UNITED STATES US

SHIP DATE: 16FEB23
ACTWGT: 1.00 LB
CAD: 8954530/INET4580

BILL SENDER

TO   CLERKS OFFICE, ROOM 202
US DISTRICT COURT FOR SOUTHERN FL
701 CLEMATIS STREET

WEST PALM BEACH FL 33401
(561) 803-3400                    REF:
INV:
PO:                               DEPT:





FRI - 17 FEB 8:00A
FIRST OVERNIGHT

TRK#
0201   7713 2972 1810



X1 PBIA         33401
                FL-US    PBI



