IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

RMST HOLDING COMPANY, INC., a Florida Corporation, R.M. STARK & CO., INC., a Florida Corporation, and GARY L. STARK, individually,

Plaintiffs

v.

PREMIUM 72 CAPITAL, LLC, a Texas limited liability company, PREMIUM 72 INTERNATIONAL, LLC, a Nevada limited liability company, AYNBET INVESTMENTS, LLC, a Texas limited liability company, ARTURO NICOLAYEVSKY, individually, EDUARDO PEREZ, individually, and ISAAC WRIGHT, individually,

Defendants
_______________________________________/

CASE NO.: 9:21-cv-81995-AMC

**DECLARATION OF GARY L. STARK**

STATE OF FLORIDA

COUNTY OF OKEECHOBEE

I, GARY L. STARK, under penalty of perjury attest to the following:

1. I am over 18 years of age and have personal knowledge of the facts stated herein.

## I. BACKGROUND

2. In 1994, I purchased a controlling interest in R.M. Stark & Co., Inc. ("RM Stark"), now a Florida corporation. Since 1994, RM Stark has operated as a broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC"). As a SEC registered broker-dealer,

RM Stark is subject to the rules and regulations of the Financial Industry Regulatory Authority ("FINRA").

## II.     TRANSACTION AT ISSUE

3.      On October 8, 2019, on behalf of RM Stark, as President and CEO, I executed a Letter of Intent (the "LOI") with OPC Advisors, LLC, a Texas limited liability company ("OPC"). Upon information and belief, OPC changed its name to Premium 72 Capital, LLC, on or about November 13, 2020.  OPC Advisors, LLC and/or Premium 72 Capital, LLC will be referred to herein as "Premium 72 Capital/OPC."  Arturo Nicolayevsky ("Mr. Nicolayevsky") executed the LOI on behalf of Premium 72 Capital/OPC.  The LOI set forth RM Stark and Premium 72 Capital/OPC's mutual intention to enter into a transaction whereby Premium 72 Capital/OPC and/or Mr. Nicolayevsky and/or his associates would acquire RM Stark through a stock purchase. A true and accurate copy of the LOI is attached hereto as Exhibit A.

4.      Upon information and belief, Premium 72 Capital/OPC is registered as an investment advisor in the state of Texas, and is affiliated with Defendants Premium 72 International, LLC ("Premium 72 International"); Aynbet Investments, LLC ("Aynbet"), Eduardo Perez, also known as Eduardo Perez Alducin ("Mr. Perez"); Isaac Wright ("Mr. Wright"); and Mr. Nicolayevsky.

5.      At the time of the LOI, RM Stark was wholly owned by RMST Holding Company, Inc., a Florida corporation ("RMST").

6.      At the time of the LOI, I owned a majority, controlling interest of RMST and was president and CEO of RMST.

7.      On January 2, 2020, as President and CEO of RMST, I executed the "Gary L. Stark, et al. to OPC Advisors, LLC Stock Purchase Agreement" (the "Stock Purchase Agreement").  The

Stock Purchase Agreement was between Premium 72 Capital/OPC as purchaser on the one hand and me, Bryan Florescue Irrevocable Trust U/A Dated January 1, 1995, a Florida trust, and Gretchen Florescue Irrevocable Trust U/A Dated January 1, 1995, a Florida Trust[1], and RMST, collectively as "seller," on the other. Mr. Nicolayevsky executed the Stock Purchase Agreement on behalf of Premium 72 Capital/OPC on January 2, 2020. A true and accurate copy of the Stock Purchase Agreement is attached hereto as Exhibit B.

8. The intent of the transaction contemplated by the Stock Purchase Agreement was to sell one hundred percent (100%) of the outstanding stock of RMST (RM Stark's holding company) to Mr. Nicolayevsky, Mr. Perez, and/or entities owned or controlled by either or both of them.

9. FINRA's rules provide that FINRA has the right to approve (or disapprove) the sale of one hundred percent (100%) of the stock of the holding company of a FINRA registered broker-dealer, like RMST. Accordingly, the Stock Purchase Agreement contemplated a bifurcated transaction, with a portion of the RMST stock to be transferred upon an initial closing (the "First Closing") and the balance of the stock transferred at a subsequent closing following the required FINRA approval (the "Second Closing").

10. Pursuant to the bifurcated transaction, forty-eight (48) shares, equivalent to twenty-four percent) (24%), of RMST, were contingently transferred to Premium 72 Capital/OPC at the time of the First Closing, on or about January 2, 2020.

11. In connection with the Stock Purchase Agreement, Premium 72 Capital/OPC caused a Continuing Member Application Form to be filed with FINRA on August 20, 2020, in furtherance of obtaining FINRA's approval of the transaction for the contemplated change in

[1] The trusts were passive, minority shareholders of RMST.

ownership of RMST, the holding company of RM Stark. A true and accurate copy of the Continuing Member Application Form (the "Membership Application") submitted to FINRA is attached hereto as Exhibit C.

12. On September 2, 2020, FINRA approved the Continuing Member Application via letter (the "Approval Letter"). A true and accurate copy of the "Approval Letter is attached hereto as Exhibit D. Pursuant to the Approval Letter, the effectiveness of FINRA's approval of the transaction was contingent upon the execution of a Membership Agreement by RM Stark's replacement CEO, Stacey Stark.

13. On September 2, 2020, Ms. Stark executed an "R.M. Stark & Co., Inc. Membership Agreement" (the "Membership Agreement") and the Membership Agreement was submitted to FINRA. A true and accurate copy of the Membership Agreement is attached as Exhibit E.

14. On or about September 22, 2020, I executed a Supplemental Purchase Agreement between me, on the one hand, and Premium 72 International, Mr. Nicolayevsky, and Mr. Perez on the other. A true and accurate copy of the Supplemental Purchase Agreement is attached hereto as Exhibit F. The purpose of the Supplemental Purchase Agreement was to effectuate the Second Closing.

15. In connection with the Supplemental Purchase Agreement, Mr. Nicolayevsky and Mr. Perez represented to me that Premium 72 International was a successor and/or affiliated entity of Premium 72 Capital/OPC.

16. Pursuant to the Supplemental Purchase Agreement, I was to receive a total of four million five-hundred thousand dollars ($4,500,000) in connection with the Second Closing. The Supplemental Purchase Agreement contemplated payment to me in the amount of one million six-hundred thousand dollars ($1,600,000) on or about September 22, 2020, and Premium 72

International would execute a promissory note, to be guaranteed by Messrs. Nicolayevsky and Perez) in my favor for the remaining two million nine-hundred thousand dollars ($2,900,000).

17. In connection with the Supplemental Purchase Agreement, and also on September 22, 2020, Premium 72 International, as maker, and Messrs. Nicolayevsky and Perez, as guarantors, entered into a Promissory Note in my favor. A true and accurate copy of the Promissory Note is attached hereto as Exhibit G. Pursuant to the Promissory Note, Premium 72 International was to make certain payments of principal and interest to me over time, in accordance with the terms of the Promissory Note, and Messrs. Nicolayevsky and Perez personally guaranteed the payment.

18. Pursuant to the Promissory Note, and as security for prompt payment, Mr. Nicolayevsky and Mr. Perez were required to execute stock powers for the transfer of securities held by both of them to me, in an amount equal to all principal and interest due under the Promissory Note. As additional collateral, Mr. Nicolayevsky was to execute an irrevocable assignment of two million nine-hundred thousand dollars ($2,900,000) from the proceeds of his existing life insurance policy – AXA Insurance, Policy No. 11931115.

19. The Supplemental Purchase Agreement likewise requires Mr. Nicolayevsky and Mr. Perez to execute the stock powers and irrevocable assignment of life insurance policy proceeds referenced in the Promissory Note.

20. On or about September 22, 2020, at the Second Closing, as contemplated in the Supplemental Purchase Agreement, Stock Purchase Agreement, and Promissory Note, Premium 72 Capital/OPC was required to pay me one million six hundred thousand dollars ($1,600,000) in cash (the "Partial Payment"). I received the Partial Payment, except for approximately thirty five thousand dollars ($35,000), which Premium 72 Capital/OPC originally disputed. Although

Premium 72 Capital/OPC ultimately acknowledge that I was owed the $30,000, this sum remains outstanding.

21. In reliance on the Partial Payment and the promises made in the Stock Purchase Agreement, Supplemental Purchase Agreement, and Promissory Note, I transferred the remaining shares of RMST to Premium 72 Capital/OPC on or about September 22, 2020.

22. Since the Partial Payment, I have received no further payment under the Stock Purchase Agreement, Supplemental Purchase Agreement, or the Promissory Note.

23. Mr. Nicolayevsky and Mr. Perez failed to execute stock powers for the transfer of securities held by both of them to me in an amount equal to all principal and interest due under the Promissory Note, thereby breaching the terms of the Supplemental Purchase Agreement and Promissory Note.

24. Mr. Nicolayevsky failed to maintain the irrevocable assignment of $2,900,000 from the proceeds of AXA Insurance Policy No. 11931115 to me, thereby breaching the terms of the Supplemental Purchase Agreement and Promissory Note.

## III. <u>DEFENDANTS' MALFEASANCE</u>

25. Notwithstanding the breach of the various agreements by Mr. Nicolayevsky, Mr. Perez, Premium 72 Capital/OPC, and Premium 72 International, as outlined above, as required by FINRA pursuant to the Membership Agreement, I have continued to serve as RM Stark's Financial and Operations Principal ("FINOP").

26. In connection with my role as FINOP of RM Stark, I have observed and uncovered numerous actions by Mr. Nicolayevsky, Mr. Perez, and various entities they own or control, including but not limited to Premium 72 Capital/OPC and Premium 72 International that jeopardized, and continue to jeopardize, the business and well-being of RM Stark.

A. PPP Loan Fraud

27. On or about June 15, 2021, Ellen Adler, head of legal and accounting at RM Stark, informed me that through a casual google search of "Premium 72" and "OPC," she discovered that $195,970 in proceeds from a U.S. Small Business Administration Payroll Protection Program ("PPP") loan had been paid to RMST.

28. On information and belief, Mr. Nicolayevsky utilized the confidential RM Stark payroll records we provided him as part of his due diligence during sale negotiations to procure the PPP loan. On further information and belief, Mr. Nicolayevsky received three separate PPP loans in like amounts, in the names of other entities under his control utilizing the confidential RM Stark payroll records. All of the PPP loan proceeds purportedly paid to RMST, and the other entities, were transmitted to Mr. Nicolayevsky at his home address in April and June 2020, prior to the Second Closing. Mr. Nicolayevsky improperly utilized his home address as RMST's corporate address on the PPP loan application he improperly submitted, purportedly on RMST's behalf.

29. Mr. Nicolayevsky did not advise me or, upon information and belief, any other director of RMST or RM Stark that he had applied for and received proceeds of any PPP loan on behalf of RMST.

30. At the time Mr. Nicolayevsky applied for and received proceeds from the PPP loan on behalf of RMST, he was not authorized to act on behalf of RMST. At most, Mr. Nicolayevsky, at that time (after the First Closing but prior to the Second Closing), was a minority shareholder in RMST. Moreover, at that time, Premium 72 Capital/OPC's continued ownership of the stock was contingent upon FINRA's approval of the sale.

31. At the time Mr. Nicolayevsky applied for and received proceeds from the PPP loan on behalf of RMST, I was the President and Chief Executive Officer of RMST. I was also the majority shareholder of RMST. Neither Mr. Nicolayevsky nor anyone else sought my permission or consent to submit a PPP loan application on behalf of RMST.

32. On June 28, 2021, after discovering that proceeds from a PPP loan purportedly issued to RMST had been paid to Mr. Nicolayevsky, Ms. Adler and I undertook an investigation and sent a letter to Mr. Nicolayevsky detailing what we had uncovered regarding the improper PPP loan and demanding that the funds be repaid. A true and accurate copy of my June 28, 2021 letter to Mr. Nicolayevsky is attached hereto as Exhibit H.

33. Mr. Nicolayevsky and Mr. Perez have refused to provide any information about how the proceeds of the PPP loan were used. However, upon information and belief, those funds were not used for the purposes of operating expenses of RMST or RM Stark and neither entity received any use or benefit from the proceeds whatsoever.

B. Breaches of the Membership Agreement Management Requirements

34. In addition to improperly obtaining a PPP loan in RMST's name, Mr. Nicolayevsky, along with Mr. Perez, have undertaken various actions to undermine the FINRA-approved Membership Agreement, thereby jeopardizing RM Stark's FINRA registration.

35. The Membership Agreement includes numerous requirements, including that the representations in the Membership Application remain accurate. Those representations include, among other things, that there should be no material impact (financial, operational, managerial, supervisory) expected following the sale as most of the supervisory structure shall remain exactly as it is [prior to the sale]. (*See* Ex. C).

36. The Membership Application also provides that Mr. Nicolayevsky and Mr. Perez "shall not be registered at [RM Stark] and remain passive indirect owners with no present responsibility or obligation for the day to day operation of [RM Stark]. Note that [RM Stark's staff shall remain substantially unchanged following FINRA approval." *Id.*

37. The Membership Application details numerous other requirements and representations made by RM Stark, to all of which RM Stark was required to adhere pursuant to FINRA's approval.

38. Following FINRA's approval of the Membership Application and Membership Agreement, I observed numerous actions undertaken by Mr. Nicolayevsky, Mr. Perez, and/or entities controlled by them which are directly contrary to FINRA's approval. Those actions include:

a. Hiring Susan Davis in contemplation of replacing Jerry Desiderio, RM Stark's long-standing Chief Compliance Officer;

b. Terminating Jerry Desiderio as RM Stark's long-standing Chief Compliance Officer;

c. Hiring Peggy Lebert as RM Stark's new Chief Compliance Officer upon the resignation of Susan Davis;

d. Creating and maintaining an employee organization chart through which Mr. Nicolayevsky purported to re-assign various employees' roles at RM Stark;

e. Improperly directing the options of Regulation Best Interest Implementation on Salesforce;

f. Executing contracts on behalf of RM Stark for RM Stark's data storage, as well as executing a contact with Sycamore for RM Stark's operations, payroll, and compliance software;

g. Revising RM Stark's recruiting procedures;

h. Stripping Ms. Adler of her position as an officer and director of RM Stark and RMST, as well as her day-to-day responsibilities with both companies;

i. Hiring an individual named Anisa Perez, in my opinion unqualified for the position, to maintain the company books and records, and to undertake certain bookkeeping tasks of RM Stark;

j. Entering into various written contracts on behalf of RM Stark, including with entities such as Addepar, Salesforce, Sycamore, and Vantage Point;

k. Revising on-boarding documents for new registered representatives, creating a new Independent Broker Agreement to include dual registration with Premium 72 International, and digitizing such documents without RM Stark's knowledge or consent;

l. Changing RM Stark's email and payroll vendor to a payroll vendor not capable of handling broker-dealer payroll;

m. Canceling RM Stark's worker's compensation policy and 401(k) Plan, and bundling them with a new payroll provider not qualified to service the payroll requirements of a broker-dealer;

n. Opening and controlling JP Morgan Chase checking accounts and credit card in RM Stark's name and improperly using Mr. Nicolayevsky's personal address as the primary address for those accounts;

o.  Taking a $5,000 cash advance on RM Stark's company credit card for Mr. Nicolayevsky's own personal benefit;

p.  Consulting with various FINOP applicants in furtherance of an effort to replace me;

q.  Unilaterally authorizing multiple withdrawals from RM Stark's Pershing account and transferring the funds to the JP Morgan Chase accounts, thereby negatively impacting RM Stark's net capital requirements under FINRA regulations;

r.  Demanding access to RM Stark's computer database at Pershing, LLC (RM Stark's clearing firm), to allow them to access all company and customer files and accounts;

s.  Purporting to terminate Stacey Stark and purporting to hire Michael Cutbirth as the new Chief Executive Officer.

t.  Listing Mr. Nicolayevsky as RM Stark's Director of Finance on a recent SEC filing; and

u.  Improperly convening a "Board of Directors and Shareholders Meeting" on September 3, 2021, at which Mr. Nicolayevsky and Mr. Perez purportedly voted to remove and replace me, Stacey Stark, and Ellen Adler as Officers and Directors of RMST and RM Stark.

39.     All of the foregoing conduct is in contravention of representations made in the Membership Application and FINRA's approval of the Membership Application and Membership Agreement. This conduct, and potential further similar conduct, jeopardize RM Stark's FINRA registration, which is dependent upon adherence to representations made in the Membership Application.

C.     Improperly Encumbering Assets of RM Stark

40.     I have uncovered numerous instances in which Defendants have improperly encumbered RM Stark's assets.

41.     On or about November 6, 2020, Mr. Nicolayevsky, purportedly on behalf of RM Stark, executed an Agreement for the Purchase and Sale of Future Receipts with AMZ Group, LLC ("AMZ"), identified as Contract ID 467 ("AMZ Contract 467"). Pursuant to AMZ Contract 467, and without my knowledge or consent, Mr. Nicolayevsky and Mr. Perez sold two hundred and seventy-four thousand dollars ($274,000) of future revenues of RM Stark to AMZ for the sum of two hundred thousand dollars ($200,000). A true and accurate copy of AMZ Contract 467 is attached hereto as Exhibit I.

42.     I also learned through reviewing a Form UCC-1 filing by AMZ that all of RM Stark's assets were pledged as collateral to secure payment under AMZ Contract 467.

43.     AMZ Contract 467 is signed by Mr. Nicolayevsky as principal of RM Stark. At the time, Mr. Nicolayevsky had no authority to act as principal of RM Stark and was prohibited from so acting pursuant to FINRA's approval of the Membership Application.

44.     I further discovered that on or about December 3, 2020, Mr. Nicolayevsky and Mr. Perez, again purportedly on behalf of RM Stark, executed another Agreement for the Purchase and Sale of Future Receipts with AMZ, identified as Contract ID 489 ("AMZ Contract 489"). Pursuant to AMZ Contract 489, and without my knowledge or consent, Mr. Nicolayevsky and Mr. Perez sold two hundred and six thousand dollars ($206,000) of future revenues of RM Stark to AMZ for the sum of one hundred and sixty thousand dollars ($160,000). A true and accurate copy of AMZ Contract 489 is attached hereto as Exhibit J.

45.      AMZ Contract 489 is signed by Mr. Nicolayevsky and Mr. Perez on behalf of RM Stark. At the time, Mr. Nicolayevsky and Mr. Perez had no authority to act on behalf of RM Stark and were prohibited from so acting pursuant to FINRA's approval of the Membership Application.

46.      I further discovered that on or about January 28, 2021, Mr. Nicolayevsky and Mr. Perez, again purportedly on behalf of RM Stark, executed a Merchant Agreement with AMZ, identified as Contract ID 516 ("AMZ Contract 516"). While AMZ Contract 516 purports to consolidate AMZ Contract 467 and AMZ Contract 489, it added monies to the principal amount of RM Stark's receivables purchased by AMZ, thereby further encumbering RM Stark's assets. A true and accurate copy of AMZ Contract 516 is attached hereto as Exhibit K.

47.      AMZ Contract 516 is signed by Mr. Nicolayevsky and Mr. Perez on behalf of RM Stark. At the time, Mr. Nicolayevsky and Mr. Perez had no authority to act on behalf of RM Stark and were prohibited from so acting pursuant to FINRA's approval of the Membership Application.

48.      Mr. Nicolayevsky and Mr. Perez have represented to Stacey Stark, and Ms. Stark reported to me, that other undisclosed liabilities exist whereby Mr. Nicolayevsky and Mr. Perez have further encumbered RM Stark's assets. However, Mr. Nicolayevsky and Mr. Perez have refused to provide me or anyone else at RM Stark with further information regarding such encumbrances.

49.      Despite Mr. Nicolayevsky and Mr. Perez's refusal to provide information about further encumbrances on the assets of RM Stark or RMST, I have uncovered the following UCC Financing Statement Addendums, which appear to evidence further improper encumbrances on the assets of RM Stark and RMST:

a. August 26, 2021 UCC Financing Statement, identifying Zahav Asset Management LLC the Secured Party and RMST as an Additional Debtor. A true and accurate copy is attached as Exhibit L ;

b. December 20, 2021 UCC Financing Statement, identifying Kingdom Logistics LLC as the Secured Party and Premium 72 Capital as the Debtor. A true and accurate copy is attached as Exhibit M;

c. February 22, 2022 UCC Financing Statement, identifying NFG Advance LLC as the Secured Party and Premium 72 Capital as the Debtor. A true and accurate copy is attached as Exhibit N;

d. August 2, 2021 UCC Financing Statement, identifying Byline Bank as the Secured Party and RMST as the Debtor. A true and accurate copy is attached as Exhibit O;

e. February 7, 2020 UCC Financing Statement, identifying Byline Bank as the Secured Party and RMST as the Debtor. A true and accurate copy is attached as Exhibit P.

50. The improper encumbrance of RMST and RM Stark's assets is in contravention of FINRA's approval of the Membership Application. The asset encumbrances run afoul of the provision of the Membership Application that requires that:

> Additional capital infusions, if needed, would come from the current and post closing direct owner: RMST Holding Company, Inc., and indirectly from the new indirect owner; PREMIUM 72 Advisors, LLC and it's [sic] majority upstream owner, [Mr. Nicolayevsky]..., as well... b. There are no current financing arrangements contemplated c. Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital condition.

51. The improper encumbrance of RMST and RM Stark's assets jeopardizes RM Stark's FINRA registration because its FINRA registration is dependent upon its compliance with

the representations in the Membership Application. Additionally, the encumbrances on RM Stark's assets, without any notice or additional information to me or RM Stark, adversely affect RM Stark's accounting reporting and net capital requirements. I prepare required financial reporting for RM Stark, and encumbrances without disclosure to me or anyone at RM Stark aside from Defendants may adversely affect the veracity of RM Stark's financial reporting.

52. The improper encumbrances of RMST and RM Stark's assets likewise jeopardizes RM Stark's business, because Mr. Nicolayevsky and Mr. Perez's leveraging of RMST's assets could result in a creditor foreclosing on its security interest on RMST's assets in the event Mr. Nicolayevsky and Mr. Perez default on their obligations under any relevant financing agreement. Any such foreclosure would result in a potential change in ownership of RMST and myriad regulatory issues, which can cause irreversible harm to RMST's employees and customers.

53. The improper encumbrance of RM Stark's assets is also in contravention of the Supplemental Purchase Agreement and Promissory Note; Mr. Nicolayevsky and Mr. Perez are required to execute stock powers for the transfer of securities held by Premium 72 Capital/OPC, including RMST. By encumbering the assets of RM Stark, Mr. Nicolayevsky and Mr. Perez have improperly diminished the value of collateral securing repayment of the Promissory Note.

I DECLARE ON THE PENALTY OF PERJURY THAT THE ABOVE IS TRUE AND CORRECT. Signed and stated in the County of Okeechobee, in the State of Florida.

Dated: 5/3/2022

GARY STARK

Case 9:21-cv-81995-AMC Document 26-3 Entered on FLSD Docket 05/16/2022 Page 1 of 16

# Exhibit A

**Letter of Intent**

**RM Stark & Co., Inc. and OPC Advisors, LLC**

The purpose of this letter of intent ("LOI") dated **October 8, 2019**, is to set forth our present mutual intentions with respect to a proposed transaction (the "Proposed Transaction") between **Gary Stark/RM Stark & Co., Inc.** ("Seller") with FINRA CRD # **7612**, an S Corporation with legal address of 701 SE 6th Avenue, Suite 203, Delray, Florida 33483, and **OPC Advisors, LLC/Arturo Nicolayevsky** ("Buyer"), a limited liability company with address at 121 North Post Oak Lane, Suite 705, Houston, Texas 77024, whereby Buyer will acquire, in a stock purchase, **RM Stark & Co., Inc.** ("RMS").

This LOI is not intended to and does not constitute a binding agreement among the parties with respect to the Proposed Transaction or otherwise. Any agreement with respect to the Proposed Transaction would only arise as a result of the negotiation, execution and delivery of a written definitive agreement relating to the Proposed Transaction by and between Buyer and Seller.

This LOI contains a non-comprehensive list of the anticipated terms and conditions related to the proposed agreement between Buyer and Seller. This LOI does not contain all matters upon which agreement must be reached to consummate the Proposed Transaction, which will be included in the definite Purchase-Sell Agreement ("PSA").

1. **Acquisition of Assets and Purchase Price.**

(a) Subject to the satisfaction of conditions described in this LOI, at the closing of the Proposed Transaction, Buyer would acquire RMS in a stock purchase, resulting in Buyer receiving the purchase price and its terms, set forth in Section 1(b):

i. Seller represented to Buyer that as of **09-27-2019**, RMS holds approximately Four Hundred and Twenty-Eight Million, Thirty-Three Thousand, Nine Hundred and Forty-Three US Dollars **($428,033,943)** in assets under management ("AUM"). See Exhibit A
ii. RMS' broker-dealer license: FINRA CRD # 7612, SEC # 8-22543;
iii. RMS' Revenue and Cash Flow, as derived from investments of its AUM; and
iv. Other assets of RMS (subject to certain exclusions) as represented on "Exhibit B".

(b) The purchase price for the equity purchase of RMS will be One Million, Six Hundred Thousand, 00/100 **($1,600,000.00)**, to be paid to Seller on Closing Date.

(c) The closing date and place for this transaction, shall be decided by both Buyer's Bank before PSA is executed, and on a mutually agreed by Buyer and Seller date and place.

2. **Other Items to Be Addressed at the Closing of the Proposed Transaction.** For a period of one year after Closing Date, Seller agrees to assist and help Buyer on RMS' transition of ownership to avoid any business disruptions and keep the day-to-day business as usual.

3. **Due Diligence.** Buyer shall have until **November 30th, 2019** ("DD Due Date") to do its due diligence in order to present Seller proof of financing for the purchase of RMS. Seller will allow Buyer and its advisors full access to the records, of the Seller for the purpose of completing Buyer's due diligence review. The due diligence investigation will include, but is not limited to, a complete review of the financial, legal, tax, intellectual property and labor records and agreements of the Seller, and any other matters that Buyer's accountants, tax and legal counsel, and other advisors deem relevant.

4. **Exclusivity.** In consideration of the expenses that both Seller and Buyer have incurred and will incur in connection with the Proposed Transaction: **Seller agrees that**, until **November 30th, 2019**, neither it nor any of its representatives, officers, employees, directors, agents, stockholders, subsidiaries or affiliates shall initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer from any person or group of persons other than Buyer and its affiliates (an "Acquisition Proposal") to acquire all or any portion of the Assets, whether by merger, purchase of membership interest, purchase of assets or otherwise, or provide any non-public information to any third party in connection with an Acquisition Proposal or enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Proposed Transaction with Buyer.

5. **Termination**. This LOI will automatically terminate and be of no further force and effect upon the earlier of

   (i) Execution of a written purchase agreement by Buyer and Seller;
   (ii) Mutual agreement of Buyer and Seller; or
   (iii) By DD Due Date

Notwithstanding anything in the previous sentence, paragraphs 7, 8, and 9 shall survive the termination of this LOI and the termination of this LOI shall not affect any rights any Party has with respect to the breach of this LOI by another Party prior to such termination.

6. **Governing Law.** This LOI shall be governed by and construed in accordance with the laws of the State of Texas.

7. **Confidentiality.** This LOI is confidential to the Parties and their representatives.

8. **No Third-Party Beneficiaries.** Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity, other than the Parties and their successors or assigns, any rights or remedies under or by reason of this LOI.

DocuSign Envelope ID: 0E13C382-2DAF-4910-A260-9003849EEF49
222

9. **Expenses.** The Parties will each pay their own transaction expenses, including the fees and expenses of attorneys, brokers and other advisors, incurred in connection with the Proposed Transaction.

**OPC Advisors, LLC**

By: ______________________________ Date: ________________
Name: Arturo Nicolayevsky
Title: Managing Member

**RM STARK & CO., INC.**

By: ______________________________ Date: ________________
Name: Gary Stark
Title: President

4810-4004-5419, v. 1 CONFIDENTIAL 3 | Page

DocuSign Envelope ID: 0E13C382-2DAE-4910-A260-9003849EEE49
222

**EXHIBIT A: AUM**

| 09-27-2019 | Balances |
|---|---|
| Pershings | $320,333,695 |
| Mutual Funds, Annuities, Alt. Investments | $117,700,248 |
| **Total** | **$428,033,943** |

4810-4004-5419, v. 1

CONFIDENTIAL

4 | Page

# EXHIBIT B: OTHER ASSETS

| Robin | Tom | Empty Office | Gary |
|---|---|---|---|
| 1 -Desk | 2 - Desks | 1 - Desk | 2 - Desks |
| 1 -Glass Desk | 1 - Computer Desk | 1 - Computer | 1 - Desk Chair |
| 2 - Computers | 2 - Desk Chairs | 4 - Monitors | 2 - Side chairs |
| 2 - Monitors | 1 - Server | 2 - Cork Boards | 1 - Table |
| 1 - Printer (HP DeskJet 4480) | 1 - Computer | 1 - Desk Chair | 1 - Credenza |
| 1 - Printer (HP OfficeJet 8610) | 1 - Printer (HP InkJet 6970) | | 1 - Printer (HP OfficeJet 8600) |
| Battery Back-up | Bookshelf | | 1 - Computer |
| TV | 1 - Artwork | | 1 - TV |
| 3 - 4 Drawer file (Ellen) | 1 - Cork Board | | 1 - TV stand (cabinet) |
| 1 - 2 Drawer file (Ellen) | 1 - Monitor | | Bookcase |
| 1 - 2 Drawer file (Ellen - black) | | | Safe |
| 1 Plastic File | | | Artwork |
| 1 -Artwork (Sailboat) | | | 2 - Silk Plants |
| 1 - Desk Chair | | | Small Fridge |

| Reception Area | Center Area | Conference Room | MJ |
|---|---|---|---|
| 2 - Side Chairs | 1 - Desk | Conference Table | 1 - Desk (really bad) |
| 1 - Square Table | 1 - Monitor | 6 Chairs | 1 - side desk |
| 2 - Lamps | 1 - Filing Cabinet (2 drawer) | Computer Desk | 1 - TV |
| 3 - Silk Plants | 1 - Credenza | 3 - Artwork | 2 - Artwork |
| 1 - End Table | Copier | 1 - Silk Plant | 2 - Computers |
| | 1 - Table | 1 - Sofa | 2 - Monitors |
| | Sailboat | 1 -Vase | 1 -Printer (HP 5660) |
| | Cannon | | 1 - Table |
| | Bulls | | 1 - Time Stamp |
| | 4 - Artwork | | 1 - Desk Chair |
| | 1 - Chair | | 1 - Desk Chair w/o arms |
| | | | 1 - Desk |

| File Room | Jerry | Stacey |
|---|---|---|
| 4 - 5 drawer File Cabinet | 1 - Desk | 1 - Desk |
| 3 - 4 drawer File Cabinet | 1 - Side Desk | 1 - Side Desk |
| 1 - 6 drawer File Cabinet (Trash) | 3 - Bookcases | 3 - 2 drawer black Filing Cabinets |
| 7 - Shelving Units | 1 - 2drawer File Cabinet (wood) | 1 - Side Table |
| 1 - Desk | 1 - TV | 2 - Computers |
| 1 - Shredder | 1 - 4 drawer File Cabinet (bad) | 2 - Monitors |
| 1 - Computer | 1 - 2 drawer File Cabinet (black) | 1 - Printer (HP OfficeJet 8710) |
| 1 - Monitor | 1 - 5 drawer File Cabinet | |
| 1- Printer (HP Deskjet 1112) | 1 - Desk chair | |
| 1 - Desk Chair | | |
| 1 - Water Cooler | | |
| 1 - Fridge | | |

Highlighted items should be trashed.



## Certificate Of Completion

Envelope Id: 0E13C3822DAF4910A2609003849EEF49
Subject: Please DocuSign: 2019-10-08 - LOI - RMS.pdf
Source Envelope:
Document Pages: 5
Certificate Pages: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 0
Initials: 0

Status: Sent

Envelope Originator:
Arturo Nicolayevsky
121 N Post Lane
Ste 705
Houston, TX 77024
info@premium72.com
IP Address: 74.124.45.125

## Record Tracking

| Status: Original<br>10/8/2019 10:17:55 AM | Holder: Arturo Nicolayevsky<br>info@premium72.com | Location: DocuSign |
|---|---|---|

| Signer Events | Signature | Timestamp |
|---|---|---|
| Gary Stark<br>gstark101@me.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 10/8/2019 10:32:23 AM<br>ID: eca56d65-7bb3-46d6-bb6d-b08d80a1dd14 | | Sent: 10/8/2019 10:21:19 AM<br>Viewed: 10/8/2019 10:32:23 AM |
| Arturo Nicolayevsky<br>info@premium72.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/8/2019 10:21:20 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

**CONSUMER DISCLOSURE**

From time to time, Premium 72 Capital (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Premium 72 Capital:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: arturo@premium72.com

**To advise Premium 72 Capital of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at arturo@premium72.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Premium 72 Capital**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Premium 72 Capital**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari ™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Premium 72 Capital as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Premium 72 Capital during the course of my relationship with you.

DocuSign SECURED

## Certificate Of Completion

Envelope Id: 0BC91EC76FC845B98489FA9C74001653

Status: Sent

Subject: Please DocuSign: 2019-10-06 - Term Sheet 2 - RMS.pdf

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 2 | Signatures: 0 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Arturo Nicolayevsky |
| AutoNav: Enabled | | 121 N Post Lane |
| EnvelopeId Stamping: Enabled | | Ste 705 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Houston, TX 77024 |
| | | info@premium72.com |
| | | IP Address: 74.124.45.125 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>10/8/2019 10:21:37 AM | Holder: Arturo Nicolayevsky<br>info@premium72.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Gary Stark<br>gstark101@me.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 10/8/2019 10:32:23 AM<br>ID: eca56d65-7bb3-46d6-bb6d-b08d80a1dd14 | | Sent: 10/8/2019 10:24:39 AM<br>Viewed: 10/8/2019 10:33:30 AM |
| Arturo Nicolayevsky<br>info@premium72.com<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/8/2019 10:24:39 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

**CONSUMER DISCLOSURE**

From time to time, Premium 72 Capital (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Premium 72 Capital:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: arturo@premium72.com

**To advise Premium 72 Capital of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at arturo@premium72.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Premium 72 Capital**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Premium 72 Capital**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari ™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Premium 72 Capital as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Premium 72 Capital during the course of my relationship with you.

October 6, 2019

**Mr. Gary Stark**
RM Stark & Co., Inc.
701 SE 6th Avenue, Suite 203,
Delray, Florida 33483

**RE: Term Sheet**

**OPC Advisor, LLC,** wishes to do purchase **RM Stark & Co., Inc.** in an equity purchase with the following terms:

| | |
|---|---|
| **Purchase Price** | **$4,500,000**<br>• 3.52 (Multiple) |
| **Down-Payment** | **$1,600,000** (36%)<br>• LOI Bank |
| **Deferred Compensation to Seller** | **$1,300,000** (28%)<br>• 1st Year Interest Only + 3-Year Term<br>• 5.0% Annual Interest<br>• 12 Quarterly Payments of $116,887<br>• Total Interest: $167,338<br>• Secured by Stock owned by Arturo Nicolayevsky and Eduardo Perez |
| **Override Compensation to Seller** | **$1,600,000** (36%)<br>• 1st Year Interest Only + 3-Year Term<br>• 5.0% Annual Interest<br>• 12 Quarterly Payments of $143,860<br>• Total Interest: $206,324<br>• Secured by Stock owned by Arturo Nicolayevsky and Eduardo Perez<br>• AUM Attrition Variance +/- 15% (Not market volatility). Everything above will be deducted from Seller |
| **TOTAL PAYMENTS** | **$4,873,962** |
| **DIVIDEND** | 5-Year profits participation of 2.5% of Parent Company |

Attorneys will draft appropriate legal documents to secure above terms.

| | |
|---|---|
| By: ______________________________ | By: ______________________________ |
| **Arturo Nicolayevsky** Date | **Gary Stark** Date |
| OPC Advisors, LLC | RM Stark & Co., Inc. |
| Title: Managing Member | Title: President |

# OPC Advisors, LLC future plans

1. **Investments:** Additional capital will be invested in:
   a. Technology: Streamlining company communications, account openings, compliance reports, document management, client's account access, phone app, etc.
   b. Management: Seasoned Senior Level industry specific executives
   c. Marketing & Advertising: Live presentations, seminars, web marketing (per compliance), etc.
2. **Custodians:**
   a. The company has current relations with Citibank Private Banking and Goldman Sachs, that can leverage negotiations with Pershings.
3. **Cash:**
   a. The company will deposit in bank $300K-$500K as working capital and to satisfy custodian needs.
4. **Management:**
   a. Company's invitation to Gary to be part of the Board of Directors and to actively participate in the decision making
   b. Our company is very conservative and prudent in making any abrupt change to the ongoing/daily business. All changes that management considers that will improve overall company's performance, shall be appropriately weighted between Gary, Susan, Eduardo and Arturo, before making any change, i.e. custodian/clearing costs,…
5. **AUM**
   a. We expect to bring approximately a minimum of $100 Million in additional AUM into the business within the next 12 months.
   b. The company currently has in place LOIs to purchase other BD/RIA.
   c. The company extensive network of Financial Advisors/Brokers that may be ready to move their business into RMS, after we acquire it.

# Exhibit B

**GARY L. STARK, et al. to OPC ADVISORS, LLC**
**STOCK PURCHASE AGREEMENT**

This STOCK PURCHASE AGREEMENT ("Agreement"), dated as of the date last entered below, is entered into by and among **OPC Advisors, LLC**, a Texas limited liability company ("Purchaser"), **Gary L. Stark**, an individual, **Bryan Florescue Irrevocable Trust U/A Dated January 1, 1995**, a Florida trust, and **Gretchen Florescue Irrevocable Trust U/A Dated January 1, 1995**, a Florida trust, (hereinafter referred collectively as the "Seller"), and **RMST Holding Company, Inc.,** a Florida corporation ("Company"). (Purchaser, Seller and Company may be collectively referred to as the "Parties").

WHEREAS, the Company is a holding company owning certain assets, including, but not limited to, R.M. Stark & Co., Inc., a registered securities broker-dealer (CRD# 7612 and SEC# 8-22543) (the "BD");

WHEREAS, Seller currently owns one hundred percent (100%) of the issued and outstanding stock of the Company (the "Interests");

WHEREAS, Purchaser desires to purchase the Interests and the Seller desires to sell the Interests to Purchaser.

NOW THEREFORE, in consideration of the terms, conditions, and covenants herein contained, the parties hereby agree as follows:

**DEFINITIONS**

**A. Certain Definitions.** For purposes of this Agreement, the following capitalized terms have the following meanings.

(a) "Affiliate" means, with respect to a specified Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, the specified Person. The term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as applied to a Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise. The Seller is an Affiliate of the Company and each other Affiliate of the Company until the Closing.

(b) "Business" means the provisions of securities brokerage services to individuals and institutions.

(c) "Business Day" means any day that is not a Saturday, Sunday, or any other day on which banks are required or authorized by Law to be closed in Houston, Texas. Any action that must be taken under this Agreement on or by a

day that is not a Business Day, may be validly taken on or by the next day that is a Business Day.

(d)     "Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

(e)     "Company Intellectual Property" means all Intellectual Property owned, held or used by the Company.

(f)     "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the business, products, financial condition, services, research or development of the Company, its suppliers, distributors, customers, independent contractors or other business relations. "Confidential Information" includes the following: (i) internal business and financial information, such as information relating to strategic and staffing plans and practices, business, finances, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods; (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, the Company's suppliers, distributors, customers, independent contractors or other business relations and their confidential information; (iii) Trade Secrets, know-how, compilations of data and analyses, processes, techniques, methods, protocols and systems, formulae, algorithms, recipes, research, industrial models and specifications; (iv) all inventions, improvements and invention disclosures, not yet the subject of patent applications, and all similar or related information (whether or not patentable); (v) all information developed in which the Company has a proprietary interest, and a legitimate business reason for guarding against unauthorized use or disclosure; and (vi) all other unpublished or secret Company Intellectual Property.

(g)     "Consent" means any approval, consent, ratification, waiver or other authorization.

(h)     "Contract" means, whether written or oral, any indenture, contract, agreement, permit, license, lease, purchase order, sales order, arrangement or other commitment, promise, obligation or undertaking to which a Person is a party or by which a Person or its assets are bound.

(i)     "Copyright" means all original works of authorship fixed in any tangible medium of expression (as defined in 17 U.S.C. § 101 et seq.).

(j)     "Damages" means any legal or equitable loss, liability, cost, damage (including incidental and consequential damage), deficiency, diminution in value, Tax, penalty, fine, interest, any attorneys' fees and expenses, and all amounts paid in investigation, defense or settlement of a Claim or Proceeding, whether or not arising out of a claim or demand of a Person not a party to this Agreement.

(k)   "Disclosure Schedule" means the disclosure schedules delivered by the Company and the Seller to Purchaser concurrently with the execution and delivery of this Agreement.

(l)   "ERISA Affiliate" means any Person that is, or at any relevant time was, treated as a single employer with the Company, under Code Section 414 or ERISA Section 4001.

(m)   "GAAP" means generally accepted accounting principles for financial reporting in the United States.

(n)   "Governmental and/or Regulatory Authorization" means any Consent, franchise, license, registration, certificate, qualification, permit or any other right or privilege issued, granted, given or otherwise made available by or under the authority of any Governmental and/or Regulatory Body and/or any Regulatory Association or Body or under any applicable Law, Rule or Regulation.

(o)   "Governmental and/or Regulatory Body" means any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, or any other authority, agency, department, board, commission or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal or arbitrator of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency or authority, including by way of example and not limitation, the Financial Industry Regulatory Authority ("FINRA").

(p)   "Knowledge of the Company" means the actual knowledge, assuming a reasonably comprehensive investigation of the Company's books and records and of the senior employees of the Company who would reasonably be expected to be aware of the matter, regarding the accuracy and completeness of any representation made by the Company and contained in this Agreement, the Disclosure Schedule or any other Transaction Document.

(q)   "Immediate Family" means a child, stepchild, grandchild, parent, stepparent, grandparent, sibling or current or former spouse, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, and includes any adoptive relationships.

(r)   "Indebtedness" means: (i) all obligations for borrowed money or in respect of loans or advances, (ii) all obligations evidenced by bonds, debentures, notes, interest rate swap agreements or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of the Company, (iv) all obligations arising from

overdrafts or negative cash balances, (v) all obligations arising from deferred compensation arrangements and employee bonuses (whether accrued or not), (vi) all obligations of the Company for retention arrangements, change of control payments, severance plans, bonus plans, employment agreements or any other plan, agreement or arrangement to which the Company is a party, which liability is payable or becomes due as a result of this Agreement, (vii) all obligations of the Company secured by a Lien, (viii) all accrued but unpaid Taxes, (ix) all overdue trade payables, (x) all capital lease obligations, determined in accordance with the Company's historical accounting practices, (xi) all notes and accounts payable to any Affiliates of the Company, any Related Parties of the Seller, or any employees of the Company, (xii) accrued but unpaid legal or other professional fees, and (xii) all guaranties, accrued interest, prepayment premiums or penalties related to any of the foregoing.

(s)     "Intellectual Property" means all Marks, Copyrights and Trade Secrets and all other associated proprietary information in which the Company has an ownership interest.

(t)     "IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of the Treasury.

(u)     "IT Systems" means any and all electronic technology and computer systems (including software, hardware and other equipment, firmware and embedded software) relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information, whether or not in electronic format, which technology and systems are used in or necessary to the conduct of the Business.

(v)     "Laws" means any federal, state, local, municipal, foreign, international, multi-national or other constitution, law, ordinance, principle of common law, code, regulation, statute, administrative interpretation, policy, guideline or treaty.  Unless otherwise specified, a reference to a particular Law means that Law, as amended and supplemented from time to time, and, to any corresponding provisions of successor Laws.  Laws shall also include all Rules and Regulations that are or may be adopted by any Regulatory Body.

(w)     "Liability" means, with respect to a Person, any liability or obligation of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the Person's financial statements.

(x)     "Licensed Intellectual Property" means Intellectual Property that is licensed to the Company by another Person or licensed by the Company to another Person.

(y)      "Licenses of Intellectual Property" means the licenses under which Licensed Intellectual Property is licensed to the Company or other Persons.

(z)      "Lien" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

(aa)      "Material Adverse Change" means any material and adverse change in the business, results of operations, assets or financial condition of the Company, as determined from the perspective of a reasonable Person in Purchaser's position. However, none of the following, in and of itself or themselves, constitutes a Material Adverse Change: (i) any change in the United States or foreign economies or securities or financial markets in general, (ii) any change after the date of this Agreement in applicable Laws or accounting rules not uniquely relating to the Company, and (iii) any outbreak of hostilities, acts of war or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war or terrorism or military actions existing or underway as of the date of this Agreement, but in each of (i), (ii) and (iii), such change or event must not disproportionately and adversely affect the Company compared to other companies of similar size operating in the same industry.

(bb)      "Occupational Safety and Health Law" means any Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

(cc)      "Order" means any order, writ, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental and/or Regulatory Body.

(dd)      "Ordinary Course of Business" means, with respect to a particular act of a Person, the act: (i) is consistent in nature, scope and magnitude with the past practices of the Person and is taken in the ordinary course of the normal, day-to-day operations of the Person; (ii) does not require authorization by the board of directors or shareholders of the Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature; and (iii) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same or a similar line of business as the Person.

(ee)   "Organizational Documents" means, with respect to any Person that is a corporation, its articles or certificate of incorporation, as the case may be, and bylaws; with respect to any Person that is a partnership, its certificate of partnership and partnership agreement; with respect to any Person that is a limited liability company, its certificate of formation and limited liability company or operating agreement; with respect to any Person that is a trust or other entity, its declaration or agreement of trust or constituent document; and with respect to any other Person, its comparable organizational documents; in each case, as in effect on the date of this Agreement.

(ff)   "Person" means an individual, corporation, limited liability company, partnership, association, trust, any unincorporated association, Governmental and/or Regulatory Body or other entity.

(gg)   "Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental and/or Regulatory Body or arbitrator.

(hh)   "Related Party" means, with respect to a specified Person, any of the following Persons: (i) any executive officer or director (including any member of the executive officer's or director's Immediate Family) of the specified Person; (ii) any Affiliate of the specified Person; (iii) any stock or equity holder holding 10% or more of the stock or equity of the specified Person (including any executive officer or director of such stockholder or equity holder); (iv) any trust or other similar entity created or operating for the benefit of the specified Person or the specified Person's Immediate Family or any trust beneficiaries or other similar beneficiaries (or Immediate Family of such beneficiaries) of the specified Person; or (v) or any member of the Immediate Family of the specified Person.  For purposes of this Agreement, each Seller will be deemed a Related Party with respect to any other Seller and the Company.

(ii)   "Representative" of a Person means the Person's directors, officers, managers, employees, advisers, agents, consultants, accountants, counsel, investment bankers or other representatives.

(jj)   "Schedule" means a part or section of the Disclosure Schedule.

(kk)   "Securities Act" means the Securities Act of 1933, as amended.

(ll)   "Security" or ("Securities") includes any note, bond, debenture, a share in a corporation, whether or not transferable or denominated "stock," mortgage, instrument issued in bearer or registered form, share certificate, or any other evidence of indebtedness issued by a corporation or a government.

(mm)   "Seller GLS Personal Property" means all monies and/or securities currently on deposit in Pershing and other accounts, whether designated an account of Gary L. Stark (GLS), RMST Holding Company, Inc., or R.M. Stark & Co., Inc. that are the personal property of Seller GLS, representing capital contributions made by GLS, and are not assets of the Company or the BD.

(nn)   Software" means computer software programs, including all source code, object code, specifications, databases, web interfaces, designs, user manuals, training materials and all other documentation related to these programs.

(oo)   "Subsidiary" of a Person, means any corporation, more than 50% of whose outstanding voting securities, or any partnership, limited liability company, or other entity, more than 50% of whose total equity interests, is directly or indirectly owned by such Person.

(pp)   "Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(qq)   "Tax" or "Taxes" means (i) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), custom duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, and any amounts payable under the determination or settlement of an audit, and (ii) liability of the Company for the payment of any amounts of the type described in clause (i) above, as a result of any express or implied obligation to indemnify or otherwise assume or succeed to the liability of any other Person.

(rr)   "Trade Secrets" means information that derives independent economic value (actual or potential) from not being generally known to and not being readily ascertainable by proper means by a Person able to obtain economic value from its use or disclosure, and is the subject of efforts to maintain its secrecy that are reasonable under the circumstances, and rights in any jurisdiction to limit the use or disclosure thereof by any Person, including those described on Schedule 2.12.

(ss)   "Transaction Documents" means collectively, this Agreement, the Disclosure Schedule, and any and all exhibits, schedules, and attachments to any such documents and any other documents executed in connection therewith.

**B. Interpretation.** If a term is defined as one part of speech (such as a noun), it will have a corresponding meaning when used as another part of speech (such as a verb). The words "include," "includes" and "including" are to be read as if they were followed by the phrase "without limitation". A reference to an agreement means that agreement, as amended and supplemented from time to time, subject to restrictions on amendment or supplementation contained in that agreement. The headings used in this Agreement are for convenience only and do not affect the meaning or interpretation of this Agreement. All accounting terms used in this Agreement and not expressly defined in this Agreement will have the meanings given to them under GAAP.

## ARTICLE 1.
## SALE AND PURCHASE OF THE INTERESTS

**1.1 Sale of the Ownership Interests; First and Second Closings.** Upon execution of this Agreement as provided in Section 4.1 hereto (the "First Closing"), subject to the terms and conditions herein set forth, and on the basis of the representations, warranties and agreements herein contained, Seller shall deliver to Purchaser a share certificate evidencing an amount of shares equal to twenty-four percent (24%) of the Company's outstanding ownership interests on a fully diluted basis as of the First Closing. There shall be both the First Closing and a second closing (the "Second Closing") (When applicable both the First Closing and the Second Closing may be referred to as the "Closings").

**1.2 Second Closing.** At the Second Closing, subject to the terms and conditions herein set forth, and on the basis of the representations, warranties and agreements herein contained, Seller shall deliver to Purchaser a share certificate evidencing an amount of shares equal to seventy-six percent (76%) of the Company's outstanding ownership interests on a fully diluted basis as of the Second Closing. For avoidance of doubt, the Interests shall represent one-hundred percent (100%) of the Company's outstanding ownership interests at such time.

**1.3 Disbursement of Seller GLS Personal Property.** At the Second Closing, Seller and Purchaser agree to disburse to or otherwise transfer to Seller GLS all of the monies and/or securities on deposit in the following accounts. To the extent certain amounts are required by the BD's clearing firm or by FINRA, to remain in one or more of the accounts of the BD, such as Items 1.3(a), (c), (d) and (e) for example, Purchaser agrees to pay to Seller at the Second Closing an amount equal to such amounts required to remain in any account(s) and Seller agrees to leaves such funds in such account(s), which subsequent to the Second Closing shall remain the property of the Company or the BD, as the case may be.

(a) Pershing Account #51Y-891057 in the name of R.M. Stark & Co., Inc.

(b) Pershing Account #51Y-177218 in the name of RMST Holding Company, Inc.

(c) Pershing Clearing Deposit Account #79Z997375

(d) FINRA Account re CRD 7612

(e) Bank of America Account #003603202538

**1.4 Consideration and Payment for the Interests at the First Closing**. In consideration for an amount of the Interests representing twenty-four percent (24%) of the outstanding ownership interests of the Company, Purchaser shall pay to Seller the sum of Three Hundred Eighty-Four Thousand Dollars (USD$384,000.00) in cash ("First Closing Payment") at the First Closing.

**1.5 Consideration and Payment for the Interests at the Second Closing.** BD is a subsidiary of the Company and a Financial Industry Regulatory Authority ("FINRA") member broker-dealer firm. Direct and indirect sales of twenty-five percent (25%) or greater of a broker-dealer's ownership interest must be effected pursuant to FINRA rules and regulations. Hence, upon FINRA's approval of Purchaser's Form 1017 Continuing Membership Application ("CMA') for the change in the Company's ownership, the Purchaser and Seller will, within five (5) business days of such approval date, hold the Second Closing, whereat Purchaser shall pay to the Seller one million two hundred and sixteen thousand dollars (USD$1,216,000.00) ("Second Closing Payment"). CMA approval from FINRA will most likely take the form of an email from FINRA to the broker-dealer firm.

***1.5* Reserved.**

**1.6 CMA Denial or Approval with Material Negative Modifications to Membership Agreement**. If FINRA either (a) does not approve the CMA for any reason, or (b) approves the CMA but with material negative modifications to the broker-dealer's membership agreement, Purchaser shall have the right not to proceed to the Second Closing and any further duties and responsibilities under this Agreement shall cease. Additionally, Seller shall return the First Closing Payment to Purchaser's attorney's escrow account according to instructions given by Purchaser's attorney at such time. Additionally, Purchaser shall return by way of transfer to Seller the stock certificate evidencing ownership thereof. The Parties agree to effect such unwinding as soon as practicable after the FINRA denial or such material negative modification to the Membership Agreement, provided that Purchaser has the right, but not the obligation to process an appeal of the FINRA denial on behalf of the Company, and the Seller and Company agree to provide their best efforts in assisting Purchaser in this regard.

**1.7 Expenses of CMA**. Purchaser agrees to reimburse all costs associated with the filing and processing of the CMA, including the FINRA filing fee, but excluding any of Seller's own legal fees. If, during the CMA process, FINRA deems anything with the Company's current operations to be deficient (for example, email retention, WSPs, etc.) Company agrees to pay for such expense to satisfy any FINRA comments.

## ARTICLE 2.

## REPRESENTATIONS AND COVENANTS OF SELLER

In order to induce Purchaser to enter into this Agreement and consummate the Transactions contemplated hereby, the Seller hereby, where applicable, makes the following representations to Purchaser, each of which is complete and accurate as of the date of this Agreement (other than those representations provided as of a specific date) subject to the qualifications and exceptions set forth in the Disclosure Schedule attached hereto and incorporated herein as Exhibit B.

**2.1 Organization; Power; Authorization.**

(a) The Company is a Sub-S Corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and is duly qualified or registered to do business as a foreign corporation (i) in each jurisdiction listed in Schedule 2.1, and (ii) in each jurisdiction in which the failure to be so duly qualified or registered has not, and could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

(b) The Company has all required power and authority to carry on its business as presently conducted, to enter into and perform this Agreement and the other Transaction Documents to which it is a party and to carry out the Closing.

(c) This Agreement is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights generally, and subject, as to enforceability, to general principals of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). The execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of the Company and the Seller, as necessary.

**2.2 Non-Contravention; Consents.** With the exception of FINRA and Purchaser's Lender, the execution and delivery by Seller of this Agreement and all of the other Transaction Documents to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by Seller, do not and will not (a) violate, conflict with or result in a breach of, (b) constitute a default under (with or without the passage of time, the giving of notice, or both), (c) result in the creation of any Lien upon the Interests or the Company's assets (with the exception of Purchaser's Lender), (d) give any other Person the right to modify, terminate or accelerate any obligation under, (e) result in a violation of, or (f) require any consent, Governmental and/or Regulatory Authorization, exemption or other action of or by, or notice or declaration to, or filing with, any Governmental and/or Regulatory Body or other Person under, the Company's organizational documents, any Contract listed in Schedule 2.11, or any Law or order to which the Company or its assets is subject. In connection herewith, Purchaser shall make available to Seller all of Purchaser's loan documents reflecting any indebtedness to any Lender arising out of this Agreement.

**2.3** **Corporate Records**. The Certificate (or Articles) of Incorporation and By-laws of the Company attached hereto together as Exhibit A constitute a complete and accurate copy of the Company's Organizational Documents and are valid and remain in full force and effect. The corporate record books of the Company accurately reflect all corporate action taken and documented by its members, managers, or committees. The copies of the corporate records of the Company, as delivered to Purchaser, are complete and accurate copies of the originals of such documents.

**2.4** **Capitalization.** Seller represents that the authorized share ownership currently owned by Seller represents 100% of the issued and outstanding ownership interests of the Company. Such interests are owned free and clear of any lien, encumbrance, adverse claim, restriction on sale, transfer or voting (other than restrictions imposed by applicable securities laws), preemptive right, option, or other right to purchase, and upon the consummation of the sale of such interests as contemplated hereby, Purchaser will have good title to the Interests, free and clear of any lien, encumbrance, adverse claim, restriction on sale, transfer or voting (other than restrictions imposed by applicable securities laws), preemptive right, option or other right to purchase. All outstanding ownership interests of the Company have been duly authorized and validly issued and are fully paid and non-assessable.

**2.5** **Subsidiaries; Investments.**

(a) The Company has one subsidiary, the BD.

(b) The Company does not own, directly or indirectly, any equity ownership interest, voting securities, or other interest that, upon the happening of a contingency, will become an equity interest in any other Person.

**2.6** **Financial Statements.** Schedule 2.6 is comprised of the following financial statements: (a) the Company's audited balance sheet as of September 30, 2018, and the related statements of operations for the fiscal year then ended; (b) the Company's audited balance sheet as of September 30, 2019, and the related statements of operations for each of the twelve (12) month periods then ended; and (c) BD's FOCUS reports, as filed with FINRA, for each of the four quarterly periods from October 2018 through September 30, 2019 (the "Financial Statements"). The Financial Statements present fairly, in all material respects, the financial position of the Company and BD as of the date of the respective balance sheet and the results of its operations for the periods shown therein, in each case in a manner consistent with the Company's past practices and its books and records. Upon approval of the CMA and the Second Closing, the Purchaser confirms that the BD shall have an amount of net capital necessary to maintain within proper net capital compliance according to Pershing, LLC requirements and FINRA rules and regulations; Purchaser shall further deposit capital sufficient to ensure the continued operation of the BD's business.

**2.7** **Absence of Material Undisclosed Liabilities.** Except as disclosed in Schedule 2.7, the Company has no Liabilities, except for Liabilities reflected or reserved

against in the Financial Statements and current Liabilities incurred in the Ordinary Course of Business since September 30, 2019.

**2.8    Absence of Certain Changes.**  Since January 1, 2019, the Company and BD have conducted their respective business only in the Ordinary Course of Business, and no Material Adverse Change has occurred.  Except as disclosed in Schedule 2.8, since January 1, 2019, there has not been, whether for the Company or BD:

(a)    any purchase, sale or other disposition, or any agreement or other arrangement for the purchase, sale or other disposition, of any properties or assets involving the payment or receipt of more than Fifty Thousand Dollars ($50,000.00);

(b)    any increases in the salary, wage, or bonus paid to an employee or group of employees, in excess of Ten Thousand Dollars ($10,000.00) or any amendment or termination of any existing employee benefit plan or arrangement or any adoption of any new employee benefit plan or arrangement;

(c)    any change in accounting methods;

(d)    any material change in collection policies or payment policies;

(e)    any amendment to the Company's or BD's Organizational Documents;

(f)    any action or failure to take any action that has, had or would reasonably be expected to have the effect of accelerating to pre-Closing periods, a material amount of sales to customers or other revenues that would otherwise be expected to take place or be incurred after Closing;

(g)    except as set forth in this Agreement or any other Transaction Document, agreement or understanding, whether in writing or otherwise, for the Company to take any of the actions specified in paragraphs (a) through (f) above.

**2.9    Properties.**

(a)    The Company has good title to, or has a valid leasehold interest in, all assets material to its business and to those assets reflected on the Financial Statements or acquired by it after the date thereof, free and clear of any and all Liens, except for (i) properties disposed of since that date in the Ordinary Course of Business, (ii) Taxes which are not yet due and payable, (iii) Liens reflected in the Financial Statements, (iv) Liens of record that do not materially detract from the value of the property subject thereto or impair the operations of the Company, and (v) Liens that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change (collectively, "Permitted Liens").

(b)     The Company does not own any real property.

(c)     The Company has a valid leasehold interest in the real property which it leases, 730 South Federal Highway, Lake Worth Beach, Florida 33460, (the "Leased Real Property"), free and clear of any and all Liens, except for Permitted Liens. The lease shall be provided to Purchaser concurrently herewith (the "Real Property Lease"). The Real Property Lease affords the Company peaceful and undisturbed possession of the Leased Real Property. The Leased Real Property constitutes the only real property used or occupied by the Company or reflected on the Company's financial statements.

**2.10    Tax Matters**. The Company shall provide Purchaser with a copy of its Tax Returns and those of BD for the years ended September 30, 2018 and 2019. Additionally:

(a)     (i) The Company has duly filed all Tax Returns it was required to file; (ii) all such Tax Returns were complete and accurate and all Taxes of the Company (whether or not shown on any Tax Return and whether or not any Tax Return was required) have been paid; (iii) the Company is not the beneficiary of any extension of time within which to file any Tax Return; (iv) the Company has maintained adequate term for Taxes (excluding amounts deferred to take into account timing differences between book and tax) payable as of the Closing Date; (v) to the Knowledge of the Company, no claim has ever been made by a Governmental and/or Regulatory Body in a jurisdiction where the Company does not currently file Tax Returns that the Company is or may be subject to taxation by that jurisdiction; and (vi) there are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax, except for Liens for Taxes not yet due.

(b)     There is no material dispute or claim concerning any Tax Liability of the Company either (i) claimed or raised by any Governmental and/or Regulatory Body in writing or (ii) to the Knowledge of the Company based upon personal contact with any agent of such Governmental and/or Regulatory Body.  the Company has not received from any Governmental and/or Regulatory Body any written notice of proposed adjustment, deficiency, underpayment of Taxes or any other such notice which has not been satisfied by payment or been withdrawn, and no claims have been asserted relating to such Taxes against the Company.  To the Knowledge of the Company, there is no dispute or claim concerning any Tax liability of the Company either claimed or raised by any Governmental and/or Regulatory Body in writing.

(c)     No Tax Return has been audited, or is currently the subject of audit. The Company has delivered correct and complete copies of all federal and foreign Tax Returns, examination reports, and statements of deficiencies assessed against, or agreed to by the Company since its formation.  The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency.

(d) The Company is not a party to any joint venture, partnership or other arrangement or contract that could be treated as a partnership for Federal income tax purposes. The Company has not entered into any sale leaseback or leveraged lease transaction that fails to satisfy the requirements of Revenue Procedure 2001-28 (or similar terms of foreign Law) or any safe harbor lease transaction.

(e) The Company is not required to include in a taxable period ending after Closing Date, taxable income attributable to income that accrued in a prior taxable period but was not recognized in any prior taxable period as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting or Section 481 of the Code or any comparable term of state, local, or foreign tax law or a "closing agreement" as described in Section 7121 of the Code.

(f) The Company has not engaged in any "reportable transaction" as defined in Section 1.6011-4 of the Treasury Regulations.

(g) The Company has not received from any Governmental and/or Regulatory Body any written notice of proposed adjustment, deficiency, underpayment of Taxes or any other such notice which has not been satisfied by payment or been withdrawn, and no claims have been asserted relating to such Taxes against the Company.

(h) The Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts, allocable, paid or owing to any employee, independent contractor, creditor, member, partner or other Person.

(i) The Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(j) None of the assets of the Company, including goodwill, are assets described in Section 197(f)(9) of the Code.

(k) For avoidance of doubt, Seller is liable for the payment of all Company and BD taxes due as of the Second Closing as well as for taxes on revenue earned prior to the Second Closing but not yet received by the Second Closing, provided that twenty-four percent (24%) of such taxes would be payable by Purchaser but solely to the extent Seller received profit distributions between the First Closing and Second Closing.

**2.11 <u>Material Contracts</u>**. Schedule 2.11, reflects all of the following described Contracts, if any, to which the Company is a party:

(a)    Contract(s) involving a potential commitment or payment to or by the Company in excess of $5,000, which is not cancelable by the Company without penalty on not less than 30 days' notice;

(b)    Contract(s) under which the Company leases real property from LWB, LLC;

(c)    Contract(s) containing covenants directly or explicitly limiting in any respect the freedom of the Company to compete in any line of business or with any Person (of which there are none);

(d)    Contract(s) relating to the licensing, distribution, development, purchase, supply, sale or servicing of its goods or services or any license (*i.e.,* the Independent Broker Agreements between the Company and its Independent Registered Representatives);

(e)    Contract(s) for borrowing or any pledge or security arrangement (of which there are none);

(f)    any redemption or purchase Contract(s) affecting or relating to the securities of the Company, including any agreement with any Stockholder, which includes anti-dilution rights, registration rights, voting arrangements, operating covenants, approval rights, or similar terms (of which there are none);

(g)    The Company's 401(k) Profit Sharing Plan;

(h)    any acquisition, merger, consolidation or similar Contract (of which there are none);

(i)    any collective bargaining Contract with any labor union or other employee representative of a group of employees (of which there are none); or

(j)    any employment Contract or severance arrangement requiring an annual payment of cash compensation in excess of $25,000 for such Person (of which there are none).

All such Contracts listed in Schedule 2.11 (the "Material Contracts") are in full force and effect and constitute valid and binding obligations of the Company and, to the Knowledge of the Company, of the other parties thereto, and are enforceable in accordance with their respective terms subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights generally, and subject, as to enforceability, to general principals of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). To the Knowledge of the Company, the Company has not received any notice or threat to terminate any Material Contract. Neither the Company nor, to the Knowledge of the Company, any other party is in default in complying with any

terms of any Material Contract, and no condition, event or fact exists that with notice, lapse of time or both, could constitute a default under any Material Contract on the part of the Company.

**2.12. Intellectual Property.** The Company has no ownership or other interest in Intellectual Property.

**2.13 Information Technology.**

(a) With the exception of the software provided by or through Pershing, LLC, the Company's Clearing Firm, the Company uses off the shelf Software, and the Company is in possession and control of the applicable source code, object code, documentation, and know-how to the extent required for use, maintenance and support of the Software as used, maintained, or supported in the business of the Company.

(b) There are no Internet domain names that are used in the Business.

(c) The Company is in compliance with all applicable Laws regarding the collection, use and protection of personal information and with the Company's published and internal privacy and data security policies and procedures, and no Person has gained unauthorized access to or made any unauthorized use of any personal information maintained by the Company.

**2.14 Litigation.** With the exception of *Roberta O"Grady, Claimant, v. R.M. Stark & Co., Inc., Thomas J. Marino, Individually, and Capstone Financial Group, LLC, a Florida Limited Liability Co., Respondents; R.M. Stark & Co., Inc., Cross-Claimant, v. Thomas J. Marino, Cross-Respondent,* FINRA Arbitration Case No. 19-00968, and Supreme Court of the State of New York, County of Kings, Index No. 2019/19, *Nicholas A. Owoyemi, Plaintiff v. Financial Industry Regulatory Authority, R.M. Stark & Co., Inc., Chase Investments Services Corporation, Merrimack Corporate Securities, Inc., Defendants,* and the potential FINRA Arbitration to be litigated between R.M. Stark & Co., Inc. and Nicholas A. Owoyemi and the potential litigation between R.M. Stark & Co., Inc. and HDI Specialty Insurance Company, its Errors and Omissions carrier, there is no Proceeding pending or, to the Knowledge of the Company, threatened against the Company or BD or affecting the assets of the Company or BD, or, as to matters related to the Company or BD, against any officer, director, Stockholder or key employee of the Company or BD in their respective capacities in such positions. It is expressly understood and agreed by the Parties hereto that any damages or other relief awarded for or against R.M. Stark & Co., Inc. are to be paid by or to Gary L. Stark. Seller agrees to use its best efforts to avoid harming the reputation of the Company or the BD should any litigation exist subsequent to the Second Closing.

**2.15 Labor Matters.** Schedule 2.15 is a complete and accurate list of each employee of the Company (each, a "Company Employee" and, collectively, the "Company

Employees") describing for each such Company Employee: (a) the position held; (b) his or her name; (c) the annual salary paid (including any commissions, overrides or other compensation); and (d) the amount, if any, of his or her 2019 bonus and anticipated 2020 bonus. The Company complies, in all material respects, with all Laws governing labor, employment, fair employment practices, terms and conditions of employment, Occupational Safety and Health, and wages and hours. There are no charges of employment discrimination or unfair labor practices existing, pending or, to the Knowledge of the Company, threatened against or involving the Company.

**2.16 Employee Benefit Programs.**

(a) The Company maintains, sponsors or contributes to a 401(k) Profit Sharing Plan administered by Levy and Associates. The terms and operation of each Employee Benefit Program comply with all Laws relating to each such Employee Benefit Program. There are no unfunded obligations of the Company under any Employee Benefit Program and all contributions, premiums, expenses and benefit payments required to be made to or in connection with each Employee Benefit Program under the terms of that Employee Benefit Program, ERISA, the Code and other applicable Laws have been timely made. The Company is not required to make any payments or contributions to any Employee Benefit Program under any collective bargaining agreement or, to the Knowledge of the Company, any applicable labor relations Law. The Company shall cause all documentation and information related to the Company's Profit Sharing Plan to be made available to Purchaser by Levy and Associates prior to the execution hereof.

(b) Neither the execution of this Agreement nor the consummation of the transactions contemplated hereunder will (i) result in any payment becoming due to any current or former officer, director, employee, consultant, agent or independent contractor under an Employee Benefit Program or other compensatory arrangement, (ii) increase any benefits otherwise payable under any Employee Benefit Program, or (iii) result in the acceleration of the time of payment or vesting of any benefits of any such person under any Employee Benefit Program. No amount or other entitlement under any Employee Benefit Program that could be received arising out of the consummation of the Agreement (either alone or together with any other related event, including termination of employment) by any Person could be an "excess parachute payment" (as defined in Code Section 280G(b)(1)).

**2.17 Insurance Coverage.** Schedule 2.17 contains a complete and accurate summary of the insurance policies currently maintained by the Company. Except as heretofore set forth in Paragraph **2.14**, there are currently no claims pending against the Company under any insurance policies currently in effect and covering the assets, business or employees of the Company, and all premiums due and payable with respect to the policies maintained by the Company have been paid to date. To the Knowledge of the Company, there is no threatened termination of any such policies or arrangements.

**2.18** **Investment Banking; Brokerage.** Other than such fee that shall be paid by Seller to a business broker there is no other similar compensation payable by the Company or based on any arrangement or agreement made by or on behalf of the Company in connection with this Agreement.

**2.19** **Compliance with Laws.**

(a) The Company complies, in all material respects, with all applicable Laws. Neither the Company nor, to the Knowledge of the Company, any employee of the Company, is in default with respect to any Order relating to the Business or this Agreement.

(b) The Company holds all Governmental and/or Regulatory Authorizations necessary for the ownership, operation and use of the Company's assets and the conduct of the Business and there are no outstanding material violations of any of the foregoing. The Company has not received any written notice asserting any such violation, defaults or failures to comply with applicable Laws. All such Governmental and/or Regulatory Authorizations are in full force and effect and are not subject to any suspension, cancellation, modification or revocation or any proceedings related thereto, and, to the Knowledge of the Company, no such suspension, cancellation, modification or revocation or proceeding has been threatened or is reasonably likely to occur.

**2.20** **Bank Accounts.** Schedule 2.20 lists all of the Company's bank accounts (designating each authorized signatory and the level of each signatory's authorization) with addresses of the respective financial institutions.

**2.21** **Names and Locations.** During the five-year period prior to the date of this Agreement, the Company has not, and none of its predecessors, if any, has used any name under which it or they have invoiced account debtors, maintained records concerning its or their assets or otherwise conducted its or their business. All of the Company's tangible assets are located at 730 South Federal Highway, Lake Worth Beach, Florida 33460.

**2.22** **Affiliate Transactions.** None of the Company, the Seller or a Related Person, or any of them, has, or since January 1, 2019;

(a) Had any interest in any asset used in or pertaining to the Business;

(b) With the exception of Stark Financial Advisers, Inc. and LWB, LLC, had owned, of record or beneficially, an equity interest or any financial or other interest in any Person that (i) had business dealings or a material financial interest in any transaction with the Company other than business dealings or transactions with Stark Financial Advisers, Inc. and LWB, LLC, each of which has been conducted in the Ordinary Course of Business at substantially prevailing market prices and on substantially prevailing market terms, or (ii) to the Knowledge of the

Company, engaged in competition with the Company with respect to any line of the goods or services of the Company (a "Competing Business") in any market presently served by the Company; or

(c)     Is a party to any Contract with, or has any claim or right against, the Company.

**2.23    Warranties.** All services rendered by the Company have been sold or rendered in conformity in all material respects with all applicable Contracts, including all express and implied warranties. The Company has no Liability (and, to the Knowledge of the Company, there is no reasonable basis for any present or future Proceeding against it giving rise to any such Liability) for curing or providing additional services or other Liabilities in connection therewith in excess of any contingent liability reserve specifically established with respect thereto and included on the Financial Statements or to be included on the books of the Company as of the Closing. No services rendered by the Company are subject to any guaranty, warranty or indemnity beyond the applicable standard terms and conditions of such service (including those applicable as a result of any course of dealing or conduct between the Company and the Person to whom the services were provided or as a result of any statements in any of the Company's services or promotional literature). The Company has not received any notice of any claims relating to any of its services.

**2.24    Accounts Receivable.** All accounts receivable, unbilled invoices, costs in excess of billings, work in process and other amounts reflected on the Financial Statements or on the accounting records of the Company as of the Closing Date (collectively, the "Accounts Receivable") as being due to the Company have arisen in the Ordinary Course of Business, represent valid and enforceable obligations to the Company and, to the Knowledge of the Company, are not and will not be subject to any contests, claims, counterclaims or setoffs other than in the Ordinary Course of Business. Since September 30, 2019, there has been no Material Adverse Change in the amount or collectability of the Accounts Receivables due the Company or the related terms or reserves from that reflected in the Base Balance Sheet. Except as disclosed in Schedule 2.24 (i) no account debtor or note debtor is delinquent for payments in excess of $1,000 or for more than 30 days, (ii) no account debtor or note debtor has refused or, to the Knowledge of the Company, threatened to refuse to pay its obligations to the Company for any reason, or has otherwise made a claim to set-off or similar claim, and (iii) to the Knowledge of the Company, no account debtor or note debtor is insolvent or bankrupt.

**2.25    Indebtedness.** Schedule 2.25 is a list of all Indebtedness of the Company as of both the First Closing and the Second Closing.

**2.26    Validity of the Interests.** The Interests issued hereunder have been duly authorized by the appropriate company action of the Company.

**2.27    Transfer of the Interests.** Seller shall transfer title in and to the Interests to Purchaser free and clear of all liens, security interests, pledges, encumbrances,

charges, restrictions, demands and claims, of any kind and nature whatsoever, whether direct or indirect or contingent at the First Closing and the Second Closing as the case may be.

**2.28** **Reserved.**

**2.29** **SEC and FINRA Registration**. BD is registered as a broker-dealer with the SEC, is a duly qualified member in good standing of FINRA, and has provided to Purchaser true and correct copies of all its filings with the SEC and amendments thereto since inception. It is duly qualified and registered as a broker-dealer in each jurisdiction where failure to be so qualified or registered could have a material adverse effect on the condition of the Company and is in compliance with all applicable laws, rules and regulations of the SEC, FINRA and any such jurisdiction.

**2.30** **Adequate Licenses.** All of the BD's officers and employees who are required to be licensed or registered to conduct the business of BD, as presently conducted, are duly licensed or registered in each state in which such licensing or registration is so required.

**2.31** **Statements.** This Agreement and the documents and certificates furnished or to be furnished to Purchaser by Seller at or prior to either the First Closing, or the Second Closing, taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which they were made, not misleading.

**2.32** **Company Representations.** The officer of the Company executing this Agreement hereby represents and warrants that all representations and warranties made by the Company in this Agreement to Purchaser are true.

**2.33** **Evidence of Interests.** On the First Closing and Second Closing Dates, as defined in Section 4.1 below, Seller shall deliver to Purchaser stock certificates as stated in Sections 1.1 and 1.2 above, respectively, subject to no liens, security interests, pledges, encumbrances, charges, restrictions, demands or claims in any other party whatsoever. In addition, each operating agreement revision shall contain language similar in intent and meaning as the following:

**THE INTEREST (OR OTHER SECURITIES) BEING TRANSFERRED, AND AS REFLECTED IN THE COMPANY'S BOOKS AND RECORDS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THE INTERESTS MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN OPINION OF COUNSEL THAT AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT IS AVAILABLE.**

**2.34** **The Company Ownership Interest**. Seller and Company acknowledge and certify that after the transfer of the balance of the Interests to Purchaser at the Second

Closing the Seller shall not retain any ownership interest in the Company. Ownership of the Company shall thereafter be 100% owned by Purchaser.

**2.35** **Retention of Key Employees**. Seller and Company shall exercise their best efforts to ensure that employees or independent contractors currently in place at BD will remain in place through the approval of BD's CMA and the date of the Second Closing.

**2.36** **One Year Transition.** For a period of one (1) year, but no greater than one (1) year, from the date of the Second Closing, Gary Stark will assist the Company in order to help in the transition of the Company to the new ownership by Purchaser. Pursuant to Section 2.35 above, Gary Stark shall continue to use his best efforts to ensure that employees or independent contractors currently in place at BD will remain in place through the one-year transition period.

## ARTICLE 3.
## REPRESENTATIONS AND COVENANTS OF PURCHASER

**3.1** Purchaser represents and warrants to Seller as follows:

(a) Purchaser (i) is a limited liability company duly organized and validly existing under the laws of the jurisdiction of its formation and (ii) has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the other Transaction Documents to which it is a party.

(b) The execution, delivery and performance by Purchaser under the Transaction Documents to which it is a party and the transactions contemplated hereby and thereby, including, without limitation, the purchase of the Interests (a) have been duly authorized by all necessary action, (b) do not contravene the terms of Purchaser's organizational documents, or any amendment thereof, and (c) do not violate, conflict with or result in any breach or contravention of or the creation of any lien under, any contractual obligation of Purchaser, or any requirement of law applicable to Purchaser.

(c) No approval, consent, compliance, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority or any other Person in respect of any requirement of law, is necessary or required in connection with the execution, delivery or performance (including, without limitation, the purchase of the Interests) by Purchaser of the Transaction Documents to which Purchaser is a party or the transactions contemplated hereby, except for the CMA and Purchaser's Lender's approval.

(d) The Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser and constitute the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency,

reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability (regardless of whether considered in a proceeding at law or in equity).

(e) The Interests to be purchased by Purchaser hereunder will be acquired for investment for Purchaser's own account, not as nominee or agent, and not with a view to or for sale or resale in connection with any distribution of any part thereof, and Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Purchaser does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to any Person, with respect to any of the Interests. Notwithstanding the foregoing, Purchaser shall be entitled to transfer all or part of the Interests to one or more affiliated companies or subsidiaries, provided that such transfer is effected subsequent to the Second Closing and not as an assignment at any time prior to the Second Closing.

(f) Purchaser acknowledges that it has, by reason of its business or financial experience, the capacity to protect its own interests in connection with the transaction and that it is able to bear the economic risk of its investment in the transaction. Purchaser not been organized solely for the purpose of acquiring the Interests.

(g) Purchaser has adequate means of providing for current needs and contingencies, has no need for liquidity in the investment, and is able to bear the economic risk of an investment in the Interests. Purchaser represents that Purchaser is able to bear the economic risk of the investment and at the present time could afford a complete loss of such investment. Purchaser has had a full opportunity to inspect the books and records of the Company and to make any and all inquiries of the Company's officers and directors regarding the Company and its business, as Purchaser has deemed appropriate.

(h) Purchaser will not sell or otherwise transfer the Interests without registration under the Act or an exemption therefrom and fully understands and agrees that Purchaser must bear the economic risk of Purchaser's purchase for an indefinite period of time because, among other reasons, the Interests have not been registered under the Act or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Act and under the applicable securities laws of such states or unless an exemption from such registration is available.

(i) Purchaser understands that Seller is under no obligation to register the Interests on Purchaser's behalf or to assist Purchaser in complying with any exemption from registration under the Act, except as set forth herein.

(j) There are no brokerage commissions, finder's fees or similar fees or commissions payable by Purchaser, in connection with the transactions contemplated hereby, based on any agreement, arrangement or understanding with Purchaser or any action taken by Purchaser.

## ARTICLE 4
## FIRST & SECOND CLOSINGS AND DELIVERY OF DOCUMENTS; CMA APPROVAL

**4.1 <u>First and Second Closings</u>.** The First Closing shall be deemed to have occurred upon execution of this Agreement. Immediately upon such execution, the following shall occur as a single integrated transaction:

(a) *Delivery by Seller at First Closing.* Seller shall deliver to Purchaser the stock certificate and any and all other instruments of conveyance and transfer required by Section 1.1 to consummate the transfer of the Interests to Purchaser, which shall include a listing of the current assets under management of the BD, as well as all fixed assets of the Company and the BD.

(b) *Delivery by Seller at Second Closing.* Seller shall deliver to Purchaser the stock certificate and any and all other instruments of conveyance and transfer required by Section 1.2 to consummate the transfer of the Interests to Purchaser, which shall include a listing of the current assets under management of the BD, as well as all fixed assets of the Company and the BD.

(c) *Delivery by Purchaser at First Closing.* Purchaser shall deliver the First Closing Payment to Seller at the First Closing.

(d) *Delivery by Purchaser at Second Closing.* Purchaser shall deliver the Second Closing Payment to Seller at the Second Closing.

(e) Filing of the CMA. The Seller and the Company agree to work with Purchaser and Purchaser's attorney to file the Form CMA on behalf of BD within Fifteen (15) business days of the First Closing, seeking FINRA's approval of the sale of the remaining seventy-six percent (76%) of the Company.

**4.2 <u>Pending CMA Approval Conduct of Business</u>.** Except as required by this Agreement or with the prior written consent of Purchaser, from the date of this Agreement until approval of the CMA, the Company and BD shall, and the Seller shall cause the Company and BD to (i) operate in the Ordinary Course of Business, (ii) exercise its best efforts to preserve intact and maintain the Business, all business relationships and goodwill with its employees, registered representatives, independent contractors, suppliers and service providers of and to the Business, (iii) not take any action that would be required to be disclosed pursuant to <u>Section 2.8</u>, and (iv) not do any of the following unless with the consent of the Purchaser:

(a) effect any change in the capitalization, or the issued and outstanding equity, of the Company, or make any amendment to the Organizational Documents of the Company, provided that this section shall not include return of capital or ownership draws by the Seller that do not place the Company outside of FINRA net capital compliance;

(b) merge or consolidate the Company with any other Person, or restructure, reorganize or completely or partially liquidate or otherwise enter into any agreements or arrangements imposing material changes or restrictions on the Company's assets, equity, or Business;

(c) purchase, sell, lease, let lapse, exchange or otherwise dispose of or acquire any assets (other than transactions occurring in the Ordinary Course of Business);

(d) enter into, amend, modify or terminate, or cancel, modify or waive any provision of, any Material Contract or Real Property Lease, or modify or waive any claims or rights of the Company;

(e) create, incur or forgive any Indebtedness in excess of Five Thousand Dollars ($5,000.00), make or forgive any loans, advances, guarantees or capital contributions to, or investments in, any Person in excess of Five Thousand ($5,000.00), create or incur any Lien on the outstanding ownership interests, or other equity of the Company, or create or incur any Lien on any the Company asset;

(f) with the exception of those legal matters set forth in Paragraph **2.14** above, settle or compromise any Proceeding, pending or threatened (in each case, except for claims under insurance policies within applicable policy limits);

(g) (i) make any changes with respect to accounting policies or procedures, except as required by changes in applicable Law, or (ii) make or revoke any Tax election;

(h) fail to exercise a right of renewal or extension under any License other than in the Ordinary Course of Business;

(i) adopt or commit to adopt any new employee benefit plan, program, arrangement or agreement;

(j) issue, sell, pledge, dispose of, grant, transfer, encumber or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of, any securities of the Company or securities convertible or exchangeable into or exercisable for any securities of the Company, or any

options, warrants or other rights of any kind to acquire any securities of the Company or such convertible or exchangeable securities;

(k)     repurchase, redeem, repay or otherwise acquire any outstanding securities of the Company;

(l)     (i) accelerate the delivery or sale of any goods or services or offer discounts on the sale of any goods or services, (ii) defer any actions, expenditures or investments appropriate or necessary to operate and conduct the Business, (iii) make any change in the levels of materials or supplies used in the conduct of the Business, or (iv) engage in any practice to accelerate the collection of any accounts receivable or delay payment of any accounts payable or other Liabilities beyond their scheduled due dates or otherwise manage cash in a manner similar to any of the foregoing, in each case other than in the Ordinary Course of Business;

(m)     enter into any legally binding commitment with respect to any of the foregoing.

**4.3     Maintenance of Ownership.** From the date of this Agreement to the Second Closing, the Seller will not sell, pledge, gift or otherwise transfer to any other Person, any of the Interests in the Company or options to purchase any of the Interests in the Company, except in accordance with this Agreement or as required by operation of Law.

## ARTICLE 5
## INDEMNIFICATION

**5.1     By Seller.** Subject to the terms and conditions of this Section 5, the Seller shall defend, indemnify and hold harmless Purchaser and its Affiliates (including the Company after Closing), members, officers, directors, managers, employees, agents, partners, representatives, successors and assigns (collectively, the "Purchaser Parties") from, and pay on behalf of or reimburse such Purchaser Parties, as and when incurred, for any Damages that a Purchaser Party may suffer, sustain, or become subject to, as a result of, in connection with, relating to or incidental to or by virtue of:

(a)     an inaccuracy in any representation of the Company or the Seller in this Agreement or any other Transaction Document;

(b)     any non-fulfillment or breach by the Company or Seller of any covenant or other term of this Agreement or any other Transaction Document;

(c)     any claim by a holder of or former holder of any ownership interests of the Company, or any other Person (i) seeking to assert ownership or rights to ownership of any membership interests or other equity of the Company; (ii) based upon any rights of a holder of membership interests, option, or preemptive rights

of the Company; or (iii) based upon any rights under the Organizational Documents of the Company;

(d) any fees, expenses or other payments incurred or owed by the Seller or the Company to any agent, broker, investment banker or other Person retained or employed by any of them in connection with this Agreement; or

(e) any claim by any Governmental and/or Regulatory Body for any Taxes of the Company or the Seller, allocable to any period ending on or prior to the date of the Second Closing, or of any other Person, whether as a transferee or successor, by Contract or otherwise, or a claim by any Governmental and/or Regulatory Body for any Taxes arising from or occasioned by the sale of the Interests under this Agreement.

**5.2 By Purchaser.** Subject to the terms and conditions of this Section 5, Purchaser shall defend, indemnify and hold harmless the Seller, its members, officers, directors, managers, employees, agents, partners, representatives, successors and assigns (collectively, the "Seller Parties") from and against and pay on behalf of or reimburse the Seller Parties, as and when incurred, for all Damages that a Seller Party may suffer, sustain, or become subject to, as a result of, in connection with, relating to or incidental to or by virtue of:

(a) any inaccuracy of any representation of Purchaser in this Agreement or any other Transaction Document;

(b) any non-fulfillment or breach by Purchaser of any covenant or other term of this Agreement or any other Transaction Document; or

(c) any claim by any Governmental and/or Regulatory Body for any Taxes of the Company or the Purchaser, allocable to any period beginning on or subsequent to the date of the Second Closing, or of any other Person, whether as a transferee or successor, by Contract or otherwise, or a claim by any Governmental and/or Regulatory Body for any Taxes arising from or occasioned by the sale of the Interests under this Agreement that are found to have been the payment responsibility of the Purchaser or the Company on or subsequent to the date of the Second Closing; or

(d) any fees, expenses or other payments incurred or owed by the Purchaser to any agent, broker, investment banker or other Person retained or employed by any of them in connection with this Agreement.

**5.3 Indemnification Procedures.** Any claim or demand for indemnification under this Section 5 (each a "Claim") shall be asserted and resolved as follows:

(a) If a Purchaser Party or a Seller Party (as the case may be, "Indemnified Party") has a Claim against, respectively, any Seller Party or Purchaser Party (as the case may be, "Indemnifying Party") that does not involve a Claim being asserted against or sought to be collected by a Person not a party to this Agreement, the Indemnified Party shall give the Indemnifying Party written notice (a "Claim Notice") of any matter that the Indemnified Party has determined, has given or could give rise to a right of indemnification under this Agreement, supported by reasonable documentation setting forth the nature of the circumstances entitling the Indemnified Party to indemnification under this Agreement, including references to the specific terms of this Agreement upon which the Indemnified Party is relying in making a Claim.

(b) If a Person not a party to this Agreement asserts a Claim against an Indemnified Party for which the Indemnifying Party would be liable under this Agreement (each, a "Third Party Claim"), then the Indemnified Party shall promptly deliver a Claim Notice to the Indemnifying Party as set forth in subparagraph (a) above.

(c) Any payment of Damages required under this Section 5 shall be reduced by any insurance proceeds actually received by the Indemnified Party or any of its Affiliates with respect to the Claim giving rise to the payment of Damages.

(d) Any Damages due and payable under this Section 5 shall be paid as soon as practicable thereafter.

## ARTICLE 6
## MISCELLANEOUS

**6.1 Disclosure Schedule.** The information disclosed in the Disclosure Schedule constitutes exceptions to particular representations and covenants of the Company and the Seller as set forth in this Agreement, or descriptions or lists of assets and Liabilities and other items referred to in this Agreement. If there is any inconsistency between the statements in this Agreement and those in the Disclosure Schedule (other than an exception expressly set forth as such in the Disclosure Schedule with respect to a specifically identified representation or covenant), the statements in this Agreement will control. The statements in the Disclosure Schedule and those in any supplement thereto, relate only to the Section of this Agreement to which they expressly relate and not to any other Section or term of this Agreement.

**6.2 No Construction Against Drafter.** The Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents with counsel sophisticated in similar transactions. Therefore, if an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents are to be construed as if the parties had drafted them jointly, as opposed to being construed

against a party because it was responsible for drafting one or more terms of this Agreement or the other Transaction Documents.

**6.3 <u>Notices</u>.** Any notice, request, instruction, or other document required by the terms of this Agreement, or deemed by any of the Parties hereto to be desirable, to be given to any other Party hereto shall be in writing and shall be given by facsimile, personal delivery, overnight delivery, or mailed by registered or certified mail, postage prepaid, with return receipt requested, to the following addresses:

| | |
|---|---|
| <u>To Purchaser</u>: | OPC Advisors, LLC<br>c/o Arturo Nicolayevsky<br>121 N Post Oak Ln #705<br>Houston, TX 77024<br>(281) 804-2119<br>Fax: 281-214-0917<br>arturo@premium72.com |
| <u>With a copy to</u>: | Gregory Levine<br>Gregory Levine Law<br>11 Broadway, Suite 615<br>New York, NY 10004<br>(646) 783-1250<br>Fax (646) 417-7017 |
| <u>To Company</u>: | RMST Holding Company, Inc.<br>c/o Gary Stark<br>730 S. Federal Highway<br>Lake Worth Beach, Florida, 33460<br>(561) 243-3815<br>gstark@rmstark.com |
| <u>To Seller</u>: | Gary Stark, et al.<br>730 S. Federal Highway<br>Lake Worth Beach, Florida, 33460<br>(561) 715-6073<br>gstark@rmstark.com |
| <u>With a copy to</u>: | Ellen R.P. Adler<br>16840 U.S. Highway 441 North<br>Okeechobee, Florida 34972<br>(561) 715-6098<br>eadler@rmstark.com |

The persons and addresses set forth above may be changed from time to time by a notice sent as aforesaid. If notice is given by facsimile, personal delivery, or overnight

delivery in accordance with the provisions of this Section, said notice shall be conclusively deemed given at the time of such delivery. If notice is given by mail in accordance with the provisions of this Section, such notice shall be conclusively deemed given seven days after deposit thereof in the United States mail.

**6.4    Waiver and Amendment.** Any term, provision, covenant, representation, warranty or condition of this Agreement may be waived, but only by a written instrument signed by the Party entitled to the benefits thereof. The failure or delay of any Party at any time or times to require performance of any provision hereof or to exercise its rights with respect to any provision hereof shall in no manner operate as a waiver of or affect such Party's right at a later time to enforce the same. No waiver by any Party of any condition, or of the breach of any term, provision, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or waiver of any other condition or of the breach of any other term, provision, covenant, representation or warranty. No modification or amendment of this Agreement shall be valid and binding unless it be in writing and signed by all Parties hereto.

**6.5    Choice of Law.** This Agreement and the rights of the Parties hereunder shall be governed by and construed in accordance with the laws of the State of Florida including all matters of construction, validity, performance, and enforcement and without giving effect to the principles of conflict of laws.

**6.6    Waiver of Jury Trial.** Except to the extent that Arbitration is required by any Governmental and/or Regulatory Authority, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

**6.7    Submission to Jurisdiction; Consent to Service of Process.** The United States District Court for the district within Florida containing the County of Palm Beach, or, if such court does not have subject matter jurisdiction, the state courts of Florida located in the county within Florida containing the city of Lake Worth Beach, County of Palm Beach, shall have exclusive jurisdiction over and shall resolve all disputes arising out of or related to this Agreement. Each party hereby irrevocably accepts and submits to the exclusive jurisdiction of such courts, in personam, with respect to any such dispute. Each party irrevocably and unconditionally (a) waives any objection to the laying of venue of any Proceeding arising out of or related to this Agreement in (i) the district court of the state of Florida located in the county within Florida containing the city of Lake Worth Beach, or (ii) any Federal court sitting in the district within Florida containing the city of Lake Worth Beach, and (b) agrees not to plead or claim that any such Proceeding brought in any such court has been brought in an inconvenient forum. Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each of the parties hereby consents to process being served by any party to this Agreement in any Proceeding by the delivery of a copy thereof in accordance with Section 6.3.

**6.8 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

**6.9 Attorneys' Fees.** Except as otherwise provided herein, if a dispute should arise between the Parties including, but not limited to arbitration, each Party shall bear its own attorneys' fees.

**6.10 Taxes.** Any income taxes required to be paid in connection with the payments due hereunder, shall be borne by the Party required to make such payment. Any withholding taxes in the nature of a tax on income shall be deducted from payments due, and the Party required to withhold such tax shall furnish to the Party receiving such payment all documentation necessary to prove the proper amount to withhold of such taxes and to prove payment to the tax authority of such required withholding.

**6.11 Headings.** The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

**6.12 Severability.** If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

**6.13 Fees.** Except as may otherwise be provided herein, each party will be responsible for the fees and expenses of its own counsel.

**6.14 Further Assurances.** Each of the parties shall execute such documents and perform such further acts (including, without limitation, obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person) as may be reasonably required or desirable to carry out or to perform the provisions of this Agreement.

**6.15 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with its terms, and that the parties will be entitled to seek an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled at law or in equity.

**6.16 Assignment; Binding Agreement.** A party may not assign its rights or delegate its duties under this Agreement without the prior written consent of each other party to this Agreement, except that Purchaser may assign its right to purchase the Interests hereunder to any of its Affiliates, without the prior written consent of Seller or the

Company, provided that Purchaser does so prior to the submission of the FINRA Rule 1017 application contemplated by this Agreement. This Agreement binds, is enforceable by, and inures to the benefit of, the parties and their respective successors, heirs, personal representatives and permitted assigns, and no others. Nothing in this Agreement is intended to give any Person not a party to this Agreement, the benefit of any legal or equitable right, remedy or claim under this Agreement, except as expressly provided in this Agreement.

**(Balance of Page Intentionally Left Blank)**

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, as of the date last written herein below.

**Purchaser:**
OPC Advisors, LLC

By: ______________________ DATE: 01-02-2020
Arturo Nicolayevsky, Authorized Signatory

**Seller:**
Gary Stark

By: ______________________ DATE: 1-2-20
Gary Stark

**Company:**
RMST Holding Company, Inc.

By: ______________________ DATE: 1-2-20
Gary Stark, President

# EXHIBIT A

**The Company's Certificate (or Articles) of Incorporation and Current By-Laws.**



FLORIDA DEPARTMENT OF STATE
Katherine Harris
Secretary of State

April 20, 1999

R.M. STARK & CO., INC.
701 SOUTHEAST SIXTH AVENUE
SUITE 100
DELRAY BEACH, FL 33483

The Certificate of Domestication and Articles of Incorporation for R.M. STARK & CO., INC. were filed on April 16, 1999 effective September 29, 1988, and assigned document number P99000035669. Please refer to this number whenever corresponding with this office.

Enclosed is the certification requested.

Please be aware if the corporate address changes, it is the responsibility of the corporation to notify this office.

Should you have any further questions regarding this matter, please feel free to telephone (904) 487-6052, the New Filings Section.

Randall Purintun
Document Specialist
Division of Corporations

Letter Number: 799A00020323

FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS
99 APR 16 AM 8:23

# ARTICLES OF INCORPORATION

# OF

# R.M. STARK & CO., INC.

The undersigned incorporator to these Articles of Incorporation is a natural person competent to contract and hereby forms a Corporation for profit under Chapter 607 of the Florida Statutes.

## ARTICLE I – NAME

The name of the Corporation is R.M. STARK & CO., INC. (hereinafter the "Corporation."

## ARTICLE II – PRINCIPAL OFFICE

The address of the principal office of this Corporation is 701 Southeast Sixth Avenue, Delray Beach, Florida 33483.

## ARTICLE III – SHARES

The maximum number of shares that the Corporation is authorized to issue and have outstanding at any one time is TWO MILLION (2,000,000) shares of common stock, each share having no par value.

## ARTICLE IV – INITIAL REGISTERED AGENT AND STREET ADDRESS

The name and Florida street address of the Corporation's initial registered agent are: GARY L. STARK, 701 Southeast Sixth Avenue, Delray Beach, Florida 33483.

## ARTICLE V – INCORPORATOR

The name and street address of the incorporator of this Corporation is:

GARY L. STARK
701 Southeast Sixth Avenue
Delray Beach, Florida 33483

IN WITNESS WHEREOF, I have hereunto set my hand and seal, acknowledged and filed the foregoing Articles of Incorporation under the laws of the State of Florida this ___ day of April, 1999.

Gary L. Stark, Incorporator

## ACCEPTANCE OF REGISTERED AGENT DESIGNATED IN ARTICLES OF INCORPORATION

Having been named as registered agent and to accept service of process for the above stated Corporation at the place designated in this Certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. If further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Gary L. Stark, Registered Agent

4-14-99
Date



I certify the attached is a true and correct copy of the Certificate of Domestication and Articles of Incorporation for R.M. STARK & CO., INC., filed on April 16, 1999 effective September 29, 1988, as shown by the records of this office.

The document number of this corporation is P99000035669.

Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capitol, this the Twentieth day of April, 1999

*Katherine Harris*

Katherine Harris
Secretary of State

CR2EO22 (1-99)

99 APR 16 AM 8:24

# CERTIFICATE OF DOMESTICATION

OF

R.M. STARK & CO., INC.

1. The date on which R.M. STARK & CO., INC. (hereinafter the "Corporation") was first incorporated was September 29, 1988, under the name A.J. WEED & CO., INC., and the jurisdiction where the Corporation was first incorporated was the State of New York. The date on which the Certificate of Amendment to Certificate of Incorporation changing the name of the Corporation from A.J. WEED & CO., INC. to R.M. STARK & CO., INC. was filed was July 22, 1994, in the State of New York.

2. The name of the Corporation immediately prior to the filing of this Certificate Of Domestication was R.M. STARK & CO., INC.

3. The name of the Corporation as set forth in its Articles Of Incorporation filed in accordance with of Section 607.1801, paragraph (2)(b), of the Florida Business Corporation Act, is R.M. STARK & CO., INC.

4. The address and jurisdiction of the principal place of business of the Corporation immediately prior to the filing of this Certificate Of Domestication is 701 Southeast Sixth Avenue, Delray Beach, Florida 33483.

IN WITNESS WHEREOF, the undersigned, GARY L. STARK, the President, Chief Executive Officer, and Director of R.M. STARK & CO., INC., authorized to sign

this Certificate Of Domestication on behalf of the Corporation, has hereunto set his hand and seal under the laws of the State of Florida, this 14 day of April, 1999.

R.M. STARK & CO., INC.

By: ______________________
GARY L. STARK,
President, Chief Executive Officer, and Director

BY-LAWS OF

RMST HOLDING CO., INC

## ARTICLE I - OFFICES

The principal office of the Corporation shall be established and maintained at County of in the City of State of Florida. The Corporation may also have offices at such places within or without the State of Florida as the board may from time to time establish, or as the business of the Corporation may require from time to time.

## ARTICLE II - SHAREHOLDERS

1. ANNUAL MEETINGS

The annual meeting of the Shareholders of this Corporation shall be held on the day of of each year or at such other time and place designated by the Board of Directors of the Corporation. Business transacted at the annual meeting shall include the election of Directors of the Corporation and all other matters properly before the Board. If the designated day shall fall on a Sunday or legal holiday, then the meeting shall be held on the first business day thereafter.

2. SPECIAL MEETINGS

Special meetings of the Shareholders shall be held when directed by the President or the Board of Directors, or when requested in writing by the holders of not less than 10% of all the shares entitled to vote at the meeting. A meeting requested by Shareholders shall be called for a date not less than 10 nor more than 60 days after the request is made unless the Shareholders requesting the meeting designate a later date. The call for the meeting shall be issued by the Secretary, unless the President, Board of Directors, or Shareholders requesting the meeting shall designate another person to do so.

3. PLACE

Meetings of Shareholders shall be held at the principal place of business of the Corporation or at such other place as may be designated by the Board of Directors

4. NOTICE

Written notice to each Shareholder entitled to vote stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor more than 60 days before the meeting. If any Shareholder shall transfer his stock after notice, it shall not be necessary to notify the transferee. Any Stockholder may waive notice of any meeting either before, during or after meeting, by a writing signed by the Shareholders entitled to the notice.

5. QUORUM AND VOTING

The majority of the Shares entitled to vote, represented in person or by Proxy, shall constitute a Quorum at a meeting of Shareholders, but in no event shall a Quorum consist of less than 1/3 of the shares entitled to vote at the meeting.

After a Quorum has been established at a Shareholders meeting, the subsequent withdrawal of Shareholders, so as to reduce the number of shares entitled to vote at the meeting below the number required for the Quorum, shall not effect the validity of any action taken at the meeting or any adjournment thereof.

If a quorum exists, action on a matter, other than the election of directors, is approved if the votes cast by the holders of the Shares represented at the meeting and entitled to vote on the subject matter favoring the action exceed the votes cast opposing the action, unless a greater number of affirmative votes or voting by classes is required by the Florida Business Corporation Act or the Corporation's Articles of Incorporation.

6. PROXY

Every Shareholder entitled to vote at a meeting of Shareholders, or to express consent or dissent without a meeting, or his duly authorized attorney-in-fact, may authorize another person or persons to act for him by Proxy. The Proxy must be signed by the Shareholder or his attorney-in-fact. A Proxy shall be effective when received by the Secretary of the Corporation or other person authorized to tabulate votes. No Proxy shall be valid after the expiration of eleven months from the date thereof, unless otherwise provided in the Proxy.

ARTICLE III - DIRECTORS

1. BOARD OF DIRECTORS

The business of the Corporation shall be managed and its corporate power exercised by a Board of Directors, each of whom shall be of full age. It shall not be necessary for Directors to be Stockholders or residents of the state of Florida.

2. ELECTION AND TERM OF DIRECTORS

Directors shall be elected at the annual meeting of Stockholders and each Director elected shall hold office until his successor has been elected and qualified, or until his prior resignation, removal, or death. Unless otherwise provided in the Articles of Incorporation, Directors shall be elected by a plurality of the votes cast by the shares entitled to vote in the election at a meeting at which a quorum is present.

3. VACANCIES

If the office of any Director, member of a committee or other officer becomes vacant, including a vacancy resulting from an increase in the numbers of Directors, the remaining Directors in office, though less than a quorum, by a majority vote, may appoint any qualified person to fill such vacancy, who shall hold office for the unexpired term and until his successor shall be duly chosen.

4. REMOVAL OF DIRECTORS

Any or all of the Directors may be removed with or without cause by vote of a majority of all of the stock outstanding and entitled to vote at an annual meeting or special meeting of Stockholders called for that purpose.

5. NUMBER OF DIRECTORS; NEWLY CREATED DIRECTORSHIPS

The authorized number of directors shall not be less than nor more than . The number of Directors may be increased by amendment of these By-Laws, by the affirmative vote of a majority in interest of the Stockholders, at the annual meeting or at a special meeting called for that purpose, and by like vote the additional Directors may be chosen at such meeting to hold office until the next annual election and until their successors are elected and qualify.

6. RESIGNATION

A Director may resign at any time by giving written notice to the Board, the President or the Secretary of the Corporation. Unless otherwise specified in the notice, the resignation of such officer shall take effect upon receipt thereof by the Board, and the acceptance of the resignation shall not be necessary to make it effective.

7. QUORUM OF DIRECTORS AND VOTING

A majority of the Directors shall constitute a quorum for the transaction of business. If at any meeting of the board there shall be less than a quorum present, a majority of those present may adjourn the meeting from time to time until a quorum is obtained, and no further notice thereof need be given other than by announcement at the meeting which shall be so adjourned. If a quorum is present when a vote is taken, the affirmative vote of a majority of Directors present shall be the act of the Board of Directors.

8. PLACE AND TIME OF BOARD MEETINGS

The board may hold its meeting at the office of the Corporation or at such other places, either within or without the State of Florida as it may from time to time determine.

9. NOTICE OF MEETINGS OF THE BOARD

A regular annual meeting of the Board may be held without notice at such time and place as it shall from time to time determine. Special meetings of the Board shall be held upon notice to the Directors and may be called by the President upon three days notice to each Director either personally or by mail or by wore; special meetings shall be called by the President or by the Secretary in a like manner on written request of two Directors. Notice of a meeting need not be given to any Director who submits a waiver of notice whether before or after the meeting or who attends the meeting without protesting prior thereto or at its commencement, the lack of notice to him.

10. REGULAR ANNUAL MEETING

A regular annual meeting of the Board shall be held immediately following the annual meeting of Stockholders at the place of such annual meeting of Stockholders.

11. EXECUTIVE AND OTHER COMMITTEES

The Board, by resolution, may designate two or more of their members to any committee. To the extent provided in said resolution or these By-Laws, said committee amy exercise the powers of the Board concerning the management of the business of the Corporation.

12. COMPENSATION

No compensation shall be paid to Directors, as such, for their services, but by resolution of the Board, a fixed sum and expenses for actual attendance, at each regular or special meeting of the Board may be authorized. Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

ARTICLE IV - OFFICERS

1. OFFICERS, ELECTION AND TERM

a) The Board may elect or appoint a Chairman, a President, one or more Vice Presidents, a Secretary and a Treasurer, and such other officers as it may determine, who shall have such duties and powers as hereinafter provided. If specifically authorized by the Board of Directors, an officer may appoint one or more officers or assistant officers.

b) All officers shall be elected or appointed to hold office until the meeting of the Board following the next annual meeting of Stockholders and until their successors have been elected or appointed and qualified.

c) Any two or more offices may be held by the same person.

2. REMOVAL, RESIGNATION, SALARY, ETC.

a) Any officer elected or appointed by the Board may be removed by the Board with or without cause.

b) In the event of the death, resignation or removal of an officer, the Board in its discretion may elect or appoint a successor to fill the unexpired term.

c) An officer may resign at any time by delivering a written notice to the Corporation.

d) The salaries of all officers shall be fixed by the Board.

e) The Directors may require any Officer to give security for the faithful performance of his duties.

f) Any vacancy in any office may be filled by the Board of Directors.

3. DUTIES

The officers of this Corporation shall have the following duties:

The President shall be the chief executive officer of the Corporation, shall have general and active management of the business and affairs of the Corporation subject to the directions of the Board of Directors, and shall preside at all meetings of the Shareholders and Board of Directors.

In absence of the President or in the event of his death, inability or refusal to act, the Vice-President (or in the event there is more than one Vice-President, the Vice-Presidents in the order of their appointment) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.

The Secretary shall have custody of, and maintain, all of the corporate records except the financial records; shall record the minutes of all meetings of the Shareholders and Board of Directors, send all notices of all meetings and perform such other duties as may be prescribed by the Board of Directors or the President.

The Treasurer shall have custody of all corporate funds and financial records, shall keep full and accurate accounts of receipts and disbursements and render accounts thereof at the annual meetings of Shareholders and whenever else required by the Board of Directors or the President, and shall perform such other duties as may be prescribed by the Board of Directors or the President.

ARTICLE V - STOCK CERTIFICATES

1. ISSUANCE

Every holder of shares in this Corporation shall be entitled to have a certificate representing all shares of which he is entitled. No certificate shall be issued for any share until such share is fully paid.

2. FORM

Certificates representing shares in this Corporation shall be signed by the President or Vice President and the Secretary or an Assistant Secretary and may be sealed with the seal of this Corporation or a facsimile thereof.

3. TRANSFER OF STOCK

The Corporation shall register a stock certificate presented to it for transfer if the certificate is properly endorsed by the holder of record or by his duly authorized attorney.

4. LOST, STOLEN OR DESTROYED CERTIFICATES

If the Shareholder shall claim to have lost or destroyed a certificate of shares issued by the Corporation, a new certificate shall be issued upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed, and at the discretion of the Board of Directors, upon the deposit of a bond or other indemnity in such amount and with such sureties, if any, as the Board may reasonably require.

ARTICLE VI - BOOKS AND RECORDS

1. BOOKS AND RECORDS

This Corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its Shareholders, Board of Director and committees of Directors.

This Corporation shall keep at its registered office or principal place of business a record of its Shareholders, giving the names and addresses of all Shareholders and the number of the shares held by each.

Any books, records and minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

2. SHAREHOLDERS' INSPECTION RIGHTS

If he gives the Corporation written notice of his demand, made in good faith and stating the purpose thereof, at least 5 business days before the date on which he wishes to inspect and copy, a shareholder shall have the right to examine, in person or by agent or attorney, during regular business hours for any proper purpose, the Corporation's relevant books and records of accounts, minutes and records of Shareholders and to make extract therefrom.

3. FINANCIAL INFORMATION

The Corporation shall furnish its shareholders annual financial statements, which may be consolidated or combined statements of the Corporation and one or more of its subsidiaries, as appropriate, that include a balance sheet as of the end of the fiscal year, an income statement for that year, and a statement of cash flows for that year. If financial statements are prepared for the Corporation on the basis of generally accepted accounting principles, the annual financial statements for the shareholders also must be prepared on that basis.

If the annual financial statements are reported upon by a public accountant, his report must accompany them. If not, the statements must be accompanied by a statement of the President or the person responsible for the Corporation's accounting records:

(1) stating his reasonable belief whether the statements were prepared on the basis of generally accepted accounting principles and, if not, describing the basis of preparation; and

(2) describing any respects in which the statements were not prepared on a basis of accounting consistent with the statements prepared for the preceding year.

The Corporation shall mail the annual financial statements to each shareholder within 120 days after the close of each fiscal year. Thereafter, on written request from a shareholder who was not mailed the statements, the Corporation shall mail him the latest annual financial statements.

## ARTICLE VII - DIVIDEND

The Board may out of funds legally available therefor, at any regular or special meeting, declare dividends upon the capital stock of the Corporation as and when it deems expedient. Before declaring any dividend there may be set apart out of any funds of the Corporation available for dividends, such sum or sums as the Board from time to time in their discretion deem proper for working capital or as a reserve fund to meet contingencies or for equalizing dividends or for such other purposes as the Board shall deem conducive to the interests of the Corporation.

## ARTICLE VIII - CORPORATE SEAL

The seal of the Corporation shall be circular inform and bear the name of the Corporation, the year of its organization and the words "CORPORATE SEAL, FLORIDA." The seal may be used by causing it to be impressed directly on the instrument or writing to be sealed, or upon adhesive substance affixed thereto. The seal on the certificates for shares or on any corporate obligation for the payment of money may be facsimile, engraved or printed.

ARTICLE IX - EXECUTION

All corporate instruments and documents shall be signed or countersigned, executed, verified or acknowledged by such officer or officers or other person or persons as the Board may from time to time designate.

ARTICLE X - FISCAL YEAR

The fiscal year shall begin the first day of in each year.

ARTICLE XI - NOTICE AND WAIVER OF NOTICE

Whenever any notice is required by these By-Laws to be given, personal notice is not meant unless expressly so stated, and any notice so required shall be deemed to be sufficient if given by depositing the same in the post office box in a sealed post-paid wrapper, addressed to the person entitled thereto at his last known post office address, and such notice shall be deemed to have been given o the day of such mailing. Stockholders not entitled to vote shall not be entitled to receive notice of any meetings except as otherwise provided by Statute.

Whenever any notice is required to be given under the provisions of any law, or under the provisions of the Articles of Incorporation of the Corporation, or these By-Laws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time state therein, shall be deemed equivalent thereto.

ARTICLE XII - CONSTRUCTION

Whenever a conflict arises between the language of these By-Laws and the Articles of Incorporation, the Articles of Incorporation shall govern.

ARTICLE XIII - ACTION WITHOUT A MEETING

1. ACTION BY SHAREHOLDERS WITHOUT A MEETING.

Any action required or permitted to be taken at a meeting of the shareholders may be taken without a meeting, without prior notice, and without a vote if one or more consents in writing, setting forth the action so taken, shall be signed and dated by the holders of the outstanding stock entitled to vote with respect to the subject matter thereof and having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation for inclusion in the minute book.

2. ACTION BY DIRECTORS WITHOUT A MEETING.

Any action required or permitted to be taken by the Board of Directors or a committee of the Board at a meeting may be taken without a meeting if all the members of the Board or the committee take the action, each director or committee member signs a written consent describing the action taken, and the consents are filed with the records of the Corporation.

ARTICLE XIV - AMENDMENTS

These By-Laws may be altered or repealed and By-Laws may be made at any annual meeting of the Stockholders or at any special meeting thereof if notice of the proposed alteration or repeal to be made be contained in the notice of such special meeting, by the affirmative vote of a majority of the stock issued and outstanding and entitled to vote thereat, or by the affirmative vote of a majority of the board at any regular meeting of the board or at any special meeting of the board if notice of the proposed alteration or repeal to be made, be contained in the notice of such special meeting.

EXHIBIT B

AUM - 401k

AUM - 401k

| AUM as of 02-03-202 | AMOUNT |
|---|---|
| Pershing | 342,060,390.78 |
| Mutual Funds | 120,788,901.64 |
| TOTAL | **462,849,292.42** |

| 401k as of 12-31-2019 | AMOUNT |
|---|---|
| American Funds Employee 401k | **1,718,343.00** |

Pershing AUM a/o 2/3/2020
Sorted by Type

| ACCOUNT NUMBER | SHORT NAME | ACCOUNT WORTH | IP NUMBER | CATEG. |
|---|---|---|---|---|
| 78Y005222 | | 114,760.29 | R31 | 529C |
| 51Y902672 | | 4,073.81 | A50 | 529P |
| 51Y902680 | | 5,766.12 | A50 | 529P |
| 51Y902698 | | 4,073.81 | A50 | 529P |
| 51Y192241 | | 11,982.31 | A21 | 529P |
| 51Y194825 | | 9,137.80 | Z20 | CLUB |
| 51Y195582 | | 576.67 | Z20 | CLUB |
| 78Y004936 | | 3,795.87 | R31 | CLUB |
| 7N8152491 | | 7,500.62 | N52 | CORP |
| 7N8150347 | | 291.89 | N52 | CORP |
| NRM865875 | | 7,001.49 | A50 | CORP |
| 51Y960688 | | 653,354.40 | A21 | CORP |
| 7N8005855 | | 39,979.36 | N52 | CORP |
| 51Y159182 | | 48.07 | A01 | CORP |
| 7N8001706 | | 82.26 | N52 | CORP |
| 78Y154905 | | 28,597.05 | R31 | CORP |
| 51Y195319 | | 0.83 | A21 | CORP |
| 51Y017760 | | 1,437.34 | Z41 | CORP |
| 51Y196853 | | 46,398.29 | Z21 | CORP |
| 51Y196002 | | 549,884.48 | Z20 | CORP |
| 51Y177218 | | 191,039.57 | A03 | CORP |
| 7N8153978 | | 66,101.83 | N21 | CORP |
| 7N8187000 | | 309,807.11 | N21 | CORP |
| Q1M100004 | | 80.16 | A01 | CORP |
| TRB100030 | | 1,227,880.87 | A01 | CORP |
| 51Y195608 | | 57,591.39 | Z09 | CORP |
| 51Y179636 | | 79.02 | Z29 | CORP |
| 51Y196705 | | 48,904.78 | F03 | CORP |
| 51Y196754 | | 24,449.39 | F03 | CORP |
| 51Y196762 | | 24,449.39 | F03 | CORP |
| 51Y196788 | | 24,437.74 | F03 | CORP |
| 51Y196796 | | 24,449.39 | F03 | CORP |
| 51Y196804 | | 24,449.39 | F03 | CORP |
| 51Y196812 | | 24,437.74 | F03 | CORP |
| 51Y196820 | | 24,449.39 | F03 | CORP |
| 51Y196838 | | 24,449.39 | F03 | CORP |
| 51Y196846 | | 24,449.39 | F03 | CORP |
| 7N8750112 | | 133,762.92 | N05 | CPPS |
| 7N8750120 | | 16,537.42 | N05 | CPPS |

| | | | | |
|---|---|---|---|---|
| 7N8187505 | | 121,560.73 | N05 | TRST |
| 7N8187513 | | 25,493.30 | N05 | TRST |
| 7N8002043 | | 151,148.53 | N52 | TRST |
| 78Y003201 | | 169,409.72 | R31 | TRST |
| 51Y196242 | | 330,135.08 | T01 | TRST |
| 51Y191086 | | 820,585.94 | A01 | TRST |
| 51Y196531 | | 16,971.61 | F03 | TRST |
| 78Y003896 | | 62,760.60 | R31 | TRST |
| 51Y184917 | | 8,334,276.97 | Z41 | TRST |
| 51Y018628 | | 132.98 | T01 | |
| 7N8005723 | | 206,331.25 | N05 | |
| | | | | |
| TOTAL AUM | | 342,060,390.78 | | |

# Mutual Fund Assets $65,750,630

11:27 AM CST, Tue, Feb 4, 2020

| Management Company | Value | %Chg |
|---|---|---|
| AIG ANNUITIES-VARIABLE & INDEX | $2,328,948.06 | 0.32 % |
| ALLIANCEBERNSTEIN INVESTMENTS | | Not Available |
| ALLIANZ LIFE | $120,610.08 | 0.39 % |
| AMERICAN FUNDS | $38,738,598.61 | 0.57 % |
| AMUNDI PIONEER ASSET MANAGEMENT | $764,610.40 | 0.56 % |
| AR GLOBAL INVESTMENTS, LLC | $866,982.47 | 0.01 % |
| AXA EQUITABLE | $283,237.88 | 0.55 % |
| BENEFIT STREET PARTNERS | | Not Available |
| BRIGHTHOUSE FINANCIAL (FKA METLIFE) | $442,176.77 | 0.19 % |
| CALAMOS FUNDS | $97,678.38 | 1.06 % |
| CALVERT | $440,992.00 | 0.81 % |
| COLONY CAPITAL | $43,595.11 | 0.00 % |
| COLUMBIA THREADNEEDLE | $797,230.81 | 0.94 % |
| DAVIS FUNDS | | Not Available |
| DODGE & COX MANAGEMENT COMPANY | | Not Available |
| DWS | $1,043,353.72 | 0.73 % |
| EDVEST COLLEGE SAVINGS PLAN | $137,709.48 | 0.26 % |
| FEDERATED SECURITIES CORP. | $36,246.25 | 0.47 % |
| FIDELITY ADVISOR FUNDS (FIAM) | $154,995.08 | 0.97 % |
| FIRST EAGLE FUNDS | | Not Available |
| FRANKLIN TEMPLETON INVESTMENTS | $16,398,384.58 | 0.27 % |
| GABELLI FUNDS, INC. | | Not Available |
| GRIFFIN CAPITAL COMPANY, LLC | $0.00 | 0.00 % |
| HARTFORD FUNDS | $2,340.50 | 1.35 % |
| INVESCO | $5,824,738.91 | 0.63 % |
| J.P. MORGAN FUNDS | $0.00 | 0.00 % |
| JACKSON | $5,165,643.08 | 0.35 % |
| JOHN HANCOCK ANNUITIES | $1,165,673.85 | 0.79 % |
| JOHN HANCOCK INVESTMENT MANAGEMENT | $571,050.23 | 0.81 % |
| LINCOLN FINANCIAL GROUP | $2,914,313.53 | 0.54 % |
| LORD ABBETT & CO LLC | | Not Available |
| MAINSTAY FUNDS | | Not Available |
| MFS INVESTMENT MANAGEMENT | $317,803.37 | 0.91 % |
| NATIONWIDE | $37,444,575.52 | 0.12 % |
| NATIONWIDE FUNDS | $50,597.39 | 0.47 % |
| NUVEEN MUTUAL FUNDS | | Not Available |
| PACIFIC LIFE | $837,099.83 | 0.05 % |
| PIMCO RETAIL FUNDS | $61,729.98 | 0.40 % |
| PRINCIPAL FUNDS | | Not Available |
| PRUDENTIAL ANNUITIES | $2,185,486.76 | 0.37 % |
| PUTNAM INVESTMENTS | $305,265.09 | -1.43 % |
| SECURITY BENEFIT LIFE | $1,871.62 | -0.29 % |
| TALCOTT RESOLUTION LIFE INSURANCE | $1,009,055.18 | 0.62 % |
| TRANSAMERICA PREMIER LIFE (WRL VA) | $229,001.28 | 0.87 % |
| WELLS FARGO FUNDS | $7,305.84 | 0.51 % |

**Total: $ 120,788,901.64**

Management company Value reflects close of business as of 02/03/2020. Percent change is based on previous business day and includes all settled purchases, redemptions and market fluctuations. Values calculated using the most current net asset value for mutual funds and unit price for program managers and annuities. Alternative Investment Product account values displayed are those provided by the issuer of the securities. The account value is not necessarily the amount an investor can expect to receive upon liquidation, share repurchase or tender. Please also note certain products may prorate based upon specific share repurchase or tender requirements.

Information contained herein is based on sources and data believed reliable, but is not guaranteed by us, and is not to be construed as an offer or a solicitation of an offer to buy or sell securities mentioned herein. This is for information purposes only and is not intended to satisfy any compliance or regulatory conditions set forth by any governing body of the securities industry. The user is responsible for verifying the accuracy of the data received. These reports are not to be used as a substitute for any reports distributed by your mutual fund, program manager or insurance companies nor any monthly or annual statements by the broker dealer that maintains custody of your account.

Copyright © 2020 DST Systems, Inc. All Rights Reserved.
Covered by US Patent No. 7,275,046



AMERICAN
FUNDS®
From Capital Group

Review your plan to see how to make it more effective.

## Plan Review

**RM STARK & CO INC 401K PSP**
**IRK20946**
**Period Ending December 31, 2019**

FOR PLAN SPONSOR/FINANCIAL ADVISOR AND TPA USE ONLY. NOT FOR DISTRIBUTION TO THE GENERAL PUBLIC.

# Plan Overview

RM STARK & CO INC 401K PSP

| | 1/1/2018 - 12/31/2018 | 1/1/2019 - 12/31/2019 |
|---|---|---|
| Plan asset balance | $1,346,833 | $1,718,343 |
| Participants with an account balance | 9 | 9 |
| Average account balance | $149,350 | $190,609 |
| Participants contributing | 8 | 8 |
| Contribution total | $117,788 | $74,544 |
| Participants with a loan balance | 0 | 0 |
| Loan balance | $0 | $0 |
| Distribution total | $0 | $0 |
| Terminated participants with a balance | 1 | 1 |
| Investment options with a balance | 12 | 12 |
| Average number of investments per participant | 5 | 4 |

# EXHIBIT C

**Seller Disclosure Schedule (all relevant schedules here)**

Existing Contracts

| COMPANY | CONTRACT # | SERVICE | TERM (YRS.) | START DATE |
|---|---|---|---|---|
| AT&T | ADV14102484 | Internet & Voice Bundle | 2 | 9/21/2019 |
| Archive America | | Archiving Records | 8 | 5/2/2011 |
| City of Delray Beach | 19-00036887 | Business Tax Renewal | 1 | 10/1/2019 |
| Anne M Gannon | 199506815 | Local Business Tax Notice | | |
| City of Delray Beach | 4494 | Alarm System | | |
| Milner | 248400 | Konica Minolta Color System | | |
| Milner | 248400 | Ricoh Blw System | | |
| SIPC | | Securities Investor Protection Corp. | | |
| STS Program Management | | $100K Bond | | |
| SecuritiesGold E/O Insurance | | | | 6/4/1998 |
| CalSurance | | Professional Liability | | |
| Pure Beverage Systems | | Beverages | | 6/15/2015 |
| Morningstar | | Market Data Information | | 1/23/2013 |

# Exhibit C

✓ **Your form was submitted to FINRA successfully. Please print this form now if you wish to retain a copy for your records.**

**Filing ID:** 4464626 (Please retain this number for further inquiries regarding this form)

**Submitted By:** lgregory7

**Submitted Date:** Thu Aug 20 15:15:22 EDT 2020

<< Back to Filing Cabinet

Introduction

# Continuing Member Application

## Introduction

The Continuing Membership Application Form ("Form CMA," "Form," or "Application") is designed to assist Applicants in the preparation of an Application filed pursuant to NASD Rule 1017 in which the Applicant seeks approval from the Financial Industry Regulatory Authority, Inc. ("FINRA") for a change in ownership, control or business operations. The completed Form, with all required questions answered, and all required supporting documentation attached, must be filed electronically with FINRA.

To assist in the completion of Form CMA, important information is provided below concerning the following:

- Completing the Form
  - Substantially Complete Requirement
  - Form Structure and Using the Form
  - Mandatory Information
  - Terms Used in the Form
  - Saving the Form Prior to Submission
  - Submitting the Form
- Maintaining the Accuracy of the Application

### Completing the Form

The Form references information and documentation required under the Membership Rules of FINRA (see NASD Rule 1010 Series). Form CMA is structured to capture information and documentation pertinent to the Applicant's proposed change in ownership, control or business operations. However, additional information and documentation may be requested once the FINRA Staff ("Staff") has had an opportunity to review the Application.

Applicants are encouraged to include as much of the requested information and documentation in their initial Form CMA submission as possible. Experience has shown that Applications containing well thought out, detailed, and complete information and documentation can be processed more efficiently with less need for Staff to seek out supplemental information. Complete Applications help the Staff to gain a prompt understanding of the Applicant's proposed change, which facilitates FINRA's ability to review whether the Applicant meets the standards for admission contained in NASD Rule 1014, against which applications submitted utilizing the Form CMA are evaluated. Applicants are encouraged to review additional materials about the Continuing Membership Application process, available on www.finra.org. Applicants should also consider consulting the Staff in advance of submitting Form CMA, particularly for any Application involving novel or complex business arrangements.

#### Substantially Complete Requirement

Form CMA is intended to provide an Applicant with information and requests that are required of it in the Application process. Applicants should note that an Application will not be accepted for processing unless it is deemed substantially complete. While the Form identifies information and documentation that is minimally required in order to file Form CMA, an Applicant is urged not to limit itself to completion of the required fields if and when any optional information fields are applicable or if additional information can be provided that is material to the Applicant's planned change. It is also important to note that, since the Form is submitted exclusively on an electronic basis, it is critical that the Applicant ensure that each attached document is actually the document indicated and contains relevant information

Every Form CMA will be reviewed initially for content by Staff. Should an Applicant fail to provide accurate material information or documentation relevant to the Applicant's proposed change, a submitted Form CMA may be rejected as "not substantially complete."

#### Form Structure and Using the Form

The Form is structured to collect information, data and documentation from the Applicant in order for Staff to evaluate the Application against the standards for admission contained in NASD Rule 1014. The Form requests that information be provided in formats including narrative text, fields that require a selection or mouse-click (e.g., drop-down lists, radio buttons), data entered directly into the Form, information entered into tables in the Form or connected to the Form, and attachments of supporting documents.

The Form is designed to leverage, where possible, certain information provided by the Applicant to FINRA through means other than the Form itself, in particular, information submitted via the Central Registration Depository (CRD®). In instances where information from other sources are leveraged, if any such information presented to the Applicant in the Form is inaccurate, an Applicant must update the source system before ultimately submitting or amending the Form CMA. (Typically it takes one business day after updating the source system for Form CMA to reflect such changes.)

**Mandatory Information**

Certain aspects of the Form are indicated with a red asterisk ( * ), indicating that such aspect (e.g., question, data field, information, document request) of the Form is a required field. A system completeness check is conducted on every Form CMA attempted to be submitted to FINRA. Any Form CMA that fails to address each of the required fields will not be permitted to proceed with submission. Failure to address required fields will, when attempting to submit the Form, result in identification of the missing or unanswered information to the Applicant, who will be responsible for addressing the missing information before attempting to resubmit the Application.

While certain aspects of the Form are indicated as required, Applicants are strongly encouraged to address any optional information fields of the Form that are applicable to the Applicant's proposed change.

**Terms Used in the Form**

Unless otherwise stated, the terms used in this Form (e.g., "Applicant," "Associated Person") have the same definition as prescribed in NASD Rule 1011. Additionally, the Form makes certain references that should be construed in a consistent manner. Please note the following references have the meaning prescribed here:

"Associated Person" has the meaning prescribed to such term in NASD Rule 1011(b).

"CRD system" means the Central Registration Depository, the central licensing and registration system for the U.S. securities industry and its regulators.

"SEA" means the Securities Exchange Act of 1934.

"SEA Rule" means a rule promulgated under the SEA.

**Saving the Form Prior to Submission**

An Applicant may review, enter, and otherwise prepare Form CMA and save the most recent version of the Form prior to submitting the Application for review by Staff. The Form need not be fully prepared or completed in order to be saved. The most recent saved version of a draft Form CMA is retained on FINRA's electronic filing platform until a final version is submitted to FINRA.

**Submitting the Form**

After completing the Form CMA, an Applicant must submit the Form for review by Staff. An electronic completeness check is run on the Form CMA upon attempting submission to determine whether all required fields have been addressed. Upon successfully passing the electronic completeness check, the Form is routed to Staff for a determination of whether the Application is substantially complete. If determined to be substantially complete, the Application will be assigned for continuing review. After submission, an Applicant will be able to view its submitted Form CMA via FINRA's electronic filing system.

**Maintaining the Accuracy of the Application**

Each Applicant with FINRA must, at all times, ensure the accuracy of its Application. The Applicant is responsible for keeping its Application current and accurate throughout the Application review process. The Applicant must amend or otherwise notify Staff of any information in, or any information omitted from, its Application that is or makes the Application inaccurate, incomplete or misleading.

Application type

# Continuing Member Application

## Type of Continuing Membership Application

Identify the type of change that is contemplated (select all that apply).

**Ownership or asset transfer changes**

☐ Merger of the member with another member

☐ Direct or indirect acquisition by the member of another member

☐ Direct or indirect acquisition or transfer of 25% or more in the aggregate of the member's assets or any asset, business or line of operation that generates revenues comprising 25% or more in the aggregate of the member's earnings measured on a rolling 36 month basis

☑ Change in the equity ownership or partnership capital of the member resulting in one person or entity directly or indirectly owning or controlling 25% or more of the equity or partnership capital

**Change(s) in business operations**

☐ Material change in business operations

☐ Removal or modification of a membership agreement restriction

☐ Market making, underwriting or acting as a dealer for the first time

☐ Adding a business activity that requires a higher minimum net capital under Securities Exchange Act (SEA) Rule 15c3-1.

☐ Expansion of Associated Persons, offices, or number of markets made

☐ Other

Applicant contact information

# Continuing Member Application

## Applicant contact information

Provide the following information for the person who will be the primary contact for the Applicant during FINRA's review of the Continuing Membership Application. Note that this is the person to whom FINRA will direct Application related questions and correspondence.

| Field | Value |
|---|---|
| Firm name * | R.M. STARK & CO., INC. |

**Contact person**

| Field | Value |
|---|---|
| First name * | GREGORY |
| Last name * | LEVINE |
| Email address * | glevine@gregorylevinelaw.com |
| Phone number * | 6467831250 |
| Fax number | |

**Mailing address**

| Field | Value |
|---|---|
| Company name * | Gregory Levine Law |
| Street address, line 1 * | Suite B1, Administrative Offices |
| Street address, line 2 | 225 Brewers Bridge Rd. |
| City * | Jackson |
| State * | New Jersey |
| ZIP Code * | 08527 |

Standard 1: Overview of the Applicant

# Continuing Member Application

## Standard 1: Overview of the Applicants

NASD Rule 1014(a)(1): The application and all supporting documents are complete and accurate.

**Overview of the proposed change**

1. Provide a complete description of the proposed change, identifying *

a. the terms and nature of the proposed change,

b. the date the transaction is expected to be completed,

c. the business reason(s) for the change,

d. the financing for the transaction, including the source of funding for the purchase and recapitalization (as applicable), and

e. an overview of the impact(s) (e.g., financial, operational, managerial, supervisory), or lack thereof, to the Applicant as a result of the change.

a. OPC Advisors, LLC is purchasing 100% of the parent company of the Applicant. The Applicant's parent company is RMST Holding Company, Inc. The proposed change is a sale as mentioned above and is a negotiated, arms length transaction agreement between and among the parties (the Seller and Purchaser). b. The transaction is expected to be completed upon FINRA approval. c. Seller wishes to sell in order to gain economically from Seller's hard work over the years, and the Purchaser wishes to purchase in order to grow the business and expand its activity in the securities industry. d. Purchaser has received a Small Business Administration loan (SBA Loan) and loan documentation is provided in Standard 7 below. e. There should be no material impact (financial, operational, managerial, supervisory) expected following the sale as most of the supervisory structure shall remain exactly as it is now. Gary Stark, the CEO and FINOP shall remain as FINOP but a new CEO shall be introduced during the application. All other personnel will remain as is.

2. For any persons or entities, including other broker-dealers and investment advisory firms, that will become associated or affiliated with the Applicant, through ownership, employment, or otherwise, as a result of the proposed transaction, please provide the name of the person or entity, describe the relationship such person or entity will have with the Applicant, for any entity describe the business conducted by such entity, and identify whether the Applicant will be conducting business with or on behalf of the person or entity. *

As stated above, OPC Advisors, LLC shall be the INDIRECT parent company of the Applicant subsequent to the closing, as described in the Stock Purchase Agreement. Presently, OPC Advisors, LLC is owned 18% by Eduardo Perez (see below) and 82% by Aynbet Investments, LLC, which is 100% owned by Arturo Nicolayevsky (see below). All formation and governing documents for both OPC and Aynbet Investments, LLC are provided below. It is not currently contemplated that these two company shall conduct business per se, with the Applicant.

**Specify changes in direct ownership.**

Below is a read-only view of the current direct owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | CRD ID | Domestic or Foreign Entity, or Individual | Roles | Date role acquired | Ownership percentage | Control person? |
|---|---|---|---|---|---|---|
| STARK, GARY LESTER | 433866 | Individual | PRESIDENT / CEO/FINOP/SROP/CROP/MUNI PRINC | 07/01/1994 | Less than 5% | Y |
| DESIDERIO, JERRY ANTHONY | 2799614 | Individual | CCO-CHIEF COMPLIANCE OFFICER | 08/01/2008 | Less than 5% | Y |
| RMST HOLDING COMPANY, INC. | xxx-xx-7969 | Domestic | OWNER | 04/01/2002 | 75% or more | Y |
| BUDDIE, THOMAS SCOTT | 3227592 | Individual | REGISTERED OPTIONS PRINCIPAL | 06/01/2017 | Less than 5% | Y |

Please edit the chart below to describe the proposed changes in the Applicant's direct ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

**1. Proposed changes in direct ownership**

CRD ID: 433866 Name *: Gary Stark

Domestic or Foreign Entity, or Individual: Individual

Roles: FINOP

Date role acquired: 08/17/1995

Ownership percentage: 0%

Control person? ○ Yes ◉ No

Registrations

| Code | Date |
|---|---|

s27/28 08/17/1995

Continuing education * (•) Active ( ) Inactive

Will the Applicant claim any registration exemptions for this person? If so, list them. NO

Will the Applicant apply for any waivers of required examinations for this person? If so, list them. NO

Scheduled examinations and dates N/A

4. Provide a description of the duties and responsibilities of any non-registered owners , along with an explanation for why they should not be required to register with the Applicant (please refer to the applicable registration provisions, such as NASD Rules 1021, 1022 and 1060, as well as Notice to Members 99-49.). This should include responsibilities performed:

At the Applicant,

At any affiliated companies, and

At any other companies anticipated to conduct business with the Applicant. *

1. FINOP for the applicant. 2. Not known at present. 3. Not known at present.

## 2. Proposed changes in direct ownership

CRD ID 4106947 Name * Stacey R. Stark

Domestic or Foreign Entity, or Individual: Individual

Roles: CEO

Date role acquired: 03/24/2020

Ownership percentage: 0%

Control person? (•) Yes ( ) No

Registrations

| Code | Date |
|---|---|
| Series 7 | 11/18/2002 |
| Series 66 | 01/06/2006 |

Continuing education * (•) Active ( ) Inactive

Will the Applicant claim any registration exemptions for this person? If so, list them. NO

Will the Applicant apply for any waivers of required examinations for this person? If so, list them. NO

Scheduled examinations and dates: Ms. Stark shall apply for the Series 24 license following the acceptance of this CMA application by FINRA.

4. Provide a description of the duties and responsibilities of any non-registered owners , along with an explanation for why they should not be required to register with the Applicant (please refer to the applicable registration provisions, such as NASD Rules 1021, 1022 and 1060, as well as Notice to Members 99-49.). This should include responsibilities performed:

At the Applicant,

At any affiliated companies, and

At any other companies anticipated to conduct business with the Applicant. *

1. CEO duties at applicant firm. 2. Not contemplated at this time. 3. Not contemplated at this time.

## 3. Proposed changes in direct ownership

CRD ID 284519 Name * OPC Advisors, LLC

Domestic or Foreign Entity, or Individual: Domestic Entity

Roles: Owner

Date role acquired: 02/20/2020

Ownership percentage: Shall be 100%

Control person? (•) Yes ( ) No

Registrations

| Code | Date |
|---|---|

Continuing education * ○ Active ◉ Inactive

Will the Applicant claim any registration exemptions for this person? If so, list them. n/a Legal Entity

Will the Applicant apply for any waivers of required examinations for this person? If so, list them. n/a Legal Entity

Scheduled examinations and dates n/a Legal Entity

4. Provide a description of the duties and responsibilities of any non-registered owners , along with an explanation for why they should not be required to register with the Applicant (please refer to the applicable registration provisions, such as NASD Rules 1021, 1022 and 1060, as well as Notice to Members 99-49.). This should include responsibilities performed:

At the Applicant,

At any affiliated companies, and

At any other companies anticipated to conduct business with the Applicant. *

1. N/A OPC Advisors, LLC is a legal entity. Arturo Nicolayevsky and Eduardo Perez shall be indirect owners of the Applicant and direct owners of OPC Advisors, LLC. They shall not be registered at the Applicant and remain passive indirect owners with no present responsibility or obligation for the day to day operations of the Applicant. Note that the Applicant's staff shall remain substantially unchanged following FINRA approval. Additional personnel shall be introduced elsewhere in this application. 2. Both individual persons referenced above shall own the affiliated company that is OPC Advisors, LLC, the prospective new parent of the Applicant. 3.

## 4. Proposed changes in direct ownership

CRD ID 2799614 Name * DESIDERIO, JERRY ANTHONY

Domestic or Foreign Entity, or Individual Individual

Roles CCO-CHIEF COMPLIANCE OFFICER

Date role acquired 08/01/2008

Ownership percentage Less than 5%

Control person? ◉ Yes ○ No

Registrations

| Code | Date |
|---|---|
| S24 | 05/20/2004 |
| S63 | 06/30/1997 |
| S63 | 02/24/2005 |
| S65 | 01/22/2004 |
| S7 | 12/02/1996 |

Continuing education * ◉ Active ○ Inactive

Will the Applicant claim any registration exemptions for this person? If so, list them. NO

Will the Applicant apply for any waivers of required examinations for this person? If so, list them. NO

Scheduled examinations and dates N/A

4. Provide a description of the duties and responsibilities of any non-registered owners , along with an explanation for why they should not be required to register with the Applicant (please refer to the applicable registration provisions, such as NASD Rules 1021, 1022 and 1060, as well as Notice to Members 99-49.). This should include responsibilities performed:

At the Applicant,

At any affiliated companies, and

At any other companies anticipated to conduct business with the Applicant. *

CURRENT CCO THAT IS REMAINING WITH FIRM AFTER FINRA APPROVAL

## 5. Proposed changes in direct ownership

CRD ID 3227592 Name * BUDDIE, THOMAS SCOTT

Domestic or Foreign Entity, or Individual Individual

Roles

REGISTERED OPTIONS PRINCIPAL

Date role acquired: 06/01/2017

Ownership percentage: Less than 5%

Control person? (•) Yes ( ) No

Registrations

| Code | Date |
|---|---|
| S24 | 07/14/2004 |
| S4 | 07/13/2000 |
| S55 | 11/18/1999 |
| S66 | 11/26/2004 |
| S7 | 09/10/1999 |

Continuing education * (•) Active ( ) Inactive

Will the Applicant claim any registration exemptions for this person? If so, list them.: NO

Will the Applicant apply for any waivers of required examinations for this person? If so, list them.: NO

Scheduled examinations and dates: N/A

4. Provide a description of the duties and responsibilities of any non-registered owners , along with an explanation for why they should not be required to register with the Applicant (please refer to the applicable registration provisions, such as NASD Rules 1021, 1022 and 1060, as well as Notice to Members 99-49.). This should include responsibilities performed:

At the Applicant,

At any affiliated companies, and

At any other companies anticipated to conduct business with the Applicant. *

CURRENT PRINCIPAL REMAINING WITH FIRM AFTER FINRA APPROVAL

**Specify changes in indirect ownership.**

Below is a read-only view of the current indirect owners of the Applicant (information obtained from the CRD system).

Please click the "Refresh" button to reload the information (from CRD) below.

| Full legal name | Domestic or Foreign Entity, or Individual | Entity in which interest is owned | Roles | Date role acquired | Ownership percentage | Control person? | CRD ID, EIN, IRS # |
|---|---|---|---|---|---|---|---|
| STARK, GARY LESTER | Individual | RMST HOLDING COMPANY, INC. | OWNER | 04/01/2002 | 75% or more | Y | 433866 |

Please edit the chart below to describe the proposed changes in the Applicant's indirect ownership. (Information provided here will be used solely for the review of this Application and will not update the CRD system).

**1. Proposed changes in indirect ownership**

CRD ID: n/a

Name *: Aynbet Investements, LLC

Domestic or Foreign Entity, or Individual: Domestic Entity

Entity in which interest is owned: OPC Advisors, LLC

Roles: owner

Date role acquired: 06/14/2014

Ownership percentage: 82%

Control person? (•) Yes ( ) No

**2. Proposed changes in indirect ownership**

CRD ID: NONE

Name *: Eduardo Perez

| | |
|---|---|
| Domestic or Foreign Entity, or Individual | Individual |
| Entity in which interest is owned | OPC Advisors, LLC |
| Roles | owner |
| Date role acquired | May 22, 2018 |
| Ownership percentage | 18% |
| Control person? | ○ Yes ● No |

**3. Proposed changes in indirect ownership**

| | | | |
|---|---|---|---|
| CRD ID | 5851384 | Name * | Arturo Nicolayevsky |
| Domestic or Foreign Entity, or Individual | | | Individual |
| Entity in which interest is owned | | | Aynbet Investments, LLC |
| Roles | | | owner |
| Date role acquired | | | 04/07/2011 |
| Ownership percentage | | | 100% |
| Control person? | | | ● Yes ○ No |

**Provide supporting documents.**

1. Pre- and post-change business organizational charts, identifying the Applicant's owners and affiliated entities (indicate all direct and indirect owners of the Applicant and percentage of ownership for each) *

Standard 1 - Applicant PRE and POST Organization Chart.pdf 80349 bytes

Standard 1 - Applicant PRE and POST Organization Chart - REVISED APRIL 27 2020.pdf 84154 bytes

Standard 1 - Question 4 - Applicant PRE and POST Organization Chart - REVISED June 22 2020.pdf 81682 bytes

2. Any modified formation documents of the Applicant stemming from the change *

STD 1 SUPPORTING DOC 2.pdf 26830 bytes

3. Formation documents for any entities (e.g., corporations, partnership, trusts), including holding companies, that are or will be new owners, directly or indirectly, of the Applicant *

Standard 1 - Prospective Parent Company Formation Document.pdf 464617 bytes

Standard 1 - Prospective Parent Company Governing Document.pdf 532169 bytes

Standard 1 - Prospective Indirect Parent Governing Document.pdf 312950 bytes

Standard 1 - Prospective Indirect Parent Formation Document.pdf 334193 bytes

4. As applicable, if this Application is filed on behalf of multiple firms: a signed statement, from a principal officer of each Applicant, indicating this Application is being filed on the firm's behalf

5. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 1 - Applicant Formation Documents.pdf 699162 bytes

Standard 1 - Current Parent Company Governing Document.pdf 1677792 bytes

Standard 1 - Current Parent Company Formation Document.pdf 1812555 bytes

Standard 1 - Applicant Governing Document.pdf 3638542 bytes

RM STARK Response to FINRA 20200430 Request - Submitted.pdf 197482 bytes

RM STARK Response TO finra 20200616 Request - Submitted 20200626.pdf 163540 bytes

Standard 1 SBA Letter Response.pdf 125306 bytes

Fully Executed Escrow Agreement - Stark to OPC 20200204.pdf 381847 bytes

Amendment to Escrow Agreement 20200730 Fully Executed.pdf 1324072 bytes

**Standard 2: Licenses and registrations**

# Continuing Member Application

## Standard 2: Licenses and registrations

NASD Rule 1014(a)(2): The Applicant and its Associated Persons have all licenses and registrations required by state and federal authorities and self-regulatory organizations.

The Applicant is reminded that failure of its Associated Persons to schedule and successfully complete any required qualification examinations in a timely manner may result in a significant delay of the Application review process, or a lapse or denial of the Application. It is strongly suggested that any qualification examination(s) be completed in advance of the filing of the Form CMA where possible or be scheduled within the first 30 days of filing Form CMA, and that all registration requirements be completed within the first 60 days of filing Form CMA to avoid delays in processing of the Application.

**Provide information regarding direct owners**

The list of direct owners below is repeated from the Applicant's input in Standard 1 above. If the information displayed is incomplete or inaccurate, please edit Standard 1 before completing this section of the Form.

Please provide the information below for all direct owners who will have an ownership stake in the Applicant after the proposed change.

| CRD ID | Name | Continuing education |
|---|---|---|
| 433866 | Gary Stark | Active |
| 4106947 | Stacey R. Stark | Active |
| 284519 | OPC Advisors, LLC | Inactive |
| 2799614 | DESIDERIO, JERRY ANTHONY | Active |
| 3227592 | BUDDIE, THOMAS SCOTT | Active |

**Provide information about the Applicant following the proposed change**

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

○ Yes ◉ No

Each Applicant, except a sole proprietorship, is required to have a minimum of two registered principals with respect to each aspect of its investment banking and securities business. Pursuant to the FINRA Rule 9600 Series, FINRA may waive the requirement in situations that indicate conclusively that only one person associated with an Applicant should be required to register as a principal. Each Applicant must also have a Financial and Operations (FinOp) Principal (or Introducing Broker-Dealer FinOp Principal, as applicable). Additionally, an Applicant engaged in certain activities must have other appropriately registered principals (for example, an Applicant that will be engaged in options transactions with the public must have a Registered Options Principal). Please refer to NASD Rules 1021 (Registration Requirements) and 1022 (Categories of Principal Registration) for the appropriate categories of principal registration.

2. Is the Applicant seeking a waiver, or seeking to maintain a waiver already in place, of the two principal requirement under NASD Rule 1021? *

○ Yes ◉ No

3. Will the Applicant have any non-registered officers, directors, or control persons following the change? *

○ Yes ◉ No

**Provide supporting documents.**

1. Management organizational chart, identifying officers, principals and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the change *

Standard 2 Pre and Post Management Organizational Chart.pdf 70607 bytes

2. An attestation for officers, directors, owners and control persons who will not participate in the day-to-day securities or investment banking operations of the Applicant or act in any capacity that would require that these individuals become registered

STD 02 - Nicolayevsky and Perez Executed Attestations 20200505.pdf 392417 bytes

3. Any other documentation that would be pertinent to FINRA's review of this Standard

**Provide specific information regarding supervisors.**

The list of personnel below is repeated from the Applicant's input in Standard 1 above. If the information listed is inaccurate or incomplete, please edit Standard 1 before completing this section of the Form.

**CRD IDNameContinuing education**

1. Does the Applicant anticipate being registered with or withdrawing registration from any other regulatory or self-regulatory organization(s) and/or state(s) as a result of the change? *

○ Yes ◉ No

2. Does the Applicant anticipate being exempt from registration with the Securities Information Center, pursuant to SEA Rule 17f-1, following implementation of the proposed change? *

◉ Yes ○ No

Identify the exemption that applies to the Applicant with a brief explanation of its application in light of the proposed change. *

The Applicant clears all business on a fully disclosed basis with it's clearing firm and does not, does not expect to, and has not during the last 6 months held customer securities (stock certificates).

**Provide supporting documents.**

1. For the Applicant:

   a. Options allocation form (if applicable)

   b. Lost and stolen securities registration (if applicable)

   c. Evidence of registration with MSRB (if applicable)

2. For personnel:

   a. A management organizational chart, identifying officers, principals, and supervisors of the Applicant and the proposed business activities and/or product lines supervised by each person following the proposed change *

   Standard 2 Pre and Post Management Organizational Chart.pdf 70607 bytes

3. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 3: Compliance with securities laws, just and equitable principles of trade**

# Continuing Member Application

## Standard 3: Compliance with securities laws, just and equitable principles of trade

NASD Rule 1014(a)(3): The Applicant and its Associated Persons are capable of complying with the federal securities laws, the rules and regulations thereunder, and FINRA Rules, including observing high standards of commercial honor and just and equitable principles of trade. In determining whether this standard is met, the Department shall take into consideration whether:

In determining whether this standard is met, the Department shall take into consideration whether:

A. a state or federal authority or self-regulatory organization has taken permanent or temporary adverse action with respect to a registration or licensing determination regarding the Applicant or an Associated Person;

B. an Applicant's or Associated Person's record reflects a sales practice event, a pending arbitration, or a pending private civil action;

C. an Applicant or Associated Person is the subject of a pending, adjudicated, or settled regulatory action or investigation by the Commission, the Commodity Futures Trading Commission, a federal, state, or foreign regulatory agency, or a self-regulatory organization; an adjudicated, or settled investment-related private civil action for damages or an injunction; or a criminal action (other than a minor traffic violation) that is pending, adjudicated, or that has resulted in a guilty or no contest plea or an Applicant, its control persons, principals, registered representatives, other Associated Persons, any lender of 5% or more of the Applicant's net capital, and any other member with respect to which these persons were a control person or a 5% lender of its net capital is subject to unpaid arbitration awards, other adjudicated customer awards, or unpaid arbitration settlements;

D. an Associated Person was terminated for cause or permitted to resign after an investigation of an alleged violation of a federal or state securities law, a rule or regulation thereunder, a self-regulatory organization rule, or industry standard of conduct;

E. a state or federal authority or self-regulatory organization has imposed a remedial action, such as special training, continuing education requirements, or heightened supervision, on an Associated Person; and

F. a state or federal authority or self-regulatory organization has provided information indicating that the Applicant or an Associated Person otherwise poses a threat to public investors.

**Explain how this Standard is met.**

1. Is the Applicant or any of its Associated Persons the subject of any of the following *

a. adverse actions by state or federal authority or self-regulatory organizations with respect to registration or license determinations;

b. a sales practice event, pending arbitration or pending private civil action;

c. pending, adjudicated or settled regulatory action or investigation by any regulatory or self-regulatory authority, or any civil or criminal action resulting in guilty or no contest plea;

d. unpaid arbitration awards involving the Applicant, its control persons, principals, registered representatives, any lender of 5% or more of the Applicant's net capital, or any other Associated Person of the Applicant;

e. termination for Cause or permitted to resign after an investigation of an alleged violation of federal or state securities law, rules or regulations or a self-regulatory rule or industry standard of conduct;

f. regulatory imposed remedial action such as special training, continuing education requirements, or heightened supervision on an Associated Person by a state or federal authority or self-regulatory organization; or

g. information from an industry authority indicating the Applicant or its Associated Persons are a threat to public?

(•) Yes ( ) No

Regarding the event(s), unless details of a particular event have been reported to the CRD system, provide information (e.g., subject party, nature of the activity, any findings, any fine, other dispositions) for each event involving the Applicant and/or its Associated Persons. *

Please see documents uploaded below.

2. Pursuant to NASD Rule 1014(b)(1), where the history of the Applicant or its Associated Persons includes any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E), there is a presumption that the Application should be denied. The Applicant may overcome the presumption of denial by demonstrating that it can meet each of the standards for admission in NASD Rule 1014(a), notwithstanding the existence of any of the events set forth in NASD Rule 1014(a)(3)(A) and (C) through (E). To the extent that any of the referenced events exist for the Applicant or its Associated Persons, provide a detailed explanation, in light of the existence of such events, as to how the Applicant is nonetheless capable of complying with industry rules, regulations, laws, and observing high standards of commercial honor and just and equitable principles of trade. Please reference any controls or systems put in place and refer to any specific pages or sections in the Applicant's written supervisory procedures that address heightened supervisory requirements. *

Please see documents uploaded below.

3. Indicate whether the Applicant or any Associated Persons have been found to have violated the same federal securities laws or regulations, the rules thereunder, or FINRA Rules on more than one occasion. In such instances, identify the nature of the repetitive occurrences, the corrective action the Applicant has taken to prevent future violations, and the specific persons with responsibility for supervision in the areas noted with repeat violations and/or Associated Persons who have been found to have repeat violations. *

Not applicable pursuant to the above inquiry.

4. Will this Application involve a transfer of assets without a corresponding transfer of liabilities? *

( ) Yes (•) No

**Provide supporting documents.**

1. Documentation of any of the events described in NASD Rule 1014(a)(3), unless the event has been reported to the CRD system

3. Any other documentation that would be pertinent to FINRA's review of this Standard

STD 03 - Item 3 - Eduardo Perez Explantion of Events.pdf 115654 bytes

STD 03 - Items 1 and 2 - Firm Responses re Rebut Presumption and Schedule.pdf 240778 bytes

**Standard 4: Contractual and business relationships**

# Continuing Member Application

## Standard 4: Contractual and business relationships

NASD Rule 1014(a)(4): The Applicant has established all contractual or other arrangements and business relationships with banks, clearing corporations, service bureaus, or others necessary to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Identify whether any new agreements or business relationships are being established or whether existing agreements are being modified in order to effectuate the proposed change. Such agreements may include, but are not limited to, expense sharing, clearing, custody, outsourcing, independent contractor, etc. *

At this time, since the business location(s) and the business conduct are not expected to change subsequent to FINRA approval and closing, no new agreements/contracts/leases are contemplated by the firm and/or the eventual new ownership.

2. Identify any dependencies or conditions (e.g., shareholder approval, regulatory approval) that must be satisfied prior to conducting the proposed change. *

Other than FINRA approval a majority of the shareholders of the current parent have already approved the ultimate sale of 100% of the Applicant's share ownership.

3. Will the proposed change result in the creation of an expense sharing agreement ("ESA") or amendment to an existing ESA? *

○ Yes ◉ No

**Provide supporting documents.**

1. Copies of the Applicant's Fidelity bond and cancellation rider (if impacted by the proposed change)

2. Agreements, to the extent any such agreements are put in place, replaced or amended as a result of the proposed change, including:

a. Clearing agreements

b. Administrative services agreement

c. Agreement with FinOp Principal

d. Commission sharing agreement

e. Technology services agreement, including arrangements with third-party providers of electronic storage media (SEC Rule 17a-4(f))

f. Compliance services/support agreement

g. Expense sharing agreements and supporting documents, including bank statements, tax returns, etc., as applicable

h. Other agreements pertinent to the conduct of the proposed change

3. Transaction documents (e.g., letter(s) of intent, asset purchase agreements, share purchase agreements, merger agreements, board resolutions)

2020-01-02 - SIGNED - Stark et al to OPC SPA.pdf 4088897 bytes

4. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 4 - Question 2 - 24 percent certificate transfer.pdf 455035 bytes

Standard 4 - Question 2 - New 24 percent stock cert provided to OPC Advisors LLC.pdf 1313539 bytes

Standard 4 - Question 3 - RMST Minutes approving sale of Applicant.pdf 89738 bytes

Standard 4 - Question 3 - RMST Minutes re dividing Gary Stark Shares.pdf 153533 bytes

Standard 4 - Question 4 - Applicant Stock Cert owned by RMST.pdf 1307066 bytes

Standard 4 - Question 5 - Stock Certificates of Current Ownership RMST.pdf 3378924 bytes

Standard 4 - Question 6 - Corporate Resolution re CEO.pdf 144525 bytes

Standard 4 - Question 7 - LN transfer to AN.pdf 142579 bytes

Standard 4 - Question 2 - Corporate Resolution.pdf 92864 bytes

**Standard 5: Facilities**

# Continuing Member Application

## Standard 5: Facilities

NASD Rule 1014(a)(5): The Applicant has or has adequate plans to obtain facilities that are sufficient to:

(A) initiate the operations described in the Applicant's business plan, considering the nature and scope of operations and the number of personnel; and

(B) comply with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Is the Applicant making any material changes to existing facilities or locations, or will any proposed change in business require additional space and/or locations? *

○ Yes ◉ No

2. As applicable, identify whether various departments (e.g., research, investment banking, trading) of the Applicant are separated by appropriate information and physical barriers, and describe the methods for maintaining such barriers.

The Applicant's current business does not require the use of informational or physical barriers at this time.

3. Will the Applicant, as a result of the proposed change, at any of its locations share office space with an entity or an individual conducting activities other than the Applicant's business? *

○ Yes ◉ No

4. Will the Applicant enter into or acquire any new lease or sublease arrangements as a result of the proposed change? *

○ Yes ◉ No

5. Will the proposed change result in any change in locations of the Applicant that are owned premises, or result in the addition of private residence used as offices of the Applicant? *

○ Yes ◉ No

**Provide supporting documents.**

1. For each leased location impacted by the proposed change, the master lease (the agreement between the owner of the property and the initial lessee)

2. For each sub-leased location impacted by the proposed change, the sub-lease

3. For each sub-lease impacted by the proposed change, written authorization from the landlord evidencing consent to sublet the premises (if required)

4. For each owned premises impacted by the proposed change, draft or executed deed of ownership

Note that the existence of an Expense Sharing Agreement does not negate the requirement to evidence that the Applicant has the right to operate from the premises.

5. Space sharing agreements impacted by or implemented as a result of the proposed change

6. A supervisory chart or listing which evidences the supervisory structure, the location of each designated supervisor, the number of Associated Persons currently supervised by each, and the anticipated additional number of Associated Persons to be supervised as a result of the proposed change

Standard 5 - Post Closing Supervisory Chart Locations and Supervisors.pdf 80929 bytes

7. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 6: Communications and operational systems**

# Continuing Member Application

## Standard 6: Communications and operational systems

NASD Rule 1014(a)(6): The communications and operational systems that the Applicant intends to employ for the purpose of conducting business with customers and other members are adequate and provide reasonably for business continuity in each area set forth in NASD Rule 1013(a)(1)(F)(xii).

**Explain how this Standard is met.**

1. Describe (i) the impact, if any, on the communication and operational systems of the Applicant which are utilized for the purpose of conducting business with customers and other firms, (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity. *

Because no daily operational management (other than CEO change), or business conduct is changing as a result of this application, the Applicant does not expect any material impact on the communication and operational systems used for conducting business with customers and other firms. As is currently the case, both (ii) the adequacy of such systems in light of the proposed change, and (iii) the impact on plans in place to ensure business continuity, remain as is.

2. Describe how the systems and equipment of the Applicant will be impacted by the proposed change, and how the Applicant will address potential issues (e.g., adding new systems/equipment, modifying existing systems). *

No changes are contemplated in this regard. It shall be business as usual post FINRA approval and closing.

3. Regarding business continuity, describe how the proposed change impacts capacity in light of any anticipated increase in usage levels, and describe in detail any changes to contingency plans to address system failures, disaster recovery plans, system security, etc. *

No changes are contemplated in this regard. It shall be business as usual post FINRA approval and closing.

4. Will the Applicant conduct business from multiple locations as a result of the proposed change? *

○ Yes ◉ No

5. Will, as a result of the proposed change, one or more of the Applicant's proposed locations be the residence of an Associated Person? *

○ Yes ◉ No

6. Will the proposed change affect or result in the Applicant's use of social media sites, such as blogs and social networking sites, for business communications? *

○ Yes ◉ No

**Provide supporting documents.**

1. Business continuity plan (if impacted)

Standard 6 - Draft BCP for CMA 20200327.pdf 157172 bytes

2. Business continuity disclosure statement (if available)

3. A step-by-step description of the order flow on the trading platforms, supported by screenshots or schematic diagrams (as applicable to the proposed change)

4. Screenshots of both Applicant-facing and outward-facing pages of the social media sites, showing the flow from one screen to another (if applicable)

5. A systems conversion timeline, testing plan, and implementation schedule for proposed changes (if applicable)

6. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 7: Maintaining adequate net capital**

# Continuing Member Application

## Standard 7: Maintaining adequate net capital

NASD Rule 1014(a)(7): The Applicant is capable of maintaining a level of net capital in excess of the minimum net capital requirements set forth in SEA Rule 15c3-1 adequate to support the Applicant's intended business operations on a continuing basis, based on information filed under NASD Rule 1013(b)(5).

The Department may impose a reasonably determined higher net capital requirement for the initiation of operations after considering:

A. the amount of net capital sufficient to avoid early warning level reporting requirements, such as SEA Rule 17a-11;

B. the amount of capital necessary to meet expenses net of revenues for at least twelve months, based on reliable projections agreed to by the Applicant and the Department;

C. any planned market making activities, the number of markets to be made, the type and volatility of products, and the anticipated maximum inventory positions;

D. any plan to enter into other contractual commitments, such as underwritings or other securities-related activities;

E. any plan to distribute or maintain securities products in proprietary positions, and the risks, volatility, degree of liquidity, and speculative nature of the products; and

F. any other activity that the Applicant will engage in that reasonably could have a material impact on net capital within the first twelve months of business operations.

**Explain how this Standard is met.**

1. Provide a detailed description of *

a. the nature and source of the Applicant's capital;

b. the terms and conditions of all financing arrangements; and

c. any impact to the Applicant's ability to maintain net capital in excess of the Applicant's existing (or revised) minimum net capital requirement, and to support, on a continuing basis the business operations as proposed by the Applicant.

a. The source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business. Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that the new indirect ownership is not seeking to modify the business model at this time. PLEASE NOTE THAT GARY STARK, THE CURRENT CEO AND MAJORITY INDIRECT OWNER HAS CONFIRMED THAT HE/THE PARENT HAS NOT FOUND IT NECESSARY TO INFUSE ADDITIONAL CAPITAL INTO THE APPLICANT BECAUSE THE PREEXISTING REVENUE STREAM ADEQUATELY COVERS ALL APPLICANT CAPITAL NEEDS AND HAS DONE SO FOR A CONSIDERABLE TIME. Additional capital infusions, if needed, would come from the current and post closing direct owner: RMST Holding Company, Inc., and indirectly from the new indirect owner; OPC Advisors, LLC and it's majority upstream owner, Arturo Nicolayevsky, as well. Mr. Nicolayevsky's personal account statements are provided below, along with OPC Advisor's account statements. b. There are no current financing arrangements contemplated c. Because of the current pre-existing revenue stream, the Applicant does not see any negative or material impact to remain in compliant net capital condition.

2. Will the Applicant, in connection with the proposed change, rely on any form of subordinated lending relating to its capital position? *

○ Yes ◉ No

3. Describe plans for additional funding of the Applicant, should such additional funding become necessary in the future. *

As stated above, the Applicant shall seek additional funding from it's parent organization if and when necessary. Please note Applicant's preexisting revenue stream.

4. Provide a statement of the Applicant's statutory minimum net capital requirement, pursuant to SEA Rule 15c3-1, and any change in net capital calculation methodology by the Applicant, as a result of the proposed change. *

The Applicant's statutory minimum net capital requirement is $100,000.00 - there is no change in the net capital requirement or its calculation methodology resulting from the proposed change in indirect ownership.

5. Does the Applicant propose to rely on a pre-existing stream of revenue to support its capitalization in light of the proposed change? *

(•) Yes ( ) No

Provide a detailed description of the revenue stream, how it is earned, and the entity or individual which is earning that revenue. *

The source of the Applicant's capital shall continue to be from existing revenue streams generated by the Applicant's business. Please note that the Applicant is a long standing and viable FINRA member broker-dealer firm and that the new indirect ownership is not seeking to modify the business model at this time. Revenue is earned by the Applicant via commissions.

**Provide specific data regarding infusions of capital to fund the Applicant.**

6. In connection with the proposed change, provide a list of all persons or entities that have contributed or plan to contribute equity capital or debt financing to the Applicant's business and provide information regarding the nature of the capital and/or financing.

| Date or Anticipated Date | Source | Recipient | Amount | Transfer Instrument (e.g., wire, check) |
|---|---|---|---|---|

**Provide supporting documents.**

1. Verification of all funding, including but not limited to the below list. The information provided must provide Staff with a clear picture of the movement of funds from their origin to the Applicant, including any movement between intermediary and/or holding companies.

a. For each source of funding: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the withdrawal of funds from the source account, and also the three prior months

STD 7 - Seller Receipt of first closing funding - see page 31 of 34.pdf 720392 bytes

STD 07 - SBA Loan Documentation re OPC Advisors LLC.pdf 1992927 bytes

Standard 7 - Question 7b - SBA Loan - Security Agreements.pdf 6852595 bytes

Standard 7 - Question 7b - SBA Loan - UCC Financing Statements.pdf 3389436 bytes

Standard 7 - Question 7b - SBA Loan - Unconditional Guarantee.pdf 1716597 bytes

Standard 7 - Question 7a - First Closing Funding Evidence.pdf 743468 bytes

STD 07 - A Nicolayevsky Chase Checking Acct2255 January 2020.pdf 37336 bytes

b. For the Applicant: bank statements, checks (front and back), or wire advices (or the equivalent) covering the month of the deposit of funds into the Applicant's account, and also the three prior months

c. For both the source and receiving entities, the corporate minutes (or equivalent) reflecting the authorization of funding

d. Evidence of the financial wherewithal of anticipated sources of future funding, such as bank statements (or the equivalent)

STD 07 - Purchaser-Prospective Owner Checking Acct December 2019.pdf 33875 bytes

STD 07 - Purchaser-Prospective Owner Checking Acct February 2020.pdf 33943 bytes

STD 07 - Purchaser-Prospective Owner Checking Acct January 2020.pdf 34006 bytes

STD 07 - Purchaser-Prospective Indirect Owner Dec2019 JanFeb2020 Brokerage Accts.pdf 870222 bytes

Standard 7 - Question 4 Nicolayevsky April 2020 Royal Alliance Statement.pdf 2470186 bytes

Standard 7 - Question 4 Nicolayevsky Feb 2020 Royal Alliance Statement.pdf 2362306 bytes

Standard 7 - Question 4 Nicolayevsky March 2020 Royal Alliance Statement.pdf 3326146 bytes

STD 07 - A Nicolayevsky 200k.pdf 6630319 bytes

STD 07 - A Nicolayevsky Chase Checking Acct2255 January 2020.pdf 37336 bytes

e. As applicable to the proposed change: pro-forma financial statements of the Applicant for twelve months, specifically identifying revenues and expenses related to the proposed change as well as the impact to equity, net capital, and projected profit or loss

STD 07 RMStark CMA Pro Forma Financial Projection - CMA.xlsx 17335 bytes

f. Financial assumptions supporting the monthly projections *

STD 07 Supporting Doc F.pdf 48638 bytes

2. If the Applicant proposes to use a form of subordinated lending: a draft of the anticipated agreement and related supporting documentation (as detailed in Regulatory Notice 10-15)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

Standard 7 - Question 5 - RM Stark March 2020 EFOCUS submitted - amendment.pdf 39543 bytes

RM Stark May 2020 Balance Sheet.pdf 176939 bytes

RM Stark May 2020 Income Statement.pdf 178084 bytes

RM Stark May 2020 Net Capital.pdf 137936 bytes

RM Stark May 2020 Trial Balance.pdf 179070 bytes

**Standard 8: Financial controls**

# Continuing Member Application

## Standard 8: Financial controls

NASD Rule 1014(a)(8): The Applicant has financial controls to ensure compliance with the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Provide specific information regarding the financial controls**

1. Identify the impact of the proposed change on the financial controls, systems, policies, and procedures that the Applicant will use to enable the FinOp principal to promptly access the Applicant's books and records, and to keep abreast of any financial and related problems occurring at the Applicant. *

As stated elsewhere in this CMA, the Applicant's business model shall not change as a result of the contemplated sale. The Applicant's management team, other than replacing current CEO, Gary Stark, with proposed CEO, Stacey R. Stark, shall not change. Most importantly for this Standard 8 is that Mr. Stark shall remain the Applicant's FINOP and that Stacey R. Stark is intimately knowledgeable of the Applicant's business having worked there under Gary Stark for approximately 18 years.

2. Describe how the proposed change will affect any of the following items: *

a. Accounting system

b. Hardcopy and/or electronic books and records

c. Authorized signatories on bank and trading accounts

d. Individual(s) responsible for daily journal entries and monthly closing of books and records

e. Authorizations required and procedures regarding withdrawals of capital

f. If the FinOp Principal works offsite or remotely: whether he or she will have online access to bank accounts, clearing accounts, etc., and whether that access will be read-only

g. Whether the Applicant will employ or associate other persons who will support the financial and operation functions (e.g., internal bookkeeping staff); if so, identify each such person and their roles and responsibilities

No changes a. through and include g. above shall be affected in any material way post FINRA approval.

**Provide specific information regarding the Applicant's FinOp Principal(s).**

3. Will the FinOp Principal change as a result of this Application? *

○ Yes ◉ No

4. Will the Applicant have more than one FinOp Principal as a result of the change? *

Yes ◉ No

5. Provide a detailed description of the prior work experience of the Applicant's FinOp Principal relative to the business activities the Applicant will conduct following the change. (This description must also address how the individual satisfies NASD Rule 1014(a)(10)(D) which requires one year of direct or two years related experience in the subject area to be supervised. ) *

Mr. Stark has owned the Applicant indirectly for decades, and has been, currently is, and expects to remain the Applicant's FINOP following FINOP approval of this CMA. His credentials and experience have always been more than adequate and there is no reason to expect any difference subsequent to FINRA approval.

6. Will the Applicant's FinOp Principal be either part-time with the Applicant or dually associated with another broker-dealer? *

Yes ◉ No

**Provide supporting documents.**

1. Rule 3270 (formerly Rule 3030) notifications for the FinOp Principal (if applicable)

2. Financial control procedures (if altered by the proposed change)

3. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 9: Written procedures**

# Continuing Member Application

## Standard 9: Written procedures

NASD Rule 1014(a)(9): The Applicant has compliance, supervisory, operational, and internal control practices and standards that are consistent with practices and standards regularly employed in the investment banking or securities business, taking into account the nature and scope of Applicant's proposed business.

**Explain how this Standard is met.**

1. Describe any impact upon the Applicant's compliance, supervisory, operational, and internal control practices and standards in light of the proposed change. *

Other than the physical change of CEOs, as mentioned earlier in this CMA, management (hence compliance, supervisory, operational and internal control practices) shall remain the same. It is not contemplated that the new CEO will seek to manage the Applicant differently in any material way during the first 12 months following FINRA approval.

**Provide supporting documents.**

1. Written supervisory procedures ("WSPs") impacted by the proposed change, including:

a. Written supervisory control procedures

Standard 9 - Draft WSPs for CMA.pdf 2197198 bytes

b. Anti money laundering procedures

Standard 9 - Draft AML Plan for CMA.pdf 243130 bytes

c. Financial control procedures

d. Internal operating procedures

e. Internal control procedures

Ensure that the WSPs contain a Designation of Principals identifying the principal(s) responsible for each area (e.g., AML, Supervisory Controls) and business activity or product line (including activities or product lines categorized as OTH or Other that require broker-dealer registration).

As a reminder, please ensure that the WSPs clearly state:

- Who: the identification of the principal/ supervisor responsible for conducting the subject procedure
- What: a description of the specific procedure that is to be conducted by the principal/supervisor
- When: a statement as to when or how often the specific procedure is to be conducted
- How evidenced: a statement as to how the Applicant will evidence the fact that the procedure has been conducted

WSPs that do not conform to the above may not be deemed adequate under this Standard.

2. WSP checklist, as it pertains to procedures impacted by the change

3. Sample of the reports (if impacted by the proposed change) utilized to support supervisory, AML, financial control, internal operating, and internal control procedures *

Standard 09 Supporting Documents 3 - Reports.pdf 37299 bytes

4. Any other documentation that would be pertinent to FINRA's review of this Standard

Revised Supervisory Chart from WSP 20200820.pdf 123779 bytes

**Standard 10: Supervisory structure**

# Continuing Member Application

## Standard 10: Supervisory structure

NASD Rule 1014(a)(10): The Applicant has a supervisory system, including written supervisory procedures, internal operating procedures (including operational and internal controls), and compliance procedures designed to prevent and detect, to the extent practicable, violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

In evaluating the adequacy of a supervisory system, the Department shall consider the overall nature and scope of the Applicant's intended business operations and shall consider whether:

A. the number, location, experience, and qualifications of supervisory personnel are adequate in light of the number, location, experience, and qualifications of persons to be supervised; the Central Registration Depository record or other disciplinary history of supervisory personnel and persons to be supervised; and the number and locations of the offices that the Applicant intends to open and the nature and scope of business to be conducted at each office;

B. the Applicant has identified specific Associated Persons to supervise and discharge each of the functions in the Applicant's business plan, and to supervise each of the Applicant's intended offices, whether or not such offices are required to be registered under FINRA Rules;

C. the Applicant has identified the functions to be performed by each Associated Person and has adopted procedures to assure the registration with FINRA and applicable states of all persons whose functions are subject to such registration requirements;

D. each Associated Person identified in the business plan to discharge a supervisory function has at least one year of direct experience or two years of related experience in the subject area to be supervised;

E. the Applicant will solicit retail or institutional business;

F. the Applicant will recommend securities to customers;

G. the location or part-time status of a supervisor or principal will affect such person's ability to be an effective supervisor;

H. the Applicant should be required to place one or more Associated Persons under heightened supervision pursuant to Notice to Members 97-19;

I. any remedial action, such as special training or continuing education requirements or heightened supervision, has been imposed on an Associated Person by a state or federal authority or self-regulatory organization; and

J. any other condition that will have a material impact on the Applicant's ability to detect and prevent violations of the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Describe any changes or additions to *

   a. management or supervisory personnel (including heads of business lines),

   b. addition of offices,

   c. changes to supervisory responsibilities,

   d. changes involving heightened supervision, and

e. any changes to supervisory systems or to the supervisory framework.

a. Stacey R. Stark shall replace Gary Stark as CEO. Gary Stark shall remain, however, as FINOP. b. N/A c. The compliance officer shall remain the same. Otherwise, as the CEO is an oversight position, the Applicant does not expect any material changes to the day to day operations within the first 12 months of business following FINRA approval. d. No changes expected re heightened supervision, and e. No changes expected re supervisory systems or supervisory framework.

2. Persons identified in Form CMA who are or will be responsible for discharging supervisory functions must have a minimum of one year of direct experience or two years of related experience in the subject area to be supervised. (See NASD Rule 1014(a)(10)) In light of the noted requirement, describe the relevant experience of personnel to supervise new or expanded areas of the Applicant's business relating to the proposed change, including (at a minimum) *

a. where such experience was obtained,

b. duration of the experience, and

c. positions held and responsibilities.

Please refer to Stacey R. Stark's resume attached below which evidences and highlights his more than adequate supervisory experience.

3. Will the proposed change to the Applicant result in a change in Chief Compliance Officer? *

○ Yes ◉ No

**Provide supporting documents.**

1. Rule 3270 (formerly Rule 3030) notification(s) for principals other than the FinOp Principal (addressed in Standard 8) that have outside business activities (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

STD 10 - Stacey Stark Resume for FINRA CMA.pdf 132221 bytes

**Standard 11: Books and records**

# Continuing Member Application

## Standard 11: Books and records

NASD Rule 1014(a)(11): The Applicant has a recordkeeping system that enables Applicant to comply with federal, state, and self-regulatory organization recordkeeping requirements and a staff that is sufficient in qualifications and number to prepare and preserve required records.

**Explain how this Standard is met.**

1. Describe any changes to the Applicant's recordkeeping system as a result of the proposed change, specifically identifying any impact to *

a. procedures,

b. books and records,

c. communication systems, and

d. the software and systems to be used to prepare business and financial records, including general ledger, trial balance, balance sheet, and net capital computation (e.g., PeopleSoft, ADP, Creative Solutions).

As neither the business model or the day to day supervisory staff or procedures are expected to change in any material way following FINRA approval, there is no material impact contemplated as a result of such change with regard to any of items a. through d. above.

2. Describe any changes to, or to the scope of services provided by, any entities providing recordkeeping services to the Applicant, specifically identifying any service bureaus, clearing/correspondent arrangements, or other arrangements involving the creation and retention of books and records. *

All entities and or services above shall remain the same following FINRA approval and closing.

3. Describe how the Applicant's records storage (including email) will be impacted by the proposed change, specifically identifying (for example): *

a. hardcopy,

b. microfilm/microfiche,

c. optical storage technology, or

d. other media or methods.

None of a. through d. above shall be impacted in any material way as a result of the proposed change.

4. Describe any changes to the location where the Applicant's electronic records will be maintained (including email archives). *

Following FINRA approval all electronic records, including email, shall be retained, maintained and archived in the exact same way as they are at this time.

5. Identify all new types of records to be created and maintained as a result of the proposed change. *

None.

**Provide supporting documents.**

1. A conversion timeline, testing plan, and implementation schedule for the proposed recordkeeping system changes (if applicable)

2. Samples of relevant books and records that will be created and maintained relating to the new business activities or as a result of the proposed change

3. Any other documentation that would be pertinent to FINRA's review of this Standard

**Standard 12: Continuing education**

# Continuing Member Application

## Standard 12: Continuing education

NASD Rule 1014(a)(12): The Applicant has completed a training needs assessment and has a written training plan that complies with the continuing education requirements imposed by the federal securities laws, the rules and regulations thereunder, and FINRA Rules.

**Explain how this Standard is met.**

1. Identify any changes to the Applicant's Continuing Education ("CE") program, including the Firm Element needs assessment and written training plan as a result of the proposed change. This should include identification of what additional courses may be required, which personnel will be required to participate, and the timeline for implementing the planned modification to the CE Firm Element. *

As no change to the Applicant's business model or supervisory system is contemplated, no changes are expected to the CE Plan as a result of the proposed sale of the Applicant.

2. Identify any changes to the person(s) responsible for the Firm Element and the Regulatory Element of the Applicant's CE program. *

No changes to the individual responsible for administering the Applicant's CE Plan.

**Provide supporting documents.**

1. Revised continuing education training needs assessment and written training plan (if applicable)

2. Any other documentation that would be pertinent to FINRA's review of this Standard

# Exhibit D



Financial Industry Regulatory Authority

September 2, 2020

***Via electronic mail (glevine@gregorylevinelaw.com)***

Gregory Levine
Gregory Levine Law
Suite B1, Administrative Offices
225 Brewers Bridge Rd.
Jackson, New Jersey 08527

Re: Decision Regarding Continuing Membership Application
Firm: R.M. Stark & Co., Inc.
CRD Number: 7612; Application Number: 20200661553

Dear Mr. Levine:

Pursuant to FINRA Rule 1017, FINRA grants the continuing membership application of R.M. Stark & Co., Inc., (the "Firm") which seeks approval for an ownership change in which OPC Advisors, LLC will complete its acquisition of the Firm by purchasing 100% of the outstanding ownership interests in the Firm's direct parent, RMST Holdings, Inc. As a result of the transaction, the Firm will become indirectly owned by Aynbet Investments, LLC (82%), which is wholly-owned by Arturo Nicolayevsky, and Eduardo Perez (18%). Firm has informed FINRA that Stacey Stark will replace Gary Stark as the Firm's CEO, concurrent with the ownership change.

The effectiveness of this decision is contingent upon the execution of the enclosed Membership Agreement ("Agreement") by Ms. Stark. Upon receipt of a properly executed Agreement, FINRA will provide the Firm with final written notification of approval, at which time the Firm may effect the approved changes in accordance with the attached Agreement.

Please be advised that the executed Agreement must be returned to FINRA within twenty-five (25) days after service of this decision. The Firm should retain the original executed Agreement for its records and submit an electronic copy to FINRA via email. An executed Agreement must be returned to FINRA no later than **September 28, 2020**. The Firm should note that failure to return the executed Agreement within the required time period will constitute a lapse of the application. Pursuant to FINRA Rule 1012(b), the lapse of an application requires an applicant to submit a new application and fee if the applicant wishes to continue to seek membership.

It should be noted that, in issuing this decision, FINRA has relied upon the information and documentation submitted as part of the application process and deems the latest versions of any and all documentation submitted in support of the Firm's application as final submissions. FINRA has relied upon such information and documents to be a complete and accurate representation of the activities and procedures to be conducted by the Firm, notwithstanding any indication, implied or otherwise, that such documents were submitted as drafts.

Furthermore, please note that although the Firm and its procedures have been reviewed as part of the application process, the Firm will be subject to examination by FINRA for compliance with industry rules and regulations as well as for the overall adequacy and execution of the Firm's stated procedures.

The Firm is reminded of FINRA Rule 1017, which requires notification to and approval by FINRA of a material change in business operations prior to such change being effected. Rule 1017 also requires that the Firm file an application for approval of a change of ownership or control at least 30 days prior to effecting such change. The Firm is also reminded to discuss regulatory issues and business developments with its assigned FINRA Risk Monitoring Analyst.

No member firm communication may suggest that FINRA's approval of a new membership application, continuing membership application, or assessment of a materiality consultation, constitutes or implies that FINRA approves of or endorses any security or product offered by the member.

Any questions regarding this decision or the Agreement may be directed to Richard Nichols, Principal Examiner, at (404) 239-6161.

Sincerely,

Leyna Goro
Associate Director
Membership Application Program
(212) 858-4230
Leyna.Goro@finra.org

Attachment (1)

cc: Frank Thorn, Risk Monitoring Analyst, FINRA Boston Office
Stephen Poirier, Risk Monitoring Director, FINRA Boston Office
Jennifer Danby, Application Manager, FINRA MAP Group NYC

# Exhibit

# E



**R.M. STARK & CO., INC.**
**MEMBERSHIP AGREEMENT**
**CRD No. 7612**

FINRA grants the application of **R.M. STARK & CO., INC.** (the "Firm") for continuance in membership with FINRA, contingent upon the execution of this Membership Agreement ("Agreement") and its submission to the FINRA Membership Application Program Group, via email, by no later than **September 28, 2020**.

This Agreement shall remain in effect and bind the Firm and all of its successors to ownership or control unless this Agreement is changed, removed, or modified pursuant to applicable FINRA Rules.

*A. Undertakings*

In connection with the granting of its application for membership, the Firm undertakes to: (1) abide by any restriction specified in Section C below; (2) obtain the prior written approval of FINRA pursuant to FINRA Rule 1017 before removing or modifying any restrictions imposed or before effecting a material change in business operations; and (3) file a written notice and application with FINRA at least 30 days prior to effecting a change in ownership or control pursuant to Rule 1017.

*B. Business Activities*

The activities in which the Firm may engage are based on its business plan, any additional information provided during or subsequent to the membership application process and such other activities as may be permissible pursuant to the FINRA Membership Rules. The Firm represents that it will:

(1) Maintain a minimum net capital requirement of $100,000 pursuant to SEA Rule 15c3-1(a)(2)(iii) (the Net Capital Rule).

(2) Operate pursuant to SEC Rule 15c3-3(k)(2)(ii) (the Customer Protection Rule), clearing all transactions on a fully-disclosed basis through its clearing firm. The Firm will not hold customer funds or safekeep customer securities.

(3) Engage in the following types of business:
  A. Broker or dealer retailing corporate debt securities;
  B. Broker or dealer retailing corporate equity securities over-the-counter on an agency or riskless principal basis;
  C. U.S. government securities broker or dealer;
  D. Mutual fund retailer on an application basis or through a clearing firm;
  E. Mutual fund underwriter or sponsor;
  F. Municipal securities broker;



G. Non-exchange member arranging for transactions in listed securities by exchange member;
H. Broker or dealer selling oil and gas interests;
I. Put and call broker or dealer or option writer;
J. Private placements of securities;
K. Trading securities for own account;
L. Underwriting or selling group participant in public offerings;
M. Broker or dealer selling variable life insurance or annuities;
N. Broker or dealer making inter-dealer markets in corporate securities over-the-counter;
O. Provider of online brokerage services through a clearing firm; and
P. Commodity futures, commodities, or commodity options as a broker or dealer.

*C. Restrictions*

None

*D. Waiver/Exemption*

None

*E. Notifications*

The Firm will promptly notify FINRA if:

(1)     the Firm changes its: (a) clearing entity, service bureau, or method of clearance; and/or (b) method of bookkeeping or recordkeeping (*e.g.*, computer to manual, or utilizing an outside computer service); or

(2)     the Firm has effected any significant change in its key personnel, including but not limited to, change or loss of the General Securities Principal, Chief Compliance Officer, and/or Financial and Operations Principal.

*F. Certification*

Pursuant to Article IV, Section 1, of FINRA By-Laws, the Firm agrees:

(1)     to comply with the federal securities laws, the rules and regulations thereunder, the rules of the Municipal Securities Rulemaking Board and the Treasury Department, the By-Laws of FINRA and all rulings, orders, directions, and decisions issued and sanctions imposed under FINRA Rules;

(2)     to pay such dues, assessments, and other charges in the manner and amount as from time to time shall be fixed pursuant to FINRA By-Laws, Schedules to FINRA By-Laws, and FINRA Rules; and



(3)     that this Agreement has been executed on behalf of, and with the authority of the Firm. The undersigned and the Firm represent that the information and statements contained within the application and other information filed are current, true, and complete. The undersigned and the Firm further represent that, to the extent any information previously submitted is not amended, such information is currently accurate and complete and agree that the information contained in Form BD will be kept current and accurate by properly amending Form BD as changes occur.

Any activity that does not conform to the provisions set forth in this Agreement may form the basis for disciplinary action by FINRA against the Firm, its owners, or Associated Persons.

*Signature:*

Stacey Stark, CEO              9/2/2020
                              Date

# Exhibit F

# SUPPLEMENTAL PURCHASE AGREEMENT

**SUPPLEMENTAL PURCHASE AGREEMENT** (hereinafter referred to as the "**Agreement**") entered into this 22 day of September, 2020, by, between and among **Gary L. Stark**, an individual (hereinafter sometimes referred to as "**Seller**" or "**Stark**"); and, **Premium 72 International, LLC,** a Nevada Limited Liability Company in good standing ("hereinafter sometimes referred to as "**Premium 72**" or "**Buyer**"), and **Arturo Nicolayevsky** ("**Arturo**") and **Eduardo Perez Alduncin** ("**Eduardo**"), individually and as managing partners of **Premium 72**. (**Stark**, **Premium 72**, **Arturo** and **Eduardo** are hereafter sometimes individually referred to as a "**Party**" and collectively referred to as the "**Parties**.") All **Parties** hereto acknowledge that each has the legal right, authority and capacity to enter into this **Agreement**.

**WHEREAS, Stark** holds Eighty Seven and One-Half Percent (87.5%) of **RMST Holding Company, Inc.** ("**RMST Holding**"), a Florida Sub-S corporation in good standing; and,

**WHEREAS, RMST Holding** holds One Hundred Percent (100%) of **R.M. Stark & Co., Inc.**, (hereinafter referred to as "**RMST**"), a Florida Sub-S corporation in good standing, and a broker/dealer registered as such with the Securities and Exchange Commission ("SEC"), a member of the Financial Industry Regulatory Authority ("FINRA"), Securities Investors Protection Corporation ("SIPC") and Municipal Securities Rulemaking Board ("MSRB"); and,

**WHEREAS, Premium 72** aspires and intends to become the holding company owning companies and other entities, as the case may be, and, more specifically, broker/dealers and registered investment advisory firms ("**BDs**" and/or "**RIAs**"), acquired by and/or merged into **Premium 72** and/or **OPC Advisors, LLC**, a Texas Limited Liability Company ("**OPC**") in good standing (whose managing members are **Arturo** and **Eduardo**), for the purpose of engaging in the financial securities investment and advisory businesses; and,

**WHEREAS, Premium 72's** acquisition of **RMST Holding** and **RMST** is critical to the successful realization of the foregoing business plan; and,

**WHEREAS, Stark**, who, with more than forty (40) years of experience in the financial industry and having successfully established and operated both **RMST** and an **RIA**, has the ability and expertise to assist **Premium 72, Arturo** and **Eduardo** in achieving the foregoing goals by allowing the sale of One Hundred Percent (100%) of **RMST Holding** stock to **OPC** for One Million Six Hundred Thousand U.S. Dollars (U.S. $1,600,000.00),[1] a portion of **Seller's** total sales price of Four Million Five Hundred Thousand Dollars (U.S. $4,500,000.00), provided, however, that **Premier 72** and its managing members, jointly and severally, assume the liability for the balance of the purchase price of **RMST Holding**.

**NOW, THEREFORE,** pursuant to and in consideration of the terms, covenants, conditions, and mutual promises hereinafter set forth, the **Parties** hereto agree as follows:

1. **Promissory Note**. **Buyer** shall execute a Promissory Note (the "**Note**") in favor of **Seller**, in the principal amount of Two Million Nine Hundred Thousand Dollars U.S. (U.S.

[1] A copy of the **Stock Purchase Agreement** allowing **OPC** to effect the purchase is attached hereto as **Exhibit "A."**

$2,900,000.00), with interest thereon at the rate of Five Percent (5%) per annum, all principal and interest due four (4) years after date of execution. A copy of the **Note** setting forth all the terms thereof is attached as **Exhibit "B"** hereto and incorporated herein by reference.

2. **Collateral.** As collateral for the monies due pursuant to the **Note**, **Seller**, **Arturo** and **Eduardo** shall execute stock powers for the transfer of securities held by **OPC** to **Seller** in an amount equal to the balance of all principal and interest due under **Note**. As additional collateral, **Arturo** shall execute an irrevocable assignment of Two Million Nine Hundred U.S. Dollars (U.S. $2,900,000.00) from the proceeds of his existing Life Insurance Policy AXA Policy #119311151. It is expressly understood and agreed that the aforesaid stock powers and assignment shall be held in escrow and returned to **Seller**, **Arturo** and/or **Eduardo**, as the case may be, upon full and final satisfaction of their obligations under the said Note.

3. **Ownership Interest in Premier 72.** **Seller** shall be granted a Five Percent (5%) ownership interest in **Premium 72** and be elected as Chairman of the LLC's Board of Directors. Seller shall occupy this position and ownership interest for a period of five (5) years from the date hereof. Five (5) years following the execution of this Agreement, **Seller** agrees to sell his ownership interest in the **Premium 72** to **Buyer** at the then agreed upon fair market value of the ownership interest. In the event the **Parties** are unable to agree upon the fair market value of **Seller's** ownership interest, **Seller** and **Buyer** shall each retain an independent forensic accountant/industry specialist valuating company with knowledge and experience in determining the value of an interest in a limited liability company and they shall determine the fair market value of Seller's interest. In the event the two (2) accountants are unable to agree, then they shall retain a third independent forensic accountant/industry specialist valuating company who shall make the final determination as to the fair market value.

4. **Non-Competition, Confidentiality and Non-Solicitation**. **Seller** agrees that for a period of three (3) years after resigning from the Board of Directors and selling his ownership interest in **Premium 72** to **Buyer**, **Seller** shall not compete with **Buyer** by directly or indirectly soliciting **RMST's** customers and/or owning and operating a Broker/Dealer. It is expressly understood and agreed that this **Section 4** does not apply to any investment advisory services **Seller** may render directly or indirectly, at any present or future time through any Registered Investment Advisory firm, including, but not limited to, **Stark Financial Advisers, Inc.**

5. **No Construction Against Drafter.** The **Parties** have participated jointly in the negotiation and drafting of this **Agreement**. Therefore, if an ambiguity or question of intent or interpretation arises, this **Agreement** is to be construed as if the **Parties** had drafted them jointly, as opposed to being construed against a party because it was responsible for drafting one or more terms of this **Agreement**.

6. **Waiver and Amendment.** Any term, provision, covenant, representation, warranty or condition of this **Agreement** may be waived, but only by a written instrument signed by the **Party** entitled to the benefits thereof. The failure or delay of any **Party** at any time or times to require performance of any provision hereof or to exercise its rights with respect to any provision hereof shall in no manner operate as a waiver of or affect such Party's right at a later time to enforce the same. No waiver by any **Party** of any condition, or of the breach of any term, provision, covenant,

representation or warranty contained in this **Agreement**, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or waiver of any other condition or of the breach of any other term, provision, covenant, representation or warranty. No modification or amendment of this **Agreement** shall be valid and binding unless it be in writing and signed by all **Parties** hereto.

7. **Choice of Law.** This Agreement and the rights of the **Parties** hereunder shall be governed by and construed in accordance with the laws of the State of Florida including all matters of construction, validity, performance, and enforcement and without giving effect to the principles of conflict of laws.

8. **Waiver of Jury Trial.** Except to the extent that Arbitration is required by any Governmental and/or Regulatory Authority, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

9. **Submission to Jurisdiction; Consent to Service of Process.** The United States District Court for the district within Florida containing the County of Palm Beach, or, if such court does not have subject matter jurisdiction, the state courts of Florida located in the county within Florida containing the city of Lake Worth Beach, County of Palm Beach, shall have exclusive jurisdiction over and shall resolve all disputes arising out of or related to this **Agreement**. Each **Party** hereby irrevocably accepts and submits to the exclusive jurisdiction of such courts, *in personam,* with respect to any such dispute. Each **Party** irrevocably and unconditionally (a) waives any objection to the laying of venue of any Proceeding arising out of or related to this **Agreement** in (i) the district court of the state of Florida located in the county within Florida containing the city of Lake Worth Beach, or (ii) any Federal court sitting in the district within Florida containing the city of Lake Worth Beach, and (b) agrees not to plead or claim that any such Proceeding brought in any such court has been brought in an inconvenient forum. Each of the **Parties** agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

10. **Counterparts.** This **Agreement** may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

11. **Attorneys' Fees.** Except as otherwise provided herein, if a dispute should arise between the **Parties** including, but not limited to arbitration, each Party shall bear its own attorneys' fees.

12. **Taxes.** Except as may otherwise be set forth in a separate agreement between and/or among the **Parties** hereto, any income taxes required to be paid in connection with the payments due hereunder, shall be borne by the **Party** required to make such payment(s). Any withholding taxes in the nature of a tax on income shall be deducted from payments due, and the **Party** required to withhold such tax shall furnish to the **Party** receiving such payment all documentation necessary to prove the proper amount to withhold of such taxes and to prove payment to the tax authority of

such required withholding.

13. **Headings.** The headings in this **Agreement** are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

14. **Severability.** If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

15. **Fees and Expenses.** Except as may otherwise be provided herein, each **Party** will be responsible for the fees and expenses of its own counsel.

16. **Further Assurances.** Each of the **Parties** shall execute such documents and perform such further acts (including, without limitation, obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person) as may be reasonably required or desirable to carry out or to perform the provisions of this **Agreement**.

17. **Specific Performance.** The **Parties** agree that irreparable damage would occur if any provision of this **Agreement** were not performed in accordance with its terms, and that the parties will be entitled to seek an injunction or injunctions to prevent breaches of this **Agreement** or to enforce specifically the performance of the terms and provisions of this **Agreement**, in addition to any other remedy to which they are entitled at law or in equity.

18. **Assignment; Binding Agreement.** A party may not assign its rights or delegate its duties under this Agreement without the prior written consent of each other party to this Agreement, except that Purchaser may assign its right to purchase the Interests hereunder to any of its Affiliates, without the prior written consent of Seller or the Company, provided that Purchaser does so prior to the submission of the FINRA Rule 1017 application contemplated by this Agreement. This Agreement binds, is enforceable by, and inures to the benefit of, the parties and their respective successors, heirs, personal representatives and permitted assigns, and no others. Nothing in this Agreement is intended to give any Person not a party to this Agreement, the benefit of any legal or equitable right, remedy or claim under this Agreement, except as expressly provided in this Agreement.

19. **Condition Precedent.** It is expressly acknowledged and understood that this Agreement becomes effective, and the rights and obligations of the **Parties** hereto shall be binding, immediately upon the **Second Closing** (as set forth in **Section 1.2** of the **OPC Stock Purchase Agreement**, **Exhibit "A"** hereto). In the event there is no **Second Closing** and the **OPC Stock Purchase Agreement** is deemed null and void and of no further force or effect, then this **Agreement** shall also be null and void and of no further force or effect.

**IN WITNESS WHEREOF, THE FOREGOING SUPPLEMENTAL PURCHASE AGREEMENT IS AGREED AND ACCEPTED** on the date first above written:

**Seller:**

______________________
**Gary L. Stark**

**Buyer:**

**Premium 72 International, LLC**

By:______________________
**Arturo Nicolayevsky**, Managing Member

By:______________________
**Eduardo Perez Alduncin**, Managing Member

**Buyer's Individual Obligors:**

______________________
**Arturo Nicolayevsky**

______________________
**Eduardo Perez Alduncin**

# Exhibit

# G

# PROMISSORY NOTE

$2,900,000.00

Lake Worth Beach, Florida

Date: 09/22/2020

FOR VALUE RECEIVED, **Premium 72 International, LLC**, a Nevada Limited Liability Company in good standing (the "**Maker**"), promises to pay to **Gary L. Stark** (the "**Payee**") the principal sum of Two Million Nine Hundred Thousand Dollars U.S. (U.S. $2,900,000.00), together with interest on the unpaid principal balance at the rate of Five Percent (5%) per annum, as follows:

Upon the **Second Closing** (as set forth in **Section 1.2** of the **OPC Stock Purchase Agreement (Exhibit "A"** hereto), **Maker** shall remit to **Payee** the sum of Seventy Two Thousand Five Hundred Dollars U.S. (U.S. $72,500.00) representing Fifty Percent (50%) of the First (1st) Year's Interest due on the principal amount of Two Million Nine Hundred Thousand Dollars U.S. (U.S. $2,900,000.00).

Within Thirty (30) Days of the aforesaid payment, **Maker** shall remit to **Payee** the sum of Seventy Two Thousand Five Hundred Dollars U.S. (U.S. $72,500.00) representing the balance of the First (1st) Year's Interest due on the principal amount of Two Million Nine Hundred Thousand Dollars U.S. (U.S. $2,900,000.00).

Thereafter, commencing on the anniversary of the Second (2nd) Year after Date, the unpaid principal balance of this **Promissory Note** (the "**Note**"), if not sooner paid or declared to be due in accordance with the terms hereof, together with all accrued and unpaid interest thereon and any other amounts due and payable hereunder shall be due and payable in Twelve (12) Quarterly Installments pursuant to the **Loan Amortization Schedule** attached to this **Note** as **Exhibit "B"** and incorporated herein by reference.

This Note is guaranteed by the personal Guaranty (herein so called) of **Arturo Nicolayevsky** and **Eduardo Perez Alduncin**, owners of **Maker** ("**Guarantors**") dated of even date herewith.

As security for the prompt payment of this **Note**, **Guarantors** shall execute stock powers for the transfer of securities held by **Guarantors** to **Payee** in an amount equal to the balance of all principal and interest due under **Note**. As additional collateral, **Arturo Nicolayevsky** shall execute an irrevocable assignment of Two Million Nine Hundred U.S. Dollars (U.S. $2,900,000.00) from the proceeds of his existing Life Insurance Policy AXA Insurance, Policy #11931115.

Payments hereunder shall be made at 16840 U.S. Highway 441 North, Okeechobee, Florida 34972, or at such other place as the **Payee** may, from time to time in writing, advise. Payments hereunder shall be timely made when deposited in the United States Mail, postage prepaid, addressed to **Payee** at the address specified above. Any payments received hereunder shall be applied first to the payment of accrued and unpaid interest, and the balance to the principal amount hereof then outstanding.

**Maker** shall have the right to prepay this **Note**, in whole or in part, at any time, without notice, premium or penalty. Any prepayment of this **Note** shall be applied first to the payment of accrued

and unpaid interest, and the balance to the principal then outstanding.

Any one or more of the following shall constitute an **Event of Default** as the term is used herein:

(a) **Maker** fails to make any payment of principal or interest within five (5) days after the same is due and payable, provided there are not more than two (2) such late payments within any consecutive twelve (12) month period; and/or,

(b) **Maker** becomes bankrupt or insolvent or admits, in writing, the inability to pay debts as they mature, or makes an assignment for the benefit of creditors, or consents to the appointment of a Trustee or Receiver or takes any action to liquidate, dissolve or terminate its existence; and/or,

(c) A Trustee or Receiver is appointed for the **Maker** or for all or part of the **Maker**'s property, without its consent; and/or,

(d) All or substantially all of **Maker**'s assets are attached, seized or levied upon; and/or,

(e) Bankruptcy or Insolvency Proceedings, or any other Proceeding for relief in equity or under any Act(s) of Congress or any law(s) of any State of the United States or the United States of America are instituted against **Maker** or are consented to by **Maker**; and/or,

(f) **Maker** breaches any other provision of this **Note** or any other agreement(s) securing or guaranteeing this **Note**, or **Guarantors** breach any of the provisions of the **Guaranty**.

Without limiting any of the rights and remedies of the **Payee** set forth in this **Note**, upon an **Event of Default** the **Payee** may, at his option, without further notice or demand, (i) declare the outstanding principal balance and all accrued but unpaid interest under this **Note** at once due and payable, and (ii) pursue any and all other rights, remedies and recourse available to **Payee** hereunder or under applicable law.

The **Maker**, and all endorsers, **Guarantors** and other persons obligated hereon, hereby waive presentment, demand, protest, notice of demand, notice of protest, and notice of nonpayment. The **Maker** shall pay, promptly on demand of the **Payee**, all costs and expenses, including reasonable attorney's fees, incurred or paid by the **Payee** in connection with the enforcement of the **Payee**'s rights and remedies under this **Note**.

If any provision of this **Note** or the application therof to any party or circumstance is held invalid or unenforceable, the remainder of this **Note** and the application of such provision to other parties or circumstances will not be affected thereby and the provisions of this **Note** shall be severable in any such circumstance.

This **Note** is submitted by the **Maker** to the **Payee** at the City and State first set forth above and shall be deemed to have been made thereat. This **Note** shall be governed and controlled by the laws of the State of Florida as to interpretation, enforcement, validity, construction, effect, and in all other respects without reference to the principles of choice of law. **Maker** hereby irrevocable consents to the exclusive jurisdiction of any state or federal court in the county or judicial district

in the State of Florida.

No delay or omission by **Payee** to exercise his rights hereunder shall impair any right or power of Payee or shall be construed to be a waiver of any **Event of Default** hereunder or any acquiescence therein. No waiver of any **Event of Default** shall be construed, taken or held to be a waiver, acquiescence in or consent to any further or succeeding default of the same nature.

Maker shall furnish to **Payee** such other information with respect to **Maker** or **Guarantors** which may be requested from time to time by Payee, within a reasonable time after the applicable request.

**IN WITNESS WHEREOF**, **Maker** by its appropriate Managing Members thereunto duly authorized, has executed this **Promissory Note** as of the Date first above set forth.

**WITNESSES:**

Mary Jane Aumais
MARY JANE AUMAIS

ELLEN R.P. ADLER

**MAKER**
**Premium 72 International LLC**

**By**________________
**Arturo Nicolayevsky**, Managing Member

**By**________________
**Eduardo Perez Alduncin**, Managing Member

**GUARANTORS**

________________
**Arturo Nicolayevsky**

________________
**Eduardo Perez Alduncin**

Principal: $2,900,000.00
Interest Rate: 5.00%
Payment Interval: Quarterly
# of Payments: 12
Payment: $261,749.11

**Schedule of Payments**
Please allow for slight rounding differences.

| Pmt # | Payment | Principal | Interest | Balance |
|---|---|---|---|---|
| 1 | 261,749.11 | 225,499.11 | 36,250.00 | 2,674,500.89 |
| 2 | 261,749.11 | 228,317.85 | 33,431.26 | 2,446,183.04 |
| 3 | 261,749.11 | 231,171.82 | 30,577.29 | 2,215,011.22 |
| 4 | 261,749.11 | 234,061.47 | 27,687.64 | 1,980,949.75 |
| Year 1 | | 919,050.25 | 127,946.19 | |
| 5 | 261,749.11 | 236,987.24 | 24,761.87 | 1,743,962.51 |
| 6 | 261,749.11 | 239,949.58 | 21,799.53 | 1,504,012.93 |
| 7 | 261,749.11 | 242,948.95 | 18,800.16 | 1,261,063.98 |
| 8 | 261,749.11 | 245,985.81 | 15,763.30 | 1,015,078.17 |
| Year 2 | | 965,871.58 | 81,124.86 | |
| 9 | 261,749.11 | 249,060.63 | 12,688.48 | 766,017.54 |
| 10 | 261,749.11 | 252,173.89 | 9,575.22 | 513,843.65 |
| 11 | 261,749.11 | 255,326.06 | 6,423.05 | 258,517.59 |
| 12 | 261,749.06 | 258,517.59 | 3,231.47 | 0.00 |
| Year 3 | | 1,015,078.17 | 31,918.22 | |
| **Grand Total** | | **2,900,000.00** | **240,989.27** | |

Four year note. First year interest only of $145,000. Thereafter, 12 quarterly payments.

# Exhibit

# H



# R.M. Stark & Co., Inc.

FULL SERVICE INVESTMENT BROKERS
Member FINRA, SIPC, MSRB

June 28, 2021

Mr. Arturo Nicolayevsky
121 No. Post Oak Lane #705
Houston, TX 77024

**Transmitted Via email: arturo@premium72.com and U.S. First Class Mail, Postage Prepaid**

Re: **Notice of Intent to Contest Actionable Conduct**

Dear Arturo:

There will be neither further negotiations nor reconciliations with you. As previously stated, absent resolution of the matter hereinbelow set forth, and other separate matters of which you are aware and shall be discussed in further detail in a future writing[1], suit shall be initiated against you to recover all equitable and monetary damages due Gary and others who have been caused to suffer as a result of your misconduct; additionally, as and when necessary, all appropriate governmental authorities[2] shall be requested to further investigate your apparent, blatant wrongdoing.

It is evident that prior to close of escrow, which occurred on or about September 22, 2020 (the time you, and/or entities under your direction and/or control, became majority shareholders of RMST Holding Company, Inc.), and continuing thereafter, you[3] and other persons with whom you were and are associated, engaged in a pattern of concealment, deception, and reckless disregard for the best interests of RMST Holding Company, Inc. ("RMST Holding"), R.M. Stark & Co., Inc. ("R.M. Stark"), its employees, independent contractors, and customers. This misconduct, in flagrant disregard of the law, was deliberate and premeditated. Be assured, we are far beyond entertaining any of your protestations that documents executed by you to fraudulently and illegally obtain loans to which you were not entitled were the result of "mistake," "confusion," or "poor eyesight."

In view of the matter's severity, the following issues are to be immediately addressed and the situation rectified:

---

[1] To wit: approximately $35,000.00 due me that you wrongfully withheld at the second closing; and, your complete and utter breach of the Supplemental Purchase Agreement allowing us to accelerate and demand payment of the Promissory Note.

[2] Depending upon the evidence uncovered, these authorities may include, by way of example and not limitation, the Small Business Administration ("SBA"), the Federal Trade Commission ("FTC"), the Internal Revenue Service/Department of the Treasury ("IRS"), the Federal Bureau of Investigation ("FBI"), the United States Postal Service ("USPS"), Financial Industry Regulatory Authority ("FINRA"), the Securities and Exchange Commission ("SEC"), and all relevant states' Attorneys General and Law Enforcement Officials

[3] Unless the context requires or demonstrates otherwise, "***You***" shall include entities under your direction and/or control and/or other individuals that facilitated the actionable conduct described herein.

**Fraudulent Payment Protection Program Applications and Wrongful Receipt of Loan Funds; Concomitant Identity Theft; Conversion; Interference With Prospective Economic Advantage; and, Breach of Contract**

***Relevant History***:

In or about late 2019, negotiations commenced with respect to the purchase by OPC Advisors, LLC ("OPC") of one hundred percent (100%) of the issued and outstanding shares of RMST Holding. As you recall, there were two (2) closing dates to effect the entire transaction and transfer. Initially, OPC was to receive twenty four percent (24%) of the issued and outstanding shares of RMST Holding. The balance of the shares was not to be transferred unless and until FINRA approved the CMA; as contemplated by the parties, in the event approval was not forthcoming, the shares would be transferred back to RMST Holding, the deal would be null and void, and all parties would revert back to *status quo ante*. However, FINRA, ultimately, did approve the CMA on or about September 22, 2020.

On or about January 2, 2020, you and Gary executed the "GARY L. STARK, et al. to OPC ADVISORS, LLC STOCK PURCHASE AGREEMENT" ("the Stock Purchase Agreement"); on that date, the forty eight (48) shares of RMST Holding stock were transferred to OPC. Again, absent FINRA's approval of the CMA, it was contemplated that "any further duties and responsibilities under [the Stock Purchase] Agreement shall cease." You would cause the stock certificate to be returned to RMST Holding and Gary would cause the purchase price to be returned to you.

Consequently, from the time OPC received twenty four percent (24%) of the stock, contingent upon subsequent FINRA approval, and continuing thereafter at all times prior to September 22, 2020, you were, "potentially," a minority shareholder in RMST Holding. You were not members of the Board of Directors, you were not officers, you were not employees. Having occupied no such capacity in any manner, shape, or form, neither you, Eduardo, nor any entity under your management and/or control, had any legal or other right, or authority, to take any action whatsoever in the decision-making, operation, management, or anything else having anything to do with the business of RMST Holding and/or R.M. Stark.

During the time you and Eduardo (managing members of OPC), and Gary Stark (the majority shareholder of RMST Holding) were negotiating the sale of 100% of the stock of RMST Holding to OPC, you, your attorney, and Byline Bank (the lender loaning the SBA funds to you for the purchase of the stock) were provided with copies of all documents reflecting R.M. Stark's prior years' payroll and tax records as part of your "due diligence" into the value of the corporation. At the commencement of negotiations, on or about October 8, 2019, a Letter Of Intent ("LOI") was executed by and Gary. The LOI specifically states that the LOI "is confidential to the Parties and their representatives.

***Fraudulent PPP Application and Receipt of Funds***

Notwithstanding any of the foregoing facts, circumstances, contingencies, and/or contractual obligations, in or after January 2, 2020 – but well before September 22, 2020, you prepared and submitted applications for the loans offered by the Payroll Protection Program ("PPP") to governmental entities and lending institutions on behalf of OPC, Premium 72, and RMST Holding – all utilizing and reflecting R.M. Stark's payroll and tax documentation and information for prior years.

At no time, whatsoever, did you seek permission from Gary, President and Chief Executive Officer of RMST Holding and R.M. Stark, and the majority shareholder of RMST Holding, to file the PPP application, any other loan application, or any other document of any kind or nature, by or on behalf of RMST Holding or R.M. Stark; at no time, whatsoever, did you seek permission from Gary, President and Chief Executive Officer of RMST Holding and R.M. Stark, and the majority shareholder of RMST Holding, to file the PPP applications, any other loan applications, or any other documents of any kind or nature, by or on behalf of RMST Holding, R.M. Stark, OPC, or Premium 72, utilizing R.M. Stark's payroll and tax information, or any other information provided to you, in confidence, during the Stock Transfer Agreement negotiations.

Moreover, at no time whatsoever, did you ever disclose this fraudulent, deceptive, duplicitous, and illegal conduct to Gary, President and Chief Executive Officer of RMST Holding and R.M. Stark, and the majority shareholder of RMST Holding. In fact, in order to ensure that neither RMST Holding, R.M. Stark, nor Gary would learn of the PPP loan applications, you, essentially a stranger, neither an officer, director, employee nor affiliate – a mere minority shareholder and passive investor - utilized your home address (121 No. Post Oak Lane #705, Houston, TX 77024) as RMST Holding's corporate address.

We must also surmise that you did not disclose this malfeasance to Byline Bank, Chase Bank, or any other lending institution to whom you did or may have submitted PPP loan applications. You have stated that you were assisted by individuals at both Byline Bank and Chase Bank in the preparation of the PPP loan applications. Further investigation and discovery will disclose if they did, in fact, assist you and whether they were complicit in enabling you to perpetrate this fraud.

***Written Notice Your Malfeasance***

In or about April 2020, Ellen Adler prepared and submitted a PPP loan application to Bank of America on behalf of RMST Holding/R.M. Stark utilizing the R.M. Stark 2019 payroll and tax documents. We were thereafter advised that the application had been received and we would be receiving further instructions. We heard nothing; attempts to communicate with Bank of America were futile.

Oddly, on or about June 25, 2020, R.M. Stark was advised by Bank of America that "Your duplicate loan application for the Paycheck Protection Program with the Small Business Administration is being closed for you." [Emphasis in original.] On or about June 26, 2020, R.M. Stark receive further notification from Bank of America that "Your Paycheck Protection Program loan application has been declined by the Small business Administration (SBA). . ." "The SBA has responded and notified us that your loan application was declined for the following reason: each applicant is permitted to have only one Payroll Protection Program loan with the SBA. The SBA records reflect that the applicant already has a Paycheck Protection Program loan."

Attempts to gather additional information about the foregoing communications from Bank of America and through the SBA proved fruitless. Apparently, the lenders were inundated with requests for information and it was impossible to even speak with someone. Eventually, we did not pursue the matter further and went about our business of managing the day-to-day operations of the firm.

NOW WE KNOW WHY OUR LOAN APPLICATION WAS DECLINED.

A few days ago, on or about June 15, 2021, only by casually googling "OPC" and "Premium 72," did we discover the proceeds from the PPP loan for which RMST Holding/R.M. Stark had applied, approximately one hundred ninety five thousand nine hundred seventy dollars ($195,970.00) had been stolen by you. The information discovered on-line also revealed the OPC and Premium 72 had utilized R.M. Stark's identical payroll figures and documents to procure additional loans in similar amounts from Byline Bank and Chase.[4] All loan proceeds related to these PPP loan applications were transmitted to you at your home address (121 No. Post Oak Lane #705, Houston, TX 77024), in April and June of 2020.

Clearly, you never had any intention of disclosing your wrongdoing. You certainly never mentioned your receipt of the PPP loan funds – funds which never belonged to you and to which you were never entitled. In fact, funds which belonged to RMST Holding/R.M. Stark while Gary was the majority shareholder/owner. Funds you never even attempted to deposit with either corporation at any time. Furthermore, it is abundantly clear that you did NOT utilize these loan funds for the purpose for which they were intended – payroll!

Again, we do not want to hear any excuses. Your preparation and submission of the PPP loan applications utilizing R.M. Stark's payroll and tax documentation was deliberate, fraudulent, and illegal. Your preparation and submission of the PPP loan application in the name of RMST

---

[4] It is our understanding that neither OPC nor Premium 72 had employees or a payroll during 2019 (other than what you and Eduardo may have paid yourselves).

Holding was also deliberate, fraudulent, and illegal.[5] Furthermore, it constitutes "identity theft" for which we shall, if necessary, incorporate as a separate cause of action in our civil complaint.

Had there been any knowledge of the conduct in which you and your cohorts had engaged, not only would Gary never had allowed you to purchase RMST Holding/R.M. Stark, but FINRA would have never approved the CMA. Unfortunately, you have created a situation where we cannot go back in time and undo all the wrong that has been done.

***Demand For Restitution and Damages***

You must recognize that, by law, we cannot fail to disclose to all relevant institutions and appropriate authorities your submission of the fraudulent PPP loan applications and receipt of the PPP loan proceeds. The purpose of informing you of our position is not to gain any undue compensation or exact revenge. It is to afford you the opportunity to make restitution and do what is right in order to mitigate the damages caused by you.[6]

As part of the rectification/restitution process, there are a series of steps that must be taken. Unless otherwise stated, the documents and information demanded hereinbelow stem from January 1, 2019 to the present:

***You*** are to immediately disclose and produce documentation reflecting all PPP (and other, if any) loan applications filed, regardless of the entity named in the application(s);

***You*** are to immediately disclose and produce documentation reflecting any and all funds or other assets received by ***You*** as a result of any of the aforesaid loan application(s), including complete financial records showing both the receipt and distribution of the funds/assets received;

***You*** are to immediately disclose and produce documentation reflecting all bank, brokerage, or other accounts opened by ***You***, regardless of the name(s) under which the account(s) were opened;

***You*** shall agree to and cooperate with having the financials of RMST Holding recalculated as of the date of the second closing, September 22, 2020, in order to adjust the capital withdrawal by Gary, if and as necessary;

---

[5] See the FTC site for basis of this allegation. "Identity theft" can engender both criminal penalties and civil damages.

[6] A portion of these damages necessarily include not only the time and monies expended in dealing with the Net Capital deficiency you caused the firm to suffer, but also the diminishment in the firm's value and reputation. Had the PPP monies been in RM Stark's bank account – where it belonged – there would probably not have been Net Capital issue(s). Of course, in all likelihood, there would have been no Net Capital issue to begin with because you would not have been permitted to purchase the RMST Holding stock in the first place.

Upon restitution of the PPP loan funds to R.M. Stark, ***You*** are to immediately cooperate with having the financials of RMST Holding and R.M. Stark restated for the period beginning April 2020 through the present for FINRA filing;

Upon restitution of the PPP loan funds to R.M. Stark, ***You*** are to immediately cooperate with having the RMST Holding 2020 tax returns reviewed, amended and refiled, providing its shareholder(s) with revised 1099s, if and as necessary;

***You*** shall agree to and cooperate with the retention of outside counsel to oversee the foregoing, in the event outside counsel becomes necessary; and,

***You*** shall bear all of the costs of above.

Again, we wish to impress upon you that the foregoing is not negotiable. You have already admitted to filing multiple PPP loan applications in the name of various corporations, as well as procuring PPP funds in response to more than one of these applications – including RMST Holding/R.M. Stark.

Your answer is expected as soon as possible advising us when we may expect your compliance with this demand. In the event we do not receive a favorable response by Monday, July 5, 2021, legal action shall be initiated against ***You*** without further notice.

Very truly yours,

Gary L. Stark
Individually and on behalf of RMST Holding Company, Inc. and R.M. Stark & Co., Inc.

Ellen R.P. Adler
Individually and on behalf of RMST Holding Company, Inc. and R.M. Stark & Co., Inc.

cc: Mr. Eduardo Perez (eduardo@premium72.com)
Mr. James Trotter (James.Trotter@finra.org)
Ms. Stacey Stark, President/CEO R.M. Stark & Co., Inc.
Byline Bank/Legal Counsel, PPP Division
Chase Bank/Legal Counsel, PPP Division
SBA
FTC

# Exhibit

# I



## Agreement for the Purchase and Sale of Future Receipts

**Contract ID:** 467

**Seller's Legal Name:** "OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." and the entities listed in "Exhibit A" D/B/A: PREMIUM 72 CAPITOL

**Form of Business Entity**: [ ] Corporation; [x] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other:

**Street Address**: 730 S FEDERAL HWY, City: LAKE WORTH, State: FL; Zip: 33460

**Mailing Address**: 121 N POST OAK LN APT 705, City: HOUSTON, State: TX; Zip: 77024

**Primary Contact Name**: ARTURO NICOLAYEVSKY Title: PRINCIPAL

**Time in Business**: **Federal Tax ID Number**: 13.3485532

**Purchase Price**: $200,000 **Purchased Amount**: $274,000 **Average Monthly Sales**: $ 150,000

**Specified Percentage**: 24

**Initial Weekly Amount:** $ 8,562.50 (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

Effective, November 2, 2020 Seller, identified above, hereby sells, assigns and transfers to AMZ GROUP, LLC located at 1430 Broadway, Suite 402, New York, New York 10018, ("Buyer"), without recourse, the Purchased Amount by delivering the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts"). "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements and outstanding receivables, on or about the eighteenth day of each month, reconcile the Merchant's bank account by either crediting or debiting the difference from or back to the Merchant's bank account so that the amount debited per month equals the Specified Percentage. Specified Percentage and Daily Amount shall remain unchanged unless such statements and receivables are provided. Notwithstanding anything to the contrary of this Agreement, upon the occurrence of a default as defined by this Agreement, the Specified Percentage shall equal 100%.

The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the business bank account designated in the Authorization Agreement for Automated Clearing House Transactions signed on the date of this Agreement and as it may be amended or replaced from time to time (the "Account") and the ability to withdraw the Initial Daily Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

The Personal Guaranty of Performance by Guarantor(s) is attached hereto as Exhibit "A".

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

Seller: "OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC."

Agreed to by: Arturo Nicolayevsky (Signature), its Member (Title)

**Agreement of Each Owner:** Each Owner signing below agrees to the terms of the Credit Report Authorization

below. Name: ARTURO NICOLAYEVSKY

Signature: Arturo Nicolayevsky

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the Account and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

   In the event that Seller changes or permits changes to the Account or the ACH authorization approved by the Buyer or adds an additional bank account, Buyer shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify the new or additional bank of this Agreement and to direct such new or additional bank to remit to the Buyer all or any portion of the amounts received by such bank. Seller hereby grants to Buyer an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints the Buyer or any of the representatives of Buyer as Seller's attorney in fact, to take any and all action necessary to direct such new or additional bank to remit to Buyer amounts received by such bank.

2. **Seller May Request Changes to the Daily Amount (IMPORTANT PROTECTION FOR SELLER):** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. Upon reasonable verification of such information, Buyer shall adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default.** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement,

Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

6. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

7. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

8. **Right to Cancel:** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within 5 days after Buyer has delivered the Purchase Price. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and returning the Purchase Price to Buyer. For the Seller's right to cancel to be effective, Buyer must receive both the notice and the Purchase Price within 7 days after the Buyer has delivered the Purchase Price. Buyer shall retain the Origination Fee, but Seller shall not be responsible for any other costs if this Agreement is cancelled pursuant to this Section.

9. **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

13.1. **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

13.2. **Stacking Prohibited**. Seller shall not enter into any merchant cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

13.3. **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4. **Governmental Approvals**. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5. **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6. **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.

13.7. **No Pending or Contemplated Bankruptcy**. As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.8. **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.9. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.10. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's future receipts.

13.11. **No Diversion of Receipts.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.

13.12. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

**14. Rights of Buyer:**

14.1. **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Seller to Buyer pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Buyer may notify account debtors, or other persons obligated on the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

14.2. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.3. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.4. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

14.5. **ACH Authorization**. Seller represents and warrants that (i) the Account is Seller's bank account; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Account; (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH transaction is rejected by Seller's financial institution for any reason other than a stop payment order placed by Seller with its financial institution, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH transaction that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any payment or credit, Seller authorizes Buyer to initiate ACH entries to or from the Account to correct the error. Seller acknowledges that the origination of ACH entries to and from the Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to

the terms of this Authorization. Seller requests the financial institution that holds the Account to honor all ACH entries initiated in accordance with this Authorization. Seller authorizes Buyer to initiate an ACH to Buyer or any affiliated entity as authorized by the ACH agreement Seller authorizes Buyer or any entities listed on the ACH authorization form accompanying this Agreement to initiate ACH transactions pursuant to this Agreement. If an ACH is rejected due to a default, Seller authorizes Buyer to submit an ACH transaction for an amount up to the outstanding balance plus applicable default fees and costs.

**15. Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer, or (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are four or more ACH transactions attempted by Buyer are rejected by Seller's bank.

**16. Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

16.2. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

16.3. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.4. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

16.5. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

16.6. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

16.7. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**17. Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

**18. Assignment**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller. This Agreement is owned and serviced by AMZ Group, LLC. For the avoidance of doubt, AMZ Group, LLC shall be entitled collect all payments related to this Agreement and enforce the terms as plaintiff in a court of competent jurisdiction.

**19. Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

Zoho Sign Document ID: ZDTMLZPT-TLKOEIVKKIDP67S_7GJKFUP93AYUQR3-3O

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other

Page 7 of 13

communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**20. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of [New York], without regards to any applicable principals of conflicts of law. Seller understands and agrees that (i) Buyer is located in [New York], (ii) Buyer makes all decisions from Buyer's office in [New York], (iii) the Agreement is made in [New York] Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in [New York], (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

**21. Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**22. Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**23. Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**24. Facsimile Acceptance**. Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

**25. Confidentiality**: The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

**26. Monitoring, Recording, and Solicitations.**

26.1. **Authorization to Contact Seller by Phone.** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

26.2. **Authorization to Contact Seller by Other Means.** Seller also agrees that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

**27. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

28. <u>CLASS ACTION WAIVER</u>. **BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

## Appendix A – List of Fees and Charges

The Agreement provides that Seller shall be liable for the following amounts, in addition to the Purchased Amount of Future Receipts:

1. **Origination Fee as set forth on page one.**
2. **All costs Buyer incurs because Seller fails to notify Buyer in a timely manner that the Daily Amount is not available in the Account.**
3. **All costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.**
4. **All costs of collections, including attorney fees and all costs related to the enforcement of any other remedies available to Buyer if the Seller defaults.**

# Exhibit A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of NOVEMBER 02 ___ 2020 "OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." (the "Guarantor"), for the benefit of AMZ Group LLC, ("Buyer").

Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

**RECITALS**

**A.** Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Purchase Agreement"), dated of even date herewith, between Buyer and "OPC ADVISORS, LLC" , "R M STARK & CO INC" "RMST HOLDING COMPANY, INC." ("Seller"), Buyer has purchased Future Receipts of Seller.

**B.** Buyer is not willing to enter into the Purchase Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

**C.** Guarantor will directly benefit from Buyer and Seller entering into the Purchase Agreement.

**AGREEMENT**

As an inducement to Buyer to purchase the Future Receipts identified in the Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

**2. Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Purchase Agreement.

**3. Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Purchase Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Purchase Agreement or otherwise modify, amend or change the terms of the Purchase Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor. Guarantor expressly consents to conduct business by electronic means.

**4. Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Purchase Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain either performance or payment for such default from Seller or any other guarantor.

**5. Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and

that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.

**6. 20. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of [New York], without regards to any applicable principals of conflicts of law. Seller understands and agrees that (i) Buyer is located in [New York], (ii) Buyer makes all decisions from Buyer's office in [New York], (iii) the Agreement is made in [New York] Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in [New York], (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any otherforum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

**7. <u>JURY WAIVER</u>: THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**8. <u>CLASS ACTION WAIVER</u>: BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:**

**(I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**10. Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**11. Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.

**12. Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**For Individual Guarantors -**
**Guarantor:** ARTURO NICOLAYEVSKY **(Print Name)**
**Signature:** Arturo Nicolayevsky
**Guarantor's SSN:** 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

**For Individual Guarantors -**
**Guarantor:**________________ **(Print Name)**
**Signature:**________________
**Guarantor's SSN:** ________________

**For Corporate Guarantors (or other entities)**
**Guarantor:** ARTURO NICOLAYEVSKY
**Guarantor's EIN:** 13.3485532
**By:** Arturo Nicolayevsky
**Print Name of Signer:**
**Its:** Arturo Nicolayevsky **(Official Position)**

**For Corporate Guarantors (or other entities)**
**Guarantor:**________________
**Guarantor's EIN:**________________
**By:**________________
**Print Name of Signer:**
**Its:**________________ **(Official Position)**

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

"OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." ]("Seller") hereby authorizes Purchaser ("Purchaser") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Purchaser from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Purchaser, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Purchaser to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Purchaser from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Purchaser to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement for the Purchase and Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Purchaser to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Purchaser a limited Power of Attorney to take action in Seller's name to facilitate this authorization.

Transfer Funds To/From:

Name of Bank: JP MORGAN CHASE

ABA Transit/Routing #: 111000614

Checking Account #: 131385186

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

Seller Information:

Seller's Name: OPC ADVISORS, LLC

Signature of Authorized Representative: Arturo Nicolayevsky

Print Name: ARTURO NICOLAYEVSKY

Title: PRINCIPAL

Seller's Tax ID: 13.3485532

Date: Nov 06 2020

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

"OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." ](“Seller”) hereby authorizes Purchaser (“Purchaser”) to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Purchaser from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the “Agreement”) entered into between Seller and Purchaser, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Purchaser to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Purchaser from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Purchaser to contact Seller’s financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement for the Purchase and Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Purchaser to contact Seller’s financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller’s financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Purchaser a limited Power of Attorney to take action in Seller’s name to facilitate this authorization.

Transfer Funds To/From:

Name of Bank: BANK OF AMERICA

ABA Transit/Routing #: 063100277

Checking Account #: 003603202538

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

Seller Information:

Seller’s Name: R.M. STARK & CO. INC

Signature of Authorized Representative: Arturo Nicolayevsky

Print Name: ARTURO NICOLAYEVSKY

Title: PRINCIPAL

Seller’s Tax ID: 13.3485532

Date: Nov 06 2020

1. This Agreement is owned and serviced by AMZ Group, LLC. For the avoidance of doubt, AMZ Group, LLC shall be entitled collect all payments related to this Agreement and enforce the terms as plaintiff in a court of competent jurisdiction.

2. **Origination Fee** - Covers the costs of customer acquisition, underwriting, and related expenses:

   a. 5% of the Purchase Price, withheld from the Purchase Price at time of funding.

3. **ACH Program Fee** – Covers the cost of account maintenance as it pertains to our software, ACH processing, and the banks which handle the recurring payments, withheld from the Purchase Price at the time of funding:

| | |
|---|---|
| a. Amount funded up to $6,000.00 | $150.00 |
| b. Amount funded up to $10,000.00 | $250.00 |
| c. Amount funded up to $50,000.00 | $495.00 |
| d. Amount funded up to $100,000.00 | $795.00 |
| e. Amount funded up to $150,000.00 | $1,195.00 |
| f. Amount funded up to $200,000.00 | $1,495.00 |
| g. Any funded amount more than $200,000.00 | $1,795.00 |

4. **NSF Fee: $50.00 each-Fee** incurred or each retuned payment, default declared after our (4) "Non-Sufficient Funds" retuned transactions without having a make-up payment arranged.

5. **Bank Change Fee: $75.00**—Covers the process of updating account information to debit payments from a different business bank account.

6. **Blocked Account Fee: $2,500.00**—Fee incurred when merchant directs their bank to stop our ACH debit or if he ACH debit returns as unauthorized by the Merchant, which places the Merchant in default per our agreement.

7. **Default Fee: The greater of: 33% of outstanding balance at time of default or $5,000.00**—Fee incurred when account in placed into default status by having too many NSF transactions (our [2] or more as described above), by having a "Blocked Account" (see "Blocked Account Fee" above), by having a "Closed" or "Frozen" account ACH return code, or by changing bank account without supplying new account information first to continue paying outstanding balance. Merchant may be placed into "Default" status by any definition of the term as it is defined within the Merchant Agreement.

8. **UCC Filing Fee:** $200.00-Covers he cost of filing a UCC-1 Lien with the respective Secretary of State trough a third-party provider and covers the cost of the UCC-3 Lien Termination filing.

9. **Electronic Transfer Fee: $35.00** - Covers the cost of sending funds via electronic transfer, withheld rom he Purchase Price at the time of funding.

**For the Merchant #1**

Name _ARTURO NICOLAYEVSKY ___________

X Arturo Nicolayevsky ______________________

**Owner / Guarantor #1**

Name _ARTURO NICOLAYEVSKY ___________

X Arturo Nicolayevsky ______________________

CUSTOMER AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS ©
**[ACH CREDITS & DEBITS]**

COMPANY NAME AMZ GROUP LLC

COMPANY ID NUMBER 467

I (we) hereby authorize the Company named above (the "COMPANY"), to initiate debit and credit entries to my (our) [ ] Checking [ ] Savings account (select one) indicated below and the depository named below, hereinafter "DEPOSITORY", to debit or credit the same to such account. I further authorize the Company to debit said account up to the amount of the outstanding balance plus fees and costs or for such amount allowed by law in the event a debit entry is rejected by the Depository.

DEPOSITORY NAME OPC ADVISORS, LLC

ROUTING/ABA NO 111000614 ACCOUNT NO. 131385186

**Please Check Those That Apply:** **This is a Bank Account of a Natural Person**
**___This Account is Used for Commercial/Business Transactions**

This authority is to remain in full force and effect until COMPANY has received written notification of its termination in such time, but no less than 3 business days before any payments are due to be made, and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

CLIENT NAME (Business or Personal as Appropriate) OPC ADVISORS, LLC

DATE Nov 06 2020 SIGNATURE(S) Arturo Nicolayevsky

PRINT NAME(S) ARTURO NICOLAYEVSKY

PHONE # ______

**A COPY OF THIS AGREEMENT MUST BE GIVEN TO THE CUSTOMER(S) WHO SIGNED**

**NOTE: ALL WRITTEN DEBIT AND CREDIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.**

CUSTOMER AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS ©
**[ACH CREDITS & DEBITS]**

COMPANY NAME AMZ GROUP LLC

COMPANY ID NUMBER 467

I (we) hereby authorize the Company named above (the "COMPANY"), to initiate debit and credit entries to my (our) [ ] Checking [ ] Savings account (select one) indicated below and the depository named below, hereinafter "DEPOSITORY", to debit or credit the same to such account. I further authorize the Company to debit said account up to the amount of the outstanding balance plus fees and costs or for such amount allowed by law in the event a debit entry is rejected by the Depository.

DEPOSITORY NAME R.M. STARK & CO. INC

ROUTING/ABA NO 063100277 ACCOUNT NO. 003603202538

**Please Check Those That Apply: This is a Bank Account of a Natural Person**
**___This Account is Used for Commercial/Business Transactions**

This authority is to remain in full force and effect until COMPANY has received written notification of its termination in such time, but no less than 3 business days before any payments are due to be made, and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

CLIENT NAME (Business or Personal as Appropriate) R.M. STARK & CO. INC

DATE Nov 06 2020 SIGNATURE(S) Arturo Nicolayevsky

PRINT NAME(S) ARTURO NICOLAYEVSKY

PHONE # ______

**A COPY OF THIS AGREEMENT MUST BE GIVEN TO THE CUSTOMER(S) WHO SIGNED**

**NOTE: ALL WRITTEN DEBIT AND CREDIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.**

Zoho Sign Document ID: ZDTMLZPT-TLKOEIVKKIDP67S_7GJKFUP93AYUQR3-3O

# ADDENDUM TO CONTRACT

## WAIVER OF PERSONAL SERVICE

This Addendum ("Addendum") is to be made a part of the purchase and sale of future receivables agreement (the "Contract") between AMZ Group LLC ("Purchaser") and "OPC ADVISORS, LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." "Merchant") and ARTURO NICOLAYEVSKY ("Guarantor") (collectively the "Parties") dated NOVEMBER 2, 2020 .

1. Merchant hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Merchant understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Merchant further agrees to waive any objection to the absence of formal service of process.

2. Guarantor hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Guarantor understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Guarantor further agrees to waive any objection to the absence of formal service of process.

3. MERCHANT HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT arturo@premiun72.com OR BY UNITED STATES POSTAL SERVICE AT OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

4. GUARANTOR HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT OR BY UNITED STATES POSTAL SERVICE AT arturo@premiun72.com OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

5. Merchant or Guarantor shall notify Purchaser of any changes to its physical address or email address for service. Unless Purchaser is notified of a change in address, all addresses shall be presumed to be accurate.

6. This Addendum shall supersede any notice requirements in the Contract with respect to service of process.

For the Merchant Name: ARTURO NICOLAYEVSKY, PRINCIPAL

X Arturo Nicolayevsky

Guarantor Name: ARTURO NICOLAYEVSKY, PRINCIPAL

X Arturo Nicolayevsky

Zoho Sign Document ID: ZDTMLZPT-TLKOEIVKKIDP67S_7GJKFUP93AYUQR3-3O

Powered by AMZ Group LLC

Exhibit A to contract #467

November 2, 2020

OPC, LLC
PREMIUM 72 PRIVATE EQUITY, LLC
PREMIUM 42, L.P.
PREMIUM 72 GLOBAL, LLC
ANEP INVESTMENTS, LLC PREMIUM
72 LP
PREMIUM 72 HOLDINGS, LLC
PREMIUM 72 ENERGY TRADERS LLC
AYNBET INVESTMENTS, LLC

**ARTURO NICOLAYEVSKY, PRESIDENT**

X Arturo Nicolayevsky ____________________________

Zoho Sign Document ID: ZDTMLZPT-TLKOEIVKKIDP67S_7GJKFUP93AYUQR3-3O

Powered by AMZ Group LLC

# Prepay Addendum #467

November 2, 2020

**This Pre-Payment Addendum between AMZ Group, LLC & OPC Advisors, LLC is applicable to contract number 467 dated November 2, 2020.**

**Merchant acknowledges Merchant agreement for the purchase and sale of future receivables as a whole, inclusive of this addendum.**

**AMZ Group, LLC reserves the right in its sole discretion, to terminate all discount tiers if a merchant default occurs based on the entire merchant agreement for the purchase of future receivables. This addendum does not supersede or modify any terms or conditions as per signed merchant agreement for the purchase of future receivables.**

**AMZ Group, LLC early payoff discount tier:**

**Option #1**
**If the advance is paid off within the first 30 calendar days from the date of funding, the factor reduction will be 1.25 on the total purchase amount.**

**Option #2**
**If the advance is paid off within the first 60 calendar days from the date of funding, the factor reduction will be 1.30 on the total purchase amount.**

**There will be no discount thereafter.**

**ARTURO NICOLAYEVSKY**

**x** Arturo Nicolayevsky ______________________________

# Exhibit

# J

## Agreement for the Purchase and Sale of Future Receipts

**Contract ID:** 489

**Seller's Legal Name:** "PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC" and the entities listed in "Exhibit A" D/B/A: PREMIUM 72 CAPITOL

**Form of Business Entity**: [ ] Corporation; [x} Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other:

**Street Address**: 730 S FEDERAL HWY, City: LAKE WORTH, State: FL; Zip: 33460

**Mailing Address**: 121 N POST OAK LN APT 705, City: HOUSTON, State: TX; Zip: 77024

**Primary Contact Name**: ARTURO NICOLAYEVSKY Title: PRINCIPAL

**Time in Business**: **Federal Tax ID Number**: 13.3485532

**Purchase Price**: $160,000 **Purchased Amount**: $206,400 **Average Monthly Sales**: $ 150,000

**Specified Percentage**: 24

**Initial Weekly Amount:** $ 12,900 (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

Effective, December 3, 2020 Seller, identified above, hereby sells, assigns and transfers to AMZ GROUP, LLC located at 1430 Broadway, Suite 402, New York, New York 10018, ("Buyer"), without recourse, the Purchased Amount by delivering the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts"). "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements and outstanding receivables, on or about the eighteenth day of each month, reconcile the Merchant's bank account by either crediting or debiting the difference from or back to the Merchant's bank account so that the amount debited per month equals the Specified Percentage. Specified Percentage and Daily Amount shall remain unchanged unless such statements and receivables are provided. Notwithstanding anything to the contrary of this Agreement, upon the occurrence of a default as defined by this Agreement, the Specified Percentage shall equal 100%.

The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the business bank account designated in the Authorization Agreement for Automated Clearing House Transactions signed on the date of this Agreement and as it may be amended or replaced from time to time (the "Account") and the ability to withdraw the Initial Daily Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

The Personal Guaranty of Performance by Guarantor(s) is attached hereto as Exhibit "A".

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

Seller: "PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC."

Agreed to by: Arturo Nicolayevsky (Signature), its Managing Director (Title)

**Agreement of Each Owner:** Each Owner signing below agrees to the terms of the Credit Report Authorization

below. Name: ARTURO NICOLAYEVSKY

Signature: Arturo Nicolayevsky

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the Account and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

   In the event that Seller changes or permits changes to the Account or the ACH authorization approved by the Buyer or adds an additional bank account, Buyer shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify the new or additional bank of this Agreement and to direct such new or additional bank to remit to the Buyer all or any portion of the amounts received by such bank. Seller hereby grants to Buyer an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints the Buyer or any of the representatives of Buyer as Seller's attorney in fact, to take any and all action necessary to direct such new or additional bank to remit to Buyer amounts received by such bank.

2. **Seller May Request Changes to the Daily Amount (IMPORTANT PROTECTION FOR SELLER):** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. Upon reasonable verification of such information, Buyer shall adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default.** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement,

Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

6. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

7. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

8. **Right to Cancel:** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within 5 days after Buyer has delivered the Purchase Price. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and returning the Purchase Price to Buyer. For the Seller's right to cancel to be effective, Buyer must receive both the notice and the Purchase Price within 7 days after the Buyer has delivered the Purchase Price. Buyer shall retain the Origination Fee, but Seller shall not be responsible for any other costs if this Agreement is cancelled pursuant to this Section.

9. **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

13.1. **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

13.2. **Stacking Prohibited**. Seller shall not enter into any merchant cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

13.3. **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4. **Governmental Approvals**. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5. **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6. **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.

13.7. **No Pending or Contemplated Bankruptcy**. As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.8. **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.9. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.10. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's future receipts.

13.11. **No Diversion of Receipts.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.

13.12. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

**14. Rights of Buyer:**

14.1. **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Seller to Buyer pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Buyer may notify account debtors, or other persons obligated on the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

14.2. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.3. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.4. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

14.5. **ACH Authorization**. Seller represents and warrants that (i) the Account is Seller's bank account; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Account; (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH transaction is rejected by Seller's financial institution for any reason other than a stop payment order placed by Seller with its financial institution, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH transaction that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any payment or credit, Seller authorizes Buyer to initiate ACH entries to or from the Account to correct the error. Seller acknowledges that the origination of ACH entries to and from the Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to

the terms of this Authorization. Seller requests the financial institution that holds the Account to honor all ACH entries initiated in accordance with this Authorization. Seller authorizes Buyer to initiate an ACH to Buyer or any affiliated entity as authorized by the ACH agreement Seller authorizes Buyer or any entities listed on the ACH authorization form accompanying this Agreement to initiate ACH transactions pursuant to this Agreement. If an ACH is rejected due to a default, Seller authorizes Buyer to submit an ACH transaction for an amount up to the outstanding balance plus applicable default fees and costs.

**15. Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer, or (f) Seller fails to provide timely notice to Buyer such that in any given calendar month there are four or more ACH transactions attempted by Buyer are rejected by Seller's bank.

**16. Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1. The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

16.2. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

16.3. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.4. This Agreement shall be deemed Seller's Assignment of Seller's Lease of Seller's business premises to Buyer. Upon an Event of Default, Buyer may exercise its rights under this Assignment of Lease without prior notice to Seller.

16.5. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.

16.6. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

16.7. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**17. Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

**18. Assignment**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller. This Agreement is owned and serviced by AMZ Group, LLC. For the avoidance of doubt, AMZ Group, LLC shall be entitled collect all payments related to this Agreement and enforce the terms as plaintiff in a court of competent jurisdiction.

**19. Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC
Case 9:21-cv-81995-AMC Document 234-1 Entered on FLSD Docket 05/15/2023 Page 166 of
222

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other

Page **7** of **13**

communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**20. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of [New York], without regards to any applicable principals of conflicts of law. Seller understands and agrees that (i) Buyer is located in [New York], (ii) Buyer makes all decisions from Buyer's office in [New York], (iii) the Agreement is made in [New York] Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in [New York], (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

**21. Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**22. Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**23. Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**24. Facsimile Acceptance**. Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

**25. Confidentiality**: The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

**26. Monitoring, Recording, and Solicitations.**

26.1. **Authorization to Contact Seller by Phone.** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

26.2. **Authorization to Contact Seller by Other Means.** Seller also agrees that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

**27. <u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**28. CLASS ACTION WAIVER. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

## Appendix A – List of Fees and Charges

The Agreement provides that Seller shall be liable for the following amounts, in addition to the Purchased Amount of Future Receipts:

1. **Origination Fee as set forth on page one.**
2. **All costs Buyer incurs because Seller fails to notify Buyer in a timely manner that the Daily Amount is not available in the Account.**
3. **All costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.**
4. **All costs of collections, including attorney fees and all costs related to the enforcement of any other remedies available to Buyer if the Seller defaults.**

# Exhibit A

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of DECEMBER 3 2020 "PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC."(the "Guarantor"), for the benefit of AMZ Group LLC, ("Buyer").

Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

**RECITALS**

**A.** Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Purchase Agreement"), dated of even date herewith, between Buyer and "PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." ("Seller"), Buyer has purchased Future Receipts of Seller.

**B.** Buyer is not willing to enter into the Purchase Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

**C.** Guarantor will directly benefit from Buyer and Seller entering into the Purchase Agreement.

**AGREEMENT**

As an inducement to Buyer to purchase the Future Receipts identified in the Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

**1. Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

**2. Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Purchase Agreement.

**3. Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Purchase Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Purchase Agreement or otherwise modify, amend or change the terms of the Purchase Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor. Guarantor expressly consents to conduct business by electronic means.

**4. Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Purchase Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain either performance or payment for such default from Seller or any other guarantor.

**5. Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC

that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.

**6. 20. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of [New York], without regards to any applicable principals of conflicts of law. Seller understands and agrees that (i) Buyer is located in [New York], (ii) Buyer makes all decisions from Buyer's office in [New York], (iii) the Agreement is made in [New York] Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in [New York], (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any otherforum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

**7. <u>JURY WAIVER</u>: THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**8. <u>CLASS ACTION WAIVER</u>: BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:**

**(I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**10. Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**11. Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.

**12. Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**For Individual Guarantors -**
**Guarantor:** ARTURO NICOLAYEVSKY **(Print Name)**
**Signature:** Arturo Nicolayevsky
**Guarantor's SSN:** 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

**For Individual Guarantors -**
**Guarantor:**__________ **(Print Name)**
**Signature:**__________
**Guarantor's SSN:**__________

**For Corporate Guarantors (or other entities)**
**Guarantor:** ARTURO NICOLAYEVSKY
**Guarantor's EIN:** 13.3485532
**By:** Arturo Nicolayevsky
**Print Name of Signer:**
**Its:** Owner **(Official Position)**

**For Corporate Guarantors (or other entities)**
**Guarantor:**__________
**Guarantor's EIN:**__________
**By:**__________
**Print Name of Signer:**
**Its:**__________ **(Official Position)**

**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

"PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." ](“Seller”) hereby authorizes Purchaser (“Purchaser”) to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Purchaser from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the “Agreement”) entered into between Seller and Purchaser, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Purchaser to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Purchaser from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Purchaser to contact Seller’s financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement for the Purchase and Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Purchaser to contact Seller’s financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller’s financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Purchaser a limited Power of Attorney to take action in Seller’s name to facilitate this authorization.

Transfer Funds To/From:

Name of Bank: JP MORGAN CHASE

ABA Transit/Routing #: 111000614

Checking Account #: 131385186

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

Seller Information:

Seller's Name: **PREMIUM 72 CAPITAL LLC**

Signature of Authorized Representative: Arturo Nicolayevsky

Print Name: ARTURO NICOLAYEVSKY

Title: PRINCIPAL

Seller's Tax ID: 13.3485532

Date: Dec 03 2020

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

"PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC." ](“Seller”) hereby authorizes Purchaser (“Purchaser”) to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Purchaser from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the “Agreement”) entered into between Seller and Purchaser, as it may be amended, supplemented or replaced from time to time. Seller also authorizes Purchaser to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Purchaser to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Purchaser from Seller under the terms of the Agreement.

Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes Purchaser to contact Seller’s financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement for the Purchase and Sale of Future Receipts. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes Purchaser to contact Seller’s financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller’s financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Seller grants Purchaser a limited Power of Attorney to take action in Seller’s name to facilitate this authorization.

Transfer Funds To/From:

Name of Bank: BANK OF AMERICA

ABA Transit/Routing #: 063100277

Checking Account #: 003603202538

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

Seller Information:

Seller’s Name: R.M. STARK & CO. INC

Signature of Authorized Representative: Arturo Nicolayevsky

Print Name: ARTURO NICOLAYEVSKY

Title: PRINCIPAL

Seller’s Tax ID: 13.3485532

Date: Dec 03 2020

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC

1. This Agreement is owned and serviced by AMZ Group, LLC. For the avoidance of doubt, AMZ Group, LLC shall be entitled collect all payments related to this Agreement and enforce the terms as plaintiff in a court of competent jurisdiction.
2. **Origination Fee** - Covers the costs of customer acquisition, underwriting, and related expenses:

   a. 5% of the Purchase Price, withheld from the Purchase Price at time of funding.
3. **ACH Program Fee** – Covers the cost of account maintenance as it pertains to our software, ACH processing, and the banks which handle the recurring payments, withheld from the Purchase Price at the time of funding:

| | |
|---|---|
| a. Amount funded up to $6,000.00 | $150.00 |
| b. Amount funded up to $10,000.00 | $250.00 |
| c. Amount funded up to $50,000.00 | $495.00 |
| d. Amount funded up to $100,000.00 | $795.00 |
| e. Amount funded up to $150,000.00 | $1,195.00 |
| f. Amount funded up to $200,000.00 | $1,495.00 |
| g. Any funded amount more than $200,000.00 | $1,795.00 |

4. **NSF Fee: $50.00 each-Fee** incurred or each retuned payment, default declared after our (4) "Non-Sufficient Funds" retuned transactions without having a make-up payment arranged.
5. **Bank Change Fee: $75.00**—Covers the process of updating account information to debit payments from a different business bank account.
6. **Blocked Account Fee: $2,500.00**—Fee incurred when merchant directs their bank to stop our ACH debit or if he ACH debit returns as unauthorized by the Merchant, which places the Merchant in default per our agreement.
7. **Default Fee: The greater of: 33% of outstanding balance at time of default or $5,000.00**—Fee incurred when account in placed into default status by having too many NSF transactions (our [2] or more as described above), by having a "Blocked Account" (see "Blocked Account Fee" above), by having a "Closed" or "Frozen" account ACH return code, or by changing bank account without supplying new account information first to continue paying outstanding balance. Merchant may be placed into "Default" status by any definition of the term as it is defined within the Merchant Agreement.
8. **UCC Filing Fee:** $200.00-Covers he cost of filing a UCC-1 Lien with the respective Secretary of State trough a third-party provider and covers the cost of the UCC-3 Lien Termination filing.
9. **Electronic Transfer Fee: $35.00** - Covers the cost of sending funds via electronic transfer, withheld rom he Purchase Price at the time of funding.

**For the Merchant #1**

Name _ARTURO NICOLAYEVSKY ___________

X Arturo Nicolayevsky

**Owner / Guarantor #1**

Name _ARTURO NICOLAYEVSKY ___________

X Arturo Nicolayevsky

CUSTOMER AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS ©
**[ACH CREDITS & DEBITS]**

COMPANY
NAME AMZ GROUP LLC

COMPANY
ID NUMBER 489

I (we) hereby authorize the Company named above (the "COMPANY"), to initiate debit and credit entries to my (our) [ ] Checking [ ] Savings account (select one) indicated below and the depository named below, hereinafter "DEPOSITORY", to debit or credit the same to such account. I further authorize the Company to debit said account up to the amount of the outstanding balance plus fees and costs or for such amount allowed by law in the event a debit entry is rejected by the Depository.

DEPOSITORY NAME PREMIUM 72 CAPITAL LLC

ROUTING/ABA NO 111000614 ACCOUNT NO. 131385186

**Please Check Those That Apply:** **_This is a Bank Account of a Natural Person**
**___This Account is Used for Commercial/Business Transactions**

This authority is to remain in full force and effect until COMPANY has received written notification of its termination in such time, but no less than 3 business days before any payments are due to be made, and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

CLIENT NAME (Business or Personal as Appropriate) PREMIUM 72 CAPITAL LLC

DATE Dec 03 2020 SIGNATURE(S) Arturo Nicolayevsky

PRINT NAME(S) ARTURO NICOLAYEVSKY

PHONE # ______________________

**A COPY OF THIS AGREEMENT MUST BE GIVEN TO THE CUSTOMER(S) WHO SIGNED.**

**NOTE: ALL WRITTEN DEBIT AND CREDIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.**

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC

CUSTOMER AUTHORIZATION AGREEMENT FOR PREAUTHORIZED PAYMENTS ©
**[ACH CREDITS & DEBITS]**

COMPANY NAME AMZ GROUP LLC

COMPANY ID NUMBER _489__________________

I (we) hereby authorize the Company named above (the "COMPANY"), to initiate debit and credit entries to my (our) [ ] Checking [ ] Savings account (select one) indicated below and the depository named below, hereinafter "DEPOSITORY", to debit or credit the same to such account. I further authorize the Company to debit said account up to the amount of the outstanding balance plus fees and costs or for such amount allowed by law in the event a debit entry is rejected by the Depository.

DEPOSITORY NAME__R.M. STARK & CO. INC______________________

ROUTING/ABA NO 063100277____________________ACCOUNT NO. 0036032 0253 8_____________

**Please Check Those That Apply:** **This is a Bank Account of a Natural Person**
**___This Account is Used for Commercial/Business Transactions**

This authority is to remain in full force and effect until COMPANY has received written notification of its termination in such time, but no less than 3 business days before any payments are due to be made, and in such manner as to afford COMPANY and DEPOSITORY a reasonable opportunity to act on it.

CLIENT NAME (Business or Personal as Appropriate) R.M. STARK & CO. INC

DATE Dec 03 2020 SIGNATURE(S) Arturo Nicolayevsky

PRINT NAME(S) ARTURO NICOLAYEVSKY

PHONE # ______________________________

**A COPY OF THIS AGREEMENT MUST BE GIVEN TO THE CUSTOMER(S) WHO SIGNED**

**NOTE: ALL WRITTEN DEBIT AND CREDIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION.**

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC

**ADDENDUM TO CONTRACT**

**WAIVER OF PERSONAL SERVICE**

This Addendum ("Addendum") is to be made a part of the purchase and sale of future receivables agreement (the "Contract") between AMZ Group LLC ("Purchaser") and "PREMIUM 72 CAPITAL LLC" , "R M STARK & CO INC" , "RMST HOLDING COMPANY, INC" ("Merchant") and ARTURO NICOLAYEVSKY ("Guarantor") (collectively the "Parties") dated DECEMBER 3, 2020 .

1. Merchant hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Merchant understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Merchant further agrees to waive any objection to the absence of formal service of process.

2. Guarantor hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Guarantor understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Guarantor further agrees to waive any objection to the absence of formal service of process.

3. MERCHANT HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT arturo@premiun72.com OR BY UNITED STATES POSTAL SERVICE AT OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

4. GUARANTOR HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT OR BY UNITED STATES POSTAL SERVICE AT arturo@premiun72.com OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.

5. Merchant or Guarantor shall notify Purchaser of any changes to its physical address or email address for service. Unless Purchaser is notified of a change in address, all addresses shall be presumed to be accurate.

6. This Addendum shall supersede any notice requirements in the Contract with respect to service of process.

For the Merchant Name: ARTURO NICOLAYEVSKY, PRINCIPAL

X Arturo Nicolayevsky

Guarantor Name: ARTURO NICOLAYEVSKY, PRINCIPAL

X Arturo Nicolayevsky

Zoho Sign Document ID: NX7M42-NKXMATA0BGSXPC9N98SD68G_NWY-AOBVJKGC

Powered by AMZ Group LLC

Exhibit A to contract #489

December 3, 2020

OPC, LLC
PREMIUM 72 PRIVATE EQUITY, LLC
PREMIUM 42, L.P.
PREMIUM 72 GLOBAL, LLC
ANEP INVESTMENTS, LLC PREMIUM 72 LP
PREMIUM 72 HOLDINGS, LLC
PREMIUM 72 ENERGY TRADERS LLC
AYNBET INVESTMENTS, LLC

**ARTURO NICOLAYEVSKY, PRESIDENT**

X Arturo Nicolayevsky ____________________________

# Exhibit

# K

Contract ID# 516

Sales Partner:

# AMZ GROUP LLC

## MERCHANT AGREEMENT

Agreement dated Jan 28, 2021 between AMZ GROUP LLC (**"AMZG"**) and the Merchant listed below (**"MERCHANT"**)
(Month) (Day) (Year)

**MERCHANT INFORMATION**

Merchant's Legal Name: Premium 72 Capital LLC + R M STARK & CO INC + RMST HOLDING COMPANY INC

D/B/A: Premium 72 Capital State of Incorporation / Organization: TX Federal Tax ID 81-2957354

Type of Entity (circle one) Corporation Limited Liability Company Limited Partnership Limited Liability Partnership Sole Proprietorship

Physical Address: 121 N POST OAK LANE APT 705 City: HOUSTON State: TX Zip: 77024

Contact Name: ARTURO NICOLAYEVSKY Contact Number: 281-591-7777 Email: arturo@premium72.com

Mailing Address: 121 N POST OAK LANE APT 705 City: HOUSTON State: TX Zip: 77024

**PURCHASE AND SALE OF FUTURE RECEIVABLES**

Merchant ("Merchant" or "Seller") hereby sells, assigns and transfers to AMZG ("AMZG" or "Buyer") (making AMZG the absolute owner) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to AMZG.

The Purchased Amount shall be paid to AMZG by Merchant's irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to, and pre- approved by, AMZG (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as AMZG receives payment in full of the Purchased Amount. Merchant hereby authorizes AMZG to ACH Debit the specified remittances from the merchant's Account on a daily basis and will provide AMZG with all required access codes, and monthly bank statements. Merchant understands that it is responsible for ensuring that the specified percentage to be debited by AMZG remains in the Account and will be held responsible for any fees incurred by AMZG resulting from a rejected ACH attempt or an event of default. (See Appendix A) AMZG is not responsible for any overdrafts or rejected transactions that may result from AMZG's ACH debiting the specified amounts under the terms of this agreement. AMZG will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage. AMZG may, upon Merchant's request, adjust the amount of any payment due under this Agreement at AMZG's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between AMZG and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**Total Purchase Price:** 387310.50 **Specified Percentage: 24% Estimated Daily Amount: $** 4421.79 **Total Purchased Amount:$** 530615.39

**THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGE 2, THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AG[REEMENT]**

**FOR THE MERCHANT (#1)**
**By** ARTURO NICOLAYEVSKY
**(Print Name and Title)**
DocuSigned by: [signature] 3507E548A92D443... **Sign Here**

**FOR THE MERCHANT (#2)**
**By** EDUARDO MAURICIO PEREZ
DocuSigned by: Eduardo Perez F2D2F7342B874... **Sign Here**

**OWNER (#1)**
**By** ARTURO NICOLAYEVSKY
**(Print Name and Title)**
DocuSigned by: [signature] 3507E548A92D443... **Sign Here**

**OWNER (#2)**
**By** EDUARDO MAURICIO PEREZ
**(Print Name and Title)**
DocuSigned by: Eduardo Perez F2D2F7342B87490... (Signature) **Sign Here**

**AMZ GROUP LLC**

**By** ______________________ **Sales Associate Name:** ______________________
**(Company Officer)** **(Signature)**

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT PROGRAM

1.1 **Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to AMZG and appoint a Bank acceptable to AMZG, to obtain electronic fund transfer services and/or "ACH" payments. Merchant shall provide CMS and/or its authorized agent with all of the information, authorizations and passwords necessary to verify Merchant's receivables, receipts and deposits into the account. Merchant shall authorize AMZG and/or its agent to deduct amounts owed to AMZG for the Receipts as specified herein from settlement amounts which would otherwise be due to Merchant from electronic check transactions and to pay such amounts to AMZG by permitting AMZG to withdraw the specified percentages by ACH debiting of the account. The authorization shall be irrevocable absent AMZG's written consent.

1.2 **Future Purchases.** AMZG reserves the right to rescind the offer to make any purchase payments hereunder, in its sole discretion._

1.3 **Financial Condition.** Merchant and Guarantor(s) authorize AMZG and its agents to investigate their financial responsibility and history, and will provide to AMZG any bank or financial statements, tax returns, etc. as AMZG deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information AMZG is authorized to update such information and financial profiles from time to time as it deems appropriate.

1.4 **Transactional History**. Merchant authorizes AMZG and its agents to investigate their financial responsibility and history, and will provide to AMZG any authorizations, bank or financial statements, tax returns, etc., as AMZG deems necessary in its sole and absolute discretion prior to any time after the execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. Merchant waives, to the maximum extent permitted by law, any claims for damages against AMZG or any of its affiliates relating to any investigation undertaken by or on behalf of AMZG as permitted by this Agreement or disclosure of information as permitted by this Agreement.

1.5 **Indemnification**. Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by AMZG for monies owed to AMZG from Merchant and (b) actions taken by Processor in reliance upon information or instructions provided by AMZG.

1.6 **No Liability**. In no event will AMZG be liable for any claims asserted by Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of AMZG's legal fees and expenses resulting therefrom.

1.7 **Reliance on Terms**. Sections 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, AMZG and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

1.8 **Sale of Receipts**. (**THIS IS NOT A LOAN**) Merchant is selling a portion of a future revenue stream to AMZG at a discount, not borrowing money from AMZG. There is no interest rate or payment schedule and not time period during which the Purchased Amount must be collected by AMZG. If Future Receipts are remitted more slowly than AMZG may have anticipated or projected because Merchant's business has slowed down, or if the full Purchased Amount is never remitted because Merchant's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Merchant has not breached this Agreement, Merchant would not owe anything to AMZG and would not be in breach of or default under this Agreement. AMZG is buying the Purchased Amount of Future Receipts knowing the risks that Merchant's business may slow down or fail, and AMZG assumes these risks based on Merchant's representations, warranties, and covenants in this Agreement, Merchant transfers to AMZG fill and complete ownership of the Purchased Amount of Future Receipts and Merchant retains no legal or equitable interest therein. Merchant agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that AMZG is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant assets that this transaction is anything other than a sale of future receipts.

1.9 **Power of Attorney**. Merchant irrevocably appoints AMZG as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to AMZG from Processor, or in the case of a violation by Merchant of Section 1.2 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation: (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse, and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to deliver future receipts directly to AMZG' and (v) to file any claims or take any action or institute any proceeding which AMZG may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to the delivery of the Purchased Amount.

1.10 **Protections against Default**. The following Protections 1 through 8 may be invoked by AMZG, immediately and without notice to Merchant in an event of default, as prescribed by Section 3.1, OR in the event that: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the AMZG electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to AMZG; (c) Merchant changes the electronic check processor through which the Receipts are settled from Process or to

another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of AMZG, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to AMZG; (e) Merchant demonstrates an intent to default on this agreement by threatening to either cease payments or default on any provision within this Agreement; or (f) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to AMZG at law, in equity or otherwise pursuant to this Agreement. **Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** AMZG may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). **Protection 3.** Merchant shall, upon execution of this Agreement, deliver to AMZG an executed Confession of Judgment in favor of AMZG in the amount of the Purchase Amount stated in the Agreement along with legal fees calculated at thirty three percent (33%) of the purchased price less any payments made and interest. Upon breach of any provision in paragraphs 1.10, 2.9, and/or 3.1, AMZG may enter that Confession of Judgment as a judgment with the Clerk of the Court and execute thereon. **Protection 4.** AMZG may enforce its security interest in the Collateral identified in the Security Agreement herein. **Protection 5.** AMZG may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, in which AMZG shall recover judgment against Merchant, Merchant shall be liable for all of AMZG's costs of lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 6.** Merchant shall, upon execution of this Agreement, deliver to AMZG an executed assignment of lease of Merchant's premises in favor of AMZG. Upon breach of any provision in this paragraph 1.12, AMZG may exercise its rights under such assignment of lease. **Protection 7.** AMZG may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise, in an amount consistent with the Specified Percentage. **Protection 8.** AMZG shall have the right, without waiving any of its rights and remedies and without notice to Merchant and/or Guarantor(s), to notify Merchant's credit card processor of the sale of Receipts hereunder and to direct such credit card processor to make payment to AMZG of all or any portion of the amounts received by such credit card processor on behalf of Merchant. Merchant hereby grants to AMZG an irrevocable power - of-attorney, which power-of-attorney shall be coupled with an interest, and hereby appoints AMZG or any of AMZG's representatives as Merchant's attorney-in -fact, to take any and all action necessary to direct such new or additional credit card processor to make payment to AMZG as contemplated by this Section.

1.11 **Protection of Information**. Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner, in respect of himself or herself personally, authorizes AMZG to disclose information concerning Merchant's and each Owner's and/or Guarantor(s)'s credit standing and business conduct only, to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant, Guarantor(s) and Owner(s) hereby waives to the maximum extent permitted by law any claim for damages against AMZG or any of its affiliates relating to any (1) investigation undertaken by or on behalf AMZG as permitted by this Agreement and/or (ii) disclosure of information as permitted by this Agreement.

1.12 **Confidentiality**. The terms and conditions of this Agreement are proprietary and confidential unless required by law. Merchant shall not disclose this information to anyone other than its attorney, accountant, or similar service provider and then only to the extent such person uses the information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this Action. A breach entitles AMZG to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

1.13 **D/B/As**. Merchant hereby acknowledges and agrees that AMZG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between AMZG and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## II. REPRESENTATIONS, WARRANTIES, AND COVENANTS

Merchant represents, warrants, and covenants that as of this date and during the term of this Agreement:

2.1 **Financial Condition and Financial Information**. Any bank statements and financial statements of Merchant that have been furnished to AMZG, and future statements that will be furnished to AMZG, fairly represent the financial condition of Merchant at such dates, and Merchant will notify AMZG immediately if there are material adverse changes, financial or otherwise, in the condition or operation of the Merchant or any change in the ownership of the Merchant. AMZG may request statements at any time during the performance of this Agreement and the Merchant shall provide them to AMZG within five business days. Furthermore, Merchant represents that all documents, forms and recorded interviews provided to or with AMZG are true, accurate and complete in all respects, and accurately reflect Merchant's financial condition and results of operations. Merchant further agrees to authorize the release of any past or future tax returns to Merchant.

2.2 **Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate and lease its properties and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engages and/or will engage hereafter.

2.3 **Authorization**. Merchant and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 **Insurance**. Merchant will maintain business-interruption insurance naming AMZG as a loss payee and additional insured in amounts and against risks as are satisfactory to AMZG and shall provide AMZG with proof of such insurance upon request.

2.5 **Electronic Check Processing Agreement**. Merchant will not change its processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without AMZG's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6 **Change of Name and/or Location or the Sale and/or Closing of the Business**. Merchant will not conduct Merchant's business under any name other than as disclosed to AMZG or change any of its places of business without prior written consent of AMZG. Merchant will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of AMZG, and (ii) the written agreement of any purchaser or transferee assuming all of Merchant's obligations under this Agreement pursuant to

documentation satisfactory to AMZG. Except as disclosed to AMZG in writing, Merchant has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Merchant agrees that until AMZG has received all of the Purchases Amount Merchant will not voluntarily close its business on a temporary basis for renovations, repairs or other purposes. This provision, however, does not prohibit Merchant from closing its business temporarily if such closing is require to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Merchant. Prior to any such closure, Merchant will provide AMZG ten days' notice to the extent practicable.

2.7 **Estoppel Certificate**. Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from AMZG to Merchant, execute, acknowledge and deliver to AMZG and/or to any other person, firm or corporation specified by AMZG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modification, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been paid.

2.8 **No Pending or Contemplated Bankruptcy**. As of the date Merchant executes this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Merchant further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.9 **Working Capital Funding**. Merchant shall not further encumber the Receipts without (i) the written consent of AMZG, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to AMZG; or (e) Merchant takes any action, fails to take any action, or offers any incentive— economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor. These protections are in addition to any other remedies available to AMZG at law, in equity or otherwise pursuant to this Agreement. **Protection 1.** The full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately. **Protection 2.** AMZG may enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). **Protection 3.** Merchant shall, upon whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales, with any party other than AMZG. **Protection 4.** Merchant shall, upon execution of this Agreement, deliver to AMZG an executed Confession of Judgment in favor of AMZG in the amount of the Purchase Amount stated in the Agreement along with legal fees calculated at thirty three percent (33%) of the purchased price less any payments made and interest. Upon breach of any provision in paragraphs 1.10, 2.9, and/or 3.1, AMZG may enter that Confession of Judgment as a judgment with the Clerk of the Court and execute thereon.

2.10 **Unencumbered Receipts**. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of AMZG.

2.11 **Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdiction in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and *not as a consumer for personal, family or household purposes.*

2.12 **No Violation of Prior Agreements**. Merchant's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Merchant is subject, including any agreement that prohibits the sale or pledge of Merchant's future receipts.

2.13 **Applicable Fees**. Merchant acknowledges that the Applicable Fees were agreed upon between AMZG and Merchant prior to Merchant entering into this Agreement, were subject to arm-length negotiation between AMZG and Merchant, and a detailed list of Applicable Fees is set forth in Appendix A, which is attached hereto and made a part hereof.

2.14 **Origination Fee (Third Party Fees)**. To the extent that Merchant has agreed to a broker fee with a third-party broker with respect to this Agreement (which is not a party hereto), Merchant hereby requests and agrees for AMZG to withhold from the Purchase Price and pay to the third-party broker associated with this Agreement, the Origination Fee contained in Appendix A, which is attached hereto and made a part hereof.

2.15 **No Reduction of Purchase Price**. Merchant hereby: (i) agrees to pay the Applicable Fees and the Origination Fee (collectively referred to as the "Agreement Fees") in full; (ii) hereby authorizes AMZG to apply a portion of the Purchase Price due to Merchant pursuant to this Agreement towards satisfaction of Merchant's obligation to said fees by deducting the amount of the Agreement Fees from the Purchase Price prior to delivering it to Merchant; and (iii) agrees that deduction of the Agreement Fees from the Purchase Price shall not be deemed to be a reduction of the Purchase Price.

## III. EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material aspect when made; (c) the sending of notice of termination by Guarantor(s) prior to the Purchased Amount being paid to AMZG; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of AMZG; (h) Merchant shall change its depositing account without the prior written consent of AMZG; (i) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) Merchant shall default under any of the terms, covenants and conditions of either this Agreement or any other agreement with AMZG; (k) Merchant blocks the bank account and thereby stops AMZG from making a scheduled ACH debit; (l) the Specific Daily Amount fails to clear due to insufficient funds on two occasions; or (m) Merchant shall fail to deposit its Receipts into the Account.

3.2 **Remedies**. In case of any Event of Default occurs and to Section 4.4 hereof, AMZG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy. All rights, powers and remedies of AMZG in connection with this Agreement may be exercised at any time by AMZG after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 **Costs**. Merchant shall pay to AMZG all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and (b) the enforcement of AMZG's remedies set forth herein, including but not limited to court costs and attorneys' fees.

3.4 **Required Notifications**. Merchant is required to give AMZG written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give AMZG seven (7) days written notice prior to closing of any sale or all or substantially all of the Merchant's assets or stocks.

## IV. MISCELLANEOUS

4.1 **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by both parties.

4.2 **Assignment**. AMZG may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part without prior notices to Merchant.

4.3 **Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective ONLY upon receipt.

4.4 **Waiver Remedies**. No failure on the part of AMZG to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of AMZG which consent may be withheld in AMZG's sole discretion.

4.6 **Governing Law, Venue and Jurisdiction**. This Agreement shall be governed by and construed exclusively in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law. If there is any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof or in any dispute arising among the parties, then such litigation shall only be instituted in any court sitting in New York State (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, and submit to the jurisdiction of the Acceptable Forums and waive any and application made by either party to transfer such proceeding to an Acceptable Forum.

4.7 **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.8 **Entire Agreement and Severability**. This Agreement embodies the entire agreement between Merchant and AMZG and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**4.10 CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

4.11 **Facsimile Acceptance**. Facsimile signature hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

## AMZ GROUP LLC - SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name: Premium 72 Capital LLC + R M HOLDING COMPANY INC D/B/A: Premium 72 Capital
Physical Address: 121 N POST OAK LANE APT 305 City HOUSTON State TX Zip 77024
Federal ID# 81-2957354

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to AMZG a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to AMZG under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to AMZG upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover AMZG's entitlements under this Agreement, AMZG is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of AMZG's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, AMZG or an affiliate of AMZG. AMZG is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by AMZG without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, AMZG has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, AMZG will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from AMZG written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and AMZG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by AMZG. Merchant agrees to execute and deliver to AMZG such instruments and documents AMZG may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. AMZG is authorized to execute all such instruments and documents in Merchant's name.

**Additional-Collateral**. To secure Guarantor's payment and performance obligations to AMZG under the Guaranty, the Guarantor hereby grants AMZG a security interest in______________________________________________________________(the "Additional Collateral"). Guarantor understands that AMZG will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Guarantor each acknowledge and agree that any security interest granted to AMZG under any other agreement between Merchant or Guarantor and AMZG (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as AMZG deems necessary to perfect or maintain AMZG's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes AMZG to file any financing statements deemed necessary by AMZG to perfect or maintain AMZG's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to AMZG with respect to the Collateral, and the Additional Collateral, and that any subsequent lienor may be tortuously interfering with AMZG's rights. Merchant and Guarantor shall be liable for, and AMZG may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by AMZG in protecting, preserving and enforcing AMZG's security interest and rights.

**Negative Pledge**. Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. AMZG shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, AMZG may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that AMZG may enter into an agreement with Merchant's landlord giving AMZG the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, AMZG may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to AMZG, whether by acceleration or otherwise.

### GUARANTY

**Personal Guaranty of Performance**. The undersigned Guarantor(s) hereby guarantees to AMZG, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers**. In the event of a breach of the above, AMZG may seek recovery from Guarantors for all of AMZG's losses and damages by enforcement of AMZG's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral AMZG may hold pursuant to this Agreement or any other guaranty.

AMZG does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) AMZG's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to AMZG. In addition, AMZG may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to AMZG; (ii) release Merchant from its obligations to AMZG; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to AMZG under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that

United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement**. Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability**. The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

MERCHANT (#1)
By ARTURO NICOLAYEVSKY, Owner
(Print Name and Title)
DocuSigned by: 3507E548A92D443... — Sign Here
SS# 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 Drivers License Number 14093168

MERCHANT (#2)
By EDUARDO MAURICIO PEREZ, Owner
(Print Name and Title)
DocuSigned by: Eduardo Perez F2D2F7342B87490... — Sign Here
SS# 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 Drivers License Number 13617134

OWNER (#1)
By ARTURO NICOLAYEVSKY, Owner
(Print Name and Title)
DocuSigned by: 3507E548A92D443... — Sign Here
SS# 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 Drivers License Number 14093168

OWNER (#2)
By EDUARDO MAURICIO PEREZ, Owner
(Print Name and Title)
DocuSigned by: Eduardo Perez F2D2F7342B87490... — Sign Here
SS# 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 Drivers License Number 13617134

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represent that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of AMZG documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and AMZG, and AMZG shall be entitled to all remedies available under law, equity and/or this Agreement. AMZG may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor and/or Operator to AMZG. An investigative or consumer report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes AMZG, its agents and representatives and any credit reporting agency engaged by AMZG, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to AMZG as a consequence of this Agreement or for AMZG's ability to determine Merchant's eligibility to enter into any future agreement with Company.

**ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD, INTENTIONAL MISREPRESENTATION AND/OR UNJUST ENRICHMENT IN WHICH EVENT AMZG WILL BE ENTITLED TO THE RECOVERY OF NOT ONLY ITS LOSSES BUT ALSO PUNITIVE DAMAGES AND ALL OF ITS COSTS AND EXPENSES AND ITS REASONABLE LEGAL FEES.**

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep this important legal document for Seller's records.**

**DISBURSMENT OF ADVANCE PROCEEDS.** By signing below, Seller authorizes Buyer to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Seller later identifies and is acceptable to Buyer) (hereinafter referred to as the "Designated Checking Account") This authorization is to remain in full force and effect until Buyer has received written notification from Seller of its termination in such time and in such manner as to afford Buyer and Seller's depository bank a reasonable opportunity to act on it.

**BUSINESS PURPOSE ACCOUNT.** By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**MISCELLANEOUS.** Buyer is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Seller's account must comply with the provisions of U.S. law.

I, (We) Premium 72 Capital LLC + R M STARK & CO INC + RMST HOLDING COMPANY INC Hereby Authorize, AMZ GROUP LLC (Hereinafter known as "AMZG") to Electronically (ACH) debit the Bank Account Below, of which I am a signer:

Bank Name: JPMORGAN CHASE Branch:

ABA: Routing: 111000614 DDA: Account: 131385186

For the amount of: 4421.79 (Or) Percentage of each Banking Deposit: % 24

On the Following Days: Monday, Tuesday, Wednesday, Thursday, Friday

This authorization is to remain in full force and effect until COMPANY has received written notification from me at least 5 banking days prior of its termination to afford COMPANY a reasonable opportunity to act on it.

Signed (Print Name, Title) ARTURO NICOLAYEVSKY Date: Jan 28, 2021

X DocuSigned by: 3507E548A92D443...

# ADDENDUM TO SECURED PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This Addendum is entered into on the January day of 28th 2021 , __, by and between AMZ GROUP LLC ("AMZG") and Premium 72 Capital LLC + R M STARK & CO INC + RMST HOLDING COMPANY INC ("Seller").

1. Should any of the terms of this Addendum conflict with the terms of the Secured Purchase and Sale of Future Receivables Agreement dated Jan 28, 2021 (the "Agreement"), then the terms of this Addendum shall govern and be controlling. Capitalized terms used herein but otherwise not defined, shall have the same definition as in the Agreement:

   a. By signing below, the Seller hereby requests and acknowledges that the Specified Percentage shall be revised to $ 4421.79 per business day (the "Estimated Daily Payment") which the parties agree is a good-faith approximation of the Specified Percentage, based on the Seller's receipts due to AMZG pursuant to the Agreement.

   b. The Estimated Daily Payment is to be drawn via ACH payment, from the following bank account:

      i. Account Number: 131385186
      ii. Routing Number: 111000614 )
      iii. Account Name: Premium 72 Capital LLC
      iv. Bank Name: JPMORGAN CHASE

   c. At the Seller's option, within five (5) business days following the end of the calendar month, the Seller may request a reconciliation to take place, whereby the parties may ensure that the cumulative amount remitted for the subject month via the Estimated Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation upon submitting the request for reconciliation to AMZG – but in no event later than five (5) business days following the end of the calendar month – the Seller must produce any and all evidence and documentation requested by AMZG in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage. The foregoing includes without limitation, any and all bank statements, merchant processing statements, or any additional documentation necessary to ascertain the amounts of the Specified Percentage, including login to the Seller's bank account(s).

IN WITNESS WHEREOF, the parties have executed this Addendum to the Agreement as of the sate first set above.

For the Seller #1:
By: ARTURO NIC
Signature: DocuSigned by: [signature] 3507E548A92D443...

For the Seller #2:
By: EDUARDO I
Signature: DocuSigned by: Eduardo Perez F2D2F7342B87490...

*** This authorization is to remain in full force and effect until AMZ GROUP LLC receives written notification from the Seller of its termination in such time and in such manner to afford AMZ GROUP LLC a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.

# Appendix A: The Fee Structure:

A. **Origination Fee-** $8,999.00 to cover Underwriting and related expenses.

B. **ACH Program Fee-** $8,999.00 (or 12% of the funded amount, depending on size of advance) ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs.

C. **NSF Fee Standard-** $50.00 (each) up to **TWO TIMES ONLY** before a default is declared.

D. **Rejected ACH-** $100.00 – When Merchant directs bank to reject our ACH Debit.

E. **Bank Change Fee-** $500.00- When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

F. **Blocked ACH Payment-** $5,000.00—This fee is applied when Merchant directs the bank to BLOCK our ACH Debits. Blocking ACH Debits will place Merchant's account in default.

G. **Default Fee-** a Default Fee of 10% of the remaining balance at time of default shall be applied to Merchant's account in the event that Merchant defaults under the terms of the Merchant Agreement. *See* Merchant Agreement at p.4, ¶3.1.

H. **Working Capital Funding-** A fee of $5,000.00 shall be applied every time Merchant enters into any arrangement, agreement, or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than AMZG. *See* Merchant Agreement at p.3, ¶2.10.

I. **Account Management Fee-** At the end of each month, Merchant will pay to AMZG an Account Management Fee. This fee will not be applied towards the reduction of the Purchased Amount. This monthly fee will equal the average of all the payments received as a "Specified Percentage" of the Merchants settlement amount for that Month.

J. **Miscellaneous Service Fee-** Merchant shall pay certain fees for services related to the origination and maintenance of Accounts. Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or 0.00 for a bank ACH. The current charge for the underwriting and origination of each Merchant Agreement is $________ paid from the funded amount. Merchant will be charged $25.00 for every additional change of their operating bank account once they are active with AMZG. Additional copies of prior monthly statements will incur a fee of $10.00.

**Merchant 1 (sign)** DocuSigned by: [signature] 3507E548A92D443... **Print:** ARTURO NICOLAYEVSKY

**Merchant 2 (sign)** DocuSigned by: Eduardo Perez F2D2F7342B87490... **Print:** EDUARDO MAURICIO PEREZ

# ADDENDUM TO CONTRACT

## WAIVER OF PERSONAL SERVICE

This Addendum ("Addendum") is to be made a part of purchase and sale of future receivables agreement (the "Contract") between AMZ GROUP LLC ("Purchaser") and Premium 72 Capital LLC + R M STARK & CO INC + RMST HOLDING COMPANY INC ("Merchant") and ARTURO NICOLAYEVSKY, EDUARDO MAURICIO ("Guarantor") (collectively the "Parties") dated Jan 28, 2021

1. **Merchant** hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Merchant understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Merchant further agrees to waive any objection to the absence of formal service of process.
2. **Guarantor** hereby irrevocably and unconditionally waives personal service of any summons, complaint, or other process, which may be made by any other means permitted by New York law. Guarantor understands and agrees that an action, lawsuit, or controversy may be taken up and considered by a court without any further notice. Guarantor further agrees to waive any objection to the absence of formal service of process.
3. MERCHANT HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT arturo@premium72.com OR BY UNITED STATES POSTAL SERVICE AT THE ADDRESS LISTED ON THE CONTRACT OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.
4. GUARANTOR HEREBY AGREES TO ACCEPT SERVICE OF ANY SUMMONS, COMPLAINT, OR OTHER PROCESS BY ELECTRONIC MAIL ("EMAIL") AT arturo@premium72.com OR BY UNITED STATES POSTAL SERVICE AT THE ADDRESS LISTED ON THE CONTRACT OR BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW.
5. Merchant or Guarantor shall notify Seller of any changes to its physical address or email address for service. Unless Seller is notified of a change in address, all addresses shall be presumed to be accurate.
6. This Addendum shall supersede any notice requirements in the Contract with respect to service of process.

**For th**[DocuSigned by: 3507E548A92D443...]**arantor**

ARTURO NICOLAYEVSKY,

**Name:** **Date**

**For th**[DocuSigned by: 3507E548A92D443...]

ARTURO NICOLAYEVSKY,

**Name:** **Date**

**Title:** Owner

**For the P**[DocuSigned by: Eduardo Perez F2D2F7342B87490...]

EDUARDO MAURICIO PEREZ,

**Name:** **Date**

**For the**[DocuSigned by: Eduardo Perez F2D2F7342B87490...]

EDUARDO MAURICIO PEREZ,

**Name:** **Date**

**Title:** Owner

AMZ GROUP LLC

For Inquiries, please call:

Phone: (718) 676-8015

Fax: (718) 676-8050

## PAYMENT AUTHORIZATION FORM

I, ARTURO NICOLAYEVSKY (MANAGER) & EDUARDO MAURICIO PEREZ (MEMBER) of PREMIUM 72 CAPITAL LLC + R M STARK & CO INC + RMST HOLDINGS COMPANY INC. Located At 121 N POST OAK LANE APT 705. Authorize AMZ GROUP LLC, to apply a payment in the amt of $214,312.50 towards the open balance due for AMZ Contract #479 & apply a payment in the amt of $155,000 towards the open balance due for AMZ Contract #489 from the funding proceeds of AMZ Group Contract #516. Any overpayments from contract #479 & #489 will be credited to Contract #516.

---

ARTURO NICOLAYEVSKY

Owner #1

Signature

DocuSigned by:

3507E548A92D443...

Date

EDUARDO MAURICIO PEREZ

Owner #2

Signature

DocuSigned by:

Eduardo Perez

F2D2F7342B87490...

Date



## Certificate Of Completion

Envelope Id: 2AA74B5FB80847E29476BEDC96C6CDCC | Status: Completed

Subject: Please DocuSign: PREMIUM 72 -AMZ 1-28-21.pdf

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 12 | Signatures: 19 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Premium72 Capital |
| AutoNav: Enabled | | 121 N Post Lane |
| EnvelopeId Stamping: Enabled | | Ste 705 |
| Time Zone: (UTC-06:00) Central America | | Houston, TX 77024 |
| | | info@premium72.com |
| | | IP Address: 74.124.45.125 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>1/28/2021 7:32:10 PM | Holder: Premium72 Capital<br>info@premium72.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Eduardo Perez<br>alduncine@gmail.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Eduardo Perez<br>F2D2F7342B87490...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 70.139.19.54<br>Signed using mobile | Sent: 1/28/2021 7:36:30 PM<br>Viewed: 1/28/2021 7:44:36 PM<br>Signed: 1/28/2021 7:44:57 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 6/17/2020 3:28:35 PM<br>ID: c0f04580-f403-4750-b14b-c2f9218dfaf2 | | |
| Arturo Nicolayevsky<br>arturon26@hotmail.com<br>Premium 72 Capital<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>3507E548A92D443...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 74.124.45.125 | Sent: 1/28/2021 7:44:59 PM<br>Resent: 1/28/2021 7:50:24 PM<br>Viewed: 1/28/2021 7:51:07 PM<br>Signed: 1/28/2021 7:51:23 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 2/17/2018 9:02:39 AM<br>ID: 212733ee-0ff7-4848-bf80-e5c332823cbc | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Envelope Sent | Hashed/Encrypted | 1/28/2021 7:36:31 PM |
| Certified Delivered | Security Checked | 1/28/2021 7:51:07 PM |
| Signing Complete | Security Checked | 1/28/2021 7:51:23 PM |
| Completed | Security Checked | 1/28/2021 7:51:23 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

**CONSUMER DISCLOSURE**

From time to time, Premium 72 Capital (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Premium 72 Capital:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: arturo@premium72.com

**To advise Premium 72 Capital of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at arturo@premium72.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Premium 72 Capital**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Premium 72 Capital**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an e-mail to arturo@premium72.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari ™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the ‘I agree’ button below.
By checking the ‘I agree’ box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Premium 72 Capital as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Premium 72 Capital during the course of my relationship with you.

<u>**ADDENDUM**</u>

This addendum shall serve to modify the Agreement of Sale of Future Receivables, , Contract No. 516 ("Merchant Agreement") which was entered into between **AMZ GROUP, LLC** (hereafter "Purchaser") and **Premium 72 Capital, LLC, RM Stark & Co Inc., RMST Holding Company, Inc., Eduardo Perez, and Arturo Nicolayevsky** (Hereafter the "Merchants" or "Affiliates") **Dated: March 9, 2021**

**Whereas**, the Merchants have individually entered into a Merchant Agreement with Purchaser to sell a portion of their future receivables at a discount;

**Whereas**, the Merchants are affiliated and hereby pledge to assume any and all liability of the other owned entities in the event that one fails to perform or defaults under the terms and conditions the Merchant Agreement.

**Whereas**, the Purchaser has agreed to remove RM Stark & Co. Inc. from the Merchant Agreement.

**Whereas**, the Merchants agreed to pledge and assigns shares of stock and/or membership units pursuant to the Security Agreement of even date.

**Now, Therefore**, in consideration of the agreements/provisions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. RM Stark & Co. Inc shall be released as a party from the Merchant Agreement. Purchaser shall retain a security interest in all assets of RMST Holding Company, Inc. now owned or hereafter acquired including assets of affiliate entities and/or subordinate or subsidiary entities, provided that excluded from such security interest is R.M. Stark & Co., Inc., a subsidiary company of RMST Holding Company, Inc., which exclusion shall pertain expressly to all assets, including cash, required by the Financial Industry Regulatory Authority and the Securities and Exchange Commission with regard to R.M. Stark & Co., Inc.

2. This addendum does not alter the terms and conditions of the original Merchant Agreement and that all terms remain in full force and effect.

3. By executing this addendum, the undersigned represent that they have the authority to enter into this agreement on behalf of their respective companies.

[SIGNATURES ON FOLLOWING PAGE]

**Agreed & Accepted:**

**Premium 72 Capital, LLC**

DocuSigned by:
E0F0C737C4304C7...

**Name:** Arturo Nicolayevsky
**Title:** Managing Director

**AMZ Group, LLC:**

**Name:** Boris Fidler
**Title:** member.

**RMST Holding Company, Inc.,**

DocuSigned by:
E0F0C737C4304C7...

**Name:** Arturo Nicolayevsky
**Title:** President

**Aynbet Investments, LLC**

DocuSigned by:
E0F0C737C4304C7...

**Name:** Arturo Nicolayevsky
**Title:** Managing Director

**Arturo Nicolayevsky, individually and on behalf of all debtors named inMerchant Agreement**

DocuSigned by:
E0F0C737C4304C7...

**Name:** Arturo Nicolayevsky
**Title:**

**Eduardo Mauricio Perez, individually and on behalf of all debtors named in Merchant Agreement**

DocuSigned by:
Eduardo Perez
0195BB3A9F86460...

**Name:** Eduardo Perez
**Title:**

DocuSign SECURED

## Certificate Of Completion

Envelope Id: ACA52BEB840D449C92ECC484AA51F9B4
Subject: Please DocuSign: Addendum - Premium 72 OPC Advisors (002) revision.pdf
Source Envelope:
Document Pages: 2
Certificate Pages: 2
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-06:00) Central America

Signatures: 5
Initials: 0

Status: Completed

Envelope Originator:
Premium72 Capital
121 N Post Lane
Ste 705
Houston, TX 77024
info@premium72.com
IP Address: 74.124.45.125

## Record Tracking

| Status | Holder | Location |
|---|---|---|
| Status: Original<br>3/10/2021 3:28:23 PM | Holder: Premium72 Capital<br>info@premium72.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Eduardo Perez<br>eduardo@premium72.com<br>Managing Member<br>Premium 72 Escrow Services<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | DocuSigned by:<br>Eduardo Perez<br>0195BB3A9F88460...<br>Signature Adoption: Pre-selected Style<br>Using IP Address: 172.58.99.214<br>Signed using mobile | Sent: 3/10/2021 3:29:50 PM<br>Resent: 3/10/2021 3:33:48 PM<br>Viewed: 3/10/2021 3:33:44 PM<br>Signed: 3/10/2021 3:33:53 PM |
| Arturo Nicolayevsky<br>info@premium72.com<br>Managing Director<br>Premium 72<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | DocuSigned by:<br>[signature]<br>E0F0C737C4304C7...<br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 74.124.45.125 | Sent: 3/10/2021 3:33:54 PM<br>Viewed: 3/10/2021 3:40:25 PM<br>Signed: 3/10/2021 3:42:02 PM |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/10/2021 3:29:50 PM |
| Certified Delivered | Security Checked | 3/10/2021 3:40:25 PM |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Signing Complete | Security Checked | 3/10/2021 3:42:02 PM |
| Completed | Security Checked | 3/10/2021 3:42:02 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

# Exhibit

# L

21-0037922945
08/26/2021 05:00 PM
FILED
TEXAS SECRETARY OF STATE
SOS
1075543540018

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 52187 - Zahav Asset

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

82138840
TXTX

File with: Secretary of State, TX

N/I

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PREMIUM 72 CAPITAL, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ARTURO NICOLAYEVSKY | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Zahav Asset Management LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 234 Cedarhurst Ave, Apt 21B | Cedarhurst | NY | 11516 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Receivables- All assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTUOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
82138840

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME
SPARK S USA SVC

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
SPARKS USA SVC

| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
ARNIC HOLDINGS, INC

| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
SPO, INC.

| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME: PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME:

FIRST PERSONAL NAME:

ADDITIONAL NAME(S)/INITIAL(S): | SUFFIX:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME: PREMIUM 72 PRIVATE EQUITY, LLC

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME: PREMIUM 42 GLOBAL, LLC

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME: PREMIUM 42 GLOBAL, LLC

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME:

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME:

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
PREMIUM 42, L.P.

| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
PREMIUM 72 LP

| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
ANEP INVESTMENTS, LLC

| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME | |
|---|---|
| PREMIUM 72 CAPITAL, LLC | |
| OR 18b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ARTIFF, LLC | | | | |
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| AYNBET INVESTMENTS, LLC | | | | |
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BRACHOT INVESTMENTS LLC | | | | |
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 POST OAK BLVD. #21 | HOUSTON | TX | 77056 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS: 82138840-TX-0 52157 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
CHAI 18 INVESTMENTS

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN 705 | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
MUNICO INTERNATIONAL CORPORATION

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| ONE WEST LOOP SOUTH, SUITE 701 | HOUSTON | TX | 77027 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
NICART, INC.

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 1221 WOODHOLLOW STE | HOUSTON | TX | 13106 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
OPC ADVISORS, LLC

| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN APT 705 | HOUSTON | TX | 77024 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
OPC LLC

| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
PLUS PREMIUM PARTNERS, LLC

| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
PREMIUM 72 ENERGY TRADERS LLC

| | 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
PREMIUM 72 HOLDINGS LLC

| | 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 121 N POST OAK LN | HOUSTON | TX | 77024 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
PREMIUM 72 PE GP I LLC

| | 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| | 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| | 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| OR | | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
PREMIUM PORTFOLIO RESEARCH, LLC

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **19c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN 705 | HOUSTON | TX | 77024 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
RECHARGE INCORPORATED

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **20c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 2020 POST OAK BOULEVARD | HOUSTON | TX | 77056 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
RMST HOLDING COMPANY, INC

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **21c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 121 N POST OAK LN | HOUSTON | TX | 77024 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **22c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **23c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52187 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

## UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME: PREMIUM 72 CAPITAL, LLC

OR 18b. INDIVIDUAL'S SURNAME:

FIRST PERSONAL NAME:

ADDITIONAL NAME(S)/INITIAL(S): | SUFFIX:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME: SPART, L.L.C.

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2020 POST OAK BOULEVARD | HOUSTON | TX | 77056 | USA |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME: THE BEAUTY PAVILLION

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4747 WESTHEIMER RD | HOUSTON | TX | 77027 | USA |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME:

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| NICOLAYEVSKY | ARTURO | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 121 N POST OAK LN #705 | HOUSTON | TX | 77024 | USA |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME:

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME:

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

24. MISCELLANEOUS: 82138840-TX-0 52167 - Zahav Asset Manageme Zahav Asset Management LLC File with: Secretary of State, TX

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# Exhibit M

UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
Corporation Service Company
251 LITTLE FALLS DRIVE
Wilmington, DE 19808
USA

**FILING NUMBER:** 21-0056369799
**FILING DATE:** 12/20/2021 09:47 AM
**DOCUMENT NUMBER:** 1104111340001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| OR | 1a. ORGANIZATION'S NAME<br>**PREMIUM 72 CAPITAL LLC** | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>**121 N POST OAK LN APT 705** | | CITY<br>**HOUSTON** | STATE<br>**TX** | POSTAL CODE<br>**77024** | COUNTRY<br>**USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| OR | 2a. ORGANIZATION'S NAME | | | | |
| | 2b. INDIVIDUAL'S SURNAME<br>**NICOLAYEVSKY** | FIRST PERSONAL NAME<br>**ARTURO** | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS<br>**121 N POST OAK LN APT 705** | | CITY<br>**HOUSTON** | STATE<br>**TX** | POSTAL CODE<br>**77024** | COUNTRY<br>**USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| OR | 3a. ORGANIZATION'S NAME<br>**KINGDOM LOGISTICS LLC** | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>**8650 FREEPORT PKWY STE 100** | | CITY<br>**IRVING** | STATE<br>**TX** | POSTAL CODE<br>**75063** | COUNTRY<br>**USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of debtor's books and records relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
[223710258]

FILING OFFICE COPY

# Exhibit
# N

UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Lien Solutions

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
**CT Lien Solutions
2929 Allen Parkway, Ste. 3300
Houston, TX 77019
USA

**FILING NUMBER:** 22-0008906693
**FILING DATE:** 02/22/2022 08:55 PM
**DOCUMENT NUMBER:** 1122880850001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Premium Capital 72 LLC | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2700 POST OAK BLVD. 21 | | HOUSTON | TX | 77056 | USA |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | NICOLAYEVSKY | ARTURO | | | |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 121 N POST OAK LN, #705 | | HOUSTON | TX | 77024 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | NFG Advance LLC | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | | |
| 3c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 1308 Kingshighway | | Brooklyn | NY | 11229 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of debtor's books and records relating to any of the foregoing. Merchant hereby sells, assigns and transfers to NFG all of Merchant's future accounts, contract rights and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payers for the payment of Merchant's sale of goods or services until the full amount ($25,982.28) has been remitted from the Merchant to NFG.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY

# Exhibit O

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2021 Aug 02 10:15 AM

****** 202107935058 ******

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 25126 - Byline Bank

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

81732508

FLFL

File with: Department of State, FL

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: RMST HOLDING COMPANY, INC.

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 730 S. Federal Hwy. | Lake Worth Beach | FL | 33460 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME:

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: Byline Bank

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 13925 W. North Avenue | Brookfield | WI | 53005 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All goods, inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper (whether tangible or electronic), instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, commercial tort claims, contract rights and other rights to payment and performance (including but not limited to grant monies), insurance claims and proceeds, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all goodwill relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process and such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned ore hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

☒ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22.F.S. have been paid

☐ Florida documentary stamp tax is not required

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
81732508 10401 RMST HOLDING COMPANY, INC.

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# Exhibit

# P

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

2020 Feb 07 10:16 AM

****** 202000825069 ******

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 18710 - Byline Bank

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

73687110

FLFL

File with: Department of State, FL

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME: RMST HOLDING COMPANY, INC. | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 1c. MAILING ADDRESS: 730 S. Federal Hwy. | CITY: Lake Worth Beach | | STATE: FL | POSTAL CODE: 33460 | COUNTRY: USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME: Byline Bank | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 3c. MAILING ADDRESS: 13925 W North Avenue | CITY: Brookfield | | STATE: WI | POSTAL CODE: 53005 | COUNTRY: USA |

4. COLLATERAL: This financing statement covers the following collateral:
See attached Exhibit "A"

☒ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22.F.S. have been paid

☐ Florida documentary stamp tax is not required

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
73687110 10401 41485

**EXHIBIT "A"**

All goods, inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper (whether tangible or electronic), instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, commercial tort claims, contract rights and other rights to payment and performance (including but not limited to grant monies), insurance claims and proceeds, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all goodwill relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process and such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.